In The

# United States Court of Appeals

## For The Fourth Circuit

**CAMILLE SEDAR,**

*Plaintiff - Appellant,*

v.

**RESTON TOWN CENTER PROPERTY, LLC;
BOSTON PROPERTIES LIMITED PARTNERSHIP,**

*Defendants – Appellees,*

**and**

**BOSTON PROPERTIES, INC.; BEACON CAPITAL PARTNERS LLC,**

*Defendants,*

v.

**CDA INCORPORATED, d/b/a MaxSent,**

*Third Party Defendant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA**

_____

**JOINT APPENDIX
VOLUME II OF IV
(Pages 429 – 748)**

_____

<br>

| | | |
|---|---|---|
| David J. Sensenig | David D. Hudgins | Joseph P. Moriarty |
| Andrew R. Park | HUDGINS LAW FIRM, P.C. | WILLCOX & SAVAGE, PC |
| PARK SENSENIG LLC | 2331 Mill Road, Suite 100 | 440 Monticello Avenue, Suite 2200 |
| 2310 West Main Street | Alexandria, Virginia 22314 | Norfolk, Virginia 23510 |
| Richmond, Virginia 23220 | (703) 837-3206 | (757) 628-5502 |
| (804) 417-6085 | | |
| *Counsel for Appellant* | *Counsel for Appellees* | *Counsel for Appellees* |

# TABLE OF CONTENTS
## VOLUME I OF IV

**Appendix Page**

Docket Entries..................................................................................1

**Complaint**
     filed August 8, 2018...............................................................8

**Order of**
**The Honorable Theresa Carroll Buchanan**
**Re: Granting Joint Motion to Substitute Party**
     filed October 5, 2018 ...........................................................13

**Defendant Boston Properties Limited Partnership and Reston Town Center**
**Property, LLC's Answer and Third Party Compliant Against CDA**
**Incorporated, D/B/A Maxsent,**
**With Attachments,**
     filed October 17, 2018.........................................................14

     Attachments:

     **Complaint**
          dated August 8, 2018.......................................................27

     **Agreement to Provide Services for Security Guard Services between**
     **Boston Properties Limited Partnership, a Delaware Limited Partnership**
     **and CDA Inc. dba MaxSent**
          dated April 2, 2015 .........................................................32

**List of Uncontested Facts**
     filed June 26, 2019 ..............................................................72

**Defendant's Motion for Summary Judgment**
     filed July 12, 2019...............................................................75

**Defendants' Memorandum in Support of Motion for Summary Judgment**
     filed July 12, 2019...............................................................77

Statement of Material Facts as to Which there is no Genuine Issue,
With Exhibits,
    filed July 12, 2019.................................................................... 90

<u>Exhibits:</u>

A.    **First Amendment to Agreement to Provide Services**
        **dated June 9, 2016** ................................................ 96

B.    **Excerpts of Transcripts of Deposition of Michael Blanchette**
        **on June 19, 2019** ................................................. 147

        **Examination** ................................................................ 151

C.    **MaxSent Incident Report**
        **dated November 15, 2016**..................................... 179

D.    **Excerpts of Transcripts of Deposition of Camile Sedar**
        **on May 9, 2019** ................................................... 184

        **Examination** ................................................................ 188

E.    **Excerpts of Transcripts of Deposition of David Buchanan**
        **on May 29, 2019**................................................. 208

        **Examination** ................................................................ 212

F.    **Excerpts of Transcripts of Deposition of Robert Rapanut**
        **on May 29, 2019**................................................. 248

        **Examination** ................................................................ 253

G.    **Excerpts of Transcripts of Deposition of Karen Dibella**
        **on May 29, 2019**................................................. 300

        **Examination** ................................................................ 304

**Exhibits,** continued:

H.  Excerpts of Transcripts of Deposition of Damien Keer
    on May 29, 2019.................................................................. 340

    Examination .......................................................................... 344

I.  Photograph
    undated .................................................................................. 364

J.  Excerpts of Transcripts of Deposition of Anthony Swartz
    on June 19, 2019 ................................................................ 365

    Examination .......................................................................... 369

K.  Third Party Defendants' Answer and Objections to
    Plaintiff's First Interrogatories and Requests for
    Production of Documents
    dated March 13, 2019 ........................................................ 401

L.  Third Party Defendant's Answer and Objections to
    Plaintiff's First Interrogatories and Requests for
    Production of Documents
    undated .................................................................................. 406

M.  Defendant's Answer to Interrogatories
    dated March 1, 2019 .......................................................... 410

N.  Excerpts of Transcripts of Deposition of Denise Hogan
    on June 13, 2019 ................................................................ 417

    Examination .......................................................................... 421

# TABLE OF CONTENTS
## VOLUME II OF IV

**Appendix Page**

**Exhibits to Defendants' Memorandum in Support of
Motion to Exclude Expert Testimony**
        filed July 12, 2019:

1.      **Dano Holland's Report with a Statement of
        Proposed Opinions, and basis and Reasons for them**
                dated April 15, 2019 ............................................................. 429

2.      **Dano Holland's Rebuttal Report**
                dated May 30, 2019 ................................................................ 469

3.      **Transcript of Deposition of Dano Holland**
                on June 18, 2019 .................................................................... 484

                Examination ........................................................................... 487

**Exhibits to Plaintiff's Memorandum in Opposition to
Defendants' Motion Exclude Expert Testimony**
        filed July 26, 2019:

1.      **Dano Holland, P.E. Curriculum Vitae**
                updated April 11, 2019 ......................................................... 573

2.      **Experts of Transcript of Dano Holland**
                on June 18, 2019 .................................................................... 576

                Examination ........................................................................... 577

12.     **Redacted Emails between Todd Pattison and Mike Blanchette**
                dated December 27, 2018 ..................................................... 589

Plaintiff's Memorandum in Opposition to
Defendants' Motion for Summary Judgment
    filed July 26, 2019 ....................................................................... 591

<u>Exhibits:</u>

    A.    Excerpts of Transcripts of Deposition of Davida Buchanan
            on May 29, 2019.................................................................. 629

            Examination ....................................................................... 634

    B.    Excerpts of Transcripts of Deposition of Robert Rapanut
            on May 29, 2019.................................................................. 701

            Examination ....................................................................... 706

# TABLE OF CONTENTS
## VOLUME III OF IV

**Appendix Page**

**Plaintiff's Memorandum in Opposition to
Defendants' Motion for Summary Judgment
        filed July 26, 2019, continued,**

**Exhibits, continued:**

**C.    Excerpts of Transcripts of Deposition of Camille Sedar
                on May 9, 2019** ....................................................................749

                **Examination** ........................................................754

**D      Photograph
                undated** .............................................................765

**E.     Photographs
                undated** .............................................................766

**F.     Photographs
                undated** .............................................................769

**G.     Excerpts of Transcripts of Deposition of Karen Dibella
                on May 29, 2019**....................................................773

**H.     Excerpts of Transcripts of Deposition of Anthony Swartz
                on June 19, 2019** ..................................................789

                **Examination** ........................................................794

**I.      Excerpts of Transcripts of Deposition of Damien Kerr
                on May 29, 2019**....................................................837

                **Examination** ........................................................842

<u>Exhibits</u>, continued:

J.  Letter to
    Andrew R. Park from
    John A. Bruno
    Orthopedic Medicine of Alexandria, Ltd.
    Re:  Consult for Camille Sedar
            dated April 14, 2019 ............................................................. 865

K.  Affidavit of Camille Sedar
            sworn July 24, 2019 ............................................................. 891

L.  Affidavit of Dano Holland,
    With Attachments,
            sworn July 26, 2019 ............................................................. 894

M.  Excerpts of Transcripts of Deposition of Dano Holland
            on June 18, 2019 ................................................................. 928

            Examination ........................................................................ 931

N.  Excerpts of Transcripts of Deposition of Michael Blanchette
            on June 19, 2019 ................................................................. 944

            Examination ........................................................................ 949

O.  Redacted Emails between Todd Pattison and Mike Blanchette
            dated December 27, 2018 ..................................................... 972

P.  MaxSent Incident Report
            dated November 5, 2016 ...................................................... 974

Q.  Excerpts of Transcripts of Deposition of Denise Hogan
            on June 13, 2019 ................................................................. 979

            Examination ........................................................................ 984

R.  Affidavit of Dano Holland,
    With Attachments,
            sworn July 26, 2019 ............................................................. 995

<u>Exhibits</u>, continued:

S.     Photograph
         undated ................................................................1012

T.     Photograph
         undated ................................................................1013

U.     Photograph
         undated ................................................................1014

V.     Virginia Construction Code
         effective July 14, 2014 ......................................1019

Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment, With Attachment,
         filed August 1, 2019 ..........................................1024

     <u>Attachment</u>:

     *Harold B. Holbrook v. Deborah S. Davidson*, No. 2:13-cv-00027
         decided January 15, 201 ....................................1032

Order of
The Honorable Claude M. Hilton
Re:  Granting Plaintiff's Motion for Leave to File Video as an Exhibit
         filed August 5, 2019 ..........................................1037

Order of
The Honorable Claude M. Hilton
Re:  Granting Defendants' Motion for Summary Judgment
         filed August 22, 2019 ........................................1038

Plaintiff's Notice of Appeal
         filed September 4, 2019 ......................................1044

# TABLE OF CONTENTS
## VOLUME IV OF IV – DVD

**Appendix Page**

**Video taken by Damien Kerr of Trip and
Fall Scene at Reston Town Center
       undated** ............................................................................................1047



2310 West Main Street  Richmond, Virginia 23220

www.parksenenig.com

April 15, 2019

| **By U.S. Mail (all materials) and E-Mail (letter only)**<br>Joseph P. Moriarty, Esq.<br>Kevin L. Keller, Esq.<br>WILLCOX & SAVAGE, P.C.<br>Wells Fargo Center<br>440 Monticello Avenue, Suite 2200<br>Norfolk, VA 23510 | **By U.S. Mail (all materials) and E-Mail (letter only)**<br>David D. Hudgins, Esq.<br>Mary Gogoel, Esq.<br>Hudgins Law Firm, P.C.<br>515 King St., Ste. 400<br>Alexandria, VA 20602 |
|---|---|
| **By U.S. Mail (all materials) and E-mail (letter only)**<br>Timothy S. Brunick, Esq.<br>CLARKE, DOLPH, HULL,<br>& BRUNICK, P.L.C.<br>5712 Cleveland Street, Suite 130<br>Virginia Beach, VA 23462 | |

Re:   **Camille Sedar v. Boston Properties Limited Partnership, et al.**
**Civil Action No.: 1:18-cv-01111-CMH-TCB**

Dear Counsel:

Pursuant to Rule 26(a)(2) and the Scheduling Order and Discovery Plan, Plaintiff Camille Sedar identifies Dano Holland, P.E., as an expert witness and provides the following expert disclosure materials:

(1) Report dated April 11, 2019 by Dano Holland, P.E. providing a complete statement of all opinions and the basis and reasons for them;

(2) CV for Dano Holland showing his qualifications and any publications;

(3) Record of Testimony for Dano Holland listing all other cases during the previous four years in which Mr. Holland testified as an expert at trial or by deposition;

(4) Statement of Mr. Holland's compensation schedule for study and testimony in the case.



**EXHIBIT**

A

April 15, 2019
Page 2


Please contact me with any questions or concerns.

Sincerely,

Andrew R. Park
(804) 417-6085 (main)
(804) 417-6086 (direct)
(888) 552-1781 (fax)
andrew.park@parksensenig.com


Enclosures
ARP/hbt



Holland
Forensic
Engineering
Group, PLC

April 11, 2019

Mr. Andrew R. Park, Esquire
Park Sensenig
2310 West Main Street
Richmond, VA 23220

RE:             Fall on Exterior Stairway
DATE OF INCIDENT: 11/15/16
CASE:           Camille Sedar v. Boston Properties, L. P., et al.
HFEG FILE #:    18007

Dear Mr. Park:

At your request, I performed an investigation surrounding a fall that occurred at the Reston Town Center -Green Parking Garage located at 11922 Freedom Drive in Reston, VA. On 11/15/16, your client, Ms. Camille Sedar, fell on the exterior stairway at the southwest corner of the garage and injured herself. As part of my investigation, I reviewed the following documents:

- The Complaint
- Plaintiff's First Interrogatories and Requests for Production of Documents to Defendants
- Plaintiff's First Interrogatories and Requests for Production of Documents to Third-Party Defendant
- The Virginia Uniform Statewide Building Code – 1984, 1987 and 2012 editions
- The International Building Code - 2012 edition
- The Building Officials and Code Administrators Basic Building Code – 1984 and 1987 editions
- The International Property Maintenance Code – 2012 edition
- ASTM F1637-13 – Standard Practice for Safe Walking Surfaces

**OBSERVATIONS**
The following has been learned and observed from my investigation to date:

- Ms. Sedar and some companions were going to a restaurant at Reston Town Center. The car in which Ms. Sedar was traveling was parked on the first level of the Green Garage. After exiting the vehicle, Ms. Sedar and her companions walked to the southwest corner of the parking garage and walked up an interior flight of stairs to Level 2. On this level, a concrete stairway leads from the garage's exit to the public sidewalk along Freedom Drive. Ms. Sedar exited the parking garage and traveled across the landing towards the top of the exterior stairway. As Ms. Sedar reached the end of the brick pavers on the landing adjacent to the top of the stairs, she stepped on a loose and unstable brick paver, lost her balance and fell down the flight of stairs injuring herself. She was knocked unconscious during the fall.
- At the time of the fall, Ms. Sedar was wearing flats. She was also carrying a large piece of paper and a clutch style purse. She was looking straight ahead. Her companions were following her and witnessed her fall.
- Immediately after the incident, Ms. Sedar's companions took photographs of the scene and a video of the loose and unstable brick paver on the top landing where Ms. Sedar stepped just prior to falling.

8508 BURROUGHS COURT, N. CHESTERFIELD, VA 23235   •   804-387-2052

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019


Holland
Forensic
Engineering
Group, PLC

- Review of the provided photographs and video taken by Ms. Sedar's companions show a loose and unstable brick that easily rocks back and forth when it is stepped on. The photographs also show a large caulk joint that is deteriorated and sagging in multiple locations (see photographs #1 through #3). The loose brick paver is un-level when observed along the plane of the landing but is not readily discernable when looking down on the walking surface.
- I traveled to the Green Parking Garage on 7/30/18 and 4/4/19 and inspected the exterior of the garage along Freedom Drive and the location at the southwest exterior stairway where Ms. Sedar fell (see photographs #4 through #9). Repairs had been made to the large caulk joint and loose brick paver on the top landing at some time prior to my inspection. Sections of the caulk joint had already begun to sag and separate again.
- The top landing of this exterior stairway is comprised of brick pavers and a band of concrete that is actually the top tread of the concrete stair.
- Four separate handrails are provided on the stairway, but the rails fail to extend the required 12" beyond the stair's top riser.
- A similar exterior stairway is located at the southeast corner of the garage.
- According to the Fairfax County online property records, the garage was built in 1988. Historical satellite photos were used to confirm the original construction date of the garage.

## Code Review

- As a matter of background regarding building codes in Virginia, since September 1, 1973, the applicable building code has been the Virginia Uniform Statewide Building Code (VUSBC). This state code is made up of three parts, the Virginia Construction Code (VCC), the Virginia Rehabilitation Code (VRC) and the Virginia Maintenance Code (VMC). The VUSBC, which is typically revised about every three years, serves as an administrative code which adopts a family of national model building and maintenance codes. The VUSBC further amends the national codes and directs how the national building codes are to be used and enforced in the state. Between 1973 and 2003, the VUSBC adopted the Building Officials and Code Administrators (BOCA) family of codes. Since 2003, the VUSBC has adopted the International Codes as its model codes.
- The 1984 VUSBC came into effect on 4/1/86, and the 1987 VUSBC came into effect on 3/1/88. Given these dates, the construction plans for the garage were likely designed and submitted to Fairfax County for a building permit when the 1984 VUSBC was in effect.
- The 1984 VUSBC incorporates the 1984 BOCA Basic Building Code.
- At the time of the incident, the 2012 edition of the VUSBC and the adopted provisions of the 2012 International Property Maintenance Code (IPMC) was in effect.
- The following Building and Maintenance Codes are applicable to the exterior stairway where Ms. Sedar fell (see attached excerpts).

### 1984 BOCA
  ➢ Definitions for Means of Egress and Exit Discharge
  ➢ 800.1 – General - Scope
  ➢ 802.1 – Use and Occupancy Requirements – New Buildings
  ➢ 807.2.1 – Exit Discharge
  ➢ 819.1 – Exterior Stairways – As Required Exit
  ➢ 816.9 – Interior Stairways – Stairway Construction
  ➢ 816.9.1 – Interior Stairways - Strength
  ➢ 825.4 - Hazards to Means of Egress – Floor Surface
  ➢ 825.6 - Hazards to Means of Egress - Elevation Change

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC

**2012 VA Maintenance Code (Part III of the VUSBC)**
➢ 103.2 – Maintenance Requirements
➢ 302.3 – General Requirements – Sidewalks and Driveways

**2012 International Property Maintenance Code**
➢ 304.4 – Exterior Structure – Structural Members
➢ 304.10 – Exterior Structure – Stairways, Decks, Porches and Balconies

- The exterior stairway where Ms. Sedar fell is located in the building's means of egress; more specifically, the stairway is located in the exit discharge. The 1984 BOCA code is clear in sections 800.1, 802.1 and 807.2.1 that occupants should be able to safely egress from a building. Sections 816.9, 816.9.1 and 825.4 require that the treads and landings of a stairway and walking surfaces in the means of egress be slip-resistant and be capable of supporting the required loads. In section 825.6, the code even directs how small elevation changes in the means of egress should be addressed. The intent of these code sections is that a safe walking surface be provided in the means of egress to guard against someone tripping, slipping or losing their balance and falling. The loose and unstable brick paver was not capable of supporting Ms. Sedar's weight.

- Because the subject exterior stair is located on the means of egress, it is regulated by the VCC (Part I of the VUSBC). The maintenance codes require that the stairway be maintained free from hazardous conditions and deterioration. Stair components must also be able to support acceptable applied loads. The loose and unstable brick paver was a hazard within the walking surface.

- The national voluntary standard, ASTM F1637-13 – Standard Practice for Safe Walking Surfaces, is a reference that provides guidelines for the construction and maintenance of walking surfaces. It can also serve as an operational list of "Good Practices" for property owners, maintenance personnel and construction contractors. Section 5.1.1 of the standard calls for walkways to "be stable, planar, flush and even to the extent possible." Section 5.1.2 indicates that walkway surfaces should "be capable of safely sustaining intended loads." The standard goes on to identify items specific to exterior walkways in section 5.7 and identifies substandard conditions in section 5.7.1 that should be repaired such as areas where "pavement is broken, depressed, raised, undermined, slippery, uneven or cracked to the extent that pieces may be readily removed." These sections, as well as others in the standard, echo the implied intent of the building and maintenance codes.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC

**Discussions**

The plaintiff was traversing the top landing of the exterior stairway at the southwest corner of the garage. The brick paver immediately adjacent to the top concrete tread was unstable and loose. The long term failure of the adjacent caulk joint likely contributed to the paver's loss of support. The shifting of the brick paver under Ms. Sedar's weight was the condition that most likely caused her to lose her balance and fall down the exterior stairway. The brick pavers on the stairway's upper landing were improperly maintained. The sagging and deteriorated caulk joint should have alerted maintenance personnel to the potential deficiency in the walking surface. The loose and uneven brick paver violates the applicable maintenance and building codes as it does not provide a firm, stable and slip resistant walking surface in the means of egress. The large joint between the brick paver and concrete may have also served as a trip hazard and contributed to the fall once the brick rocked out of level.

From my investigation to date, I have formed the following opinions in addition to any opinions previously stated in this report:

1. The loose and unstable brick paver was structurally unsound and a hazard that violated the applicable building and maintenance codes.
2. The loose and unstable brick paver most likely caused Ms. Sedar to lose her balance and fall down the stairway.
3. The sagging and deteriorated caulk joint immediately adjacent to the loose brick paver would have been visible during routine maintenance inspections and activities. Closer inspection of the caulk joint failure should have alerted maintenance personnel to the unlevel and loose brick paver which contributed to Ms. Sedar's fall.

My opinions, which were reached to a reasonable degree of engineering certainty, are based on my knowledge, experience, training, education, observations, and the information that was obtained or relayed to me during my investigation. If additional information is provided to me, I reserve the right to alter or amend my opinions.

I trust that this information serves to clarify the issues surrounding this matter. A record of my previous testimony is attached. I have not authored any publications. Should you have any questions or if I can be of further service, please contact my office.

Sincerely,

Dano Holland, P.E.
Structural Engineer

DANO HOLLAND
Lic. No. 033040
4/11/19
COMMONWEALTH OF VIRGINIA
PROFESSIONAL ENGINEER

Enclosure

4|PAGE

-434-

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



**Photograph taken by Ms. Sedar's companions**

PHOTOGRAPH #1                    DATE TAKEN: 11/15/16

COMMENTS:  Southwest exterior stairway – view of upper landing on exterior stairway.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



**Photograph taken by Ms. Sedar's companions**

PHOTOGRAPH #2                    DATE TAKEN: 11/15/16

COMMENTS: Southwest exterior stairway – view of brick pavers on upper landing of exterior stairway

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



**Photograph taken by Ms. Sedar's companions**

PHOTOGRAPH #3                    DATE TAKEN: 11/15/16

COMMENTS: Southwest exterior stairway – view of unlevel and loose brick paver at upper landing

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #4              DATE TAKEN: 7/30/18

COMMENTS:  Southwest exterior stairway – looking west

8 | P A G E

**-438-**

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #5                    DATE TAKEN: 7/30/18

COMMENTS: Southwest exterior stairway – overhead view of stairway

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #6                    DATE TAKEN: 7/30/18

COMMENTS:  Southwest exterior stairway

10 | P A G E

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #7                DATE TAKEN: 7/30/18

COMMENTS:  Southwest exterior stairway – Exterior stairway is located on the means of egress from
the elevators and interior stair tower.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #8                    DATE TAKEN: 7/30/18

COMMENTS: Southwest exterior stairway – view of upper landing on exterior stairway

12 | P A G E

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019





PHOTOGRAPH #9                    DATE TAKEN: 7/30/18

COMMENTS: Southwest exterior stairway – 1½" wide caulk joint between brick pavers and concrete
on top landing.

1984 BOCA Excerpts

THE BOCA BASIC/NATIONAL BUILDING CODE/1984

sectional area measured in the same plane.

**Solid:** A masonry unit whose net cross-sectional area in every plane parallel to the bearing surface is 75 percent or more of its gross cross-sectional area measured in the same plane.

**Means of egress:** A continuous and unobstructed path of travel from any point in a building or structure to a public way, and consisting of three separate and distinct parts: (a) the exit access, (b) the exit and (c) the exit discharge. A means of egress comprises the vertical and horizontal means of travel and shall include intervening room spaces, doors, hallways, corridors, passageways, balconies, ramps, stairs, enclosures, lobbies, escalators, horizontal exits, courts and yards (see Article 8).

**Member**

**Primary:** Any member of the structural frame of a building or structure used as a column, grillage beam, or to support masonry walls and partitions, including trusses, isolated lintels spanning an opening of 8 feet (2438 mm) or more, and any other member required to brace a column or a truss.

**Secondary:** Any member of the structural framework other than a primary member, including filling-in beams of floor systems.

**Membrane structures**

**Air-inflated structure:** A building where the shape of the structure is maintained by air pressurization of cells or tubes to form a barrel vault over the usable area. Occupants of such a structure do not occupy the pressurized area used to support the structure.

**Air-supported structure:** A building wherein the shape of the structure is attained by air pressure and occupants of the structure are within the elevated pressure area. Air supported structures are of two basic types:

**Single skin:** Where there is only the single outer skin and the air pressure is directly against that skin.

**Double skin:** Similar to a single skin, but with an attached liner which is separated from the outer skin and provides an air space which serves for insulation, acoustic, aesthetic or similar purposes.

**Cable-restrained air-supported structure:** A structure in which the uplift is resisted by cables or webbings which are anchored to either foundations or dead men. Reinforcing cable or webbing may be attached by various methods to the membrane or may be an integral part of the membrane. This is not a cable-supported structure.

**Membrane:** As it pertains to membrane structures, a thin, flexible, impervious material capable of being supported by an air pressure of 1.5 inches of water column (373 P) (see Section 621.0).

**Membrane-covered cable structure:** A nonpressurized structure in which a mast and cable system provides support and tension to the membrane weather barrier and the membrane imparts structural stability to the structure.

**Membrane-covered frame structure:** A nonpressurized building wherein the structure is composed of a rigid framework to support tensioned

34

THE BOCA BASIC/NATIONAL BUILDING CODE/1984

**Escalator:** A power driven, inclined, continuous stairway used for raising and lowering passengers (see Section 2117.0).

**Extinguishing system, carbon dioxide ($CO_2$):** A system to supply $CO_2$ from a pressurized vessel through fixed pipes and nozzles. The system includes an automatic detection and actuating mechanism (see Section 1708.0).

**Extinguishing system, dry chemical:** A system consisting of dry chemical and expellant gas storage tanks, fixed piping, and nozzles used to assure proper distribution of an approved extinguishing agent on a specific fire hazard or into a potential fire area. The system includes an automatic detection and actuating mechanism (see Section 1710.0).

**Extinguishing system, foam:** A special system to discharge, either mechanically or chemically, a foam made from concentrates, over the area to be protected (see Section 1707.0).

**Extinguishing system, halogenated:** A system of pipes, nozzles, an actuating mechanism and a container of halogenated agent under pressure (see Section 1709.0).

**Exit:** That portion of a means of egress which is separated from all other spaces of a building or structure by construction or equipment as required in this code to provide a protected way of travel to the exit discharge (see Section 807.0).

**Exit access:** Exit access is that portion of a means of egress which leads to an entrance to an exit (see Section 810.0).

**Exit discharge:** That portion of a means of egress between the termination of an exit and a public way (see Section 807.2.1).

**Exit, horizontal:** A way of passage from one building to an area of refuge in another building on approximately the same level, or a way of passage through or around a wall or partition to an area of refuge on approximately the same level in the same building, which affords safety from fire or smoke from the area of incidence and areas communicating therewith (see Section 814.0).

**Exterior envelope:** The elements of a building which enclose conditioned spaces through which thermal energy may be transferred to or from the exterior (see Section 2402.0).

**Fire area:** The floor area enclosed and bounded by fire walls, fire separation assemblies or exterior walls of a building to restrict the spread of fire.

**Fire department connection:** A connection for fire department use in supplementing or supplying water for standpipes or sprinkler systems (see Section 1713.0).

**Fire grading:** The fire hazard classification of a building or structure in hours or fractions thereof established for its use group and occupancy in Table 1402.

28

**-446-**

# ARTICLE 8

## MEANS OF EGRESS

### SECTION 800.0 GENERAL

**800.1 Scope:** The provisions of this article shall control the design, construction and arrangement of building elements required to provide a reasonably safe means of egress from all buildings and structures hereafter erected, and from all buildings hereafter altered to a new occupant load, or manner of use, or inherent fire hazard. Existing buildings and uses shall be controlled by the provisions of Section 804.0.

**800.2 Modification of egress requirements:** When strict compliance with the provisions of this code is not practical, the building official may accept alternate means of egress which will accomplish the same purpose, by the procedure established in Article 1 for modification of this code, or by adoption of approved rules. Existing buildings shall not be occupied during repairs or alterations unless all existing means of egress and any existing fire protection are continuously maintained, or in lieu thereof, other measures are taken which provide equivalent safety.

**800.3 Minimum requirements:** It shall be unlawful to alter any building or structure in any manner that will reduce the number of exits or the capacity of exits below the requirements of this code for new buildings of the proposed use and occupancy.

### SECTION 801.0 PLANS AND SPECIFICATIONS

**801.1 Arrangement of egress:** The plans shall show in sufficient detail the location, construction, size and character of all exits together with the arrangement of aisles, corridors, passageways and hallways leading thereto in compliance with the provisions of this code.

**801.2 Number of occupants:** In other than buildings of Use Groups R-2, R-3 and I-1, the plans and the application for a permit shall designate the number of occupants to be accommodated on every floor, and in all rooms and spaces when required by the building official. When not otherwise specified, the minimum number of occupants to be accommodated by the exits shall be determined by the occupant load prescribed in Section 806.0. The posted occupant load of the building shall be limited to that number.

125

**-447-**

THE BOCA BASIC/NATIONAL BUILDING CODE/1984

### SECTION 802.0 USE AND OCCUPANCY REQUIREMENTS

**802.1 New buildings:** Every building and structure and part thereof hereafter erected shall have the prescribed number of exits of one or more of the approved types defined in this article. Exits, in combination with the exit access and exit discharge, shall provide safe and continuous means of egress to a street or to an open space with direct access to a street.

**802.2 Mixed use groups:** In buildings classified in more than one use group, each fire area shall be considered separately in determining the required number, capacity, size and construction of all exits.

**802.3 Multiple tenants:** When more than one tenant occupies any one floor of a building or structure, each tenant shall be provided with direct access to approved exits.

### SECTION 803.0 PROHIBITED USE

**803.1 General:** Exits and exit access corridors shall not be used as supply or return air ducts or plenums.

    **Exception:** The space between the corridor ceiling and the floor or roof structure above may be used as a return air plenum when the corridor is not required to be of fireresistance rated construction or when the corridor is separated from the plenum by fireresistance rated construction.

### SECTION 804.0 EXISTING BUILDINGS

**804.1 Owner responsibility:** The owner or lessee of every existing building and structure shall be responsible for the safety of all persons in, or occupying, such premises with respect to the adequacy of means of egress therefrom.

**804.2 Unsafe means of egress:** In any existing building or structure not provided with exit facilities as herein prescribed for new buildings and in which the exits are deemed inadequate for safety by the building official, such additional provision shall be made for safe means of egress as the building official shall order.

**804.2.1 Appeal from exit order:** Within seven days after the service of the exit order of the building official, the owner may file a written appeal therefrom, and the building official shall appoint a board of survey as required in Section 123.0 to make a final determination.

### SECTION 805.0 MAINTENANCE OF EXITS

**805.1 Obstructions:** It shall be unlawful to obstruct, or reduce in any manner, the clear width of any doorway, hallway, passageway or other means of egress required by the provisions of this code.

**805.2 Maintenance:** All exterior stairways and fire escapes shall be kept free of snow and ice. They shall be properly painted before and after erection; and shall be scraped and painted as often as necessary to maintain them in safe condition.

128

## SECTION 807.0 TYPES AND LOCATION OF MEANS OF EGRESS

**807.1 General:** All approved exits, including doorways, passageways, corridors, interior stairways, exterior stairways, escalators, smokeproof enclosures, ramps, horizontal exits, bridges, balconies, fire escapes and combinations thereof shall be arranged and constructed as provided in this code.

**807.2 Arrangement:** All required exits shall be so located as to be discernable and accessible with unobstructed access thereto; and so arranged as to lead directly to the street or to an area of refuge with supplemental means of egress that will not be obstructed or impaired by fire, smoke or other cause.

**807.2.1 Exit discharge:** All exits shall discharge directly at a public way or at a yard, court or open space of the required width and size to provide all occupants with a safe access to a public way.

**807.2.2 Egress through adjoining spaces:** Egress from a room or space may open into an adjoining or intervening room or area, provided such adjoining room is accessory to the area served, is not of a higher hazard than the room or space from which egress is made and provides a direct means of egress to an exit. A maximum of one exit access shall be permitted to pass through a kitchen, storeroom, restroom, closet or similar space provided that it is not the only means of access to an exit. An exit access shall not pass through a room subject to locking.

Table 807
LENGTH OF EXIT ACCESS TRAVEL [in feet[b]] [a]

| Use group | Without fire suppression system | With fire suppression system |
|---|---|---|
| A | 150 | 200 |
| B | 200 | 300 |
| E | 150 | 200 |
| F | 200 | 300 |
| H | — | 75 |
| I | 100 | 200 |
| M | 100 | 150 |
| R | 100 | 150 |
| S-1 | 200 | 300 |
| S-2 | 300 | 400 |

Note a. See the following sections for travel distance requirements for special uses.
Section 504.4: The maximum length of exit access travel in unlimited area buildings shall be 400 feet.
Section 618.3.1.4.6: The exit access travel distance set forth in Table 807 may be increased to 300 feet in high-rise buildings under the automatic fire suppression system alternatives.
Section 619.4.1: The maximum length of exit access travel from any point within a covered mall to an approved exit shall not exceed 200 feet.
Section 809.5: The maximum distance from any point on a parking tier to an exit in open parking structures shall be 300 feet.
Note b. 1 foot = 304.8 mm.

**807.2.3 Assembly buildings:** All buildings used for assembly purposes shall front on at least one street on which the main entrance and exit discharge shall be located.

THE BOCA BASIC/NATIONAL BUILDING CODE/1984

entirely within the smoke trap area. Doors, when in the open position, shall not obstruct duct openings. Duct openings may be provided with controlling dampers, if needed, to meet the design requirements, but such are not otherwise required.

**818.7.3.1 Engineered ventilation system:** A specially engineered system may be used. Such an engineered system shall provide 2,500 cubic feet per minute (cfm) (1.18 m³/s) exhaust from a vestibule when in emergency operation and shall be sized to handle three vestibules simultaneously. The smoke detectors located outside each vestibule shall, upon release, open the supply and exhaust duct dampers in that affected vestibule.

**818.7.4 Smoke trap:** The vestibule ceiling shall be at least 20 inches (508 mm) higher than the door opening into the vestibule to serve as a smoke and heat trap and to provide an upward moving air column. The height may be decreased when justified by design and test.

**818.7.5 Stair shaft air movement system:** The stair shaft shall be provided with a dampered relief opening at the top and supplied with sufficient air to discharge a minimum of 2,500 cfm (1.18 m³/s) through the relief opening while maintaining a minimum positive pressure of 0.05 inch of water column (12.44 Pa) in the shaft relative to atmosphere with all doors closed.

**818.7.6 Ventilating equipment:** The activation of ventilating equipment shall be by a smoke detector installed outside the vestibule door in an approved location. When the closing device for the stair shaft and vestibule doors is activated by smoke detection or power failure, the mechanical equipment shall operate at the levels specified in Sections 818.7.3 and 818.7.5.

**818.7.7 Standby power:** Mechanical vestibule and stair shaft ventilation systems and detector systems shall be powered by an approved standby power system conforming to Sections 2007.0 and 618.9.1.

**818.7.8 Acceptance and testing:** Before the mechanical equipment is approved by the building official, it shall be tested in the building official's presence to confirm that it is operating in compliance with these requirements.

### SECTION 819.0 EXTERIOR STAIRWAYS

**819.1 As required exit:** Exterior stairways conforming to the requirements for interior stairways as required in Section 816.0, except as to enclosures and fire doors and except as herein specifically modified, may be accepted as an element of a required means of egress in buildings not exceeding five stories or 65 feet (19812 mm) in height for other than buildings of Use Groups I-2 and I-3. Exterior stairways and exit access balconies in climates subject to snow or ice shall be protected to prevent accumulation of same.

**819.1.1 Location and arrangement:** Exterior stairways may be utilized where at least one door from each tenant space opens onto a roofed-over open balcony served by at least two stairways, except that one stairway may be provided as permitted in Section 809.3, so located as to provide a choice of

146

THE BOCA BASIC/NATIONAL BUILDING CODE/1984

**816.6 Stair exit doors:** Stairway exit doors shall comply with Sections 816.6.1 through 816.6.3.

**816.6.1 Width:** The width of every exit door to or from a stairway shall be not less than the number of units of exit width required for the capacity of the stairway which serves the floor or area from which the exit door leads; but such a door shall not be less than 28 inches (711 mm) in clear width in buildings of Use Group R-3 nor less than 32 inches (813 mm) in clear width in all other use groups.

**816.6.2 Direction of swing:** All doors shall swing on a landing in the direction of egress travel. When opening, stair exit doors shall not reduce the width of landings to less than one-half the required width. When fully open, the exit door may project 7 inches (178 mm) onto the landing.

> **Exception:** Doors leading from a room or tenant space to a stairway in buildings in which only one exit is required need not swing in the direction of egress travel.

**816.6.3 Door construction:** All doorway opening protectives, including the frames and hardware, shall be approved self-closing, swinging fire doors, except in buildings of Use Group R-3 where 1¾ inch solid core wood doors are permitted. Labeled fire doors shall have a maximum transmitted temperature end point of not more than 450 degrees F. (232 degrees C.) above ambient at the end of 30 minutes of standard fire test exposure.

**816.7 Spiral stairways:** Spiral stairways of noncombustible construction may be used as an element of a means of egress in buildings of Use Group R-3 and within a single dwelling unit and from a mezzanine area not more than 250 square feet (23.25 m²) in area and serving not more than five occupants. The minimum width shall be 26 inches (660 mm) with each tread having a 7½ inch (191 mm) minimum tread width at 12 inches (305 mm) from the narrow edge. All treads shall be identical and the rise shall be not more than 9½ inches (241 mm). A minimum headroom of 6 feet 6 inches (1981 mm) shall be provided.

**816.7.1 Circular stairways:** Circular stairways may be used as an element of egress when a minimum tread width of 10 inches (254 mm) is provided and the smaller radius is not less than twice the width of the stairway.

**816.8 Supplemental stairways:** Stairways which are not a required means of egress element, serving one adjacent floor and not connected with a corridor or stairway serving other floors, may be used in all use groups except Use Group I.

**816.9 Stairway construction:** All required interior stairways shall be built of materials consistent with the types of materials permitted in Table 401 for the type of construction of the building; except that wood handrails shall be permitted for all types of construction. Such stairways shall have solid treads and landing platforms, and all finish floor surfaces shall be of slip-resistant materials.

**816.9.1 Strength:** All stairways, platforms, landings and exits in other than buildings of Use Group R-3 shall be adequate to support a live load of 100

142

pounds per square foot (488.20 kg/m²) and a concentrated load of 300 pounds (136.20 kg).

**816.9.2 Enclosures:** Required interior exit stairways shall be enclosed in fire separation assemblies of the fireresistance rating specified in Table 401. An exit enclosure shall not be used for any purpose other than means of egress. A space below a stairway shall be enclosed as required or kept open. Only exit doors shall open into the stairway enclosure.

Exceptions
1. Exits in buildings of Use Group R-3.
2. Exits serving and contained within a single residential dwelling unit.
3. Exits in communicating floor levels as provided in Section 816.10.
4. Supplemental stairways as provided in Section 816.8.
5. Exits in open parking structures as provided in Section 809.5.

**816.10 Communicating floors:** In any building, other than Use Group H, provided with an automatic fire suppression system, not more than three communicating floor levels may be permitted without enclosure or protection between such areas, provided all the conditions described in Sections 816.10.1 through 816.10.4 are met.

**816.10.1 Location of floors:** The lowest, or next to the lowest, level is a street floor.

**816.10.2 Open communication:** The entire area, including all communicating floor levels, is sufficiently open and unobstructed to be assumed that a fire or other dangerous condition in any part will be immediately obvious to the occupants of all communicating levels and areas.

**816.10.3 Egress capacity:** Egress capacity is simultaneously sufficient for all the occupants of all communicating levels and areas, all communicating levels in the same fire area being considered as a single floor area for purposes of determination of required egress capacity.

**816.10.4 Other exits:** Each floor level, considered separately, has at least one-half of its individual required egress capacity provided by an exit or exits leading directly out of that area without traversing another communicating floor level or being exposed to the spread of fire or smoke therefrom.

**816.11 Discharge identification:** Stairways which continue beyond the floor of discharge shall be interrupted at the floor of discharge by partitions, doors or other effective means of preventing persons from continuing past the floor of discharge while egressing. A sign shall be provided at each floor landing in all interior stairways more than three stories in height, designating the floor level above the floor of discharge.

## SECTION 817.0 ACCESS TO ROOF

**817.1 By stairway or ladder:** In buildings more than three stories in height except those with a roof slope greater than four units vertical in 12 units horizontal (4:12), access to the roof shall be provided by means of a stairway

THE BOCA BASIC/NATIONAL BUILDING CODE/1984

## SECTION 824.0 MEANS OF EGRESS LIGHTING

**824.1 Artificial lighting:** All means of egress in other than buildings of Use Group R-3 shall be equipped with artificial lighting facilities to provide the intensity of illumination herein prescribed continuously during the time that conditions of occupancy of the building require that the exits be available. Lighting shall also be provided to illuminate the exit discharge. In buildings of Use Group R-2, means of egress lighting, except that lighting within a dwelling unit, shall be wired on a circuit independent of circuits within any dwelling unit. The disconnecting means and overcurrent protection device shall not be located within a dwelling unit or such that access must be obtained by going through a dwelling unit.

**824.2 Intensity of illumination:** The intensity of floor lighting shall be not less than one foot candle (10.76 lux).

**824.3 Use Groups A and E:** In buildings of Use Groups A and E for the exhibition of motion pictures or other projections by means of directed light, the illumination of aisles may be reduced during such period of projection to not less than 0.2 foot candle (2.15 lux).

**824.3.1 Control:** The lighting of exits, aisles and auditoriums shall be controlled from a location inaccessible to unauthorized persons. Supplementary control shall be provided as specified in Section 605.4 in the motion picture projection room.

**824.4 Power source:** Means of egress lighting shall be connected to an emergency electrical system that complies with Section 2006.0 to assure continued illumination for a duration of not less than 1 hour in case of emergency or primary power loss in buildings listed in Sections 824.4.1 through 824.4.6.

**824.4.1 Use Groups A, E and I:** In all buildings of Use Groups A, E and I.

**824.4.2 Use Group B:** In all buildings of Use Group B containing more than 1,000 occupants.

**824.4.3 Use Group M:** In all buildings of Use Group M when greater than 3,000 square feet (279 m²) in area on any floor, or when having one or more floors above or below grade floor.

**824.4.4 Use Group R-1:** In buildings of Use Group R-1 containing more than 25 sleeping rooms.

**824.4.5 Use Group R-2:** In all buildings of Use Group R-2 containing more than 50 occupants.

**824.4.6 Windowless buildings:** In all windowless buildings or portions thereof containing more than 100 occupants except buildings of Use Group R-3.

## SECTION 825.0 HAZARDS TO MEANS OF EGRESS

**825.1 Floor openings:** Manholes or floor access panels shall not be located in the line of egress which reduce the clearance to less than 32 inches (813 mm).

150

**825.2 Protrusions:** There shall not be low-hanging door closers that remain within the opening of a doorway when the door is open, or that protrude hazardously into the corridor or line of egress when the door is closed. There shall not be low-hanging signs, ceiling lights or similar fixtures which protrude into corridors or lines of egress.

**825.3 Identification of hazardous exits:** Doors leading to dangerous areas such as fire escapes, loading platforms, switch rooms and mechanical rooms shall be equipped with knobs, handles or push bars that have been knurled.

**825.4 Floor surface:** All floors of corridors and lines of egress shall have a slip-resistant surface.

**825.5 Open-sided floor areas:** Guards shall be located along open-sided walking surfaces, mezzanines and landings. The guards shall be constructed in accordance with Section 827.0.

**825.6 Elevation change:** Where changes in elevation exist in exit access corridors, exits or exit discharge, ramps shall be used when the difference in elevation is less than 12 inches (305 mm).

> **Exception:** At exterior doors not required for the physically handicapped and aged by Section 512.0, a maximum of 8 inches (203 mm) step down shall be permitted.

## SECTION 826.0 AISLES AND SEATS

**826.1 General:** Buildings of Use Groups A and E which contain seats, tables, displays, equipment, or other material shall be provided with aisles leading to the required exits.

**826.2 Aisle width:** In theater style seating, aisle width shall be sufficient to accommodate the capacity as indicated in Section 808.0 for corridors and shall be not less than 36 inches (914 mm) in width if serving only one side and not less than 42 inches (1067 mm) in width if serving both sides. Such minimum width shall be measured at the point farthest from an exit and shall be increased at the rate of 1½ inches (38 mm) for each 5 feet (1524 mm) in length towards an exit. With continental seating, as specified in Section 826.6, side aisles shall be not less than 44 inches (1118 mm).

**826.3 Aisle spacing:** There shall be a maximum of six intervening seats between any seat and the nearest aisle. With continental seating, as specified in Section 826.6, the number of intervening seats may be increased to 29 where egress doors are provided along each side aisle of the row of seats at the rate of one pair of egress doors for each five rows of seats. Such egress doors shall provide a minimum clear width of 66 inches (1676 mm).

**826.4 Cross aisles:** Aisles shall terminate at a cross aisle, foyer or exit without a dead end length over 20 feet (6096 mm).

**826.5 Aisle gradient:** The aisle slope shall not exceed one unit vertical in eight units horizontal (1:8). Steps shall not be used in aisles where differences in elevation can be accommodated by a slope of less than one unit vertical in

151

2012 Virginia Maintenance Code Excerpts

ADMINISTRATION

scope of the code, enforcement, fees, permits, inspections and disputes. Any provisions of Chapters 2 - 8 of the IPMC or any provisions of the codes and standards referenced in the IPMC which address the same subject matter to a lesser or greater extent are deleted and replaced by the provisions of Chapter 1. Further, any administrative requirements contained in the state amendments to the IPMC shall be given the same precedence as the provisions of Chapter 1. Notwithstanding the above, where administrative requirements of Chapters 2 - 8 of the IPMC or of the codes and standards referenced in the IPMC are specifically identified as valid administrative requirements in Chapter 1 of this code or in the state amendments to the IPMC, then such requirements are not deleted and replaced.

> Note: The purpose of this provision is to eliminate overlap, conflicts and duplication by providing a single standard for administrative, procedural and enforcement requirements of this code.

**101.8 Definitions.** The definitions of terms used in this code are contained in Chapter 2 along with specific provisions addressing the use of definitions. Terms may be defined in other chapters or provisions of the code and such definitions are also valid.

> Note: The order of precedence outlined in Section 101.6 may be determinative in establishing how to apply the definitions in the IPMC and in the referenced codes and standards.

## SECTION 102
## PURPOSE AND SCOPE

**102.1 Purpose.** In accordance with § 36-103 of the Code of Virginia, the Virginia Board of Housing and Community Development may adopt and promulgate as part of the Virginia Uniform Statewide Building Code, building regulations that facilitate the maintenance, rehabilitation, development and reuse of existing buildings at the least possible cost to ensure the protection of the public health, safety and welfare. Further, in accordance with § 36-99 of the Code of Virginia, the purpose of this code is to protect the health, safety and welfare of the residents of the Commonwealth of Virginia, provided that buildings and structures should be permitted to be maintained at the least possible cost consistent with recognized standards of health, safety, energy conservation and water conservation, including provisions necessary to prevent overcrowding, rodent or insect infestation, and garbage accumulation; and barrier-free provisions for the physically handicapped and aged.

**102.2 Scope.** In accordance with § 36-98 of the Code of Virginia, the VMC shall supersede the building codes and regulations of the counties, municipalities and other political subdivisions and state agencies.

**102.3 Exemptions.** This code shall not regulate those buildings and structures specifically exempt from the VCC, except that existing industrialized buildings and manufactured homes shall not be exempt from this code.

## SECTION 103
## APPLICATION OF CODE

**103.1 General.** This code prescribes regulations for the maintenance of all existing buildings and structures and associated equipment, including regulations for unsafe buildings and structures.

**103.2 Maintenance requirements.** Buildings and structures shall be maintained and kept in good repair in accordance with the requirements of this code and when applicable in accordance with the USBC under which such building or structure was constructed. No provision of this code shall require alterations to be made to an existing building or structure or to equipment unless conditions are present which meet the definition of an unsafe structure or a structure unfit for human occupancy.

**103.2.1 Maintenance of nonrequired fire protection systems.** Nonrequired fire protection systems shall be maintained to function as originally installed. If any such systems are to be reduced in function or discontinued, approval shall be obtained from the building official in accordance with Section 103.8.1 of the VCC.

**103.3 Continued approval.** Notwithstanding any provision of this code to the contrary, alterations shall not be required to be made to existing buildings or structures which are occupied in accordance with a certificate of occupancy issued under any edition of the USBC.

**103.4 Rental Inspections.** In accordance with § 36-105.1:1 of the Code of Virginia, these provisions are applicable to rental inspection programs. For purposes of this section:

"**Dwelling unit**" means a building or structure or part thereof that is used for a home or residence by one or more persons who maintain a household.

"**Owner**" means the person shown on the current real estate assessment books or current real estate assessment records.

"**Residential rental dwelling unit**" means a dwelling unit that is leased or rented to one or more tenants. However, a dwelling unit occupied in part by the owner thereof shall not be construed to be a residential rental dwelling unit unless a tenant occupies a part of the dwelling unit that has its own cooking and sleep-

# CHAPTER 3

# GENERAL REQUIREMENTS

*Delete Section 302.1 of the IPMC.*

*Change Section 302.2 of the IPMC to read:*

> **302.2 Grading and drainage.** All premises shall be graded and maintained to protect the foundation walls or slab of the structure from the accumulation and drainage of surface or stagnant water in accordance with the VCC.

*Change Section 302.3 of the IPMC to read:*

> **302.3 Sidewalks and driveways.** All sidewalks, walkways, stairs, driveways, parking spaces and similar spaces regulated under the VCC shall be kept in a proper state of repair, and maintained free from hazardous conditions. Stairs shall comply with the requirements of Sections 305 and 702.

*Delete Section 302.4 of the IPMC.*

*Change Section 302.5 of the IPMC to read:*

> **302.5 Rodent harborage.** All structures and adjacent premises shall be kept free from rodent harborage and infestation where such harborage or infestation adversely affects the structures.

*Delete Sections 302.8 and 302.9 of the IPMC.*

*Delete Section 304.1.1 of the IPMC.*

*Change Section 304.7 of the IPMC to read:*

> **304.7 Roofs and drainage.** The roof and flashing shall be sound, tight and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof drains, gutters and downspouts shall be maintained in good repair and free from obstructions. Roof water shall be discharged in a manner to protect the foundation or slab of buildings and structures from the accumulation of roof drainage.

*Change Section 304.14 of the IPMC to read:*

> **304.14 Insect screens.** During the period from April 1 to December 1, every door, window and other outside opening required for ventilation of

habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged or stored, shall be supplied with approved tightly fitting screens of not less than 16 mesh per inch (16 mesh per 25 mm) and every screen door used for insect control shall have a self-closing device in good working condition.

> **Exception:** Screens shall not be required where other approved means, such as mechanical ventilation, air curtains or insect repellant fans, are used.

*Delete Sections 304.18, 304.18.1, 304.18.2 and 304.18.3 of the IPMC.*

*Delete Section 305.1.1 of the IPMC.*

*Add Section 305.7 to the IPMC to read:*

> **305.7 Carbon monoxide alarms.** Carbon monoxide alarms shall be maintained as approved.

*Delete Section 306 of the IPMC in its entirety.*

*Change Section 308.1 of the IPMC to read as follows and delete the remaining provisions of Section 308:*

> **308.1 Accumulation of rubbish and garbage.** The interior of every structure shall be free from excessive accumulation of rubbish or garbage.

*Change Section 309.1 of the IPMC to read:*

> **309.1 Infestation.** This section shall apply to the extent that insect and rodent infestation adversely affects a structure. All structures shall be kept free from insect and rodent infestation. All structures in which insects or rodents are found shall be promptly exterminated by approved processes that will not be injurious to human health. After extermination, proper precautions shall be taken to prevent reinfestation.

*Add IPMC Section 310 Lead-Based Paint.*

*Add Section 310.1 to the IPMC to read:*

2012 International Property Maintenance
Code Excerpts

**304.4 Structural members.** All structural members shall be maintained free from *deterioration*, and shall be capable of safely supporting the imposed dead and live loads.

**304.5 Foundation walls.** All foundation walls shall be maintained plumb and free from open cracks and breaks and shall be kept in such condition so as to prevent the entry of rodents and other pests.

**304.6 Exterior walls.** All exterior walls shall be free from holes, breaks, and loose or rotting materials; and maintained weatherproof and properly surface coated where required to prevent *deterioration*.

**304.7 Roofs and drainage.** The roof and flashing shall be sound, tight and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or *deterioration* in the walls or interior portion of the structure. Roof drains, gutters and downspouts shall be maintained in good repair and free from obstructions. Roof water shall not be discharged in a manner that creates a public nuisance.

**304.8 Decorative features.** All cornices, belt courses, corbels, terra cotta trim, wall facings and similar decorative features shall be maintained in good repair with proper anchorage and in a safe condition.

**304.9 Overhang extensions.** All overhang extensions including, but not limited to canopies, marquees, signs, metal awnings, fire escapes, standpipes and exhaust ducts shall be maintained in good repair and be properly *anchored* so as to be kept in a sound condition. When required, all exposed surfaces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**304.10 Stairways, decks, porches and balconies.** Every exterior stairway, deck, porch and balcony, and all appurtenances attached thereto, shall be maintained structurally sound, in good repair, with proper anchorage and capable of supporting the imposed loads.

**304.11 Chimneys and towers.** All chimneys, cooling towers, smoke stacks, and similar appurtenances shall be maintained structurally safe and sound, and in good repair. All exposed surfaces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**304.12 Handrails and guards.** Every handrail and guard shall be firmly fastened and capable of supporting normally imposed loads and shall be maintained in good condition.

**304.13 Window, skylight and door frames.** Every window, skylight, door and frame shall be kept in sound condition, good repair and weather tight.

**304.13.1 Glazing.** All glazing materials shall be maintained free from cracks and holes.

**304.13.2 Openable windows.** Every window, other than a fixed window, shall be easily openable and capable of being held in position by window hardware.

**304.14 Insect screens.** During the period from [DATE] to [DATE], every door, window and other outside opening required for *ventilation* of habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged or stored shall be supplied with *approved* tightly fitting screens of minimum 16 mesh per inch (16 mesh per 25 mm), and every screen door used for insect control shall have a self-closing device in good working condition.

**Exception:** Screens shall not be required where other *approved* means, such as air curtains or insect repellent fans, are employed.

**304.15 Doors.** All exterior doors, door assemblies, operator systems if provided, and hardware shall be maintained in good condition. Locks at all entrances to dwelling units and sleeping units shall tightly secure the door. Locks on means of egress doors shall be in accordance with Section 702.3.

**304.16 Basement hatchways.** Every *basement* hatchway shall be maintained to prevent the entrance of rodents, rain and surface drainage water.

**304.17 Guards for basement windows.** Every *basement* window that is openable shall be supplied with rodent shields, storm windows or other *approved* protection against the entry of rodents.

**304.18 Building security.** Doors, windows or hatchways for *dwelling units*, room units or *housekeeping units* shall be provided with devices designed to provide security for the *occupants* and property within.

**304.18.1 Doors.** Doors providing access to a *dwelling unit*, *rooming unit* or *housekeeping unit* that is rented, leased or let shall be equipped with a deadbolt lock designed to be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort and shall have a minimum lock throw of 1 inch (25 mm). Such deadbolt locks shall be installed according to the manufacturer's specifications and maintained in good working order. For the purpose of this section, a sliding bolt shall not be considered an acceptable deadbolt lock.

**304.18.2 Windows.** Operable windows located in whole or in part within 6 feet (1828 mm) above ground level or a walking surface below that provide access to a *dwelling unit*, *rooming unit* or *housekeeping unit* that is rented, leased or let shall be equipped with a window sash locking device.

**304.18.3 Basement hatchways.** *Basement* hatchways that provide access to a *dwelling unit*, *rooming unit* or *housekeeping unit* that is rented, leased or let shall be equipped with devices that secure the units from unauthorized entry.

**304.19 Gates.** All exterior gates, gate assemblies, operator systems if provided, and hardware shall be maintained in good condition. Latches at all entrances shall tightly secure the gates.

## SECTION 305
## INTERIOR STRUCTURE

**305.1 General.** The interior of a structure and equipment therein shall be maintained in good repair, structurally sound

 **Designation: F1637 − 13**

An American National Standard

## Standard Practice for
## Safe Walking Surfaces[1]

This standard is issued under the fixed designation F1637; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

### 1. Scope

1.1 This practice covers design and construction guidelines and minimum maintenance criteria for new and existing buildings and structures. This practice is intended to provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear. These guidelines may not be adequate for those with certain mobility impairments.

1.2 Conformance with this practice will not alleviate all hazards; however, conformance will reduce certain pedestrian risks.

1.3 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

### 2. Referenced Documents

2.1 *ASTM Standards:*[2]
F1646 Terminology Relating to Safety and Traction for Footwear

### 3. Terminology

3.1 See Terminology F1646 for the following terms used in this practice:
3.1.1 Bollard,
3.1.2 Carpet,
3.1.3 Cross slope,
3.1.4 Element,
3.1.5 Fair,

3.1.6 Footwear,
3.1.7 Foreseeable pedestrian path,
3.1.8 Planar,
3.1.9 Ramp,
3.1.10 Sidewalk,
3.1.11 Slip resistance,
3.1.12 Slip resistant,
3.1.13 Walkway.
3.1.14 Walkway surface hardware, and

### 4. Significance and Use

4.1 This practice addresses elements along and in walkways including floors and walkway surfaces, sidewalks, short flight stairs, gratings, wheel stops, and speed bumps. Swimming pools, bath tubs, showers, natural walks, and unimproved paths are beyond the scope of this practice.

### 5. Walkway Surfaces

5.1 *General:*
5.1.1 Walkways shall be stable, planar, flush, and even to the extent possible. Where walkways cannot be made flush and even, they shall conform to the requirements of 5.2 and 5.3.

5.1.2 Walkway surfaces for pedestrians shall be capable of safely sustaining intended loads.

5.1.3 Walkway surfaces shall be slip resistant under expected environmental conditions and use. Painted walkways shall contain an abrasive additive, cross cut grooving, texturing or other appropriate means to render the surface slip resistant where wet conditions may be reasonably foreseeable.

5.1.4 Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use.

5.2 *Walkway Changes in Level:*
5.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.

5.2.2 Changes in levels up to ¼ in. (6 mm) may be vertical and without edge treatment. (See Fig. 1.)

5.2.3 Changes in levels between ¼ and ½ in. (6 and 12 mm) shall be beveled with a slope no greater than 1:2 (rise:run).

5.2.4 Changes in levels greater than ½ in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these.

[1] This practice is under the jurisdiction of ASTM Committee F13 on Pedestrian/ Walkway Safety and Footwear and is the direct responsibility of Subcommittee F13.50 on Walkway Surfaces.

Current edition approved Aug. 1, 2013. Published August 2013. Originally approved in 1995. Last previous edition approved in 2010 as F1637 – 10. DOI: 10.1520/F1637-13.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For Annual Book of ASTM Standards volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

1



F1637 – 13



1/4" difference in levels

**FIG. 1  Changes in Levels up to a Maximum of ¼ in. (6 mm)**

*5.3 Carpet:*

5.3.1 Carpet shall be maintained so as not to create pedestrian hazard. Carpet shall be firmly secured and seams tightly maintained. Carpet shall not have loose or frayed edges, unsecured seams, worn areas, holes, wrinkles or other hazards that may cause trip occurrence.

5.3.2 Carpet on floor surfaces shall be routinely inspected. Periodic restretching may become necessary. Periodic inspection is particularly important at step nosing edges.

5.3.3 Carpet and carpet trim (as measured when compressed) shall meet the transition requirements of 5.2.

5.3.4 Shag-type carpet shall not be used on stair treads. Carpeting should be firmly secured onto the tread and around the nosing.

*5.4 Mats and Runners:*

5.4.1 Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather. Replacement of mats or runners may be necessary when they become saturated.

5.4.2 Building entrances shall be provided with mats or runners, or other means to help remove foreign particles and other contaminants from the bottom of pedestrian footwear. Mats should be provided to minimize foreign particles, that may become dangerous to pedestrians particularly on hard smooth floors, from being tracked on floors.

5.4.3 Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations. Mats at building entrances also may be used to control the spread of precipitation onto floor surfaces, reducing the likelihood of the floors becoming slippery.

5.4.4 Mats shall be of sufficient design, area, and placement to control tracking of contaminants into buildings. Safe practice requires that mats be installed and maintained to avoid tracking water off the last mat onto floor surfaces.

5.4.5 Mats, runners, and area rugs shall be provided with safe transition from adjacent surfaces and shall be fixed in place or provided with slip resistant backing.

5.4.6 Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners, and area rugs shall not have loose or frayed edges, worn areas, holes, wrinkles, or other hazards that may cause trip occurrences.

*5.5 Illumination:*

5.5.1 Minimum walkway illumination shall be governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES) (Application and Reference Volumes).

5.5.2 Illumination shall be designed to be glare free.

5.5.3 Illumination shall be designed to avoid casting of obscuring shadows on walkways, including shadows on stairs that may be cast by users.

5.5.4 Interior and exterior pedestrian use areas, including parking lots, shall be properly illuminated during periods when pedestrians may be present.

5.6 *Headroom*—A minimum headroom clearance of 6 ft 8 in. (2.03 m), measured from the walkway surface, shall be provided above all parts of the walkway. Where such clearance is not provided in existing structures, the low clearance portions of the walkway shall be safely padded, marked with safety contrast color coding and posted with appropriate warning signs.

*5.7 Exterior Walkways:*

5.7.1 Exterior walkways shall be maintained so as to provide safe walking conditions.

5.7.1.1 Exterior walkways shall be slip resistant.

5.7.1.2 Exterior walkway conditions that may be considered substandard and in need of repair include conditions in which the pavement is broken, depressed, raised, undermined, slippery, uneven, or cracked to the extent that pieces may be readily removed.

5.7.2 Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 5.2.

5.7.3 Edges of sidewalk joints shall be rounded.

**6. Walking Surface Hardware**

6.1 Walking surface hardware within foreseeable pedestrian paths shall be maintained flush with the surrounding surfaces; variances between levels shall be transitioned in accordance with 5.2.

6.2 Walking surface hardware within foreseeable pedestrian paths shall be maintained slip resistant.

6.3 Walking surface hardware shall be installed and maintained so as to be stable under reasonable foreseeable loading.

**7. Stairs**

*7.1 General:*

7.1.1 Stairways with "distracting" forward or side views shall be avoided. A "distracting" view is one which can attract the stair user's attention, (for example, advertisements, store displays), thus distracting the stair user.

7.1.2 Step nosings shall be readily discernible, slip resistant, and adequately demarcated. Random, pictorial, floral, or geometric designs are examples of design elements that can camouflage a step nosing.

7.1.3 Doors shall not open over stairs.

7.1.4 Structure (reserved).

7.2 *Short Flight Stairs (Three or Fewer Risers):*

7.2.1 Short flight stairs shall be avoided where possible.

7.2.2 In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

2

 F1637 – 13

## 8. Speed Bumps

8.1 Design to avoid the use of speed bumps.

8.2 All speed bumps which are in foreseeable pedestrian paths shall comply with 5.2 (walkway changes in level).

8.3 Existing speed bumps, that do not conform to 5.2, shall be clearly marked with safety color coding to contrast with surroundings. Painted speed bumps shall be slip resistant. Pedestrian **CAUTION** signs are recommended.

## 9. Wheel Stops

9.1 Parking lots should be designed to avoid the use of wheel stops.

9.2 Wheel stops shall not be placed in pedestrian walkways or foreseeable pedestrian paths.

9.3 Wheel stops shall be in contrast with their surroundings.

9.4 Wheel stops shall be no longer than 6 ft (1.83 m) and shall be placed in the center of parking stalls. The minimum width of pedestrian passage between wheel stops shall be 3 ft (0.91 m).

9.5 The top of wheel stops shall not exceed 6.5 in. (165 mm) in height above the parking lot surface.

9.6 Adequate illumination shall be maintained at wheel stops as governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES-Application and Reference Volumes).

9.7 Bollards, not less than 3 ft 6 in. (1.07 m) height, may be placed in the center of parking stalls as an alternative to wheel stops. Bollards should be appropriately marked to enhance visibility.

## 10. Gratings

10.1 Gratings used in public areas should be located outside of pedestrian walkways.

10.2 Gratings located in foreseeable pedestrian walkways shall not have openings wider than ½ in. (13 mm) in the direction of predominant travel.

10.2.1 *Exemption*—The requirements of 10.2 do not apply in areas where footwear worn is controlled (for example, industrial areas).

10.3 Gratings with elongated openings shall be placed with the long dimension perpendicular to the direction of predominant travel.

10.4 Gratings shall be maintained slip resistant.

## 11. Warnings

11.1 The use of visual cues such as warnings, accent lighting, handrails, contrast painting, and other cues to improve the safety of walkway transitions are recognized as effective controls in some applications. However, such cues or warnings do not necessarily negate the need for safe design and construction.

11.2 When relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users. Bright yellow is a commonly used color for alerting users of the presence of certain walkway conditions. When properly applied and maintained, other colors can also provide effective warnings.

## 12. Keywords

12.1 carpet; floors; gratings; mats; runners; sidewalks; short flight stairs; slip resistance; speed bump; stairs; walkway; wheel stop

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).


Holland
Forensic
Engineering
Group, PLC

**DANO HOLLAND, P.E.**

**EDUCATION**
Clemson University - Clemson, South Carolina, Bachelor of Science in Civil Engineering
1992

**PROFESSIONAL REGISTRATIONS & AFFILIATIONS**
Professional Engineer Licensed in Virginia, Maryland and Washington D.C
International Institute of Building Enclosure Consultants
National Society of Professional Engineers
International Code Council
National Council of Examiners for Engineers and Surveyors

**CAREER HISTORY**
**Holland Forensic Engineering Group, PLC**, N. Chesterfield, Virginia (2018-Present)
Owner & Lead Forensic Engineer
Conduct structural forensic engineering investigations and provide expert witness
testimony for cases involving property damage and the structural integrity of single and
multi-family residential structures, office buildings, churches, warehouses, medical
facilities, hotels, manufacturing facilities, parking decks, shopping centers, schools,
agricultural structures and industrial facilities, as well as water intrusion issues, exterior
envelope issues, building code compliance, slip, trip and fall investigations, roofing
failures, construction defects, retaining wall failures, construction collapses, floor system
issues and water damage evaluation.

**FORCON International – VA, ltd.**, Richmond, Virginia (2004-2018) - Lead Forensic
Civil/Structural Engineer

**Industrial Turnaround Corporation**, Chester, Virginia (2002-2004) – Project Manager

**Boozer Lumber Company**, Columbia, South Carolina (2002) - Engineering Manager

**Suitt Construction Company**, Richmond, Virginia (1995-2002) - Project Manager -
Asst. Project Manager - Project Engineer

**Tindall Concrete Virginia**, Petersburg, Virginia (1992-1995) - Project Engineer

**PROFESSIONAL EXPERIENCE**

**FORENSIC INVESTIGATION**
• Structural forensic engineering investigation
• Building code and ADA compliance of structures
• Roof assessment and damage investigations
• Cause and origin of water infiltration and the presence of moisture in structures



Holland
Forensic
Engineering
Group, PLC

- Evaluation of construction deficiencies
- Flood damage investigations
- Chimney failures
- Structural assessment of fire damaged structures
- Cracking in masonry and concrete walls
- Timber construction failures
- Retaining wall failures
- Construction collapses
- Water leaks in foundation walls and roofs
- Wind and storm damage investigation
- Structural assessment of damaged buildings
- Evaluation of floor systems
- Water damage investigation
- Construction dispute analysis and assessment
- Evaluation of structures for damage related to earthquakes, ground movement, and vibration

## CONSTRUCTION PROJECT MANAGEMENT
- Responsible for the successful implementation, completion and profitability of projects up to seventeen million dollars
- Interpreted contract drawings and specifications to assure that construction conformed to applicable design and contract requirements
- Responsible for the overall coordination and management of project services including cost control, document control, scheduling, safety, quality control and contract administration
- Responsible for daily interaction and coordination with clients/owners
- Supervised and managed project staffs consisting of design consultants, superintendents, assistant superintendents, project engineers, site clerks, craft foremen and their crews as well all subcontracted labor
- Coordinated the functions of engineers, architects, contractors and client's personnel.
- Managed and reviewed all submittals, shop drawings, change orders, quantity surveys and document control
- Developed and maintained CPM construction schedule and monitored project to assure adherence with schedule
- Helped develop project engineers and assistant project managers
- Expedited pre-purchased equipment, materials and fabricated items
- Conducted progress and design review meetings
- Practiced daily dispute resolution, claim avoidance and risk management
- Performed client invoicing and managed project cash flow



Holland
Forensic
Engineering
Group, PLC

**DESIGN**
- Designed structural precast concrete systems for parking decks, warehouse, manufacturing, and distribution facilities, food and chemical processing facilities in VA, NC, SC, GA, MD, and DE
- Developed construction drawings for use by internal and external contractors
- Supervised and scheduled assigned drafting staff
- Managed the smooth flow of design information among all internal departments, as well as outside agencies, as it pertained to specific projects
- Served as field engineer on projects and performed initial layout and coordination among general contractor, erection crew, and engineering
- Performed constructability reviews and made recommendations for change
- Monitored and reviewed designs and quality of services
- Addressed engineering concerns and coordinated the remedial repairs requested by clients and outside contractors

**SALES AND ESTIMATING**
- Assisted in sales efforts and presentations of potential projects
- Assisted in proposal development
- Developed and maintained network of subcontractors, vendors and engineers to deliver services
- Estimated and developed costs of prospective projects
- Fostered and developed continuing relationships with established and potential clients
- Developed value engineering alternatives and evaluated associated financial affect
- Developed preliminary project capital budgets for clients

**PURCHASING**
- Developed bid packages, project deliverables, scopes of work and solicited bids
- Drafted and executed subcontracts, purchase orders and change orders
- Assured compliance with required regulations, licenses and insurance coverage
- Negotiated claims and change orders
- Negotiated and awarded subcontracts



Holland
Forensic
Engineering
Group, PLC

### Record of Testimony for Dano Holland, P.E.

1. Deposition; Laurel Haarer v. Realty Associates Advisors, LLC and ValleyCrest Landscape Maintenance, Inc., Circuit Court of Fairfax County, Virginia. Case No. CL13-17828, May 6, 2015.
2. Deposition; Heather R. O'Quinn v. National Railroad Passenger Corporation, United States District Court Eastern District of Virginia, Richmond Division, Case No:3:14-cv-00736-JAG, June 30, 2015.
3. Deposition; Joan L. Nave v. Westport Operations, LLC d/b/a Westport Rehabilitation & Nursing Center and 7300 Forest Avenue Real Estate LLC, Circuit Court for the City of Richmond, Virginia. Case No: CL14-2004, July 15, 2015
4. Deposition; Jesnique Medina v. Holiday Bowl, Inc., Circuit Court for the County of Chesterfield, Virginia. Case No: CL14-1958, July 21, 2015.
5. Trial Testimony; Francyene R. Burton and Charles Burton v. Carl Hresan, General District Court for the County of Henrico, Virginia. Case No: GV15-5848, August 31, 2015.
6. Deposition; Bernadette M. Ayers v. Americas Best Value Inn & Suites-Glen Allen/Richmond, Vantage Hospitality Group, Inc., and Amratlal R. Patel; Circuit Court for the County of Henrico, Virginia. Case No: CL15000395-00, September 16, 2015.
7. Deposition; April G. Berry v. Seaworld Parks and Entertainment LLC d/b/a Busch Gardens Williamsburg; United States District Court for the Eastern District of Virginia. Civil Case No: 4:14cv152, September 22, 2015.
8. Trial Testimony; Kodiak Construction Co., Inc. v. Ed. Cowdrey; General District Court for Hanover County, Virginia. Case No: GV15000016-00, September 28, 2015.
9. Trial Testimony; Deborah L. and John F. Kelly v. Premium Lawn Care Services, Inc., General District Court for Fairfax County, Virginia. Case No: GV15011197, November 19, 2015.
10. Deposition; Jessica Von Suck v. Reza K. Omarzai, M.D., Mahmood A. K. Omarzai, Christy B. Omarzai, and Twin Rivers Aircraft, LLC; Circuit Court for the City of Richmond, Virginia. Case No: CL15-2430-2, May 6, 2016.
11. Trial Testimony; J. Buckley & Associates, Inc. v. Charles A. Nardiello and Gayle Nardiello, Circuit Court of Loudoun County, Virginia. Case No: 94910, June 17, 2016.
12. Deposition; Jessica Von Suck v. Reza K. Omarzai, M.D., Mahmood A. K. Omarzai, Christy B. Omarzai, and Twin Rivers Aircraft, LLC; Circuit Court for the City of Richmond, Virginia. Case No: CL15-2430-2, August 9, 2016.
13. Deposition; Richard L. and Elisabeth W. Grant v. REV III, LLC; Circuit Court of Greenbrier County, West Virginia. Case No: 14-C-165, August 26, 2016.
14. Deposition; Brandon Shane Witt v. Norfolk Southern Railway Company; Circuit Court for the City of Roanoke, Virginia. Case No: CL14002060-00, December 9, 2016.
15. Deposition; Jane Washburn Robinson, Trustee for the Jane Washburn Robinson Living Trust v. Nels P. Nordquist and Jennifer D. Nordquist; Circuit Court for the City of Alexandria, Virginia. Case No: CL15004389, January 6, 2017.
16. Deposition; Brooke Collawn v. County of Henrico and VACO Risk Management Programs, Inc; Virginia Workers Compensation Commission. Richmond, Virginia. VWC File No: VA00001241908, February 14, 2017.
17. Hearing Testimony; Brooke Collawn v. County of Henrico and VACO Risk Management Programs, Inc; Virginia Workers Compensation Commission. Richmond, Virginia. VWC File No: VA00001241908, February 16, 2017.
18. Deposition; Betty Stanley v. 12th Street Commercial Block, LLC; Circuit Court for the City of Richmond, Virginia. Case No: CL16-906, March 7, 2017



19. Trial Testimony; Cynthia L. Anderson v. Bert Terranova; Circuit Court for the City of Richmond, Virginia. Case No: CL15-950, April 25, 2017.
20. Deposition; Mark K. Stallard v. Norfolk Southern Railway Company; Circuit Court of the County of Wise, Virginia. Case No. CL14000629-00, September 28, 2017.
21. Deposition; Mary Britt v. Royce Woolfolk, Jr.; Circuit Court for the City of Richmond, Virginia. Case No: CL16-002685, July 2, 2018.
22. Trial Testimony; Mary Britt v. Royce Woolfolk, Jr.; Circuit Court for the City of Richmond, Virginia. Case No: CL16-002685, July 20, 2018.
23. Deposition; Evelyn A Clark v. Canal Walk Lofts III, L.P. and Main Street Realty, Inc.; Circuit Court for the City of Richmond, Virginia. Case No: CL17-202-00, September 6, 2018.
24. Deposition; Mia Zuzack v. Luray Caverns Corporation; Circuit Court of Page County, Virginia. Case No. CL-17-227, September 10, 2018.
25. Deposition; Sean L. Griffin, Personal Representative and Administrator of the Estate of Anne J. Griffin, deceased v. Sweet Ventures, LLC, Jeff Bland Associates, LLC, et al.; Newport News Circuit Court, Newport News, Virginia. Case No. CL17-1758P-05, November 13, 2018.
26. Trial Testimony; Marcus N. A. Robinson v. Thomas Dempsey and T&D Properties; Superior Court of the District of Columbia, Civil Division. Case No. 2017 CA 003177B, November 20, 2018.

### Rate
Mr. Holland's billing rate is $245.00 per hour / $275.00 per hour for depositions and testimony.



Holland
Forensic
Engineering
Group, PLC

## RETAINER AGREEMENT AND RATE SHEET FOR

## DANO HOLLAND, P.E.

Dano Holland's billing rate is $245 per hour and is applicable to any time expended on the case including travel, investigation, research, drafting reports, testimony preparation or related activities. Depositions and court testimony, including any time expended on the day of these events, are billed at the rate of $275 per hour.

Out of pocket expenses including travel costs, parking, tolls, lodging, meals, reproduction, equipment rental, expendable supplies and other normal and customary expenses incurred during the scope of work are billed in addition to the hourly rate charges. A one-time $35 fee will be charged for any company owned equipment or cameras used during the course of the work.

Billings are typically submitted either monthly or following appropriate milestone events (i.e. report issuance, etc.) and will be deducted from the provided retainer. Invoices will be sent by e-mail. All fees shall be paid prior to deposition or trial.

Per our previous discussions, I have agreed to perform a preliminary review of the incident and of the building codes and standards that would be applicable to the area where the subject fall occurred. I will also provide a brief summary of this preliminary code review in bulleted form with excerpts of the applicable codes. I ask that a $490 retainer be provided to cover the 2 hours this review should take.

If after this preliminary review, you would like me to continue my investigation, I anticipate that I would expend approximately 13 additional hours between inspecting the scene, additional research, and generating a final report of my findings. A worksheet, which shows how this budget was calculated, is attached. I understand that some of the conditions that may have contributed to the fall may have been repaired and that a site inspection may not produce any relevant information. Obviously, if a site inspection is not performed, the time and expense for that item can be deducted from the total budget. An additional retainer would need to be provided to cover the applicable costs, if the decision is made for me to continue my investigation.

Please forward a check in the amount of $490 made payable to Holland Forensic Engineering Group, PLC to the address listed below and have the party responsible for payment of this retainer sign below as agreement to the terms stated above. A copy of HFEG's W9 is attached for your records.

HFEG Case #: 18007        Case Name: Park Sensenig Attorneys / Camille Sedar


Client Name: _____
              PLEASE PRINT


Client Signature: _____     Date: _____

8508 Burroughs Court, N. Chesterfield, VA 23235  •  804-387-2052

**-468-**



Holland
Forensic
Engineering
Group, PLC

May 30, 2019

Mr. Andrew R. Park, Esquire
Park Sensenig
2310 West Main Street
Richmond, VA 23220

RE:          Rebuttal of Defendant's Expert Witness Report
DATE OF INCIDENT: 11/15/16
CASE:         Camille Sedar v. Boston Properties, L. P., et al.
HFEG FILE #:    18007

Dear Mr. Park:

I am in receipt of the 5/13/19 report issued by Mr. Jason D. Boyd of CED Technologies, Inc. and offer the following in response:

- Since the issuance of my April 11, 2019 report, I also reviewed the following:
  - ➤ The deposition transcript of Ms. Camille Sedar
  - ➤ CDA Incorporated, D/B/A Maxsent's Rule 26(a)(1) Initial Disclosures
  - ➤ Plaintiff's Rule 26(a)(1)(A) Initial Disclosures
  - ➤ Boston Properties and Reston Town Center's Rule 26(a) Disclosures
- Ms. Sedar has no recollection of the fall. Her companions recall that Ms. Sedar was walking normally and looking forward. There is no indication that Ms. Sedar was doing anything out of the ordinary as she traversed the top landing on her way to the stairway. She was utilizing the walkway and various components as they were present in attempts to navigate through the area. Her companions have indicated through the produced video documentation and the photographs taken shortly after the incident and through their observations that Ms. Sedar was walking through the area where loose, unstable and uneven bricks and the open caulk joint were located when she fell.
- Photographs were produced of the shoes that Ms. Sedar was wearing at the time of the fall (See photographs #1 and #2 – Bates Sedar #1295 and Sedar #1296). There is a large scuff on the toe of her right shoe that she does not recall as being there prior to the fall. This scuff is an indication that the toe of her right shoe caught and dragged on some obstacle.
- The loose, unstable and uneven brick shown in the produced video, as well as the presence of other loose bricks observed by Ms. Sedar's companions, Mr. Rapanut and Ms. Buchanan, are located adjacent to a large open caulk joint that measures approximately 1½" wide. These defects were located in the area through which Ms. Sedar was walking.
- The video of the loose brick, on which Ms. Sedar likely stepped, shows that the brick rocks back and forth with little effort. When Ms. Sedar's foot likely landed on this brick and as she transferred her weight either onto or off of the brick during the normal process of her ambulation, the brick would have pitched or rolled as demonstrated in the video. The unstable nature of this brick would have caused a sudden and unexpected loss of stability in her footing and likely caused her to lose her balance. Similarly, any loose or unstable bricks in the area where Ms. Sedar was walking may have caused a loss of balance and contributed to her fall. Further, loose walkway components such as these bricks which make up the upper landing for this stairway, are of



EXHIBIT
B

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019


Holland
Forensic
Engineering
Group, PLC

greater hazard because of their location. If the loose bricks cause a stumble, instability or misstep to occur on this top landing, the person has no flat "recovery area" and is immediately confronted with the stairs. The potential for greater injury is magnified due to a fall down the stair versus a fall on level ground.

- It should also be noted that the large open gap adjacent to the loose brick likely creates a trip hazard as the front edge of the brick shifted downward. As Ms. Sedar's foot moved downward on the brick, the elevation of the adjacent edge of the concrete landing would have likely become greater than ¼", which is the minimum height of a trip hazard, as recognized by ANSI A117.1, Section 303 and ASTM F1637, Section 5.2 (see attached excerpts). The 1½" wide open gap of the caulk joint also exceeds the size of openings allowed by the industry standard ASTM F1637, section 10.2 and the code adopted accessibility standard ANSI A117.1, section 302.3 (see attached excerpts). The sagging caulk creates a hazardous opening in the walkway and a potential trip hazard when located adjacent to unstable bricks that can shift and rotate downward.

- The absence of caulk or excess sag in the caulk joint contributes to the instability of the adjacent brick pavers. The brick pavers are locked in place by friction and their interlocked nature. The displacement of the caulk allows the bricks to shift and become loose. Further, as greater volumes of water are allowed to enter the substrate through the deteriorated and sagging caulk joint, the supporting material below the brick paver can erode leading to greater instability. These are conditions that would occur over several months and are not something that would suddenly occur. Normal and routine inspections performed at a minimum during the change of seasons should identify such maintenance concerns and hazards.

- In his report, Mr. Boyd indicates that the condition of the caulk joint was not something that would indicate an issue with the adjacent brick pavers. At the time of both mine and Mr. Boyd's inspections, the caulk joint on the stair's upper landing had been replaced. However, during my 7/30/18 inspection and subsequent 4/4/19 inspection I also inspected the similar walkway and landing at the southeast corner of the Green Garage. At this stairway's upper landing, loose, raised and unstable bricks were observed on 7/30/18 (see photographs #3 through #5). During my follow-up inspection on 4/4/19, the hazardous conditions still existed (see photographs #6 through #8). Further, the long-term existence of loose and raised bricks are evidence of a lack of maintenance, inspection and identification of such hazardous conditions on the brick paver walkways. Observations of a visible trip hazard were made at one of the exterior walkways during my 7/30/18 inspection. This condition was still present when I re-visited the property over eight months later on 4/4/19.

Based on my additional review and analysis, the original opinions expressed in my 4/11/19 report remain unchanged. In addition to any opinions expressed above, I also offer the following clarifying rebuttal opinions:

1. The footwear worn by Ms. Sedar at the time of her fall was appropriate for the activity she was performing.

2. The scuff on her shoe is an indication that her shoe contacted an obstacle at the time of her fall. This obstacle may have been the edge of the concrete landing strip on the far side of the 1½" open joint.

3. The defendant failed to properly maintain the subject landing and stairway by allowing the caulk joint to sag and deteriorate. The presence of the open joint and sagging caulk allowed the adjacent brick to become loose and unstable. The deterioration of the caulk joint also contributed to the instability of the brick paver. These conditions did not develop overnight but were formed

2 |

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



Holland
Forensic
Engineering
Group, PLC

over at least several months. The presence of the loose and unstable bricks observed at the southeast exterior stairway further illustrate these conditions:

4. The unstable, loose and uneven brick(s) and/or the 1½" wide open joint are hazardous conditions in the walking surface. The open joint would allow the toe of Ms. Sedar's shoe to become caught on the edge of the concrete landing strip at the top of the stairway. The unstable, loose and uneven brick(s) would potentially cause a loss of balance and control as these brick(s) would shift when someone steps on them.

My opinions, which were reached to a reasonable degree of engineering certainty, are based on my knowledge, experience, training, education, observations, and the information that was obtained or relayed to me during my investigation. If additional information is provided to me, I reserve the right to alter or amend my opinions.

Should you have any questions or if I can be of further service, please contact my office.

Sincerely,

Dano Holland, P.E.
Structural Engineer

COMMONWEALTH OF VIRGINIA
DANO HOLLAND
Lic. No. 033040
5/30/19
PROFESSIONAL ENGINEER

Enclosure

3 |

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #1 (Bates Sedar #1295)

COMMENTS:  Shoes worn by Ms. Sedar at the time of her fall.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #2 (Bates Sedar #1296)

COMMENTS: Shoes worn by Ms. Sedar at the time of her fall.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #3                                    DATE TAKEN: 7/30/18

COMMENTS: Southeast exterior stairway. The arrow points to a readily identifiable raised brick
             paver.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019

Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #4                    DATE TAKEN: 7/30/18

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

7 | P A G E

-475-

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019


Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #5                          DATE TAKEN: 7/30/18

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019


Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #6                              DATE TAKEN: 4/4/19

COMMENTS: Southeast exterior stairway – shifted, raised and unstable brick paver

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019


Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #7                          DATE TAKEN: 4/4/19

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019

Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #8                              DATE TAKEN: 4/4/19

COMMENTS: Southeast exterior stairway – shifted, raised and unstable brick paver

# Chapter 3. Building Blocks

## 301 General

**301.1 Scope.** The provisions of Chapter 3 shall apply where required by the scoping provisions adopted by the administrative authority or by Chapters 4 through 11.

**301.2 Overlap.** Unless otherwise specified, clear floor spaces, clearances at fixtures, maneuvering clearances at doors, and turning spaces shall be permitted to overlap.

## 302 Floor Surfaces

**302.1 General.** Floor surfaces shall be stable, firm, and slip resistant, and shall comply with Section 302. Changes in level in floor surfaces shall comply with Section 303.

**302.2 Carpet.** Carpet or carpet tile shall be securely attached and shall have a firm cushion, pad, or backing or no cushion or pad. Carpet or carpet tile shall have a level loop, textured loop, level cut pile, or level cut/uncut pile texture. The pile shall be $\frac{1}{2}$ inch (13 mm) maximum in height. Exposed edges of carpet shall be fastened to the floor and shall have trim along the entire length of the exposed edge. Carpet edge trim shall comply with Section 303.



**FIG. 302.2**
**CARPET ON FLOOR SURFACES**

**302.3 Openings.** Openings in floor surfaces shall be of a size that does not permit the passage of a $\frac{1}{2}$ inch (13 mm) diameter sphere, except as allowed in Sections 407.4.3, 408.4.3, 409.4.3, 410.4, and 805.10. Elongated openings shall be placed so that the long dimension is perpendicular to the predominant direction of travel.

## 303 Changes in Level

**303.1 General.** Changes in level in floor surfaces shall comply with Section 303.

**303.2 Vertical.** Changes in level of $\frac{1}{4}$ inch (6.4 mm) maximum in height shall be permitted to be vertical.

**303.3 Beveled.** Changes in level greater than $\frac{1}{4}$ inch (6.4 mm) in height and not more than $\frac{1}{2}$ inch (13 mm) maximum in height shall be beveled with a slope not steeper than 1:2.

**303.4 Ramps.** Changes in level greater than $\frac{1}{2}$ inch (13 mm) in height shall be ramped and shall comply with Section 405 or 406.



Predominant direction of travel

Long dimension perpendicular to direction of travel

$\frac{1}{2}$ max
13

**FIG. 302.3**
**OPENINGS IN FLOOR SURFACES**

$\frac{1}{4}$ max
6.4

**FIG. 303.2**
**CARPET ON FLOOR SURFACES**

2
1
$\frac{1}{2}$ max
13

$\frac{1}{4}$ max
6.4

(a)

$\frac{1}{4} - \frac{1}{2}$
6.4   13

2
1

(b)

**FIG. 303.3**
**BEVELED CHANGES IN LEVEL**

## 304 Turning Space

**304.1 General.** A turning space shall comply with Section 304.

7



**Designation: F1637 – 13**

An American National Standard

# Standard Practice for
# Safe Walking Surfaces[1]

This standard is issued under the fixed designation F1637; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This practice covers design and construction guidelines and minimum maintenance criteria for new and existing buildings and structures. This practice is intended to provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear. These guidelines may not be adequate for those with certain mobility impairments.

1.2 Conformance with this practice will not alleviate all hazards; however, conformance will reduce certain pedestrian risks.

1.3 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]
F1646 Terminology Relating to Safety and Traction for Footwear

## 3. Terminology

3.1 See Terminology F1646 for the following terms used in this practice:
3.1.1 Bollard,
3.1.2 Carpet,
3.1.3 Cross slope,
3.1.4 Element,
3.1.5 Fair,
3.1.6 Footwear,
3.1.7 Foreseeable pedestrian path,
3.1.8 Planar,
3.1.9 Ramp,
3.1.10 Sidewalk,
3.1.11 Slip resistance,
3.1.12 Slip resistant,
3.1.13 Walkway,
3.1.14 Walkway surface hardware, and

## 4. Significance and Use

4.1 This practice addresses elements along and in walkways including floors and walkway surfaces, sidewalks, short flight stairs, gratings, wheel stops, and speed bumps. Swimming pools, bath tubs, showers, natural walks, and unimproved paths are beyond the scope of this practice.

## 5. Walkway Surfaces

5.1 *General:*
5.1.1 Walkways shall be stable, planar, flush, and even to the extent possible. Where walkways cannot be made flush and even, they shall conform to the requirements of 5.2 and 5.3.

5.1.2 Walkway surfaces for pedestrians shall be capable of safely sustaining intended loads.

5.1.3 Walkway surfaces shall be slip resistant under expected environmental conditions and use. Painted walkways shall contain an abrasive additive, cross cut grooving, texturing or other appropriate means to render the surface slip resistant where wet conditions may be reasonably foreseeable.

5.1.4 Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use.

5.2 *Walkway Changes in Level:*
5.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.

5.2.2 Changes in levels up to ¼ in. (6 mm) may be vertical and without edge treatment. (See Fig. 1.)

5.2.3 Changes in levels between ¼ and ½ in. (6 and 12 mm) shall be beveled with a slope no greater than 1:2 (rise:run).

5.2.4 Changes in levels greater than ½ in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these.

[1] This practice is under the jurisdiction of ASTM Committee F13 on Pedestrian/Walkway Safety and Footwear and is the direct responsibility of Subcommittee F13.50 on Walkway Surfaces.
Current edition approved Aug. 1, 2013. Published August 2013. Originally approved in 1995. Last previous edition approved in 2010 as F1637 – 10. DOI: 10.1520/F1637-13.
[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States

1

F1637 – 13



1/4" difference in levels

FIG. 1  Changes in Levels up to a Maximum of ¼ in. (6 mm)

5.3 *Carpet:*

5.3.1 Carpet shall be maintained so as not to create pedestrian hazard. Carpet shall be firmly secured and seams tightly maintained. Carpet shall not have loose or frayed edges, unsecured seams, worn areas, holes, wrinkles or other hazards that may cause trip occurrence.

5.3.2 Carpet on floor surfaces shall be routinely inspected. Periodic restretching may become necessary. Periodic inspection is particularly important at step nosing edges.

5.3.3 Carpet and carpet trim (as measured when compressed) shall meet the transition requirements of 5.2.

5.3.4 Shag-type carpet shall not be used on stair treads. Carpeting should be firmly secured onto the tread and around the nosing.

5.4 *Mats and Runners:*

5.4.1 Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather. Replacement of mats or runners may be necessary when they become saturated.

5.4.2 Building entrances shall be provided with mats or runners, or other means to help remove foreign particles and other contaminants from the bottom of pedestrian footwear. Mats should be provided to minimize foreign particles, that may become dangerous to pedestrians particularly on hard smooth floors, from being tracked on floors.

5.4.3 Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations. Mats at building entrances also may be used to control the spread of precipitation onto floor surfaces, reducing the likelihood of the floors becoming slippery.

5.4.4 Mats shall be of sufficient design, area, and placement to control tracking of contaminants into buildings. Safe practice requires that mats be installed and maintained to avoid tracking water off the last mat onto floor surfaces.

5.4.5 Mats, runners, and area rugs shall be provided with safe transition from adjacent surfaces and shall be fixed in place or provided with slip resistant backing.

5.4.6 Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners, and area rugs shall not have loose or frayed edges, worn areas, holes, wrinkles, or other hazards that may cause trip occurrences.

5.5 *Illumination:*

5.5.1 Minimum walkway illumination shall be governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES) (Application and Reference Volumes).

5.5.2 Illumination shall be designed to be glare free.

5.5.3 Illumination shall be designed to avoid casting of obscuring shadows on walkways, including shadows on stairs that may be cast by users.

5.5.4 Interior and exterior pedestrian use areas, including parking lots, shall be properly illuminated during periods when pedestrians may be present.

5.6 *Headroom*—A minimum headroom clearance of 6 ft 8 in. (2.03 m), measured from the walkway surface, shall be provided above all parts of the walkway. Where such clearance is not provided in existing structures, the low clearance portions of the walkway shall be safely padded, marked with safety contrast color coding and posted with appropriate warning signs.

5.7 *Exterior Walkways:*

5.7.1 Exterior walkways shall be maintained so as to provide safe walking conditions.

5.7.1.1 Exterior walkways shall be slip resistant.

5.7.1.2 Exterior walkway conditions that may be considered substandard and in need of repair include conditions in which the pavement is broken, depressed, raised, undermined, slippery, uneven, or cracked to the extent that pieces may be readily removed.

5.7.2 Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 5.2.

5.7.3 Edges of sidewalk joints shall be rounded.

## 6. Walking Surface Hardware

6.1 Walking surface hardware within foreseeable pedestrian paths shall be maintained flush with the surrounding surfaces; variances between levels shall be transitioned in accordance with 5.2.

6.2 Walking surface hardware within foreseeable pedestrian paths shall be maintained slip resistant.

6.3 Walking surface hardware shall be installed and maintained so as to be stable under reasonable foreseeable loading.

## 7. Stairs

7.1 *General:*

7.1.1 Stairways with "distracting" forward or side views shall be avoided. A "distracting" view is one which can attract the stair user's attention, (for example, advertisements, store displays), thus distracting the stair user.

7.1.2 Step nosings shall be readily discernible, slip resistant, and adequately demarcated. Random, pictorial, floral, or geometric designs are examples of design elements that can camouflage a step nosing.

7.1.3 Doors shall not open over stairs.

7.1.4 Structure (reserved).

7.2 *Short Flight Stairs (Three or Fewer Risers):*

7.2.1 Short flight stairs shall be avoided where possible.

7.2.2 In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

2

 **F1637 – 13**

## 8. Speed Bumps

8.1 Design to avoid the use of speed bumps.

8.2 All speed bumps which are in foreseeable pedestrian paths shall comply with 5.2 (walkway changes in level).

8.3 Existing speed bumps, that do not conform to 5.2, shall be clearly marked with safety color coding to contrast with surroundings. Painted speed bumps shall be slip resistant. Pedestrian **CAUTION** signs are recommended.

## 9. Wheel Stops

9.1 Parking lots should be designed to avoid the use of wheel stops.

9.2 Wheel stops shall not be placed in pedestrian walkways or foreseeable pedestrian paths.

9.3 Wheel stops shall be in contrast with their surroundings.

9.4 Wheel stops shall be no longer than 6 ft (1.83 m) and shall be placed in the center of parking stalls. The minimum width of pedestrian passage between wheel stops shall be 3 ft (0.91 m).

9.5 The top of wheel stops shall not exceed 6.5 in. (165 mm) in height above the parking lot surface.

9.6 Adequate illumination shall be maintained at wheel stops as governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES-Application and Reference Volumes).

9.7 Bollards, not less than 3 ft 6 in. (1.07 m) height, may be placed in the center of parking stalls as an alternative to wheel stops. Bollards should be appropriately marked to enhance visibility.

## 10. Gratings

10.1 Gratings used in public areas should be located outside of pedestrian walkways.

10.2 Gratings located in foreseeable pedestrian walkways shall not have openings wider than ½ in. (13 mm) in the direction of predominant travel.

10.2.1 *Exemption*—The requirements of 10.2 do not apply in areas where footwear worn is controlled (for example, industrial areas).

10.3 Gratings with elongated openings shall be placed with the long dimension perpendicular to the direction of predominant travel.

10.4 Gratings shall be maintained slip resistant.

## 11. Warnings

11.1 The use of visual cues such as warnings, accent lighting, handrails, contrast painting, and other cues to improve the safety of walkway transitions are recognized as effective controls in some applications. However, such cues or warnings do not necessarily negate the need for safe design and construction.

11.2 When relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users. Bright yellow is a commonly used color for alerting users of the presence of certain walkway conditions. When properly applied and maintained, other colors can also provide effective warnings.

## 12. Keywords

12.1 carpet; floors; gratings; mats; runners; sidewalks; short flight stairs; slip resistance; speed bump; stairs; walkway; wheel stop

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/ COPYRIGHT/).

**-483-**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    (Alexandria Division)

 4    - - - - - - - - - - - - - -   X

 5    CAMILLE SEDAR,                 :

 6                    Plaintiff,     :

 7         -vs-                      :   CASE NO.

 8    BOSTON PROPERTIES, LP, et      :   1:18cv01111 CMH/TCB

 9    al.,                           :

10                    Defendants.    :

11    - - - - - - - - - - - - - -   X

12                         Alexandria, Virginia

13                         Tuesday, June 18, 2019

14    Deposition of:

15                    DANO HOLLAND,

16         a witness, called for examination by counsel for

17    the defendants in the above-entitled matter, pursuant to

18    notice, at 2331 Mill Road, Suite 100, Alexandria,

19    Virginia, beginning at 10:14 a.m., before

20    JESSICA CROXFORD, a Court Reporter and Notary Public in

21    and for the Commonwealth of Virginia at Large, when were

22    present on behalf of the respective parties:
```



EXHIBIT
C

```
1   ON BEHALF OF THE PLAINTIFF:

2           ANDREW PARK, ESQ.

3           DAVID J. SENSENIG, ESQ.

4           PARK SENSENIG LLC

5           107 North Bridge Street

6           Bedford, Virginia 24523

7           (804) 417-6089

8           david.sensenig@parksensenig.com

9           andrew.park@parksensenig.com

10

11  ON BEHALF OF THE DEFENDANTS:

12          DAVID D. HUDGINS, ESQ.

13          JOSEPH P. MORIARTY, ESQ. (Via Teleconference)

14          HUDGINS LAW FIRM, P.C.

15          515 King Street, Suite 400

16          Alexandria, Virginia 22314

17          (703) 739-3300

18          dhudgins@hudginslawfirm.com

19

20

21

22
```



1                    C O N T E N T S

2

3  WITNESS:                              DANO HOLLAND

4     Examination by Mr. Hudgins                   4

5

6

7

8                    E X H I B I T S

9  LETTER:                    MARKED FOR IDENTIFICATION:

10    A     Notice of Deposition                 4

11    B     CV, Record of Testimony, and Rate    4

12          Sheet

13    C     Report                               4

14    D     Rebuttal Report                      4

15    E     Handwritten Notes                    86

16

17

18

19

20

21

22



1                    P R O C E E D I N G S

2              (Holland Exhibits A through D were marked for

3    identification.)

4    Thereupon,

5                          DANO HOLLAND,

6       a witness, called for examination by counsel for the

7    defendants, having been first duly sworn by the notary

8    public, was examined and testified as follows:

9            EXAMINATION BY COUNSEL FOR THE DEFENDANTS

10   BY MR. HUDGINS:

11      Q.  Good morning, Mr. Holland.  We were introduced a

12   little bit earlier this morning.  My name is

13   David Hudgins, and I'm the lawyer for Defendants Boston

14   Properties, Inc., and Reston Town Center Properties,

15   LLC.  On the phone is Mr. Joseph Moriarty, who is also

16   counsel for those entities.  We're here to take your

17   deposition regarding your proposed opinion on behalf of

18   the plaintiffs in this case.

19          You have been deposed before, I take it?

20      A.  Yes.

21      Q.  And so you understand that I'm going to be

22   asking a series of questions exploring the basis for



1   your proposed opinions?

2        A.  Yes.

3        Q.  I would like to have an understanding with you

4   that, if any of my questions are confusing or not clear,

5   that you will stop me and I'll be happy to rephrase

6   and -- so we can make sure that we are -- you know,

7   fully understand each other.

8        A.  Understood.

9        Q.  All right.  I'm going to hand you what's been

10  marked as Exhibit A.  You have that in front of you?

11       A.  Yes, sir.

12       Q.  Okay.  Would you identify that for the record,

13  please.

14       A.  It's titled Notice of Deposition.

15       Q.  Yes.  Have you seen that before?

16       A.  No, I have not.

17       Q.  All right.  This is the Notice of Deposition

18  that was filed with -- and served on counsel in this

19  case.  And you'll note that in the second paragraph, it

20  asks that you bring with you copies of everything that

21  you relied upon in developing your proposed expert

22  opinion.



1          Did you bring with you the material that is

2    referenced in that second paragraph of Exhibit A?

3       A.  I have provided copies of my entire file to --

4          MR. PARK:  We have that file here.

5       A.  -- attorneys.

6          MR. HUDGINS:  We do have this complete file

7    here?

8          MR. PARK:  Yeah.  It's out in my car.  I can go

9    get it.

10         MR. HUDGINS:  All right.  Yeah.  We -- I mean,

11   you know --

12         MR. PARK:  Sure.

13         MR. SENSENIG:  I'll go get it.

14   BY MR. HUDGINS:

15      Q.  At some point, we're going to want to confirm.

16   Because what I'd like to do is catalog everything that

17   you relied upon in developing your expert opinion.  And

18   that's -- might be tough to do by memory.

19         (Mr. Sensenig left the deposition.)

20         MR. HUDGINS:  So Mr. Sensenig just left to go

21   fetch the files that are in Mr. Park's car, I

22   understand.



1          MR. PARK:  Yes.

2          MR. HUDGINS:  And so we can go ahead and

3    proceed.

4    BY MR. HUDGINS:

5        Q.  But, in general, tell me what you looked at in

6    developing your proposed opinion.

7        A.  There were a number of photographs and a video

8    that was provided to me that was taken by companions of

9    the plaintiff following the incident.  I looked at

10   photographs of the plaintiff's shoes, visited the site

11   where the incident occurred, took photographs of the

12   site in the garage, reviewed standards, building codes,

13   reviewed the deposition transcript of Ms. Sedar,

14   Ms. Buchanan, Mr. Rapanut, Ms. Dibella, and portions of

15   the transcript of Mr. Kerr.

16       Q.  Let me step in right now because you're doing

17   this by memory, and it might be more fair to you that we

18   wait until those files are actually here.  So why don't

19   we skip over the request for the documents that's in the

20   Notice of Deposition and just move on, and then we'll

21   get back to a catalog of materials reviewed.

22       A.  Okay.



1    Q.  So in front of you is Exhibit B.  Could you

2    identify that for the record, please?

3    A.  This is a copy of my CV and record of testimony

4    and rate sheet.

5    Q.  All right.  Why don't we focus on your CV.

6    You are a civil engineer?

7    A.  Yes.

8    Q.  And you have a degree in civil engineering from

9    Clemson, 1992.  Is that --

10   A.  Yes.

11   Q.  -- shown here?

12   Any other academic training other than the

13   degree from Clemson?

14   A.  Other than continuing education and experience,

15   no.

16   Q.  Okay.  So no other college or university degrees

17   apart from the civil engineering degree from Clemson?

18   A.  That's correct.

19   Q.  All right.  The next category in your CV is your

20   professional affiliations.  You're licensed in Virginia,

21   Maryland, and D.C.

22   And tell me about these other groups.  The



1   International Institute of Building Enclosure

2   Consultants, what is that?

3       A.  It's an organization that was just renamed.  It

4   used to be called RCI, Roof Consultants Institute.  But

5   they've kind of broadened it, so they renamed it.  But

6   it basically deals and roofing, waterproofing in a

7   building, exterior components of -- of buildings to make

8   it weather-tight, kind of building envelope study.

9       Q.  All right.  That group wouldn't have anything to

10  do with surfaces such as the issue involved in this

11  case?

12      A.  Tangential to that are adhesives, caulks,

13  waterproofing materials, things of that nature.

14      Q.  Okay.  The National Society of Professional

15  Engineers seems like it must be a big organization.

16      A.  It is.  It's -- it's across North America, and

17  it's made up of the individual state chapters.  So you

18  have the national association, and then you have the

19  various state chapters up underneath that.

20      Q.  All right.  And that covers all areas of

21  practice in engineering, I would take it?

22      A.  Correct.  Yes.



1      Q.  It's not listed to civil engineers, but that

2   could include industrial engineers and --

3      A.  That's correct.  Yes.  It -- it involves a

4   number of disciplines.  And out of that, you

5   typically -- you can kind of tailor what you like to

6   receive from them as far as whether it be construction

7   or structural or other issues that they'll send you

8   specific to your discipline.  But, no, it has a number

9   of disciplines within it.

10     Q.  Okay.  What is the International Code Council?

11     A.  That's the governing body that was created late

12  '90s, brought in the other national code drafting

13  organizations, uniform code, southern code, the BOCA

14  code.  And they combined them into the International

15  Code Council, and that is the organization that drafts

16  the international building code family:  the maintenance

17  codes, the mechanical codes, plumbing codes, national

18  electric code all belong to -- or are up underneath the

19  umbrella of International Code Council.

20     Q.  All right.  And then, finally, the National

21  Council of Examiners for Engineers and Surveyors?

22     A.  Yes.  They're a -- you can call them a



1  registration and testing arm for engineers, and they're

2  a national registry for engineers to become licensed.

3  You -- and it's an organization that makes it easier to

4  get reciprocity throughout other states.  And so that as

5  you need another license in another state, once you are

6  accepted or submit all your credentials to NCEES and

7  they confirm your education, experience, and background,

8  and work experience, they will act as an intermediary

9  or -- intermediary to state licensing offices.

10     Q.  All right.  Now, I take it that one or more of

11  these different groups that you're affiliated with would

12  be where you turned for CE, continuing education

13  courses?

14     A.  I have received continuing educations courses

15  from -- or as part of all of those with the exception of

16  NCEES.  They don't offer CE.  They pretty much verify

17  the CE and your experience, if that makes sense.

18     Q.  All right.  Given the issues in this case that

19  are reflected in your proposed expert opinion, which of

20  these organizations would be most relevant in terms of

21  information or offerings of continuing education?

22     A.  The most relevant?  To -- and I don't



1  understand -- I guess I don't understand the question.

2      Q.  I mean, as you look at these different groups

3  that you're affiliated with, we've got a case that

4  involves a slip or a trip and fall, and you have

5  opinions as to, you know, what you believe to be the

6  cause of the accident.

7          Would any of these organizations that you're

8  affiliated with offer materials or education that is

9  relevant to your opinions in this case?

10     A.  They all would.

11         (Mr. Sensenig returned to the deposition.)

12  BY MR. HUDGINS:

13     Q.  Can you think of any specifics?

14     A.  Specifics as in course material that they would

15  offer?  The International Code Council offers various

16  courses throughout the year as far as the makeup of the

17  codes and tone of codes, how they're interpreted, how

18  they're applied to building structures and things of

19  that nature.  So that's -- that's a pretty obvious

20  connection between the coursework provided by ICC and

21  this case as far as walking surfaces or building codes

22  and how that's applied.



1          The National Society of Professional

2    Engineers -- same thing -- will offer coursework as far

3    as interpreting codes, maintenance, construction

4    reviews, inspections, how to assess a situation.  There

5    has -- there's a multitude of various options there.

6          And even IIBEC, the same thing.  They will

7    have -- while they're more identify -- or more specific

8    to the building envelope, as I mentioned earlier, they

9    deal a lot with maintenance issues, failure issues with

10   products such as caulking, adherence inspections, things

11   of that nature.

12         So they -- they all have offered or offer

13   continuing education from various aspects of things that

14   could be related to this case.

15     Q.  All right.  Well, let's go on into your career

16   history.  And you're currently with your own company, it

17   looks like, the Holland Forensic Engineering Group?

18     A.  Yes.

19     Q.  And you're located in Chester, Virginia?

20     A.  Chesterfield.

21     Q.  Or Chesterfield.  It's in Chester County, I

22   guess -- or --



1     A.   Chesterfield.

2     Q.   Chesterfield County.

3     A.   Yes, sir.

4     Q.   All right.  You know, as I read the description

5   of the nature of services offered by Holland Forensic,

6   it seems to me that your focus is on structural

7   integrity and property damage issues.  Would that be

8   fair to say?

9     A.   That's one of the services or one of the things

10  that I look at.

11    Q.   How much of your professional services presently

12  is related to opinions in the slip, trip, and fall

13  investigations?

14    A.   This past year?  Over my career?

15    Q.   Well, since you started Holland Forensic.

16    A.   I don't have a catalog of all my -- I don't have

17  a breakdown of all my different cases, but --

18    Q.   Have you in the past rendered expert opinions

19  involving slip, trip, and fall situations?

20    A.   Yes.

21    Q.   You have?

22    A.   Oh, yes.



1     Q.  And can you give me an idea of what percentage

2   of your total work would relate to that category:  slip,

3   trip, and fall?

4     A.  As far as slip, trip, fall, stumble, building

5   code analysis, walkway surface assessment, things of

6   that nature?

7     Q.  Yes, sir.

8     A.  It -- in some years, it may go as high as 20

9   percent of cases.  And that's -- now, my firm, I only

10  opened my firm about a year ago.  And even in that

11  timeframe, the number of slip, trip, and fall cases,

12  walkway assessment cases, it would -- it would be at

13  least 10 percent, and it may be as high as 20 percent.

14  It may be -- it may be slightly higher than that.  I

15  would have to take all my cases, break them down and do

16  the analysis of it.

17    Q.  Would it be fair to say that, based on this

18  resume here, that you are primarily a property damage

19  guy?

20    A.  No, I wouldn't categorize -- based on the

21  other -- I do a lot of property damage.  There's

22  years -- if a storm comes through and you're dealing



1   with a lot of property damage due to a storm event, like

2   a hurricane that comes through because -- or even a

3   flooding event comes through the coast or a nor'easter,

4   yes, I'll do a -- I'll do a high number of property

5   damage claims at that time.

6        But intermixed with that, I'll still have code

7   review cases; walkway assessment cases; slip, trips, and

8   falls cases; premises liability cases, so to speak, all

9   intermixed in that, and --

10   Q.  If you had to say to someone in a social

11  gathering, you know, and they ask you, "What do you do,"

12  what is Holland Forensic best known for in terms of its

13  engineering work?

14        MR. PARK:  Objection.  Compound question.

15  BY MR. HUDGINS:

16   Q.  Do you understand what I'm driving for?  I just

17  want -- give me an idea of, you know, what is it that

18  Holland Forensic concentrates most on in your

19  professional offerings?

20   A.  Typically, I'll deal with construction issues,

21  building component issues, structural integrity issues,

22  and code evaluation of different systems.  What I



1   casually tell people when they ask me at a dinner party

2   you referred to, I will typically say, "I look at a lot

3   of broken stuff" or "I look at stuff where there's a

4   question as to, is this right or is this wrong or why is

5   it performing the way that it is?"

6          That is often in a constructed system that you

7   have in building construction or site construction with

8   a building or some other entity where somebody is going

9   to be on it, in it, or around it.  Typically, machinery,

10  I would -- I may get involved in some of the initial

11  stages of that.  But I would hand that over to a

12  mechanical engineer once it got into the nuts and bolts

13  of the actual machine work.

14          But, typically, I'm evaluating systems involved

15  in construction and other items that have been

16  constructed for the use of people.

17      Q.  All right.  We had a cold winter, a really cold

18  winter, two or three years ago, and it was -- been a lot

19  of work for lawyers in the area of burst pipes,

20  particularly sprinkler systems.  Were you involved in

21  any of that --

22      A.  I have been --



1      Q.  -- work?

2      A.  -- involved in some of that.  And there are a

3   lot of different questions that arise from burst

4   sprinkler pipes as far as insulating requirements,

5   heating requirements, location, where it's installed,

6   who should have known what, what is an act of God, the

7   water damage from the sprinkler pipe versus infiltrating

8   water from a roof or the exterior, mold and fungal

9   damage as a result of water intrusion in the walls and

10   the different components of a building.

11         So, yes, I do get involved in some of that.

12   Typically, when it gets into the installation of the

13   sprinkler pipe, what is required by code for the heating

14   requirements, the locations, things of that nature, it

15   will either be handed off to a mechanical engineer or a

16   fire protection engineer, and I'll back away.  But

17   sometimes on the periphery, I almost act like a -- a

18   general practitioner, so to speak, from a medical

19   standpoint who then, in turn, hands it off to a

20   specialist.

21         I -- I will typically tell clients or other

22   people that seek out my advice or my services that if



1   it's round and has a hole in it, that's typically pipe.

2   And let's try and get you to a plumbing engineer or

3   mechanical engineer or fire protection engineer for

4   that.  And if there's something they have a question for

5   as far as the overall building code, you can get me

6   involved or come back to me, but they should be able to

7   handle that.

8       Q.  Throughout the course of your university

9   education and on through your various professional

10  affiliations, have you ever encountered a professional

11  engineer who focuses solely on safety issues?

12      A.  When I was in college?  I'm sorry.  I missed

13  the --

14      Q.  Well, just, you know, all the way through --

15  based on the totality of your education and what you

16  understand about the various fields of engineering, have

17  you ever encountered a professional who holds themselves

18  out as a safety expert?

19      A.  Yes.

20      Q.  Okay.  And, typically, what would their

21  qualifications be?

22      A.  It is varied.  And I don't know if I have ever



1    clearly understood the requirements to become a safety

2    engineer because in looking at the coursework and the

3    requirements, it is somewhat varied and it does not

4    appear that they're going through a traditional

5    engineering discipline.

6            And I've seen some safety professionals that

7    were never trained as engineers, they didn't receive an

8    engineering degree, they didn't take engineering

9    coursework, yet they have a study that allows them to be

10   a -- I think the acronym is CSE, certified safety

11   engineer.  However, they're not a licensed professional

12   engineer.  So I have come across safety engineers or

13   safety professionals or certified safety professionals,

14   and their -- like I said, their coursework and their

15   credentials has been somewhat elusive to me.

16       Q.  All right.  Well, you don't hold yourself out as

17   a safety engineer?

18       A.  No.  That is not something that I bill myself

19   out as.

20       Q.  So would it be fair to say that you were -- you

21   have, essentially, a general practice in the area

22   of civil engineering, that your practice touches on a



800.211.DEPO (3376)
EsquireSolutions.com

1  number of different areas of concern in the field of

2  civil engineering?

3      A.  Yes.  I have -- I have a -- I guess you could

4  say a varied or a wide concentration of areas that I

5  look at all under the realm of civil engineering and

6  construction.

7      Q.  What -- qualifications.  What is it about your

8  background that you feel best qualifies you to comment

9  on issues concerning safety as applied to the facts of

10 this case?

11         MR. PARK:  Object to the extent a

12 mischaracterization of his proposed opinions.

13         MR. HUDGINS:  Well, I didn't mean to do that.  I

14 just -- I want his best statement of why he feels

15 qualified to comment on safety issues as applied to the

16 facts of this case.

17         MR. PARK:  Go ahead.

18 BY MR. HUDGINS:

19     Q.  You can answer.

20     A.  Safety is something that's very closely tied to

21 the building codes.  And that's something very early on

22 in education as an engineer, as a structural engineer, a



1   civil engineer, you become accustomed to constructing

2   things in accordance with the building codes and various

3   standards.

4        And that's something that's very integral to

5   your process as a design engineer.  You have a

6   specification or a standard you have to design to.  You

7   have to make sure that it's designed and communicated

8   that way.  You also have to know that it's constructed

9   in accordance to that.

10       You have to have an understanding as to the

11  intent of the code, what the code is trying to do.  And,

12  ultimately, the building code, their scope and purpose

13  is for the safety and -- safety, health, and welfare of

14  the public.

15       So it's -- it's closely aligned as a design and

16  construction engineer that you understand this

17  inner-relationship between the building that you're

18  constructing, the components that you're constructing,

19  and who is going to be the ultimate user of that, and

20  that the public or persons that you're constructing

21  something for are able to use it safely.

22       Most of the approaches that I take with



1  evaluating walkway surfaces and other building

2  components in a building are done from a building code

3  standpoint.  I will typically fall back to that to

4  evaluate different aspects of a building or a component.

5  I will go back to the building code and say, "Does it

6  meet it?  Does it meet the intent?  Is it reasonable

7  what was done?"

8      Q.  Okay.  Have you ever made a study of

9  biomechanics?

10     A.  No.  I'm not a biomechanical engineer.  I am

11  not -- I do not offer myself as someone that is an

12  expert in human factors.  I have worked with some of

13  those professionals.  I have, you can say, received

14  training from some of those individuals.

15     Q.  Have you --

16     A.  I don't know --

17     Q.  Have you consulted with anybody in the field of

18  biomechanical engineering in developing your opinions in

19  this case?

20     A.  Other than my past experience and other

21  instances, other mechanics of falls, general ambulation

22  that I've learned in my experience on other cases and in



1  dealing with human factors experts and biomechanical

2  experts and body of movement, but I'm -- I like to have

3  a general understanding as to those concepts.  I have

4  not consulted with a biomechanical engineer or a human

5  factors expert in this case other -- other than, like I

6  said, my past experience in doing so.

7      Q.  What field of engineering would focus

8  specifically on issues regarding surface factors such as

9  friction coefficients and the like?

10      A.  What specific engineering discipline?

11      Q.  Yes, sir.

12      A.  There's a lot of them would have -- those are

13  physical properties that you have to know for a lot of

14  different systems.  Industrial engineers need to

15  understand that.  Mechanical engineers need to

16  understand that, structural engineers, biomechanical

17  engineers, even -- even to a certain extent, electrical

18  engineers.

19          But, usually, you're dealing with someone that

20  deals with surface irregularities and the evaluation of

21  surfaces -- mechanical engineer, materials engineer,

22  naval architects that are very closely related to



1  mechanical engineering.  All of those disciplines have

2  to understand the mechanics that you're describing,

3  whether it be dynamic coefficient of friction or static

4  coefficient of friction and how that is developed.

5      Q.  Have you consulted with any engineers in any of

6  those various other fields in developing your opinion in

7  this case?

8      A.  With this case specifically, no.  I've worked

9  with materials engineers, mechanical engineers, other

10  structural engineers in the past with similar cases,

11  evaluating surfaces and components and walkway

12  components similar to this case.

13      Q.  This case involves, you know, a slip, trip, and

14  fall where we have a limited amount of information

15  regarding what happened.

16          You've read the depositions in the case; have

17  you not?

18      A.  Yes.

19          MR. PARK:  Just for the record, object to the

20  prior statement in advance of the question.

21          MR. HUDGINS:  All right.

22  BY MR. HUDGINS:



1    Q.  You're aware that Ms. Sedar herself testified

2  that she has no recollection at all about what caused

3  her to fall down the steps?

4    A.  Yes.

5    Q.  And the two individuals who were present with

6  her who would be eyewitnesses both testified that they

7  didn't see what caused her to fall?

8    A.  That's correct, yeah.  They -- they did not see

9  her feet -- where her feet were placed.

10    Q.  All right.  So given the fact that we have no

11  eyewitnesses as to what caused Ms. Sedar to fall down

12  the stairs in the green garage at the Reston Town Center

13  property, have you attempted to develop an opinion as to

14  what happened that caused her to fall?

15    A.  Yes.

16    Q.  And would you agree with me that there are

17  various things that might have happened?

18    A.  Yes.

19    Q.  Okay.  And what I'd like to know is what -- you

20  have an opinion that, I think, focuses on a loose brick.

21       What other possible scenarios of causation have

22  you explored in developing your expert opinion?



1          MR. PARK:  Object to the characterization of his

2    opinions within the question.

3          You can go ahead.

4      A.  You have a normal condition of somebody just

5    fell, somebody misstepped, somebody fell for no apparent

6    reason.  Don't know why.  They just fell, lost their

7    balance.  That's one possibility and all those different

8    little tangential parts building into that.  It just

9    happened.  Nobody can explain why.

10          There is a trip scenario where she catches her

11   toe or another part of her shoe on part of the walking

12   surface.  There's a stumble scenario where she loses her

13   balance, either from one foot or the other, based on how

14   she places her foot on the walking surfaces in and of

15   herself, independent of any other condition on the

16   walkway surface; or how she places her foot on the

17   components that are there and they shift, causing her to

18   stumble or lose her balance.  The -- the slip scenario

19   does not seem as plausible, but that was thought about

20   in evaluating this situation.

21      Q.  How about the possibility that she simply

22   stepped, didn't realize that she had come to the head of



1  the stairs, and lost her balance stepping on that first

2  step?

3      A.  And just walked off the edge of the step?  Yes.

4      Q.  Isn't that a possibility here?

5      A.  I don't think the -- some of the details

6  around -- or some of the evidence that is there supports

7  that.

8      Q.  What evidence is inconsistent with her simply

9  missing that first step and falling down?

10     A.  There -- in one part of the video, it pointed

11  out where there is blood on the second tread up from the

12  bottom of the stairway.  And Ms. Sedar is approximately

13  5'9", 5'10".  And the distance from the edge of the

14  landing or the edge of that tread to the outermost edge

15  of that second tread is 5 feet.

16          Now, in order -- Ms. Sedar split her chin.  She

17  had abrasions, I think, on her arm and legs as well.

18  But there has also been testimony that she was falling

19  forward face-first.

20     Q.  Whose testimony is that?

21     A.  Rob Rapanut talks about, she fell forward

22  facedown -- or forward -- or fell down forward facedown,



1  that she's falling forward.

2      Q.  That's your recollection of his testimony?

3      A.  I know he says that on the video.  And in his

4  deposition, he says her head goes down.  So between the

5  two of that -- I don't have his entire deposition

6  memorized by heart.  But at one part of it, he talks

7  about stating that she fell down facedown.  He uses the

8  term "down" and "facedown," and he may have been

9  repeating what he said on the video.  But there's an

10 indication that she's falling forward like that, so --

11     Q.  All right.  And you rely on that as part of

12 the -- of your understanding of facts supporting your

13 opinion?

14     A.  You had asked me what facts there were to

15 support her not just walking off the top of the stair.

16 And that's what I'm trying to explain.  I'm -- so --

17     Q.  And I'm skipping around a little bit, and I

18 don't mean to do that because I want you to be able to

19 defend your opinions, so, you know -- and take all the

20 time you need to do that.

21         I do want to follow up on your reference to a

22 video.  The only video that I've seen in this case is a



1  relatively short video where there's a gentleman in camo

2  pants and he's got his toe on a jiggly brick.

3        Is that the one that you're referring to?

4     A.  Yes.

5     Q.  And there's some limited dialogue.  Are you, in

6  part, basing your opinion on something that was said in

7  that video?

8     A.  One part of it, Rob Rapanut says she fell down

9  facedown.  And I may not be saying the exact word, but I

10 know he uses the term "facedown."  Ms. Buchanan in her

11 deposition talks about Ms. Sedar being found facedown on

12 the sidewalk, her final position as she extends forward.

13       Do I use portions of that video from what

14 Rob Rapanut's saying and what he's indicating of how she

15 went forward off the step?  Yes.  Also adding in what --

16 the descriptions that Ms. Buchanan is using in her

17 deposition as far as her final placement, the bloodstain

18 that was on the tread that's pointed out by Ms. Dibella

19 at the end of that video.

20       Those all build into how she was moving forward.

21 Even their testimony of, they were walking -- Rob

22 Rapanut and Ms. Bucannan's testimony that they were



1  walking behind the plaintiff and that she was walking

2  forward.

3      Q.  All right.  Now, you've testified that you're

4  not a biomechanical engineer?

5      A.  That's correct.

6      Q.  Have you done any scientific experiments to

7  validate what the actual course of Ms. Sedar's fall may

8  have been like or how it progressed?

9      A.  Not specific to the human body, no.

10      Q.  So let me ask you this:  You've testified that

11  based on some photographs that have some blood on the

12  sidewalk and that based on that, you've got an opinion

13  as to, you know, where on these stairs Ms. Sedar's fall

14  may have commenced; is that fair to say?

15          MR. PARK:  Object to the characterization of his

16  prior testimony.

17          MR. HUDGINS:  Well, let me -- he can either

18  agree with it or tell me I'm off base.

19  BY MR. HUDGINS:

20      Q.  I believe your testimony has been that some

21  blood on one of the risers on the stairwell where

22  Ms. Sedars [sic] fell -- is part of the basis for your



1 opinion that her fall commenced at the top of the steps

2 rather than missing that first step and falling down

3 more toward the bottom of the steps?

4    A.  Yes.  And not so much looking -- not looking

5 at -- and this may sound odd -- Ms. Sedar as a human,

6 but just as a geometrical figure, a stick figure or a

7 body, a geometric body.  If it's got a certain height

8 and you're dealing with a distance, how -- how do you

9 have that part of this geometric form strike -- it has

10 to have a beginning and it has to have an end and it has

11 to have an impact.  And if there are indications that

12 she's had an impact on a certain part of her body, it

13 adds into where those forces took place, those impacts

14 took place.

15        Now, it's not an exact science in that you're

16 dealing with descriptions of individuals and a face.

17 But in the realm of possibility as to where this occurs,

18 all of that adds into it.  You can't take one thing in

19 blinders and -- and say, "Oh, well, this is definitive

20 in this case because" --

21    Q.  Well, given that we do have kind of a limited

22 amount of information concerning the fall, would you



1   agree with me that there are other possible scenarios

2   for what caused Ms. Sedar to slip, trip, or fall down

3   those stairs?

4          MR. PARK:  Objection.  Asked and answered.

5      A.  Yes.  And we talked about those a little bit

6   earlier.  There are other possibilities, yes.

7   BY MR. HUDGINS:

8      Q.  All right.  Now, in talking about the blood

9   stains on the stairs and the stick figure and that type

10  of thing, given that you are not a biomedical engineer,

11  what in your academic training or work experience gives

12  you a better ability to develop an opinion than, say,

13  the average man on the street -- man or woman on the

14  street?

15     A.  An understanding of physics, geometry, force,

16  the issues involved in this case, center of gravity, how

17  things are pitched or moved, in past investigation --

18  just my experience in past investigations and

19  evaluations of triggering factors or what can cause a

20  force placed on a moving body to adjust its final

21  position or its final resting place.  It goes back to

22  the basic study of physics.



1    Q.  Okay.  Now, the little bit of blood that was on

2  the riser that we've talked about --

3    A.  Yes.

4    Q.  -- is there any way to tell whether that came

5  from her chin, her leg, or her arm?

6        MR. PARK:  Object to that portion describing it

7  as "the little bit of blood."

8  BY MR. HUDGINS:

9    Q.  Well, the -- in the video, there are -- there's

10  one spot of blood on the surface of the sidewalk at the

11  bottom of the stairs.  Can we agree on that?

12    A.  At the bottom of the stairs on the sidewalk.

13    Q.  Yes, sir.

14    A.  Yes.

15    Q.  Okay.

16    A.  Yes.

17    Q.  Compared to that, any blood on the riser going

18  down the stairs would be relatively minor by comparison?

19    A.  The blood spot on the riser is smaller than the

20  bloodstain on the sidewalk.

21    Q.  And so my question is, what facts are you

22  relying on to -- or have you -- do you have an opinion



1  that the blood that's on the riser came from her chin

2  versus her knee versus her elbow?

3      A.  Ms. Sedar talks about having to require

4  stitches.  And -- and in her deposition, she doesn't

5  even mention scratches on her arms or legs.  That

6  observation comes from Ms. Buchanan as far as her

7  recollection that she saw that -- she thinks she

8  remembers seeing blood on the plaintiff's arm or leg.

9          Ms. Sedar doesn't remember anything.  But she

10 did have a cut on her chin that required eight stitches

11 to close up.  The -- I would expect the blood on the

12 riser to be a smaller amount than what's on the

13 sidewalk.  She came to rest on the sidewalk.  And both

14 the individuals said they had to go down there.  One --

15 Mr. Rapanut said not to move her, so there was an

16 indication she stays there.

17         So the blood that's on the tread appears to be

18 from an impact, a short contact between the two body --

19 her body and the stair, portion of her body.  From

20 that -- from her injuries, it seems to be reasonable

21 that it would be from her chin.

22     Q.  Do we know for certain that that spot was



1  actually blood that came from her body?

2      A.  No.  This is just Ms. Dibella's observation of

3  the bloodstain in the video and pointing it out there's

4  blood there.  Given Ms. Sedar's size, the point at which

5  she was moving, the indication of the way she fell, it's

6  reasonable that with blood being there and Ms. Dibella

7  making the observation that it's there, that it was from

8  Ms. Sedar.

9      Q.  All right.  Now, you haven't done any scientific

10  studies to test that theory?

11      A.  Other than just the physical parameters and just

12  the measurements that I talked about earlier, no, I have

13  not taken --

14      Q.  No computer --

15      A.  -- a mannequin or not done any kind of

16  recreation --

17      Q.  No computer simulations, any of that?

18      A.  No.  It is simply a matter of physics, fall with

19  momentum, and the falling of a body or rotating around a

20  point being your feet or the bottom of that --

21      Q.  I believe I'm fairly summarizing your proposed

22  opinion in that you focused on a single jiggly brick at



1  the top of the steps as the -- as a cause or a possible

2  cause for the fall.  Is that fair to say?

3      A.  I mentioned that there was a single jiggly brick

4  that was most likely the cause of that -- contributed to

5  that.  I also mentioned this open caulk joint and

6  sagging caulk joint that may have played a part in this

7  as well.

8      Q.  In allowing the brick to jiggle?

9      A.  In allowing the brick to jiggle, allowing

10  movement, allowing deterioration of the substrate kind

11  of contributing to that fact, the fact that the caulk

12  joint was depressed and it exposes more of this concrete

13  edge on the farther side of it, the whole size of it.

14         So, yes, I mentioned specifically this jiggly

15  brick in my initial report, and I believe I talk about

16  this open caulk joint.

17      Q.  Now, you've -- and, again, I think you focused

18  on that area around -- of the jiggly brick as the source

19  of hazard that may have caused this fall.  Do you

20  have -- let me strike that.

21         Consistent with what you've already testified

22  today regarding the little spot of blood on the steps,



1  is it possible that Ms. Sedar's fall began before the

2  point where that jiggly brick was located?

3     A.  That may be possible.  That may be possible.

4  That may be a possibility.  There's a slight incline

5  from -- along that landing that goes upwards.  It's kind

6  of an uneven walking surface, and it kind of dips down,

7  it comes back up, and then it hits this tread, and the

8  bricks are loose upon there.  So, yes, depending on --

9  that is a possibility.

10    Q.  Based on the witness testimony, we just don't

11 know?

12    A.  They were following behind her.  They were

13 inconsistent as far as how far ahead she was.  One says

14 ten steps.  The other one says an arm's length.  So,

15 yes, it's inconsistency -- it's not -- they don't have

16 an exact measurement.  We don't -- there are certain

17 aspects of that we don't know.  We have to infer from

18 what they're describing and how she's moving.

19    Q.  Now, you -- have you been qualified as an expert

20 to testify in court before?

21    A.  Yes.

22    Q.  Have you ever been qualified to testify



1  regarding a trip hazard?

2      A.  I believe I have.

3      Q.  Can you tell me where and when?

4      A.  Let me look here because these are --

5      Q.  Yeah.  Take your time.  You've got -- attached

6  to your curriculum vitae, there's a list of depositions

7  and court appearances and so forth.

8      A.  Now, do you want just trial testimony where I've

9  been qualified --

10     Q.  Trial or just -- any time you -- well, I'd like

11 to know when you were actually qualified, but also any

12 time that you consulted and offered an opinion in a trip

13 hazard scenario.

14     A.  Okay.  I can't tell you that because it's too

15 numerous for me to remember.  I'd have to go back

16 through 15 years of cases.  I know I have consulted on

17 multiple cases where there have been trip hazards of

18 varying degrees.  Some I have been retained on.  Some --

19 or some I've been retained as an expert.  Some I've just

20 been a consulting expert.

21          As far as specifically which ones I gave a

22 deposition testimony for and which ones I gave a trial



1   testimony on, I'll have to check because I know you want

2   me to be exact so that can be checked.

3        Q.  All right.

4        A.  But there are multiple -- I know that I've -- or

5   rendered opinions on multiple cases involving trip

6   incidences.

7        Q.  All right.  Well, then let's go on to ask:  Of

8   those cases, how many of them led to you appearing in

9   court and being actually accepted by the Court as an

10  expert?

11       A.  Okay.  Let me look through these.

12       Q.  Okay.

13       A.  And I know there's a number -- because this is

14  just the past four years.  I know there's a number of

15  cases that I won't know off the top --

16       Q.  When's the last time that you had a case that

17  had any similarity to this one?

18       A.  I've got one right now that I'm working on.  I

19  probably have three to five that I'm working on right

20  now that you -- could be judged as similar in nature.

21       Q.  That involve trip hazards?

22       A.  That involve trip hazards or portions, yeah,



 1  thereof.  Are they specifically the head of stairs where

 2  brick pavers are involved?  No.  So there are --

 3      Q.  Is it --

 4      A.  And I wish I had a perfect memory --

 5      Q.  That's all right.

 6      A.  -- where I could recall every single one because

 7  I'm trying to tell you as many as I can.

 8      Q.  And, listen, I'm not trying to be critical

 9  because about it because I understand that your field of

10  practice involves a wide range of engineering issues.

11          And I believe I can fairly summarize your

12  testimony in saying that, you know, safety issues such

13  as involved in this case is a relatively small part of

14  your practice.  Would that be fair to say?

15      A.  I would not consider it small because I do a lot

16  of consulting on the evaluation of walkway surfaces,

17  stairs, ramps, handrails, and those components that are

18  involved in this case, having to evaluate them, rule

19  them out, what's contributory and -- I do -- when I say

20  "a lot," I would -- like I would say, I would -- there's

21  times in a year that they may be a quarter of my

22  practice.



1    Q.   Okay.  I think you said 20 percent at some

2  point --

3    A.   Yeah.

4    Q.   -- but it's a --

5    A.   And it varies.  And I -- and I'm trying to be

6  very truthful and honest with you in your questions.

7  But out of, you know, hundreds of cases a year, 50 or --

8  they all vary.  I do not want to mislead you --

9    Q.   All right.

10   A.   -- but I want you to understand.

11   Q.   How about this question.

12   A.   Okay.

13   Q.   Have you ever had a case where you were asked to

14  render an opinion regarding a brick paver being a trip

15  hazard?

16   A.   I know I've been asked to -- either one or two

17  occasions, a brick paver being a slip hazard.  I know

18  I've been asked to render an opinion based upon tiles,

19  unevenness of tiles being a trip hazard.  I would -- I

20  think there was a walkway involving a brick paver and a

21  trip hazard.  But before I tell you definitely --

22   Q.   And off the top of your --



1      A.  -- I'd have to look back through my cases.

2      Q.  It would be impossible off the top of your head

3   to identify a specific case; is that fair to say?

4      A.  Not without me looking, because they all -- they

5   all run together.  Because I have -- I'll have cases

6   that are construction defect cases that involve hundreds

7   of thousands of dollars worth of pavers and --

8      Q.  Did you ever give any sworn testimony, either in

9   deposition or court, regarding issues involving a brick

10  paver?

11     A.  Bear with me one moment.

12          I recently had a case involving a trip off a

13  brick -- it was a transition between a brick paver

14  sidewalk and a brick paver walkway.  There was a

15  transition there, and there was a fall involving that.

16     Q.  Where was that case?

17     A.  That is number 18 in this record of testimony.

18     Q.  And did you actually appear in court or give a

19  sworn statement in a deposition?

20     A.  I provided a deposition in that case.

21     Q.  Do you remember the name of the lawyer that

22  retained you?



1      A.  John Newby with Tronfeld, West & Durrett out of

2   Richmond.  And the defense was represented by

3   John Merrick of Harman Claytor.

4      Q.  All right.  And you were on the plaintiff's

5   side --

6      A.  Yes.

7      Q.  -- with the Tronfeld firm?

8      A.  Yes, sir.

9      Q.  Did that -- that did go to court or you just

10  testified in a deposition?

11     A.  I testified -- I testified in a deposition, and

12  it did go to court.  I did not testify at court.

13     Q.  Okay.  So you never -- that never got to the

14  point where you were qualified as an expert?

15     A.  Correct.  Yeah.  I provided a deposition, and

16  then the case went on.  So, yeah, I was never -- I never

17  had -- I never had to testify in court for that.

18     Q.  Would this be the first time that -- if you were

19  to be qualified by the Court as an expert, would this be

20  the first time that you would be qualified in a case

21  involving a brick paver?

22     A.  I don't know.  I can't remember because



1  there's -- there's eight more years of testimony that

2  I'd have to go back through to see that -- because I

3  don't -- I can't remember.  I mean, I can't remember --

4  I know I've been qualified as an expert in premises

5  liability cases.

6        The exact nature of those cases, whether they be

7  a slip, a trip, a fall -- or a slip, a trip, or a

8  stumble, I can't tell you even specifically if any of

9  those instances involved a brick paver.  They may have

10 been different aspects of that where a brick paver or

11 something similar to that was involved, like a tile or

12 something of that nature.

13    Q.  Okay.  When was the first time that you did a

14 site inspection in this case?

15    A.  That would -- I was in the area and went by the

16 garage --

17    Q.  In Exhibit C, there is your proposed opinion; is

18 it not?

19    A.  Yes.  This is my initial April 11th report.  And

20 I initially visited the garage on July 30, 2018.

21    Q.  All right.  And that was sometime after the

22 actual accident involving Ms. Sedar?



1      A.  Yes.

2      Q.  You were not able to inspect the premises in the

3   condition that existed at the time of Ms. Sedar's fall?

4      A.  No, other than the general layout.  The scene

5   had been altered.  The caulk joint had been replaced.

6      Q.  All right.  And I'm sure you know that most

7   Courts won't allow evidence of any kind of repair work

8   or anything done on the premises after -- after an

9   accident of this sort.  And so we will need to be

10   careful that that doesn't come out accidentally at trial

11   because I would object and have to move to strike it.

12          So -- but I do want to confirm that you were

13   unable to look at the actual conditions that existed on

14   the day of Ms. Sedar's fall?

15      A.  Correct.  I was not -- I did not show up

16   magically at the time of her fall or right after the

17   fall, no.

18      Q.  And so you had to look at secondary sources of

19   information, photographs and a video?

20      A.  That's correct.  I'm looking at, yeah,

21   photographs, video, testimony, descriptions from other

22   individuals.  Also, even when I'm there roughly a year



1    and a half later, I'm looking at the layout, the path of

2    travel, all of the other instances where -- that did not

3    change, that there was no reason to -- there's no

4    indication that they've changed, but they -- I can look

5    at the overall picture, so to speak, to get an idea of

6    the layout of different things.

7        Q.   All right.  So you watched the video where the

8    guy in the khaki pants was jiggling the one brick?

9        A.   The camo pants?

10       Q.   Camo pants.

11       A.   Yes.

12       Q.   All right.  Would it be fair to say that you

13   were not able to take any measurements to determine what

14   type of nonalignment may have existed at that time on

15   the day of the accident?

16       A.   That's correct.  I can't -- there was -- you

17   couldn't extrapolate quantitative data, so to speak.

18       Q.   All right.  Now, there's some photographs that

19   were taken by friends of Ms. Sedar's that I believe you

20   have looked at in developing your opinion.

21       A.   Yes.

22       Q.   And would it be fair to say that it's not



1   possible to provide an accurate measurement of any of

2   the surface features based on those photographs?

3        A.  You can scale them and become close based on the

4   measurements of the brick pavers themselves.  And I did

5   do that when I went out because, in having done these

6   cases in the past, that question gets asked --

7        Q.  Yeah.  I'm not talking about going out there a

8   year and a half later.  I'm talking about looking at

9   photographs from the day of the accident.

10       A.  I understand.  I'm trying to answer that

11  question.

12       Q.  Okay.

13       A.  Given the fact that those brick pavers measure

14  4 inches wide by 8 inches in length exactly, you can

15  scale some of the measurements.  You can use a rough

16  scale to determine a variable distance, so to speak.

17  The -- you can look at -- make observations from what it

18  is now today as far as the width of the caulk joint and

19  what would be the available distance there, and you can

20  get an approximation.  You can't have an exact

21  measurement down to a 64th of an inch or anything like

22  that, but you can get an idea of those measurements.



1      Q.  Right.  Well, the building code allows some

2    variance in a surface, you know, a pedestrian surface;

3    does it not?

4      A.  They allow different tolerances for different

5    parts of the walkway components versus slopes, steps,

6    elevation changes, things of that nature.  They're all

7    different and even in overall uniformity of different

8    components.  So, yes, there are tolerances and changes

9    that are allowed by the building code.

10     Q.  And is there a code section that deals with the

11   transition from a brick paver to a concrete portion of

12   the walkway?

13     A.  Yes.

14     Q.  And there is some tolerance that's allowed in

15   that transition; is there not?

16     A.  The building code is a little more -- almost

17   rigid on the surface when you look at that transition

18   that you're talking about.

19          The building code talks about the walking

20   surface in the means of egress.  And it clearly states

21   that elevation differences less than 12 inches shall be

22   accomplished by a ramp.  The other part of that leads



1   you to believe all elevation transition should be smooth

2   and ramped.

3        Q.  Well, let's --

4        A.  And then you have other parts of the building

5   code that talk about steps allowed at thresholds, they

6   allow transition strips between different flooring

7   surfaces of maximum.  So the building code doesn't

8   specifically call out brick pavers and concrete.  It is

9   more of a general --

10       Q.  Okay.  Let's see if we can attack it this way.

11       A.  Okay.

12       Q.  The video that we've been referring to shows a

13   gentleman in the camo pants with his foot on one of the

14   pavers, and he's jiggling it and sort of rocking it as

15   it's seated as part of the surface walkway?

16       A.  Yes.

17       Q.  All right.  Would it be fair to say that there

18   was no way to measure how much out of level that brick

19   could be rocked in its seated position based on that

20   video?

21       A.  You can get an approximation.  You can't get an

22   exact distance as far as that, yes.



1    Q.  And have you made an approximation as to how

2  much -- and we're talking about the one brick rocking in

3  its spot in the walkway -- how much out of level that

4  brick could have been rocked one way or the other?

5    A.  All I can see is it's moving, and I would -- you

6  know, a safe approximation would be, it's moving less

7  than an inch in its height.  So could it be moving

8  fractions of an inch back and forth?  Yes.  But it's

9  moving less than an inch in its height based on the --

10  relative of the components around there.

11    Q.  Have you done any scientific attempt to use that

12  photograph and blow up the -- you know, a frame big

13  enough and try to use some sort of analysis technique to

14  get an exact measurement on that?

15       MR. PARK:  Objection.  Vague as to "that

16  photograph" versus the video versus the other

17  photographs.

18  BY MR. HUDGINS:

19    Q.  Well, let me -- then I'll strike all those

20  questions.

21       What have you done scientifically to determine

22  how much that brick may have been rocking out of level



1  compared to the surrounding other bricks on the day of

2  the accident?

3      A.  The quality of the video and the quality of the

4  resolution of the photographs, once you start blowing it

5  up, the details start getting so blurry you can't get a

6  good measurement off of the height variation even from

7  the aspect that -- or the orientation of how the photos

8  was taken, you can't get an exact measurement off of

9  that.

10          All you can do is get an approximation, like I

11  said before, based on the size of other items in there

12  and knowing that either movement or height is less than

13  a known quantity on that screen based on the perspective

14  of the photograph taken.

15      Q.  So it's not possible to -- to do a -- make a

16  scientific analysis of height variations?

17      A.  You would have to make -- you can make an

18  approximation.  But I think any time that you held out

19  that it is exactly this, you're going to be challenged

20  from a standpoint of, well, how do you know this or did

21  you assume this or how can you tell -- there's going to

22  be a lot of questions that's raised.



1     Q.  Wouldn't the average layperson be able to look

2  at that video and draw the same conclusion as you in

3  terms of how much out of level that brick might have

4  been rocking --

5          MR. PARK:  Object as to form.

6  BY MR. HUDGINS:

7     Q.  -- on the day of the accident?  I mean, that --

8     A.  You would -- I would love to say yes, most

9  people can do that.  But, unfortunately, when you talk

10  to people about measurements and ask them to look at

11  something or even to recollect, a lot of times, they

12  will not go back to representative items in a photograph

13  or even things that make sense, and they'll spread their

14  fingers wide apart where it looks like it's 12 inches

15  and they'll say it's 2 inches.

16          So I'm very -- any -- I'm reluctant when

17  somebody says, "Oh, it moves" -- "that moved an inch,"

18  or, "Oh, that just moved a fraction of an inch" because

19  I don't think a lot of times they look at the other

20  aspects in the photos or in videos to gain an

21  understanding.  They're quick just to say, "Oh, it's

22  about an inch," or, "Oh, it's about 2 inches."



1        And once they start studying, if you kind of

2    prompt them to, well, what's the measurement of this and

3    what's the measure -- what's the known quantity of that,

4    then you can kind of hone in on it and they'll -- "Oh,

5    okay, yeah, I agree with you.  That's about a half of an

6    inch," things of that nature.

7        Q.  I'm just interested in what -- do you think your

8    opinion would be better than the average person in

9    looking at that video and deciding how much out of level

10   the brick could be rocked one way or the other?

11       MR. PARK:  Same objection.

12       A.  As long as they were given certain observations

13   or as long as they -- you pointed out various aspects of

14   it -- well, this is this and this is that -- and, you

15   know, known quantities, you might be able to lead them

16   into gaining an understanding of that, of what you're

17   saying.

18       But I would just -- if you brought in ten people

19   and said -- I think you would get ten wildly different

20   answers unless it was prefaced by other observations and

21   their understanding, and you could get them in to be a

22   closer understanding of how much out of level or how



1  much variation or how much movement was in that brick.

2      Q.  Okay.  Apart from dealing with measurements on a

3  regular basis because, based on your profession as an

4  engineer, there's really nothing special about your

5  training as opposed to the average citizen to look at a

6  video and say, well, you know, this is how much that's

7  out of level or not.

8          MR. PARK:  Same objection.

9  BY MR. HUDGINS:

10     Q.  We're focusing just on that one video.

11         MR. PARK:  Same objection.

12     A.  There -- again, someone who's not familiar with

13  different components of how they move, even looking at

14  the video, you could have one opinion or one

15  understanding by a person that's way out on the right

16  end of the spectrum, and then you could have the opinion

17  from somebody that looks at the exact same video that's

18  way on the left end of the spectrum.  And just by

19  looking at a video without understanding the dimensions

20  that are there or how big or small something is that

21  they see in the video because they don't see a

22  representation or know the size of things.



1   BY MR. HUDGINS:

2      Q.  Well, the size of a brick is a pretty standard

3   thing; is it not?

4      A.  No, it is not.

5      Q.  Well, a brick paver is not sort of a commonly

6   known size?

7      A.  No, it is not because --

8      Q.  How about a brick paver with a guy shake -- you

9   know, toeing it with his foot?  That gives you some

10  scale; does it not?

11     A.  If you know -- if you know the dimensions of a

12  brick paver.  The reason -- when I went out and looked,

13  the reason why I measured one of those brick pavers is

14  from past experience, how they -- how the measurement

15  varies wildly on them.

16         And even building brick -- building bricks are

17  different than brick pavers because brick pavers like

18  that don't have -- don't have a mortar joint, so they're

19  bigger than a normal -- the surface area of them is

20  bigger than a normal brick.

21         And then you've got standard brick.  You've got

22  smaller brick.  You've got architect -- you've got



1  different size of brick.  And that's why I say you

2  can -- certain brick you can look at and say, this

3  should be two and three quarters -- two and

4  three-eighths inches tall by seven and five-eighths

5  inches long, and that's the exact dimension of it.  But

6  then as it's put into a system, you get a normal

7  eight-inch coursing on measure.

8           So those numbers vary.  And brick pavers are

9  different than normal building bricks.  And you can have

10 a big paver; you have an oversize paver; you can have

11 all these different sized pavers.

12     Q.  Did you measure the paver that's in -- that was

13 the focus of the camo pantsed brick jiggler?  Did you

14 measure the brick?

15     A.  Yes.

16     Q.  All right.  What is that?

17     A.  It's 4 by 8.

18     Q.  Four by eight.

19     A.  It's 4 inches wide by 8 inches long.

20     Q.  All right.  And so a standard brick like that

21 you would build a brick house, it's maybe a little

22 larger in terms of its dimensions?



1      A.  Actually, it is a little smaller.

2      Q.  A little smaller?  Oh, all right.

3      A.  Because you have to account for the mortar

4   joint.

5      Q.  All right.  And were you able to actually

6   inspect any of the brick pavers, you know, pulled out

7   of -- have you looked at a similar brick paver, you

8   know, that's not installed as part of a walkway?

9      A.  This walkway or -- or at that area?

10     Q.  Well, as part of developing your expert opinion

11  in this case, did you ever look at an exemplar brick

12  paver, you know, of the type that was in the video that

13  we're talking about?

14     A.  Yes.  On the southeast corner of the garage,

15  some of those bricks were loose, and you can step on

16  them and they'll pop up.  You can see the whole depth of

17  the brick and the width and everything.

18     Q.  All right.  And I saw your rebuttal report, and

19  you made mention of, you know, the bricks at a different

20  entrance.  And I think it's fair to tell you that I

21  would object to any testimony on that score and alerting

22  counsel to the fact that I'll object to any testimony



1 | regarding any bricks or any conditions at any other

2 | location apart from, you know, where this accident

3 | occurred.

4 | That being said, did you actually pull -- have

5 | you held one of those pavers in your hand?

6 | A.  No.  I didn't pull it out.  You had asked if

7 | there was a similar paver, and that's the closest one

8 | that I could see the end of it.

9 | Q.  You say they're 4 by 8.

10 | How thick are they?  Aren't they thinner than a

11 | standard building brick?

12 | A.  They typically are.  I didn't measure the

13 | thickness of them.

14 | Q.  Okay.  So we don't know how thick these bricks

15 | are, these pavers?

16 | A.  Not exactly.  I can't tell you the exact

17 | thickness of them.

18 | Q.  All right.  And so when did you go down and look

19 | at the other entrance?

20 | A.  Both times that I visited the site, on July the

21 | 30th of 2018 and April 4th of 2019.

22 | Q.  Why did you go -- why would you go to a



1  different location than where this accident occurred?

2      A.  To see the conditions, how it was constructed.

3  Were there similar instances?  Was there any information

4  I can gain from how that entrance was constructed versus

5  this entrance?  Is there anything that's universal or

6  systemic with the walkways?  Is there something that's

7  being done that caused this?  Is there a failure with

8  the caulk joints?  Is there anything that's there?  Is

9  it -- could I gain any information from there?

10         It was there.  I was -- I was looking at it.  I

11  might as well go -- it's similar in both the walkways,

12  traffic patterns, everything.  So why not look at it to

13  see if that jogs something that says, oh, okay, well,

14  this isn't -- it explains something totally different.

15     Q.  All right.  And, again, I think, you know, I'll

16  alert you and counsel that I would object to any

17  testimony on that score and ask that you not offer any

18  testimony without clearance from the Court.  But that

19  will be a pretrial matter that the lawyers can take up,

20  and you'll have plenty of instruction if that time

21  comes.

22     A.  Okay.  I understand.  I'm not trying to offend



1  you.  I'm just -- you're asking me questions, so I'm

2  telling you what I looked at.

3      Q.  And I'm just giving you, you know, an alert --

4      A.  Okay.

5      Q.  -- that that may be an issue of concern in

6  a pretrial motion so that --

7      A.  Okay.

8      Q.  And I know you don't want to come in and offer

9  some testimony that the Court has ordered should be

10 excluded.  So we'll take care of that in due course.

11         MR. PARK:  Just -- when you get to a breaking

12 point, if we can take a convenience bathroom break.

13         MR. HUDGINS:  Okay.

14         MR. PARK:  Just when you get to that point.

15         MR. HUDGINS:  All right.  We can take a break

16 right now if you'd like.

17         (A recess was taken.)

18         MR. HUDGINS:  Why don't we do what we started to

19 do.  Have we got that stack of material that you brought

20 up?

21 BY MR. HUDGINS:

22      Q.  Okay.  So in our notice of deposition for your



1    appearance here today, Mr. Holland, we asked that you

2    bring with you everything that you looked at supporting

3    your opinion.

4            MR. HUDGINS:  And so is that a duplicate copy?

5            MR. PARK:  Yes.

6    BY MR. HUDGINS:

7        Q.  Okay.  I'm going to hand you what counsel has

8    passed over to me.

9            MR. HUDGINS:  Counsel, is this -- are you

10   handing me this with the representation that this is the

11   universe of material that this witness has reviewed in

12   developing his proposed expert opinion?

13           MR. PARK:  Yes, we are.  That's our

14   understanding.  Is that correct?

15           MR. HUDGINS:  All right.

16           THE WITNESS:  Yes, that's correct.

17           MR. HUDGINS:  Is this a spare copy for me to

18   keep and --

19           MR. PARK:  It is.

20           MR. HUDGINS:  It is?  Okay.

21   BY MR. HUDGINS:

22       Q.  And so if I were to go through this stack, it's



1  my understanding that -- I'm being told this is

2  everything that you've looked at to develop your

3  opinion?

4      A.  Yes.  I didn't -- there are -- and I'll explain

5  to you --

6      Q.  I'm going to hand you the folder right now, and

7  if you want to flip through it.  And I know you've got

8  another folder with you.  Does that sort of --

9      A.  Yes.

10     Q.  -- contain some of the same information?

11     A.  Yes, it does.  This is my paper file.  This is

12  where all these copies came from.

13     Q.  All right.

14     A.  There are -- I think, just for full disclosure,

15  there's a couple of pages of notes in here that I took

16  last night --

17     Q.  Okay.

18     A.  -- that I did not copy between last night and

19  today providing this.

20     Q.  Are they your personal notes just based upon the

21  review of the file?

22     A.  It's my notes.  Two of them are from the review



1  of depositions.

2      Q.  Okay.

3      A.  One is a sketch that I sketched out with some

4  names written down on it.  And --

5      Q.  Okay.  Let me take a look at the stuff that is

6  not included in the package that Mr. Park has handed

7  over to me.

8      A.  Okay.  These -- these three documents were

9  developed last night.

10     Q.  Okay.  Let me -- I'll just take a look at these

11 and just see whether we want to make a copy of them.

12         Here's one that -- Buchanan's deposition.  So

13 you've gone through here, and you've got page and line,

14 notes on excerpts from her testimony?

15     A.  Yes.  Just various notes taken from her

16 testimony.

17     Q.  Okay.  All right.  And so these are passages in

18 Ms. Buchanan's testimony that you felt were significant

19 in understanding the facts of what happened here?

20     A.  I wouldn't -- some may be significant; some may

21 not.  They're just notes to jog my memory to kind of

22 summarize different things she's saying and help me find



1   the locations of where she's talking about so I can go

2   back and look at her testimony.

3       Q.  All right.  And you've got a diagram of the

4   stairs where you've taken some measurements?

5       A.  Yes.

6       Q.  All right.

7       A.  That I've drafted, yes.

8       Q.  All right.  And maybe this folds into what we

9   were talking about earlier when you were talking about

10  the blood on the second tread.

11       And then you've got Rapanut's deposition

12  outlined as well?

13       A.  Yes.  Something similar to what was listed for

14  Buchanan.

15       Q.  Okay.  What I'd like to do, and we can do this

16  after we break, is to have all of these pages copied and

17  collectively marked as Exhibit -- it will be Exhibit E

18  to this deposition.

19       Okay.  So we can move on.

20       MR. PARK:  Just for clarification, do you mean

21  these pages or these pages plus all these?

22       MR. HUDGINS:  Just -- no, I'm not going to make



1  the entire universe of materials that he reviewed an

2  exhibit.  You know, you've been kind enough to give me

3  a, you know --

4        MR. PARK:  Sure.

5        MR. HUDGINS:  -- copy of those files.  But what

6  I'm talking about is just a -- there's like maybe, I

7  don't know, less than ten pages of notes on a yellow pad

8  that Mr. Holland said that he made last night in

9  preparing to come in here today.

10  BY MR. HUDGINS:

11     Q.  Is that fair to say?

12     A.  Correct, yeah.

13     Q.  Okay.  And the exhibits that we have so far

14  include Exhibit C, which is your expert opinion.

15        And just to round out the record, could you take

16  a look at Exhibit D and identify that for the record.

17  Is that not what you've submitted as a rebuttal report?

18        MR. PARK:  Just for clarification, page 1 is a

19  transmittal cover letter --

20        MR. HUDGINS:  Yes.

21        MR. PARK:  -- from me.

22     A.  Yes, that's correct.



1    BY MR. HUDGINS:

2       Q.  Okay.  And so then the yellow pages that we'll

3    mark today that you prepared last night, we'll call

4    those collectively Exhibit E as in "Edward."

5           In your view --

6       A.  I -- I'll offer one thing about this file just

7    so you understand it.

8       Q.  All right.

9       A.  Because there are -- because I know sometimes

10   people get irritated.  But some of the "legal

11   pleadings," I think that you all call them, I did not

12   make copies of those.  They're -- I've got you

13   electronic copies from -- that was out of my electronic

14   file.  If there was anything that I printed out and

15   marked on whatsoever, you have a paper copy of it.

16      Q.  Okay.

17      A.  If it is just an electronic file that I received

18   or reviewed electronically, it's on this disk.  There

19   are also photographs that I took.  I did not -- some of

20   my photographs are printed out in my reports and

21   rebuttal reports.  All of the photographs I took in

22   relation to this are on this disk.



1      Q.  All right.

2      A.  Okay.  So you've got electronic copies of the

3   photos I took.  So that -- that's why you have some

4   that -- electronic information on a disk and others you

5   have paper copies.

6      Q.  Fair enough.

7      A.  Okay?  Just so you understand.

8      Q.  Why don't you pass that back over here, and I

9   may have a couple of questions, and we can go through

10  that.

11     A.  And I do not believe -- I think I have

12  referenced the 2012 International Building Code, and I

13  don't think there's any excerpts that I recall, and I

14  didn't -- obviously, I did not print out that entire

15  code because it would be bigger than that folder.

16     Q.  All right.  We've already discussed your review

17  of the deposition transcript of Ms. Sedar, and you also

18  reviewed the transcripts from the examinations of

19  Davida Buchanan and Robert Rapanut.  Is that fair to

20  say?

21     A.  Yes.

22     Q.  Did you look at transcripts from the deposition



 1  of Damien Kerr, Mike Blanchette, and Anthony Schwartz?

 2          MR. PARK:  Just for the record, those last two

 3  have not -- those are scheduled for tomorrow.

 4          MR. HUDGINS:  Oh, I'm sorry.  Those are --

 5          MR. PARK:  Blanchette, the two MaxSent people.

 6          MR. HUDGINS:  All right.  Then back up.

 7  BY MR. HUDGINS:

 8      Q.  Damien Kerr, did you look at --

 9      A.  I've looked at portions of his.  I have not read

10  every word of his deposition transcript.  I've kind of

11  skimmed through and looked at various portions of his

12  transcript.

13          MR. HUDGINS:  And the other -- the last two,

14  Blanchette and Schwartz, they are the MaxSent people

15  that we're going to depose tomorrow?

16          MR. SENSENIG:  Yes.

17          MR. HUDGINS:  Okay.  My mistake.

18  BY MR. HUDGINS:

19      Q.  Generally, in your view, why did Ms. Sedar fall

20  down those stairs?

21      A.  I believe she encountered either a loose brick,

22  the joint, or a combination thereof, which caused her to



1  either trip or lose her balance somehow and fall down

2  the stairs.  Based on all the information I've reviewed,

3  I think that is the most likely case.

4      Q.  All right.  And when you say the loose brick,

5  are we talking about the same one that was being toed

6  and jiggled in the video?

7      A.  That's a possibility.  But through the

8  deposition transcript, they've also said that there were

9  other loose bricks up there on that edge.  In the video,

10 Ms. Dibella, because they -- there's a discussion

11 between Major Marks, who's jiggling the bricks, and

12 Mr. Rapanut as far as there's a -- it says something to

13 the -- of, It's just that one, and Ms. Dibella says,

14 There's another loose brick or another one up there.

15      And then Rob Rapanut talks about loose bricks

16 adjacent to the area where the brick that's jiggled by

17 Major Marks in the video.  And Ms. Buchanan talks about

18 other loose bricks in addition to the one that's shown

19 in the video that's jiggled.

20      So based on their testimony that I just received

21 and reviewed, you've got other conditions up there, too,

22 that bring into question not only the stability of the



1  one brick, but you've got other bricks that are also

2  questionable because you've got multiple people talking

3  about other loose bricks.

4      Q.  Okay.

5      A.  So that's why I phrased my comment to, it could

6  be brick or bricks.  We don't know.  But the conditions

7  that are there that shift and move is the most likely

8  scenario.

9      Q.  All right.  Now, you've seen the photographs

10 that were taken on the day of the accident?

11     A.  Yes, sir.

12     Q.  All right.  And they show the -- and there are

13 various perspectives that show the -- all of the bricks,

14 and some of them focus in on, you know, a more narrow

15 range of vision.  Would that be fair to say?

16     A.  Yes.

17     Q.  Are you able to identify the exact point of

18 contact between Ms. Sedar's foot and any one or more of

19 those bricks that may have caused her to fall?

20     A.  No.  There's no photographs that shows

21 Ms. Sedar's foot on any of those bricks.

22     Q.  But my question is, in your opinion, are you



 1   able to identify the precise trip hazard that caused the

 2   fall, if that's your opinion?

 3       A.  No one offers that exact recollection where

 4   they've identified Ms. Sedar's foot in contact with a

 5   specific thing.  All I can identify are the hazards that

 6   are present and the conditions based on the observations

 7   of those other witnesses and the photographs and what I

 8   see and going back to even Ms. Sedar's shoes and the

 9   measurements, all of that together.

10       Q.  And based on our prior discussions, you

11   acknowledge that it was possible that Ms. Sedar stumbled

12   in some other way that didn't involve any of those

13   bricks?

14       A.  That is possible.

15           MR. PARK:  Asked and answered.

16       A.  That is possible.

17   BY MR. HUDGINS:

18       Q.  All right.  And would you agree in terms of

19   Ms. Buchanan that she -- much of her discussion involved

20   Ms. Sedar going down the stairs in an entirely different

21   location than where the jiggly brick in the video was?

22           MR. PARK:  Object to the characterization of the



1   prior testimony in the record.

2       A.  Yes.

3   BY MR. HUDGINS:

4       Q.  All right.  And as far as Mr. Rapanut, he was a

5   little -- he had kind of various scenarios of her going

6   down the stairs; did he not?

7       A.  That's correct.

8       Q.  So based on -- would it be fair to say that

9   based on the totality of the witnesses, we don't know

10  precisely what this -- Ms. Sedar's line of travel was

11  going down those stairs other than where she landed and

12  ended up?

13      A.  The blood is an indication of where she impacts,

14  where she ended up.  They agree that she was on the

15  sidewalk.  I don't -- I can't recall from memory right

16  now how descriptive Mr. Rapanut was as far as her final

17  location versus -- Ms. Buchanan was much more

18  descriptive than he was.

19          At -- in both their testimonies, they've put her

20  in the western-most stairway.  Now, it's a convoluted

21  pattern to get there, and Ms. Buchanan's testimony in

22  that she's first in the middle stairway or stairway



1   section and then later has to readjust based on the

2   orientation of the bloodstain to understand where

3   Ms. Sedar was walking at the time, so that is a bit

4   confusing in looking at -- or reading her deposition

5   transcript.  So --

6       Q.  Did you look at the exhibit to her deposition

7   where she circled the path of travel?

8       A.  I believe I saw a copy of that exhibit where

9   it's further to the left -- or more towards the center

10  stairway section than it is the western-most stairway

11  section.

12      Q.  Where she actually made circles on the path of

13  travel?

14      A.  I believe I saw that.

15      Q.  All right.  Okay.  Now, in your rebuttal opinion

16  letter, you talk about the condition of Ms. Sedar's

17  shoe.

18          Would you agree with me that Ms. Sedar did not

19  discuss any scuffs on her shoe in her deposition?

20      A.  That's correct.

21      Q.  Did you talk with her independently about the

22  shoes or the condition of the shoes before or after the



1   accident?

2       A.  No, I did not.

3       Q.  And so would it be fair to say that you -- your

4   proposed opinion is based solely on the information

5   that's in the transcripts?

6       A.  No.  Because I've raised the question that was

7   asked of Ms. Sedar, and I was given the answer back

8   about this scuff on her right shoe, that she doesn't

9   remember it being there prior to the incident.

10      Q.  And in my recollection -- I was at that

11  deposition -- she doesn't talk about any scuff marks on

12  her shoe.

13      A.  No, she does not talk about that in her

14  deposition.

15      Q.  So where did you go those facts?

16      A.  I asked that question to the attorneys, and that

17  question was asked to Ms. Sedar, and that was the

18  information I was given back.

19      Q.  All right.

20      A.  I did not speak with Ms. Sedar directly.

21      Q.  All right.  So that was secondhand information

22  you got through counsel?



1      A.   That's correct.

2           MR. PARK:   And just for the record, at her

3    deposition, Ms. Sedar was not asked about her shoes.

4           MR. HUDGINS:   Well, we talked about them, and

5    she said what kind of shoes she was wearing and so

6    forth.   But you're correct.   I mean, the subject of

7    scuff marks on the shoes did not come up in her

8    examination.

9    BY MR. HUDGINS:

10     Q.   And I'm just confirming with this witness that

11   you've had no conversations at all directly with

12   Ms. Sedar?

13     A.   That's correct.

14     Q.   All right.   As far as scuff marks on shoes,

15   wouldn't it be a possibility that the scuffing could

16   have happened after the trip or slip during the course

17   of a fall as she's going down the stairs?

18     A.   Can you repeat that?

19     Q.   Well, in other words, if there's a scuff mark on

20   a shoe, we don't have any direct evidence as to what the

21   cause of that scuff mark is, do we?

22     A.   That's correct.   Just the -- all you can tell is



1  the appearance of the scuff, and then you have to rely

2  on the recollection of the owner of the shoes,

3  Ms. Sedar, whether it was there or not.

4      Q.  Right.

5      A.  And then it could have been caused by another

6  impact or instance, yes.

7      Q.  And it -- and it -- for instance, one of a

8  number of possibilities is the shoe could have been

9  scuffed after she fell and when she was in the process

10  of impacting the -- you know, the stairs and the

11  sidewalk?

12      A.  Yes.

13      Q.  Okay.  We just don't know, do we?

14      A.  That's correct.  That is a -- that is a

15  question.

16      Q.  As far as the mechanics, because there are

17  multiple possibilities as to what might have caused this

18  accident, what -- is it your view that she lost her

19  balance because of an unstable brick?  Is that -- does

20  that fairly summarize your --

21      A.  Yes.

22      Q.  -- your --



1          MR. PARK:  Objection.  Asked and answered.

2     A.  Either something threw her balance off, it

3 pitched her forward, and possibly her toe caught in the

4 caulk joint, open caulk joint, or caught on the far side

5 of this concrete.  It could have been just the shifting

6 of the brick under her weight independent of anything

7 else.

8          It could have been the shifting or movement of

9 the brick and in combination of her toe catching the

10 edge of the concrete.  It could have been just her toe

11 catching the edge of the concrete independent of the

12 brick.  So any three of those scenarios are

13 possibilities which caused her to pitch forward.

14 BY MR. HUDGINS:

15     Q.  Well, we've agreed there are other possibilities

16 as well?

17     A.  That's correct.

18     Q.  That the brick might not have been implicated in

19 any of the fall at all?

20          MR. PARK:  Objection.  Asked and answered.

21     A.  That is a possibility.

22 BY MR. HUDGINS:



1    Q.   Okay.  Have you ever held the shoes in your

2   hand?

3    A.   Never held the shoes in my hand.

4    Q.   So you've just seen the pictures that were in

5   the file?

6    A.   That is correct.

7    Q.   Now, as far as the condition of the bricks that

8   factor into your proposed opinion, you don't have an

9   opinion as to how long those conditions may have existed

10   before the time of the accident or not, do you?

11    A.   What do you mean specifically -- or specifically

12   what you say, condition of the bricks?

13    Q.   Let me strike that and start over again because

14   that was confusing phrasing.

15         You have discussed the condition of the brick

16   walkway as it existed on the day of Ms. Sedar's accident

17   that is observable to you through photographs and a

18   video?

19         MR. PARK:  Objection.  Vague as to "the brick

20   walkway."

21   BY MR. HUDGINS:

22    Q.   Well, the top of the stairs.



1      A.  In looking at the area of the photographs, yes,

2   I've drawn certain -- adopt certain observations --

3      Q.  Let's call it --

4      A.  -- and conditions.

5      Q.  Let's call it the area around the jiggly brick,

6   okay?  I think we can all -- you know the area I'm

7   talking about?

8      A.  Yes, sir.

9      Q.  All right.

10          MR. PARK:  I'll just object to the

11   characterization of "jiggly brick."

12   BY MR. HUDGINS:

13      Q.  Is it part of -- well, you were not able to

14   observe that -- those conditions as they existed on the

15   day of Ms. Sedar's accident?

16          MR. PARK:  Objection.  Asked and answered.

17      A.  I have to rely on the photographs and the video

18   that was produced.

19   BY MR. HUDGINS:

20      Q.  All right.  And my question now is that, based

21   on your looking at the photographs, which you rely on in

22   developing your opinion, is it any part of your opinion



1  how long those conditions depicted in the photograph may

2  have existed prior to the time of Ms. Sedar's fall?

3      A.  Yes.

4      Q.  And what is your opinion in that regard?

5      A.  In looking at the sagging of the caulking joint

6  and the adhesion failure, some of the tears that you can

7  see in that caulk joint and how they've separated and

8  pulled away from the brick, that's not an instantaneous

9  occurrence in my experience in dealing with caulk joints

10 in the past throughout my career.  It's progressive

11 failure that happens over time with wear and due to

12 weathering and just normal use.

13      All of those conditions, looking at that, it's

14 at least months that it has been slowly developing and

15 pulling itself away from the bricks in both the concrete

16 and the bricks in its depression and sagging.

17     Q.  All right.  And you weren't able to actually

18 look at the caulk as it existed on the day of the

19 accident?

20     MR. PARK:  Objection.  Asked and answered.

21     A.  I have to rely on the photographs that were

22 provided and taken that day.



1  BY MR. HUDGINS:

2     Q.  So you're looking just at the photographs in

3  drawing that conclusion?

4     A.  Yes.

5     Q.  Now, is it possible that some thing or some

6  process may have created those conditions close in time

7  to the accident?

8     A.  In my experience in construction and engineering

9  design, evaluation and inspection, I've never seen

10  anything that would create that in a short amount of

11  time other than a slow progressive failure that I just

12  described.

13     Q.  Is it possible that some individual altered the

14  conditions at the top of those stairs before the

15  photographs were taken but after the time of Ms. Sedar's

16  fall?

17     A.  I don't know how someone would create all of

18  those conditions that I described.

19     Q.  Well, here's a possibility:  One of her friends

20  trying to be helpful walks up the stairs and shoves

21  their hands and pushes the caulk down.

22     A.  You notice where there's depression in those



1  caulks -- or in the area of the caulk where it's

2  depressed, there's valleys and there's dirt in those

3  valleys.

4        And if you take your fingertip, in my

5  experience -- because this has a -- kind of a waterproof

6  surface on the surface of the caulk.  If you start

7  pushing on that, you start smearing those dirty spots in

8  the caulk, I think you would see that.

9        Also, the adhesion failure that you see on the

10 sidewalk of the concrete and the edge of the bricks,

11 that's not something that's readily done with your

12 finger.  And, also, you get tearings.  You can see tiny

13 little tears in the caulk as it's being pulled, and

14 easily that has to do with expansion and contraction of

15 movement as that's torn.

16        If you -- if you ever tore that caulk joint out

17 or used a scraper or your finger to try and dig it and

18 tear it out, usually you see these nice clean lines

19 where that interface in that tear is immediately

20 apparent because you've got new material that's opened

21 up.  And I didn't see any of those in any of that

22 photograph --



1    Q.  In the photograph?

2    A.  Yes, sir.

3    Q.  All right.  It would have been better to observe

4  the conditions live and onsite immediately after the

5  accident; would it not?

6        MR. PARK:  Objection to the extent --

7  BY MR. HUDGINS:

8    Q.  That would be more --

9        MR. PARK: -- it's unclear as to "better."

10  BY MR. HUDGINS:

11    Q.  Well, you -- it would be a more reliable basis

12  for your opinion if you were able to actually do a

13  physical examination of the conditions as they existed

14  on the date of the accident?

15    A.  If by some miracle I was walking down the street

16  and walked up the second after she tripped and was able

17  to document, view, and look at everything, yeah, that --

18  you don't have to deal with as many variables in

19  reviewing that.

20    Q.  Or the next day or a week later or whatever.  I

21  mean, it would have been -- closer in time, it would

22  have been -- a physical examination would always be a



1   lot better than a photograph; would it not?

2       A.  In doing these inspections, yes, you -- it's

3   always nicer when you're able to do the physical

4   examination of the component or system that you're

5   looking at.  It's -- I don't think there's any

6   investigator or engineer that wouldn't like to be there

7   as soon as possible after something occurs, but --

8   because there's -- there's some things that can change,

9   and you have to weigh that into what you're looking at,

10  and other things don't.  So you use the information

11  that's available.

12          MR. HUDGINS:  All right.  I think just to move

13  things along, I'm going to surrender you to counsel for

14  Ms. Sedar for any cross-examination they might wish to

15  throw at you.  I'd like to reserve so I can talk to

16  Mr. Moriarty briefly in private.

17          MR. PARK:  Sure.

18          MR. HUDGINS:  And then we can decide whether I

19  have any further limited questions.

20          MR. PARK:  All right.

21          MR. SENSENIG:  So do you want to take -- do you

22  want to take a break?



 1         MR. PARK:  Yeah.  Let me confer with

 2  Mr. Sensenig for a couple of minutes.

 3         (A recess was taken.)

 4         MR. HUDGINS:  Okay.  I don't have any further

 5  questions.  Do you have any?

 6         MR. PARK:  We didn't have any questions, either.

 7         MR. HUDGINS:  Okay.  No questions from

 8  Ms. Sedar's counsel.  So I thank you for your

 9  corporation, and...

10         MR. PARK:  I expect you'd like to read and sign?

11         THE WITNESS:  Yes.

12         MR. HUDGINS:  Okay.  The witness would like to

13  read and sign.  We want an expedited copy of the

14  transcript.

15         (Whereupon, at 12:19 p.m., the taking of the

16  instant deposition ceased.)

17         (Holland Exhibit E was marked for

18  identification.)

19

20

21

22



1           CERTIFICATE OF READING AND SIGNING

2           I, _____, the deponent herein,

3    do hereby certify that I have read the foregoing

4    deposition and certify that it is a true and accurate

5    transcription of my testimony given in the

6    above-captioned matter, except for any corrections as

7    noted on the enclosed errata sheet.

8

9

10                                   _____

11

12

13

14

15

16

17

18

19

20

21

22



```
 1                        E-R-R-A-T-A

 2

 3   RE:_____

 4   _____

 5            Enclosed is the transcript of your

 6   deposition testimony.  Please review the transcript,

 7   complete and distribute the signed errata sheet and

 8   acknowledgement page to all parties, including this

 9   office, within 30 days.  Any changes and/or corrections

10   should be listed below and not made upon the transcript

11   itself:

12   PAGE    LINE    CHANGE OR CORRECTION     REASON

13

14

15

16

17

18

19

20

21

22   DATE: _____    SIGNATURE:_____
```



1       CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2       I, Jessica Croxford, Registered Professional

3   Reporter, Certified Court Reporter and Notary Public,

4   the officer before whom the foregoing deposition was

5   taken, do hereby certify that the foregoing transcript

6   is a true and correct record of the testimony given;

7   that said testimony was taken by me stenographically and

8   thereafter reduced to typewriting under my direction;

9   that reading and signing was requested; and that I am

10  neither counsel for, related to, nor employed by any of

11  the parties to this case and have no interest, financial

12  or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set my hand

14  and affixed my notarial seal this 21st day of

15  June, 2019.

16  My commission expires:  May 31, 2021

17

18  

19

20  _____

21  NOTARY PUBLIC IN AND FOR

22  THE COMMONWEALTH OF VIRGINIA



**DANO HOLLAND, P.E.**

**EDUCATION**
Clemson University - Clemson, South Carolina, Bachelor of Science in Civil Engineering 1992

**PROFESSIONAL REGISTRATIONS & AFFILIATIONS**
Professional Engineer Licensed in Virginia, Maryland and Washington D.C
International Institute of Building Enclosure Consultants
National Society of Professional Engineers
International Code Council
National Council of Examiners for Engineers and Surveyors

**CAREER HISTORY**
**Holland Forensic Engineering Group, PLC**, N. Chesterfield, Virginia (2018-Present)
Owner & Lead Forensic Engineer
Conduct structural forensic engineering investigations and provide expert witness testimony for cases involving property damage and the structural integrity of single and multi-family residential structures, office buildings, churches, warehouses, medical facilities, hotels, manufacturing facilities, parking decks, shopping centers, schools, agricultural structures and industrial facilities, as well as water intrusion issues, exterior envelope issues, building code compliance, slip, trip and fall investigations, roofing failures, construction defects, retaining wall failures, construction collapses, floor system issues and water damage evaluation.

**FORCON International – VA, ltd.**, Richmond, Virginia (2004-2018) - Lead Forensic Civil/Structural Engineer

**Industrial Turnaround Corporation**, Chester, Virginia (2002-2004) – Project Manager

**Boozer Lumber Company**, Columbia, South Carolina (2002) - Engineering Manager

**Suitt Construction Company**, Richmond, Virginia (1995-2002) - Project Manager - Asst. Project Manager - Project Engineer

**Tindall Concrete Virginia**, Petersburg, Virginia (1992-1995) - Project Engineer

**PROFESSIONAL EXPERIENCE**

**FORENSIC INVESTIGATION**
• Structural forensic engineering investigation
• Building code and ADA compliance of structures
• Roof assessment and damage investigations
• Cause and origin of water infiltration and the presence of moisture in structures



Holland
Forensic
Engineering
Group, PLC

• Evaluation of construction deficiencies
• Flood damage investigations
• Chimney failures
• Structural assessment of fire damaged structures
• Cracking in masonry and concrete walls
• Timber construction failures
• Retaining wall failures
• Construction collapses
• Water leaks in foundation walls and roofs
• Wind and storm damage investigation
• Structural assessment of damaged buildings
• Evaluation of floor systems
• Water damage investigation
• Construction dispute analysis and assessment
• Evaluation of structures for damage related to earthquakes, ground movement, and
  vibration

**CONSTRUCTION PROJECT MANAGEMENT**
• Responsible for the successful implementation, completion and profitability of projects
  up to seventeen million dollars
• Interpreted contract drawings and specifications to assure that construction conformed
  to applicable design and contract requirements
• Responsible for the overall coordination and management of project services including
  cost control, document control, scheduling, safety, quality control and contract
  administration
• Responsible for daily interaction and coordination with clients/owners
• Supervised and managed project staffs consisting of design consultants,
  superintendents, assistant superintendents, project engineers, site clerks, craft
  foremen and their crews as well all subcontracted labor
• Coordinated the functions of engineers, architects, contractors and client's personnel.
• Managed and reviewed all submittals, shop drawings, change orders, quantity surveys
  and document control
• Developed and maintained CPM construction schedule and monitored project to
  assure adherence with schedule
• Helped develop project engineers and assistant project managers
• Expedited pre-purchased equipment, materials and fabricated items
• Conducted progress and design review meetings
• Practiced daily dispute resolution, claim avoidance and risk management
• Performed client invoicing and managed project cash flow



Holland
Forensic
Engineering
Group, PLC

**DESIGN**
• Designed structural precast concrete systems for parking decks, warehouse, manufacturing, and distribution facilities, food and chemical processing facilities in VA, NC, SC, GA, MD, and DE
• Developed construction drawings for use by internal and external contractors
• Supervised and scheduled assigned drafting staff
• Managed the smooth flow of design information among all internal departments, as well as outside agencies, as it pertained to specific projects
• Served as field engineer on projects and performed initial layout and coordination among general contractor, erection crew, and engineering
• Performed constructability reviews and made recommendations for change
• Monitored and reviewed designs and quality of services
• Addressed engineering concerns and coordinated the remedial repairs requested by clients and outside contractors

**SALES AND ESTIMATING**
• Assisted in sales efforts and presentations of potential projects
• Assisted in proposal development
• Developed and maintained network of subcontractors, vendors and engineers to deliver services
• Estimated and developed costs of prospective projects
• Fostered and developed continuing relationships with established and potential clients
• Developed value engineering alternatives and evaluated associated financial affect
• Developed preliminary project capital budgets for clients

**PURCHASING**
• Developed bid packages, project deliverables, scopes of work and solicited bids
• Drafted and executed subcontracts, purchase orders and change orders
• Assured compliance with required regulations, licenses and insurance coverage
• Negotiated claims and change orders
• Negotiated and awarded subcontracts

1               IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF VIRGINIA

3                       (Alexandria Division)

4       - - - - - - - - - - - - - - -    X

5       CAMILLE SEDAR,                    :

6                       Plaintiff,        :

7               -vs-                      :   CASE NO.

8       BOSTON PROPERTIES, LP, et         :   1:18cv01111 CMH/TCB

9       al.,                              :

10                      Defendants.       :

11      - - - - - - - - - - - - - - -    X

12                              Alexandria, Virginia

13                              Tuesday, June 18, 2019

14      Deposition of:

15                      DANO HOLLAND,

16          a witness, called for examination by counsel for

17      the defendants in the above-entitled matter, pursuant to

18      notice, at 2331 Mill Road, Suite 100, Alexandria,

19      Virginia, beginning at 10:14 a.m., before

20      JESSICA CROXFORD, a Court Reporter and Notary Public in

21      and for the Commonwealth of Virginia at Large, when were

22      present on behalf of the respective parties:

1   International Institute of Building Enclosure

2   Consultants, what is that?

3       A.  It's an organization that was just renamed.  It

4   used to be called RCI, Roof Consultants Institute.  But

5   they've kind of broadened it, so they renamed it.  But

6   it basically deals and roofing, waterproofing in a

7   building, exterior components of -- of buildings to make

8   it weather-tight, kind of building envelope study.

9       Q.  All right.  That group wouldn't have anything to

10  do with surfaces such as the issue involved in this

11  case?

12      A.  Tangential to that are adhesives, caulks,

13  waterproofing materials, things of that nature.

14      Q.  Okay.  The National Society of Professional

15  Engineers seems like it must be a big organization.

16      A.  It is.  It's -- it's across North America, and

17  it's made up of the individual state chapters.  So you

18  have the national association, and then you have the

19  various state chapters up underneath that.

20      Q.  All right.  And that covers all areas of

21  practice in engineering, I would take it?

22      A.  Correct.  Yes.



1    Q.  It's not listed to civil engineers, but that

2    could include industrial engineers and --

3    A.  That's correct.  Yes.  It -- it involves a

4    number of disciplines.  And out of that, you

5    typically -- you can kind of tailor what you like to

6    receive from them as far as whether it be construction

7    or structural or other issues that they'll send you

8    specific to your discipline.  But, no, it has a number

9    of disciplines within it.

10    Q.  Okay.  What is the International Code Council?

11    A.  That's the governing body that was created late

12    '90s, brought in the other national code drafting

13    organizations, uniform code, southern code, the BOCA

14    code.  And they combined them into the International

15    Code Council, and that is the organization that drafts

16    the international building code family:  the maintenance

17    codes, the mechanical codes, plumbing codes, national

18    electric code all belong to -- or are up underneath the

19    umbrella of International Code Council.

20    Q.  All right.  And then, finally, the National

21    Council of Examiners for Engineers and Surveyors?

22    A.  Yes.  They're a -- you can call them a



1  registration and testing arm for engineers, and they're

2  a national registry for engineers to become licensed.

3  You -- and it's an organization that makes it easier to

4  get reciprocity throughout other states.  And so that as

5  you need another license in another state, once you are

6  accepted or submit all your credentials to NCEES and

7  they confirm your education, experience, and background,

8  and work experience, they will act as an intermediary

9  or -- intermediary to state licensing offices.

10      Q.  All right.  Now, I take it that one or more of

11  these different groups that you're affiliated with would

12  be where you turned for CE, continuing education

13  courses?

14      A.  I have received continuing educations courses

15  from -- or as part of all of those with the exception of

16  NCEES.  They don't offer CE.  They pretty much verify

17  the CE and your experience, if that makes sense.

18      Q.  All right.  Given the issues in this case that

19  are reflected in your proposed expert opinion, which of

20  these organizations would be most relevant in terms of

21  information or offerings of continuing education?

22      A.  The most relevant?  To -- and I don't



1   understand -- I guess I don't understand the question.

2       Q.  I mean, as you look at these different groups

3   that you're affiliated with, we've got a case that

4   involves a slip or a trip and fall, and you have

5   opinions as to, you know, what you believe to be the

6   cause of the accident.

7           Would any of these organizations that you're

8   affiliated with offer materials or education that is

9   relevant to your opinions in this case?

10      A.  They all would.

11          (Mr. Sensenig returned to the deposition.)

12  BY MR. HUDGINS:

13      Q.  Can you think of any specifics?

14      A.  Specifics as in course material that they would

15  offer?  The International Code Council offers various

16  courses throughout the year as far as the makeup of the

17  codes and tone of codes, how they're interpreted, how

18  they're applied to building structures and things of

19  that nature.  So that's -- that's a pretty obvious

20  connection between the coursework provided by ICC and

21  this case as far as walking surfaces or building codes

22  and how that's applied.



1          The National Society of Professional

2    Engineers -- same thing -- will offer coursework as far

3    as interpreting codes, maintenance, construction

4    reviews, inspections, how to assess a situation.  There

5    has -- there's a multitude of various options there.

6          And even IIBEC, the same thing.  They will

7    have -- while they're more identify -- or more specific

8    to the building envelope, as I mentioned earlier, they

9    deal a lot with maintenance issues, failure issues with

10   products such as caulking, adherence inspections, things

11   of that nature.

12         So they -- they all have offered or offer

13   continuing education from various aspects of things that

14   could be related to this case.

15     Q.  All right.  Well, let's go on into your career

16   history.  And you're currently with your own company, it

17   looks like, the Holland Forensic Engineering Group?

18     A.  Yes.

19     Q.  And you're located in Chester, Virginia?

20     A.  Chesterfield.

21     Q.  Or Chesterfield.  It's in Chester County, I

22   guess -- or --



1    A.  Chesterfield.

2    Q.  Chesterfield County.

3    A.  Yes, sir.

4    Q.  All right.  You know, as I read the description

5  of the nature of services offered by Holland Forensic,

6  it seems to me that your focus is on structural

7  integrity and property damage issues.  Would that be

8  fair to say?

9    A.  That's one of the services or one of the things

10  that I look at.

11    Q.  How much of your professional services presently

12  is related to opinions in the slip, trip, and fall

13  investigations?

14    A.  This past year?  Over my career?

15    Q.  Well, since you started Holland Forensic.

16    A.  I don't have a catalog of all my -- I don't have

17  a breakdown of all my different cases, but --

18    Q.  Have you in the past rendered expert opinions

19  involving slip, trip, and fall situations?

20    A.  Yes.

21    Q.  You have?

22    A.  Oh, yes.



1      Q.  And can you give me an idea of what percentage

2   of your total work would relate to that category:  slip,

3   trip, and fall?

4      A.  As far as slip, trip, fall, stumble, building

5   code analysis, walkway surface assessment, things of

6   that nature?

7      Q.  Yes, sir.

8      A.  It -- in some years, it may go as high as 20

9   percent of cases.  And that's -- now, my firm, I only

10  opened my firm about a year ago.  And even in that

11  timeframe, the number of slip, trip, and fall cases,

12  walkway assessment cases, it would -- it would be at

13  least 10 percent, and it may be as high as 20 percent.

14  It may be -- it may be slightly higher than that.  I

15  would have to take all my cases, break them down and do

16  the analysis of it.

17     Q.  Would it be fair to say that, based on this

18  resume here, that you are primarily a property damage

19  guy?

20     A.  No, I wouldn't categorize -- based on the

21  other -- I do a lot of property damage.  There's

22  years -- if a storm comes through and you're dealing



 1  with a lot of property damage due to a storm event, like

 2  a hurricane that comes through because -- or even a

 3  flooding event comes through the coast or a nor'easter,

 4  yes, I'll do a -- I'll do a high number of property

 5  damage claims at that time.

 6         But intermixed with that, I'll still have code

 7  review cases; walkway assessment cases; slip, trips, and

 8  falls cases; premises liability cases, so to speak, all

 9  intermixed in that, and --

10     Q.  If you had to say to someone in a social

11  gathering, you know, and they ask you, "What do you do,"

12  what is Holland Forensic best known for in terms of its

13  engineering work?

14         MR. PARK:  Objection.  Compound question.

15  BY MR. HUDGINS:

16     Q.  Do you understand what I'm driving for?  I just

17  want -- give me an idea of, you know, what is it that

18  Holland Forensic concentrates most on in your

19  professional offerings?

20     A.  Typically, I'll deal with construction issues,

21  building component issues, structural integrity issues,

22  and code evaluation of different systems.  What I



1  thereof.  Are they specifically the head of stairs where

2  brick pavers are involved?  No.  So there are --

3      Q.  Is it --

4      A.  And I wish I had a perfect memory --

5      Q.  That's all right.

6      A.  -- where I could recall every single one because

7  I'm trying to tell you as many as I can.

8      Q.  And, listen, I'm not trying to be critical

9  because about it because I understand that your field of

10 practice involves a wide range of engineering issues.

11          And I believe I can fairly summarize your

12 testimony in saying that, you know, safety issues such

13 as involved in this case is a relatively small part of

14 your practice.  Would that be fair to say?

15     A.  I would not consider it small because I do a lot

16 of consulting on the evaluation of walkway surfaces,

17 stairs, ramps, handrails, and those components that are

18 involved in this case, having to evaluate them, rule

19 them out, what's contributory and -- I do -- when I say

20 "a lot," I would -- like I would say, I would -- there's

21 times in a year that they may be a quarter of my

22 practice.



1      Q.   Okay.  I think you said 20 percent at some

2   point --

3      A.   Yeah.

4      Q.   -- but it's a --

5      A.   And it varies.  And I -- and I'm trying to be

6   very truthful and honest with you in your questions.

7   But out of, you know, hundreds of cases a year, 50 or --

8   they all vary.  I do not want to mislead you --

9      Q.   All right.

10     A.   -- but I want you to understand.

11     Q.   How about this question.

12     A.   Okay.

13     Q.   Have you ever had a case where you were asked to

14  render an opinion regarding a brick paver being a trip

15  hazard?

16     A.   I know I've been asked to -- either one or two

17  occasions, a brick paver being a slip hazard.  I know

18  I've been asked to render an opinion based upon tiles,

19  unevenness of tiles being a trip hazard.  I would -- I

20  think there was a walkway involving a brick paver and a

21  trip hazard.  But before I tell you definitely --

22     Q.   And off the top of your --



1     A.  -- I'd have to look back through my cases.

2     Q.  It would be impossible off the top of your head

3  to identify a specific case; is that fair to say?

4     A.  Not without me looking, because they all -- they

5  all run together.  Because I have -- I'll have cases

6  that are construction defect cases that involve hundreds

7  of thousands of dollars worth of pavers and --

8     Q.  Did you ever give any sworn testimony, either in

9  deposition or court, regarding issues involving a brick

10  paver?

11     A.  Bear with me one moment.

12         I recently had a case involving a trip off a

13  brick -- it was a transition between a brick paver

14  sidewalk and a brick paver walkway.  There was a

15  transition there, and there was a fall involving that.

16     Q.  Where was that case?

17     A.  That is number 18 in this record of testimony.

18     Q.  And did you actually appear in court or give a

19  sworn statement in a deposition?

20     A.  I provided a deposition in that case.

21     Q.  Do you remember the name of the lawyer that

22  retained you?



1      A.  John Newby with Tronfeld, West & Durrett out of

2   Richmond.  And the defense was represented by

3   John Merrick of Harman Claytor.

4      Q.  All right.  And you were on the plaintiff's

5   side --

6      A.  Yes.

7      Q.  -- with the Tronfeld firm?

8      A.  Yes, sir.

9      Q.  Did that -- that did go to court or you just

10  testified in a deposition?

11     A.  I testified -- I testified in a deposition, and

12  it did go to court.  I did not testify at court.

13     Q.  Okay.  So you never -- that never got to the

14  point where you were qualified as an expert?

15     A.  Correct.  Yeah.  I provided a deposition, and

16  then the case went on.  So, yeah, I was never -- I never

17  had -- I never had to testify in court for that.

18     Q.  Would this be the first time that -- if you were

19  to be qualified by the Court as an expert, would this be

20  the first time that you would be qualified in a case

21  involving a brick paver?

22     A.  I don't know.  I can't remember because



**Lo, May**

From: mblanchette@MaxSent.com <mblanchette@MaxSent.com>
Sent: Thursday, December 27, 2018 1:44 PM
To: 'Todd A. Pattison' <TPattison@MaxSent.com>; 'Novis, Diane' ████████████████>; 'Micheal

1

HLF00088

REDACTED

Cohrs' <MCohrs@MaxSent.com>; 'Anthony Swartz ' <rtcassistant@maxsent.com>
**Cc:** 'Erinn McDonough ' <EPeloquin@MaxSent.com>
**Subject:** RE: Claim # 6814769 Camille Sedar v. Boston Properties Limited Partnership


Good Afternoon Todd,


On the day of this incident Anthony Swartz and Aloysius Kun responded to the scene as the report indicates. Upon arrival and after the scene cleared Swartz ensured the area was safe and upon inspection did not point out any discrepancies in the bricks or the stairway or identify any trip hazards and it was dry and clear on this particular day ruling out a slip hazard. There were no other incidents prior to or after this particular incident related to this stairway/garage entrance. As a matter of fact It's been the only incident that has occurred at this stairwell or any other stairwells in the green garage since I have been here which goes back to May of 2015. Photo's were not taken and it was reported to Swartz by one of the witnesses at the time of incident that the woman had tripped and fallen down the stairs. Surveillance footage was never captured of this incident as the camera in the area does not pan to this particular location.


It is very common for us to identify and report any particular safety hazards related to trip and falls, slip and falls, lighting hazards, garage, or common area hazards that may cause injury to the general public. I have attached several examples of photos that our staff has taken in the past and reported to BXP management to have them resolved. These types of hazards are not typically resolved immediately so as you can see we would typically put up cones, caution tape, or even barricades in some cases to identify these hazards. Any day that it rains here at the town center cones are placed on the metal grates on the sidewalks by our staff to caution the public of the slippery conditions.   It is also important to understand that the bricks tend to shift during the winter months as the temps drop and BXP is constantly having to have them repaired. You can see examples of this in some of the photos of uneven bricks I have attached.


Please also see the attached weekly and nightly reports that we send out to BXP. These reports include elevator inspections, panic alarm inspections, lighting inspections, and surveillance cameras audit. It's difficult to attach all of them but these reports have been going out to the client since May of 2015. I will have a separate email coming with additional attachments.


Thanks!

Mike Blanchette

2

HLF00089

REDACTED

**-590-**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **CAMILLE SEDAR,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.: 1:18-cv-01111-CMH-TCB** |
| | ) |
| **BOSTON PROPERTIES LIMITED** | ) |
| **PARTNERSHIP, et al.** | ) |
| **Defendants.** | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Camille Sedar ("Ms. Sedar" or "Plaintiff"), by counsel, submits the following in opposition to Defendants' Motion for Summary Judgment.

## I.     INTRODUCTION

Ms. Sedar suffered severe and permanent injuries as a result of a fall that occurred on November 15, 2016, at the Reston Town Center.  In their motion, the Defendants attempt to capitalize on the fact that the fall was so severe that the impact caused Ms. Sedar to lose consciousness and any memory of the fall.  Fortunately for Ms. Sedar, co-workers were traveling behind her and witnessed and documented the incident.

Defendants' Motion for Summary Judgment contains factual inaccuracies, fails to recognize the appropriate evidentiary standard on the proximate cause issue, and ignores the applicable rule of summary judgment whereby all the evidence is viewed in the light most favorable to the non-moving party.  Instead, the Defendants attempt to "muddy the waters" on certain factual issues, which does not advance their cause at the summary judgment stage.

The record clearly supports a finding that (1) a defective condition existed at a point of egress outside of a parking garage owned and operated by the Defendants; (2) the Defendants were

aware or had constructive notice of the defective condition; (3) the defective condition was the proximate cause of Ms. Sedar's fall; and (4) Ms. Sedar suffered significant and permanent injuries as a direct result of their negligence and negligence *per se*.  Accordingly, Defendants' Motion for Summary Judgment must be denied.

## II.    BACKGROUND FACTS

### A.    The Trip To Reston Town Center.

On November 15, 2016, Ms. Sedar and some of her coworkers scheduled a farewell luncheon for a colleague, Major Alan Marks, who was being deployed overseas.  Attached hereto as Exhibit "A," Deposition of Davida Buchanan ("Buchanan"), 9:10-15. Ms. Sedar and her coworkers traveled in two separate vehicles to Reston Town Center ("RTC") where they intended to have lunch at Ted's Bulletin, a restaurant located at RTC (Ex. "A," Buchanan, 10:10-20).

Ms. Sedar drove two of her coworkers, Davida Buchanan ("Ms. Buchanan") and Robert Rapanut ("Mr. Rapanut") to RTC and parked her vehicle in the Green Garage (Ex. "A," Buchanan, 61:21-22).  It is not disputed that the Green Garage was open to the public.[1]   Ms. Buchanan observed Ms. Sedar driving and stated that she did not notice anything unusual about her driving to Reston Town Center (Ex. "A," Buchanan, 61:11-15)..  After parking, Ms. Sedar and her coworkers walked to an interior stairwell and traveled up a staircase to exit out of the Green Garage. (Ex. "A," Buchanan, 61:16-22, 62:1-20; Attached hereto as Exhibit "B," Deposition of Robert Rapanut ("Rapanut" 72:1-18)).  Her coworkers witnessed Ms. Sedar during this time and did not notice anything unusual about her ability to traverse the parking garage and the stairs.  *Id.*  Ms. Sedar hadn't voiced any complaints during this time (Ex. "A," Buchanan, 61:16-18).

---

[1] *See also,* Exhibit "G," Deposition of Anthony Swartz ("Swartz"), 62:1-3.

As they exited the garage, they approached a set of outdoor stairs.  The weather was nice; the ground was dry and devoid of any hazards other than the dangerous condition created by the bricks and caulk. (Ex. "A," Buchanan, 11:8-19, 32:10-19; Attached hereto as Exhibit. "C," Deposition of Camille Sedar ("Sedar"), 20:19-22).  Ms. Sedar was wearing shoes with a flat sole (Ex. "A," Buchanan, 25:7-9, 55:14-16).  As they approached the stairs, Ms. Buchanan and Mr. Rapanut were walking directly behind Ms. Sedar (Ex. "B," Rapanut, 67:15-17).  Mr. Rapanut stated he was approximately an arms-length behind Ms. Sedar. (Ex. "B," Rapanut, 16:14-18).  Ms. Buchanan recalls Ms. Sedar walking a couple steps ahead of her (Ex. "A," Buchanan, 17:5-11).

Ms. Sedar was not speaking with her coworkers, nor was she using her phone (Ex. "A," Buchanan, 52:11-15).  Ms. Sedar was looking straight ahead and was not distracted in any way (Ex. "A," Buchanan, 63:4-64:5).  Ms. Sedar was leading the group as she was the individual who knew where they were going (Ex. "A," Buchanan, 21:2-21).  Only moments later, Ms. Sedar fell to the ground landing face down (Ex. "A," Buchanan, 47:15-18, 84:15-19; Ex "B," Rapanut, 18:19-21, 29:20-30:6, 70:11-17, 71:2-3).

**B.      Ms. Sedar's Fall and the Dangerous Condition.**

Ms. Sedar's sudden fall caused Ms. Buchanan to look to the ground in front of her from where Ms. Sedar had just fallen and noticed an area of the bricks that were not level (Ex. "A," Buchanan, 25:13-18, 26:10-21, 28:4-14, 30:19-32:7).  Again, Ms. Buchanan noticed the bricks because that was the area from which Ms. Sedar had just fallen (Ex. "A," Buchanan, 28:13-14).  Ms. Buchanan avoided that area while going down the stairs to tend to Ms. Sedar, who had been rendered unconscious from the fall (Ex. "A," Buchanan 25:21-26:2).  After tending to Ms. Sedar for a short period, she went straight back up the stairs to further inspect the brick area she noticed immediately after Ms. Sedar's fall (Ex. "A," Buchanan, 26:16-21).  At the very top of the stairs,

3

the bricks were not level and ". . . you could actually press one and it would move [ ]" and "it was like two bricks in that particular area" (Ex. "A," Buchanan, 25:13-16). Ms. Buchanan further explains that "[w]hen she put [her] foot on it, it moved. It was already not level because there was space between the brick and the actual concrete . . . [y]es, there was a gap between it [ ]" (Ex. "A," Buchanan, 31:4-11). Ms. Buchanan also stated that she believed the gap between the brick and concrete was roughly between and "inch, maybe an inch and half" (Ex. "A," Buchanan, 42:14-18).

At that time, she noticed and told Mr. Rapanut and a parking attendant there the same thing, that the bricks were not level and there was that much space between the brick and the actual ground, the step (Ex. "A," Buchanan, 25:9-12, 26:17-21). Mr. Rapanut also witnessed the fall (Ex. "B," Rapanut, 17:8-16). According to him, Ms. Sedar's head was in his view, then it disappeared. *Id.* He heard something audible from Ms. Sedar such as a "grunt" or "small scream" at the time she disappeared from his view, and he then saw the card she was holding going through the air (Ex. "B," Rapanut, 17:10-15, 58:8-13).

Mr. Rapanut also focused on the area of the landing directly in front of where they were walking (Ex. "B," Rapanut, 34:17-22). He has described the loose bricks and how the bricks moved when he placed his feet on them (Ex. "B," Rapanut, 33:15-21). He also noticed that the bricks were not level and weren't flush (Ex. "B," Rapanut, 42:16-22). In the video taken immediately after the fall, Mr. Rapanut can be heard describing what he saw as his co-worker, Major Marks, demonstrates the looseness of the bricks (Ex. "B," Rapanut, 70:1-17; Attached hereto as Exhibit. "D," Video taken by Damien Kerr (Sedar 1297)).

C.     **The Contemporaneous Photographs and Video.**

In addition to the eyewitness testimony,  photographs and video taken by Mr. Kerr evidencing where Ms. Sedar's fall occurred in relation to the dangerous condition and show sizable

4

bloodstains left by Ms. Sedar in relation to the stairs and the dangerous condition.  Attached hereto

as Exhibit "E," Photographs taken by Damien Kerr ("Kerr Photographs")(Sedar 1298-1304).

There were bloodstains at the bottom of the stairs and on the second step.  Attached hereto as

Exhibit "F," Deposition of Karen Dibella ("Dibella"), 19:5-14.

Paramedics soon arrived on the scene, as did security personnel from MaxSent, a security

company with whom the Defendants had contracted (Ex. "G," Swartz, 65:19-66:14).   The

additional coworkers who were also planning to have lunch with Ms. Sedar's group also arrived

very soon after the incident.  Attached hereto as Exhibit "H," Deposition of Damien Kerr ("Kerr"),

12:9-17.  One such individual was Damien Kerr.  *Id.*  Mr. Kerr and his group arrived at about the

same time the ambulance arrived.  *Id.*

Mr. Kerr took photographs and a video of the area (Ex. "H," Kerr, 25:11-14, 30:5-16).

Contrary to Defendants' assertion that the photographs and video were taken sometime later in the

day, Mr. Kerr testified that he took the photographs and video very soon after his arrival and *prior*

to going to lunch (Ex. "H," Kerr, 30:5-16, 38:5-12; Ex "E," Kerr Photographs (Sedar 1298-1304)).

Indeed, the photographs depict a security guard with a walkie talkie who was still on the

scene and a bag from a paramedics who was still on the scene of the incident when the pictures

were taken (Ex. "F," Dibella, 32:1-10; Ex. "E," Kerr Photographs, Sedar 1304).

**D.     Ms. Sedar's Injuries.**

Ms. Sedar was transported to the hospital where she endured multiple surgeries on her right

arm.  Ms. Sedar suffered serious and permanent injuries, including lacerations to head and face,

concussion and post-concussive syndrome, and multipleinjuries to her right arm and elbow,

including complex radial head and ulna fractures, elbow dislocation, and lateral collateral ligament

damage.   Attached hereto as Exhibit "I," John A. Bruno, Jr., M.D. Expert Report

(4/14/19)("Bruno").[2]  Ms. Sedar noticed a significant scuff mark on the tip of her right shoe that

had not been present before the incident.  Attached hereto as Exhibit "J," Affidavit of Camille

Sedar ("Affidavit"), at ¶ 6.  Ms. Sedar took her shoes home, placed them in a shoe bag in her closet,

and has not worn them since that time. (Ex. "J," Affidavit, at ¶ 9).

     **E.**     **Expert Testimony on the Dangerous Condition, Notice and Proximate Cause.**

     Mr. Holland, an engineer with expertise in construction, construction code requirements,

structural engineering, and building materials, among other things, has offered expert opinions that

the condition constituted a defective and dangerous condition that violated numerous building code

requirements relating to a place of egress and exterior stairs.  Attached hereto as Exhibit "K,"

Holland Expert Report (4/11/2019); Holland Affidavit ("Initial Report") at p. 4.  Mr. Holland also

provided expert testimony concerning the brick and caulk materials, the breakdown of these

materials over time due to weather, normal use and other factors, and that due to the process of the

breakdown over time reasonable inspections would have revealed the dangerous condition.

Attached hereto as Exhibit "L," Deposition of Dano Holland ("Holland"), 81:4-16; 82:5-12.  Mr.

Holland also opines that the dangerous condition most likely caused her fall (Ex. "K," Initial

Report at 4).

     **F.**     **The Defendants' Failure To Inspect the Property.**

     The Defendants did not have ***any*** employees or agents in place to proactively inspect the

property for such defects.  Attached hereto as Exhibit "M," Deposition of Michael Blanchette

("Blanchette"), 63:8-20.  The Defendants contracted with MaxSent to perform certain services,

---

[2] The severity of Ms. Sedar's injuries are relevant here not only as background information concerning the case but also in connection with the Defendants' failure to properly investigate the matter given the serious nature of her injuries.  A reasonable inference can be drawn that documentation of such an investigation would not be favorable to the Defendants.

such as security services, but not to proactively inspect the property for defects.  *Id.*  Michael

Blanchette ("Mr. Blanchette"), who was in charge of the MaxSent department that worked at

Reston Town Center (Ex. "M," Blanchette, 21:4-9) testified that while MaxSent was required to

report any defects in happened to observe, it had no affirmative duty to inspect the property for

defects (Ex. "M," Blanchette, 63:8-20).  In addition, Mr. Blanchette acknowledged that "the bricks

tend to shift during winter months as the temps drop and [Boston Properties] is constantly having

to have them repaired."   Attached hereto as Exhibit "N," M. Blanchette Email to MaxSent

(12/27/18).  Despite notice of these types of conditions, the Defendants did not contract with or

employ anyone to proactively inspect the property at any time despite their duty to do so.  (Ex.

"M," Blanchette 63:8-20).  As stated by Mr. Holland, reasonable inspections should have revealed

the dangerous condition (Ex. "K," Initial Report at p. 4).

>G.    **The Defendants Failure to Properly Investigate the Incident.**

The recorded investigation done by the Defendants and their agent, MaxSent, is

suspiciously lacking considering that MaxSent knew Ms. Sedar had lost consciousness, had severe

bleeding, was transported by ambulance to Reston Hospital, and left significant bloodstains on the

stairs and walkway.[3]   Attached hereto as Exhibit "O," MaxSent Incident Report ("Incident

Report"); Ex. "E," Kerr Photographs, Sedar 1300, 1302-1303.  The incident report contains no

witness statements or photographs (Block "Photographs Taken" is checked "No") (Ex. "O,"

MaxSent Incident Report; Ex. "G," Swartz, 77:12-20).   Ms. Buchanan testified that as she was

initially tending to Ms. Sedar a witness stated to her that she had called an ambulance and that she

---

[3] MaxSent didn't even notify the Defendants of the incident until April, 2018 (Ex. "P," Hogan, 77:2-79:2).

"saw everything" Ex. "A," Buchanan, 24:9-13).  MaxSent either neglected to speak to this witness who saw everything or failed to record the substance of that conversation.

### H.      The Defendants Contradictory Testimony Concerning Video Surveillence.

Defendants' testimony concerning the use of video surveillance is also very troubling. Defendants' corporate representative, Denise Hogan testified that they did not use video surveillance at Reston Town Center in 2016 (when the incident occurred), including the area where the fall occurred.  Attached hereto as Exhibit "P," Deposition of Denise Hogan ("Hogan"), 72:1-18.  Mr. Blanchette, head of the MaxSent security department, contradicts the Defendants' assertion testifying that video surveillance cameras were in place and working at the Green Garage where the incident occurred at the time of the incident but stated that the cameras were not trained on the location of the fall (Ex. "M," Blanchette, 49:20-50:4).  Mr. Swartz, the MaxSent employee who investigated the incident, agreed that video surveillance was in place at the Green Garage at the time of the incident (Ex. "G," Swartz, 42:20-43:3).  However, Mr. Swartz contradicts Mr. Blanchette when he testified that the video surveillance included a sweep of the area where Ms. Sedar fell.  *Id.*  He stated he reviewed the videotape as part of his investigation but could not recall whether the surveillance video captured the fall because "there were multiple trips-and-falls that I had watched" (Ex. "G," Swartz, 112:1-19).

### III.     LIST OF DISPUTED MATERIAL FACTS

Plaintiff identifies the following material facts which are genuinely in dispute.

1.      A dangerous condition existed. (Defendants' paragraphs 20, 28)[4] (Ex. "A," Buchanan, 25:13-18, 26:10-21, 28:4-14, 30:19-32:7, 25:21-26:2, 26:16-21, 31:4-11, 42:14-18,

---

[4] In paragraph herein, Plaintiff has identified the paragraphs in Defendants' Statement of Material Facts which Plaintiff asserts a genuine material dispute does exist and, thus, disputes the statements in each of these paragraphs.

25:9-12; Ex. "B," Rapanut, 17:8-16, 17:10-15, 58:8-13, 34:17-22, 33:15-21, 42:16-22, 70:1-17,

18:19-21, 16:14-18; Ex. "E," Kerr Photographs (Sedar 1298-1304); Ex. "D," Kerr Video (Sedar

1297); Ex. "K," Initial Report; Ex. "Q," Rebuttal Report; Ex. "H" Kerr, 30:5-16, 38:5-12; Ex. "G,"

Swartz, 70:16-71:2, 74:17-75-7).

     2.     The proximate cause of Ms. Sedar's fall was the dangerous condition.. (Defendants'

paragraphs 4, 13 and 27) (Ex. "A," Buchanan, 25:9-12, 25:13-18, 25:21-26:2, 26:10-21, 28:4-14,

30:19-32:7, 31:4-11, 32:10-19, 32:20-33:5, 42:14-18);Ex. "B," Rapanut, 17:8-16, 17:10-15; 58:8-

13, 34:17-22, 33:15-21; 42:16-22, 70:1-17, 18:19-21, 16:14-18);Ex. "E" Kerr Photographs (Sedar

1298-1304); Ex. "D," Kerr Video (Sedar 1297); Ex. "K," Initial Report); Ex. "Q," Rebuttal

Report); Ex. "H," Kerr 30:5-16, 38:5-12); Ex. "G," Swartz 74:17-21; Ex. "J," Sedar Aff. ¶ 6-7).

     3.     The Defendants' had prior notice of the dangerous condition and of other incidents

at that location.  (Defendants' paragraphs 29, 30, 33 and 36);Ex. "G," Swartz, 70:17-22, 71;1-2,

74:19-22, 75:1-7; Ex. "K," Initial Report; Ex. "N," Blanchette Email; Ex. "Q" Rebuttal Report);

Ex. "E,"Kerr Photographs (Sedar 1298-1304); Ex. "D," Kerr Video (Sedar 1297); Ex. "G," Swartz,

74:17-21, 70:16-71:2).

     4.     There were eyewitnesses to Ms. Sedar's fall. (Defendants' paragraph 15)(Ex. "A,"

Buchanan, 25:13-18, 26:10-21, 28:4-14, 30:19-32:7, 25:21-26:2, 26: 16-21, 31:4-11, 42:14-18,

25:9-12; Ex. "B," Rapanut, 17:8-16, 17:10-15, 58:8-13, 34:17-22, 33:15-21, 42:16-22, 70:1-17,

18:19-21, 16:14-18).

     5.     The record evidences Ms. Sedar's path of travel. (Defendants' paragraph 16)(Ex.

"A" Buchanan, 72:11-74:6; Attached hereto as Exhibit "S,": Exhibit B to Buchanan Depo.; Ex.

"A," Buchanan, 73:l -74: 6; Ex. "S," Exhibit B to Buchanan Depo; Ex "R," Exhibit G to Buchanan

Dep.; Ex. "E," Kerr Photographs (Sedar 1300, 1302-1303); Ex. "B," Rapanut, 70:1-17; Ex. "D," Kerr Video).

6.      Ms. Sedar's coworkers identified the dangerous condition and documented the dangerous condition immediately after her fall, and the photographs and video were taken prior to her coworkers leaving the scene. (Defendants' paragraph 24)(Ex. "A," Buchanan, 25:13-18, 26:10-21, 28:4-14, 30:19-32:7, 25:21-26:2, , 31:4-11, 42:14-18; 25:9-12; Ex. "B," Rapanut 17:8-16, 17:10-15, 58:8-13, 34:17-22, 33:15-21, 42:16-22, 70:1-17, 18:19-21, 16:14-18; Ex. "E" Kerr Photographs (Sedar 1298-1304); Ex. "D," Kerr Video (Sedar 1297); Ex. "H," Kerr, 30:5-16, 38:5-12).

7.      There were multiple loose bricks. (Defendants' paragraph 25)(Ex. "A," Buchanan, 25:13-16; Ex. "B," Rapanut 33:15-2; Ex. "H," Kerr, 14:13-22).

8.      RTC had video surveillance of the area and may have captured the fall on video. (Defendants' paragraphs 31 and 32)(Ex. "G," Swartz, 53:10-18, 42:20-22, 43:1-3114:14-20).

9.      MaxSent was not responsible for inspecting the property for dangerous condition such as the condition that caused Ms. Sedar's injuries nor did MaxSent make regular patrols to inspect for such condition.  There is no evidence the Defendants or their agents performed any such inspections. (Defendants' paragraphs 2, 34 and 35)  (Ex. "N," Blanchette, 21:4-10, 63:8-20).

10.     Plaintiff disputes the size of the photo being carried by Ms. Sedar. (Defendants' paragraph 11)(Ex. "B," Rapanut, 4:12-14; Ex. "A," Buchanan, 53:13-14).

## IV.     ARGUMENT

### A.     Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, an award of summary judgment is appropriate only "if the movant shows that there is no genuine issue of any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  All evidence must be construed in the light most favorable to the party opposing summary judgment.  *See Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 255 (1986).  When reviewing a summary judgment motion, a court "must draw all justifiable inferences in favor of the nonmoving party." *Id.*

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Id.*  Rule 56(e) requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial through its own affidavits, or by the depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In this case, a genuine dispute exists as to whether a dangerous and defective condition existed at the Green Garage in Reston Town Center, whether the Defendants had actual or constructive notice of the dangerous and defective condition, and whether the dangerous and defective condition was the proximate cause of Ms. Sedar's fall and injuries.

### B.     The Record Supports a Finding of Negligence and Negligence *Per Se*.

The Defendants acknowledge they are the owner and manager of the property at issue. Defendants' Statement of Material Facts to Which There is No Genuine Issue, Dkt. No. 46, at 1. The incident occurred at the Green Garage, which was open to the public, at Reston Town Center around mid-day (Ex. "A," Buchanan, 9:10-10:12; 61:21-22; Ex. "G," Swartz, 62:1-3).  Thus, the

Defendants had a duty to maintain the premises in a reasonably safe manner and to warn invitees of any hidden dangers. *Amos v. NationsBank, N.A.*, 504 S.E.2d 365, 366 (Va. 1998); *See also Sons v. Basham*, 100 S. E. 813, 815 (Va. 1919)(invitee status when a visit onto another's property is of common interest or mutual advantage). Moreover, a property owner must use "ordinary care to render the premises reasonably safe for the invitee's visit." *Cerquera v. Supervalue, Inc.*, 715 F.Supp.2d 682, 686 (E.D. Va., 2010) (citing *Holcombe v. NationsBanc Financial Services,* 248 Va. 445, 447, (Va. 1994)). The landowner must inspect his property and subsequently either repair or warn of hidden dangers and defects of which the owner knows or should know but of which the invitee does not and could not reasonably know. *Trimyer v. Norfolk Tallow Co.*, 66 S.E.2d 441, 443-44 (Va. 1951). To impose liability for an injury, a "dangerous condition must have been known to the owner or occupant of the establishment, or have existed for such a length of time as to make it the defendant's duty in the exercise of ordinary care to have discovered it." *Miracle Mart. Inc. v. Webb*, 137 S.E.2d 887, 890 (Va. 1964).

To successfully apply the doctrine of negligence *per se*, a party must show that (1) the opposing party violated a statute enacted for public safety, (2) the party seeking to rely on negligence per se was a member of the class of persons intended to be protected by that statute, (3) the harm the proponent experienced was of the type the statute was designed to protected against, and (4) the statutory violation was the proximate cause of the proponent's injury. *Schlimmer v. Poverty Hunt Club* 597 S.E.2d 43, 46 (Va. 2004). Whether there was a violation of the statute and whether the violation was the proximate cause of the injury are issues for the trier of fact. *McGuire v. Hodges*, 639 S.E.2d 284, 288 (Va. 2007) (internal citations omitted). "The violation of the [Uniform Statewide] Building Code, like any statute enacted to protect health,

12

safety, and welfare, is negligence *per se*." *MacCoy v. Colony House Builders, Inc.*, 387 S.E.2d 760, 763 (Va. 1990).

### 1. A Dangerous Condition Existed at the Green Garage where Ms. Sedar fell.

The existence of the dangerous and defective condition is supported by a number of pieces of evidence in the record, including the testimony of eyewitnesses, photographs of the scene taken immediately after the incident, a video of the scene taken immediately after the accident, which includes audio statements of eyewitnesses describing just minutes after the incident what they observed, and by the expert testimony of Mr. Holland.

As set forth in the factual background above, the testimony of Mr. Kerr, Ms. Buchanan and Mr. Rapanut concerning their observations of the area immediately after the fall also evidence the defective condition. For example, Ms. Buchanan described the condition in detail and testified that the gap between the brick and the concrete was "about an inch, maybe an inch and a half" (Ex. "A," Buchanan, 42:14-18). Ms. Buchanan identified two loose bricks that were side-by-side (Ex. "A," Buchanan, 30:19-21).

Mr. Rapanut described the loose bricks and how the bricks moved when he placed his feet on them (Ex. "B," Rapanut, 33:15-21). He also noticed that the bricks were not level and weren't flush (Ex. "B," Rapanut, 42:16-22). Mr. Kerr testified about the bricks that were "out of place" and that he told someone with a walkie-talkie that the condition "seemed to be a tripping hazard" and said they should put some caution tape in the area (Ex. "H," Kerr, 14:13-22).

The photographic evidence clearly shows the gaps in the bricks, the sagging caulk, the exposed lip of concrete, and the unevenness of the bricks (Ex. "E," Kerr Photographs (Sedar 1298-1301, 1304). Similarly, the video evidences the looseness of the brick (Ex. "D," Kerr Video). Ms.

13

Buchanan testified that the photographs accurately depict the condition of the bricks as they existed at the time of the incident (Exhibit "A," Buchanan, 69:22-70:10, 74:10-22).  Mr. Swartz, the MaxSent employee, also testified that the photographs taken immediately after the accident accurately reflect the condition as it existed at that time (Ex. "G," Swartz, 101:8-106:15; Attached hereto as Exhibit "T," Exhibits 7-11 to Swartz Depo.).

Contrary to Defendants' assertion, the photographs were taken immediately after the incident before the individuals went to lunch. Mr. Kerr, who took the photographs and video, testified the photographs and video were taken very soon after his arrival, after Ms. Sedar was loaded into the ambulance and *prior* to going to lunch (Ex. "H," Kerr, 30:5-16).   Mr. Kerr also testified that he took the video prior to going to the restaurant (Ex. "H," Kerr, 38:5-12).

Q:	Did you take these photographs before or after you went to the restaurant?

A:	***Before we went to the restaurant***, after the ambulance.

	Can I correct that?

Q:	Sure, if you want to.

A:	After Ms. Sedar was loaded into the ambulance.

Q:	How long would you say – how much time had elapsed from when you arrived on the scene to when you took these photographs?

A:	When I arrived on the scene and when I took these photographs? Approximately 15 minutes.

Ex. "H," Kerr, 30:5-16 (emphasis added).

Q:	Mr. Kerr, I asked you when you took the photographs:  Did you take the video before or after you went to the restaurant?

A:	The video.  Photographs were first; then the video; then the restaurant.

Ex. "H," Kerr, 38:5-9; Ex. "F," Dibella, 17:16-18:14).

Plaintiff has also offered expert testimony concerning the existence of a dangerous condition.  Mr. Holland has opined that the condition that existed at the time of the incident was defective and violated several building code requirements.  The area where the fall occurred was "in the exit discharge" of the garage.  (Ex. "K," Initial Report, at p. 3).  As detailed in Mr. Holland's initial expert report, the BOCA code specifically addresses requirements for egress areas from buildings and the treads and landings of a stairway (Ex. "K," Initial Report, at p. 3).  The code "even directs how small elevation changes in the means of egress should be addressed."  *Id.*  Mr. Holland's testimony concerning the building code violations supports Plaintiff's negligence and negligence *per se* claims.

The building code requirements addressed by Mr. Holland are for the safety of the invitees, such as Ms. Sedar  (Ex. "K," Initial Report, at p. 3.   "The intent of these code sections is that a safe walking surface be provided in the means of egress to guard against someone tripping, slipping or losing their balance and falling" (Ex. "K," Initial Report, at p. 3).   Mr. Holland also states that the area was in violation of the Virginia Uniform Statewide Building Code because it is an exterior stair located on the means of egress.  *Id.*  In concluding that the condition was defective and dangerous and in violation of the building codes, Mr. Holland states that the loose, unstable and uneven bricks were located adjacent to a large open caulk joint that measures approximately 1 ½" wide.  Attached hereto as Exhibit "Q," Holland Rebuttal Report (05/30/2019) Holland Affidavit ("Rebuttal Report"), at p. 3.   Finally, Mr. Holland states that the "large open gap adjacent to the loose brick likely creates a trip hazard as the front edge of the brick shifted downward."  Ex. "Q," at p. 2.

As Mr. Holland's testimony highlights, this is not a case where someone fell on a sidewalk such as one maintained by a municipality.  Defendants' reliance on *Jones v. Wash. Metro Area*

*Transit Auth.*, 378 F.Supp.2d 718 (E.D.Va. 2005) is of little or no relevance to the matter before the Court. First, the *Jones* Court focused its analysis on whether the defendant owed a heightened duty – more than ordinary care – to the plaintiff because the defendant is a "common carrier." *Id*. Second, and importantly, the "one inch or less" gap at issue briefly mentioned in *Jones* was in a sidewalk maintained by the defendant without any discussion or reference to the record.[5] *Id.* at 724.

**The matter before the Court is not a "sidewalk" case.** Ms. Sedar's fall took place at the top of stairs that are part of the exit discharge of the building and covered by the relevant building codes unlike a municipality's sidewalk which falls in the public way outside the building code's jurisdiction. Ex. "U," 2012 Virginia Uniform Statewide Building Code at pp. 2-3. Logically, and as noted by Mr. Holland in his expert report, exterior stairways need to be maintained differently from a flat sidewalk area due to the greater risk of harm that would be caused by a trip at the top of stairs versus stumbling on a flat sidewalk. Ex. "Q," Rebuttal Report, at p. 1) ("Further, loose walkway components such as these bricks which make up the upper landing for this stairway are of greater hazard because of their location. If the loose bricks cause a stumble, instability or misstep to occur on this top landing, the person has no flat "recovery area" and is immediately confronted with the stairs.").

At best, Mr. Swartz's testimony that he inspected the area and did not identify any dangerous condition merely creates a factual dispute concerning the existence of a defect when there are at least four other witnesses who have testified that they saw the defect and dangerous condition immediately following Ms. Sedar's fall. Moreover, there is no evidence that Mr. Swartz

---

[5] Nevertheless, there is testimony by Ms. Buchanan that the gap was an inch maybe an inch and a half (Ex. "A," Buchanan, 42:14-18).

had any training in inspecting the premises for dangerous conditions. And, as evidenced by Mr. Blanchette's testimony, MaxSent didn't have any duty to perform inspections of the brick sidewalks.

Finally, Defendants' cite to a photograph labeled Exhibit "I" and represent that the "photos taken immediately after the fall" make it clear there was no violation of their duty of care. Defendants' MSJ Memo at p. 6-7. Defendants do not identify when it was taken. Exhibit I does not focus on the area where the dangerous condition occurred but instead is a wide-angle view of the area from a significant distance.

Plaintiff has cited to evidence in the record sufficient to support a finding that a dangerous condition existed, including photographs, video, eyewitness testimony, and expert testimony.

### 2. *The Defendants had Notice of the Dangerous Condition.*

There is sufficient evidence to support a finding that the Defendants' knew, or in the exercise of ordinary care should have known, that the dangerous condition existed and should have repaired the area. Mr. Holland has opined that the defective condition of the bricks and caulk at the time of the incident, as evidenced by photographs and video taken immediately after Ms. Sedar's fall, had existed for a significant amount of time and should have been discovered through reasonable inspections (Ex. "K," Initial Report, at p. 4). More specifically, Mr. Holland opined that "[t]he sagging and deteriorated caulk joint immediately adjacent to the loose brick paver would have been visible during routine maintenance inspections and activities." *Id.* "Closer inspection of the caulk joint failure should have alerted maintenance personnel to the unlevel and loose brick paver which contributed to Ms. Sedar's fall." *Id.*[6] Mr. Holland further states that "these conditions

---

[6] Defendants have filed a Motion to Exclude Mr. Holland's testimony. However, the motion focuses on his causation opinion and does not provide any argument for excluding his opinions

17

did not develop overnight but were formed over at least several months."  (Ex. "Q," Rebuttal

Report, at pp. 2-3).  Mr. Holland discusses the "sagging of the caulk joint and the adhesion failure"

along with "tears that you can see in that caulk joint" that evidence the fact that the condition has

existed over "at least months." (Ex. "L," Holland 81:5-16, 82:5-12).

   The Defendants also knew the condition of the bricks used at RTC deteriorated over time

through Mr. Blanchette of MaxSent, the Defendants' agent.  According to Mr. Blanchette, "the

bricks tend to shift during winter months as the temps drop and [Boston Properties] is constantly

having to have them repaired." (Ex. "N," Blanchette Email).  It is the Defendants' position that

MaxSent was responsible for inspections.  Therefore, not only does Mr. Blanchette concede that

Boston Properties knew of the issues with bricks, but his knowledge is imputed to the Defendants'

thus providing further evidence of notice.

   Finally, Mr. Swartz testified that he had actual knowledge of the condition prior to Ms.

Sedar's fall.

> Q: I can show you some other pictures.
>
> A: Coming out of this garage I myself have almost tripped on the stairwell a thousand times just because of the layout of this entrance.
>
> Q: Over what did you almost trip?
>
> A: Either the brick or the step itself.
>
> Q: And would that include times prior to Ms. Sedar's fall?
>
> A: Yes.

Ex. "G," Swartz, 70:16-71:2.

---

regarding the defective and dangerous condition, code violations or this opinion concerning
constructive notice.

18

Significantly, the Defendants' evidence has not identified any policies or procedures in place for the inspection of the premises for dangerous conditions, nor did they or anyone on their behalf perform inspections of the property for dangerous conditions. The landowner must inspect his property and subsequently either repair or warn of hidden dangers and defects of which the owner knows or should know but of which the invitee does not and could not reasonably know. *Trimyer,* 66 S.E.2d at 443-44. The Defendants failed to comply with this duty.

Defendants assert that they contracted with MaxSent to "ensure that the property was maintained." Memorandum in Support at p. 7. However, according to Michael Blanchette, the individual who supervised the MaxSent security personnel in charge of the area, MaxSent had no such duty to inspect (Ex. "M," Blanchette, 63:8-20). MaxSent's responsibility was to notify the Defendants if it happened to discovered any defects on the property, but not to affirmatively inspect for potentially dangerous conditions or safety hazards. *Id.*

> Q:   It's part of the responsibility of MaxSent to make inspections of the brick sidewalks and surfaces around [Reston] Town Center, is it not?
>
> A:   It is not.
>
> Q:   It is not?
>
> A:   It is not our primary responsibility, no. It is our responsibility is to point it out should we see uneven bricks or safety hazards, but it's not a documented inspection. So within our patrols if we would see something that is out of place or a hazard, it's our responsibility to point that out. But it is not, as I said, a documented inspection as we provide these other inspections that we include.

*Id.*

Even though MaxSent performs other inspections for the Defendants, MaxSent had no duty to inspect for dangerous conditions on the bricks, stairs, and walkways of the premises. The Defendants have not and cannot point to any evidence of any other individual or entity who had such a duty. In addition, MaxSent appears to be a security company, and there is no evidence that

their employees assigned to the property had any experience, expertise, or training on identifying

dangerous structural defects such as conditions that would be in violation of the building codes.

The Defendants' actual or constructive notice of the alleged dangerous condition is

supported by expert testimony, the testimony of the MaxSent employees, and the Defendants

failure to inspect the premises for dangerous conditions and safety hazards.

3. ***The only reasonable conclusion that can be drawn from the evidence is that the dangerous condition was the proximate cause of Ms. Sedar's fall.***

In the premises liability context, as the Defendants note in their brief, the plaintiff must

establish that the unsafe condition of which he complains was the proximate cause of his injury.

*See Roll 'R' Way Rinks, Inc. v. Smith*, 237 S.E.2d 157, 162 (Va. 1977). While evidence supporting

proximate cause need not be scientifically exact, it "must be sufficient to remove the case out of

the realm of speculation and conjecture and into the realm of legitimate inference before submitting

it to a jury for its determination." *Blacka v. James*, 139 S.E.2d 47, 50 (Va. 1964).  Generally, the

question of proximate cause is to be determined by the trier of fact.  *Brown v. Koulizakis,* 331

S.E.2d 440, 445 (Va. 1985)).   Facts establishing proximate cause "need not be proved by *direct*

evidence, but instead, may be established by *circumstantial* evidence." *Fobbs v. Webb Building*

*Limited Partnership*, 349 S.E.2d 355, 357 (Va. 1986)(emphasis added).

The evidence supports a finding that the dangerous condition caused Ms. Sedar's fall.

While none of the witnesses saw Ms. Sedar's foot in contact with the bricks, this direct evidence

is the only piece of evidence missing and, as Virginia law states, such direct evidence is not

required to establish causation and a jury amy draw reasonable inferences and deductions.  *Id*.  In

addition, Plaintiff does not need to disprove the possibility of every other cause.  *Northern Virginia*

*Power Co. v. Bailey*, 73 S.E.2d 425, 429 (Va. 1952).

20

Ms. Sedar drove two of her coworkers, Davida Buchanan ("Ms. Buchanan") and Robert Rapanut ("Mr. Rapanut") to RTC and parked her vehicle in the Green Garage (Ex. "A," 61:21-22).  The drive from work to the Green Garage covered a couple miles (Ex. "C," Sedar 31:12-17). Ms. Buchanan observed Ms. Sedar driving and stated she did not notice anything unusual about her during the drive (Ex. "A," Buchanan, 61:16-22, 62:1-20).  After she parked the car, Ms. Sedar and her coworkers walked to an interior stairwell and traveled up a staircase (Ex. "B," Rapanut, 10:15-18).  Again, her coworkers witnessed Ms. Sedar during this time and did not notice anything unusual about her ability to traverse the parking garage and the stairs (Ex. "A," Buchanan, 61:16-22, 62:1-20; Exhibit "B," Rapanut, 72:5-18).

Ms. Buchanan and Mr. Rapanut were walking behind Ms. Sedar just prior to the fall. As they exited the garage, they approached a set of outdoor stairs.  The weather was nice and the ground was dry (Ex. "A," Buchanan, 11:8-19, 32:10-19).  Ms. Sedar was wearing shoes with a flat, rubber sole (Ex. "A," Buchanan, 55:14-20).  As they approached the stairs, Ms. Buchanan and Mr. Rapanut were walking behind Ms. Sedar (Ex. "A," Buchanan, 17:5-11; Ex. "B," Rapanut 67:15-17; 16:14-18 ).  Mr. Rapanut stated he was approximately an arms-length behind Ms. Sedar (Ex. "B," Rapanut, 16:14-18).

Ms. Sedar was not speaking with her coworkers nor was she using her phone (Ex. "A," Buchanan, 52:11-15).  Ms. Sedar was looking forward and was not distracted in any way (Ex. "A," Buchanan, 63:4-64:5).  Ms. Sedar was leading the way as she was the individual who knew where they were going (Ex. "A," Buchanan, 21:2-21).  Ms. Sedar had no history of blacking out or falling or any other relevant medical issues (Ex. "J," Sedar Aff., ¶ 10).  Ms. Sedar was not experiencing any medical issues that morning and was feeling fine (Ex. "J," Sedar Aff., ¶ 10).

21

Ms. Sedar fell to the ground landing face down (Ex. "A," Buchanan, 47:15-18, 84:15-19; Ex "B," Rapanut, 18:19-21, 29:20-30:6, 70:11-17, 71:2-3).[7]  Ms. Buchanan, who was behind Ms. Sedar saw Ms. Sedar's fall causing her to look to the ground in front of her where Ms. Sedar had fallen from and she noticed an area of the bricks that was not level (Ex. "A," Buchanan, 25:13-18, 26:10-21, 28:4-14, 30:19-32:7).  Ms. Buchanan noticed the bricks because that was the area from which Ms. Sedar had just fallen (Ex. "A," Buchanan, 28:13-14).  She avoided that area while going down the stairs and tended to Ms. Sedar.   Importantly, Ms. Buchanan also clearly identified the defective condition as the location from which Ms. Sedar fell.

> Q:     My question is when you came out with Ron [sic] and you're talking to Ron [sic] and you looked and you saw Ms. Sedar on the ground, and your first instinct was to go help her.  Is that fair to say?
>
> A:     My first instinct was to help her, but I also noticed that the level of the bricks before I actually - - that's why I went to the side and didn't follow the same path.
>
> Q:     So you noticed there was a problem with some bricks?
>
> A:     Yes, I did.
>
> Q:     Were they obvious to you that there was an issue there?
>
> A:     They were obvious to me because ***that was the area that she had just fallen from.***

Ex. "A," Buchanan, 27:22 – 28:14 (emphasis added).

Ms. Buchanan further confirms that Ms. Sedar was walking over the dangerous condition when she fell when discussing the video taken by Mr. Kerr (Ex. "A," Buchanan, 65:3-10).

> Q:     Where was her path in relation to the gentlemen's foot that you see in the video?

---

[7] The testimony concerning the violent nature of the fall itself supports a finding that it was not a situation where she simply stumbled on the steps, but instead her fall was caused by a sudden trip on the dangerous condition.

22

A:     That was the path she was on walking.

Q.     You saw her on that path?

A.     Yes.

Q:     And the next thing you saw was her down on the ground?

A:     Yes, it was.

Ex. "A," Buchanan, 65:3-10.

After tending to Ms. Sedar for a short period of time, she went straight back up the stairs to further inspect the brick area she noticed immediately after Ms. Sedar's fall.  At that time she noticed and pointed it out to her coworkers the loose and uneven bricks.

Q:     Well, I'll start with that question:  Did you walk around after the fall and just kind of look at the area from different angles?

A:     After the fall?  No, I went to the top of the stairs where she had actually fallen.  I didn't look at the other area; only the area that we had exited.

Ex. "A," Buchanan, 39:7-12.

Ms. Buchanan also further lines-up the defective condition with where Ms. Sedar had landed using one of the photographs taken after the incident.  Attached hereto as Exhibit "R," Exhibit G to Buchanan Depo.

Defendants argue that Ms. Buchanan's temporary confusion during her deposition as to which staircase Ms. Sedar fell down somehow disposes of causation.  Ms. Buchanan was initially shown a photograph by the Defendants' counsel taken at a later time and from a different angle, and was asked which part of the staircase she, Ms. Sedar, and Mr. Rapanut were going down.  This attempt to manufacture conflicting testimony as to where Ms Sedar's fall occurred is a distraction that, at best, evidences an issue to be decided by the jury and is not probative on summary judgment.   That photograph caused confusion as Ms. Buchanan identified the second stairwell

23

from the right as you look from the bottom of the steps. When oriented during further examination, Ms. Buchanan clearly identified the far left stairwell (as you look from the bottom of the stairs) as the location of the accident. Ex. "A" Buchanan, 72:11-74:6; Attached hereto as Exhibit "S,": Exhibit B to Buchanan Depo.).

The pictures taken immediately after the accident clearly establish where the incident occurred because of the blood marks, if nothing else. Ms. Buchanan clearly identified the stairway closest to the wall as the area where the incident occurred and where the defect was present by placing an "x" where Ms. Sedar was lying after her fall and by placing another "x" over the path they took (Ex. "A," Buchanan, 73:l -74: 6; Ex. "S," Exhibit B to Buchanan Depo; Ex "R," Exhibit G to Buchanan Dep.). The photographs containing the bloodstains present undisputed evidence as to where the incident occurred, where the dangerous condition was located, and where everyone was focused after the incident (Ex. "E," Kerr Photographs (Sedar 1300, 1302-1303). The dangerous condition directly lines-up with the bloodstains on the concrete left by Ms. Sedar as a result of her fall.

In addition, the video taken immediately after the incident includes audio from Mr. Rapanut describing what happened as Major Marks tests the loose brick in the area of the dangerous condition. (Ex. "B," Rapanut, 70:1-17; Attached hereto as Exhibit. "D," Video taken by Damien Kerr (Sedar 1297)). Mr. Rapanut was trailing Ms. Sedar when the incident occurred and a reasonable inference can certainly be drawn given Mr. Rapanut's participation in the video that the area they were documenting was the location of the dangerous condition where Ms. Sedar fell.

Nevertheless, Plaintiff has presented significant evidence through Ms. Buchanan, the photographs, the video and other testimony to establish Ms. Sedar's path in relation to the dangerous condition. To the extent there is any factual dispute about where the incident occurred

or where the dangerous condition is located any such dispute must be resolved in favor of Ms. Sedar on summary judgment.  *See Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 255 (1986)(All evidence must be construed in the light most favorable to the party opposing summary judgment.)

Mr. Rapanut also witnessed the fall.  According to him, Ms. Sedar's head was in his view then it suddenly disappeared in a fluid motion.  Ex. "B" Rapanut, 59:2-16..  He heard something audible from Ms. Sedar and saw the picture she was holding going through the air.  Ex. "B," Rapanut, 17:10-15, 58:8-13.

Ms. Buchanan could not identify any other potential causes for the incident other than the dangerous condition caused by the bricks.

> Q:    Anything else about that vicinity that you focused on as a possible cause of Ms. Sedar's fall?
>
> A:    No.  There wasn't any debris on the ground, there was no gravel.  As you could see it was light, there was no snow.  It was not raining so there wasn't no weather issue that would have caused her to slip.  It wasn't wet in the garage.  She did not have on heels, something that may have distracted her or caused her heal to get caught in it.  There wasn't anything else that I could see that would have caused it.

Ex. "A," Buchanan 32: 10-19.

> Q:    Sometime people stumble when there's nothing wrong with the stairs or nothing wrong with where they are walking.
>
> A:    Mm-hmm.
>
> Q:    Did you think that was a possibility, that she had just over stepped or somehow fallen down the stairs?
>
> A:    She seemed perfectly fine as she exited the car when we came out of the garage with her walking.

Ex. "A," Buchanan 32:20-33:5.

Mr. Swartz also testified that the lip could have caused her fall (Ex. "G," Swartz, 74:17-75-7).

> Q:    So based on your investigation of that incident, what did you conclude caused her to fall?
>
> A:    I think her feet - - but there's a lip on this fricking stair that I've almost fallen on myself a thousand times.

Ex. "G," Swartz, 74:17-21.

Mr. Swartz was unable to recall the exact timeframe as to when that condition existed (Ex. "G," 74:17-75-7).  However, his testimony concerning his knowledge of the dangerous concrete lip when combined with the photographs showing the exposed lip immediately after her fall allow for a reasonable inference that the dangerous condition did exist *prior* to and at the time of Ms. Sedar's fall and that Mr. Swartz knew about it *prior* to her fall.  Ex. "E," Kerr Photographs (Sedar 1298-1301, 1304).

That the dangerous condition caused Ms. Sedar's fall is further evidenced by her shoes. Ms. Sedar was wearing flat shoes as opposed to a shoe with a heel..  Following the incident, Ms. Sedar was inspecting her shoes when she noticed a pronounced scuff mark on the right shoe that had not been there prior to the incident (Ex. "J," Sedar Aff. ¶ 6-7).  The scuff mark provides further circumstantial evidence that the dangerous condition caused her to trip and fall down the stairs.

Finally, Mr. Holland provides expert testimony that the dangerous condition was the most likely cause of the fall.  Mr. Holland is a Structural Engineer.  He combined information taken from the evidence outlined above regarding the fall, the photographs taken immediately following the fall, the video taken immediately after the fall, and his inspection of the property, the scuff on Ms. Sedar's shoe, and other information with his expertise in structural engineering to opine that the brick was structurally unsound and a hazard that most likely caused Ms. Sedar to lose her balance and fall down the stairs.  In addition, Mr. Holland testified that the measurements of the steps in connection with Ms. Sedar's height and the location of the blood stains supports a finding

that the start of her fall occurred on the landing where the defective condition existed (Ex. "L,"

Holland, 28:8-29:10)

Defendants cite to *Marchant v. Boddie-Noell Enterprises, Inc.*, 344 F.Supp.2d 495

(W.D.Va. 2004) as presenting a "strikingly similar" situation to the facts of this case, but *Marchant*

is very easily distinguished.  SJM Brief p. 10.  The Plaintiff in *Marchant* suffered from blackouts

that had caused other falls in public places, suffered from a visual impairment, experienced

memory problems, experienced double vision, and used a walker.  *Marchant,* 344 F. Supp 2d at

496.  Further, it was only after the plaintiff and his brother visited the area **one week later** and

found an orange safety cone on the sidewalk that they concluded that he had fallen over missing

tiles or a drainpipe.  *Id.* at 498 (emphasis added).  Neither the Plaintiff nor his caretaker, who was

with him at the time of the incident, could place him in that area at the time of the fall.  *Id.* 498-

499.

In *Morrison-Knudson Co. v. Wingate*, 492 S.E.2d 122 (Va. 1997), also cited by the

Defendants, the defendant argued that the plaintiff was required to establish the defect through

expert testimony.  *Id. at* 124; SJM Brief p. 11.  In ruling on the defective condition issue the Court

noted that the plaintiff failed to show the the defendants' deviated from the ordinary standard of

care by using a smooth concrete finish on the landing rather than a textured one, such as by

showing a deviation from building code provisions.  *Id.*  Plaintif has done so in this case through

Mr. Holland's testimony.  The *Kendrick* case cited by Defendants' is also distinguishable.  SJM

Brief p. 11.  In *Kendrick v. Vaz, Inc.*, 421 S.E.2d 447, the plaintiff alleged her foot slipped into a

hole causing her to break her ankle.  *Id. at 450.*  However, she testified that she did not feel a hole

or rut in the ground and that she did not observe the ground.  *Id.*  There was no other evidence of

a rut or hole.  The witness testimony, photographs, and video distinguish this case from *Kendrick*.

27

In this case, Ms. Sedar had no relevant health issues or health history and no history of falls. She had been driving and walking without any issues prior to the fall.  The weather was nice and there were no other hazardous condition, such as water or ice.  Her co-workers were walking directly behind her and immediately after the incident identified the location where she fell.  Ms. Buchanan identified the area and the defect as she went to assist Ms. Sedar.  Her co-workers took photographs and video of the area where she fell and the dangerous condition within minutes of the fall while security and medical personnel were still on the scene.

In *Hudson v. Boddie-Noell Enters., Inc*. (W.D. Va. 2012) (attached hereto) the plaintiff slipped and fell as he approached the door to the Hardees restaurant, but he was unable to see what caused him to fall.  The plaintiff testified that he observed ice in the area where he fell.  *Id*.  The plaintiff's wife, who was with him at the time, also testified that they observed ice in the area after the plaintiff's fall, but she did not observe the plaintiff step on the ice and slip.  *Id*.  Another witness testified that the plaintiff appeared to have tripped on the curb before getting to the door.  *Id*.  After considering the circumstantial evidence in the light most favorable to the plaintiff, the *Hudson* Court concluded that a reasonable jury could determine that the ice in front of the restaurant door caused the plaintiff to fall.

In *McGuire v. Hodges*, 639 S.E.2d 284 (Va. 2007), the Supreme Court of Virginia considered the tragic case of a toddler who allegedly squeezed through an unsecured fence and gate and drowned in the pool. *Id*. at 285.  In *McGuire*, there was no direct evidence of how the child got through the gate.  Circumstantial evidence showed that homeowner had a defective gate with a low latch, or an unlocked gate tied together with a chain, and that the toddler had been seen attempting to open the gate.  *Id*. at 288-89.  Nobody saw the toddler enter through the defective

28

gate, but it was sufficient to prove negligence if a jury could reasonably infer that the toddler could open the gate wide enough to get through.  *Id*. at 290.

In *Wooldridge v. Echelon Service Co*., 416 S.E.2d 441 (Va. 1992), an assailant entered a government building and killed one person in the building.  While there was no direct evidence that the defendant knew or permitted the assailant on the property, the circumstantial evidence established that the defendants saw a "flash . . . like someone had ran . . . from the down elevator to the up elevator" and failed to take action to pursue the person, that the call alerting security of the attack occurred soon after the "flash," and the assailant was the only unauthorized person in the building at the time of the attack. *Id. at 442*.  The *Woolridge* Court concluded that this was sufficient circumstantial evidence for a jury to conclude that the defendant's inaction was the proximate cause of the plaintiff's injury.  *Id. at 443*.

Like the *Hudson*, *McGuire* and *Woolrdige* Courts, Ms. Sedar has presented sufficient circumstantial evidence for a jury to reasonably infer that Ms. Sedar stepped on the defective bricks at the point of egress from the Green Garage.  This finding can be made without conjecture or speculation.

In the end, this case presents a factual scenario that walks right up the line of direct evidence to prove proximate cause.  The fact that Ms. Sedar tripped and fell on the dangerous condition is fully supported by the testimony of the eyewitnesses, the photographs, the video, her shoes, and by expert opinion.  Contrary to the cases cited by the Defendants, the evidence surrounding Ms. Sedar's pre-accident condition and conduct, the clean condition of the area other than the dangerous condition on which she fell, and the environmental conditions all support a finding that there was no cause for her fall other than the dangerous condition.  The weather was clear, the lighting was good, Ms. Sedar suffered from no relevant medical conditions or illnesses, Ms. Sedar

29

had just driven without any difficulty, Ms. Sedar had just traversed the garage and another set of stairs with no difficulty, Ms. Sedar was in no way distracted and was looking forward, and there were no other hazards such as water, ice or gravel in the area.  When the facts are viewed in the light most favorable to the plaintiff and including all reasonable inferences that may be drawn, as they must be on summary judgment, the fact that the dangerous condition was the cause of her fall is the only reasonable conclusion.

## V.    CONCLUSION

There is ample evidence in the record that a dangerous condition existed, that the Defendants knew or should have known of the dangerous condition, and that the dangerous condition was the proximate cause of Ms. Sedar's fall and the injuries she sustained in that fall. Accordingly, Defendants' Motion for Summary judgment must be denied and Plaintiff afforded any additional relief the Court deems necessary and appropriate.

July 26, 2019

Respectfully submitted,

**CAMILLE SEDAR**

By Counsel:

_____/s/ David J. Sensenig_____
David J. Sensenig (VSB No. 41102)
Andrew R. Park (VSB No. 41072)
Stephen D. Burns (VSB No. 74728)
PARK SENSENIG LLC
2310 West Main Street
Richmond, Virginia 23220
Tel (804) 417-6085
Fax (888) 552-1781
david.sensenig@parksensenig.com
andrew.park@parksensenig.com
stephen.burns@parksensenig.com
*Counsel for Camille Sedar*

30

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the above and foregoing has been served upon the following by ECF this 26th day of July 2019:

Joseph P. Moriarty, Esq.
WILLCOX & SAVAGE, P.C.
Wells Fargo Center
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510-2243
Email: jmoriarty@wilsav.com
*Counsel for Defendants Boston Properties Limited Partnership and Reston Town Center Property, LLC*

David D. Hudgins, Esq.
Mary Goegel, Esq.
Hudgins Law Firm, P.C.
Eisenhower Center III, 2331 Mill Rd., Suite 100
Alexandria, VA 22314
Email: dhudgins@hudginslawfirm.com
Email:  mgoegel@hudginslawfirm.com
*Counsel for Defendants Boston Properties Limited Partnership and Reston Town Center Property, LLC*

_____ /s/ David J. Sensenig _____

1

EARL HUDSON, Plaintiff,

v.

BODDIE-NOELL ENTERPRISES, INC.,
Defendant.

Civil Action No. 7:11CV00466

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
VIRGINIA ROANOKE DIVISION

Dated: June 13, 2012

MEMORANDUM OPINION

By: Hon. Glen E. Conrad
Chief United States District Judge

In this premises liability action, Earl
Hudson ("Hudson"), seeks to recover for
personal injuries sustained after he allegedly
slipped on a patch of ice outside the entrance
to a Hardee's restaurant owned and operated
by the defendant, Boddie-Noell Enterprises,
Inc. ("Boddie-Noell"). The case is presently
before the court on the defendant's motion for
summary judgment. For the reasons stated
below, the defendant's motion will be denied.

Factual and Procedural Background

The following facts are presented in the
light most favorable to the plaintiff. See
Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
255 (1986) (noting that all evidence must be
construed in the light most favorable to the
party opposing summary judgment).

On the morning of December 17, 2010,
Hudson and his wife, Mary, traveled to
Roanoke from their home in Franklin County
for a medical appointment. Reports from the
National Climatic Data Center indicate that
approximately three inches of snow and
freezing rain had fallen in Roanoke the day
before and remained on the ground.

Following the medical appointment, the
couple went to the Hardee's restaurant on
Route 419, where they arrived just before
11:00 a.m. According to Mary, portions of the
restaurant's parking lot and sidewalks had
been cleared, while other areas were still
covered with snow.

Page 2

Mary entered the restaurant first. Immediately
prior to entering the restaurant, she observed
an area of "black ice ... right as you get ready
to step in the door." (Mary Hudson Dep. at 41.)
Mary testified that it appeared that the
particular area of the sidewalk had not been
salted or treated.

While Mary waited to place the couple's
order, the plaintiff attempted to enter the
restaurant. He did not have any trouble "until
[he] went to the door and pulled on it and [his]
feet went out from under [him]." (Hudson
Dep. at 65.) The incident happened very
quickly and Hudson did not see what caused
him to fall. During his deposition, Hudson
testified as follows:

> Q. And when did you first realize
> that you were falling?
> A. When I started to fall. It
> happened so quickly, you didn't
> know it.
> Q. And did you know what
> caused you to fall?
> A. All I know is my feet slipped
> out from under me.
> Q. Okay.
> A. My feet went back this way
> and I'm grabbing to try to hold
> the door because I had my arm in
> it, and I went all the way down
> and hit on this wrist and arm.
> Q. After you fell, did you see
> anything on the ground?
> A. Ma'am, I didn't see nothing; I
> was knocked out.
> . . .
> Q. Did you ever see any black
> ice?
> A. I didn't see nothing, ma'am,

fastcase

except                    stars.
Q.                        Okay.
A. When I hit right here, that did
me for a little while.

(Id. at 74-76.)

Page 3

Deontay Gray, who saw Hudson fall, and
Donald Dean, another customer, helped lift
Hudson up and into the restaurant. Dean
testified at his deposition that there was ice
"[r]ight in front of the door" in the area in
which Hudson fell, and that an ice chipper was
sitting near the entrance. (Dean Dep. at 11-13.)
When asked to describe the patch of ice, Dean
testified that "[i]t was frozen layers . . . where
you had tracked like you had walked on it and
then it had froze[n] instead of melting." (Id. at
14.)

Hudson fractured his left wrist and three
ribs as a result of the fall. He also suffered from
a concussion and "some swelling in the brain."
(Hudson Dep. at 36.)

Hudson filed this negligence action
against Boddie-Noell in the Circuit Court for
the County of Roanoke. Boddie-Noell then
removed the action to this court on the basis of
diversity of citizenship. Following the close of
discovery, Boddie-Noell moved for summary
judgment. The court held a hearing on the
motion on June 5, 2012.

## Standard of Review

Under Rule 56 of the Federal Rules of Civil
Procedure, an award of summary judgment is
appropriate only "if the movant shows that
there is no genuine issue of any material fact
and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a). In
reviewing a motion for summary judgment,
the court must construe the record in the light
most favorable to the non-moving party.
Anderson, 477 U.S. at 255. To withstand
summary judgment, the non-moving party

must offer evidence from which a reasonable
jury could return a verdict for that party. Id. at
252.

## Discussion

"The essential elements of a negligence
claim in Virginia, as elsewhere, are (1) the
identification of a legal duty of the defendant
to the plaintiff; (2) a breach of that duty; and
(3)

Page 4

injury to the plaintiff proximately caused by
the breach." Talley v. Danek Medical, Inc., 179
F.3d 154. 1547 (4th Cir. 1999). In moving for
summary judgment on Hudson's claim of
negligence, Boddie-Noell argues that
Hudson's evidence is insufficient to establish
any of these essential elements, and that it is
clear, as a matter of law, that Hudson was
guilty of contributory negligence. For the
following reasons, the court concludes that
genuine issues of material fact preclude the
entry of summary judgment in favor of the
defendant.

## I. Duty

Turning first to the element of duty, the
court notes that it is undisputed that Hudson
was an invitee on Boddie-Noell's premises
and, thus, that the defendant owed him "a duty
of using ordinary care to maintain its premises
in a reasonably safe manner and to warn [him]
of any hidden dangers." Amos v. NationsBank,
N.A., 504 S.E.2d 365, 366 (Va. 1998). On the
other hand, Boddie-Noell was not the insurer
of Hudson's safety, Miracle Mart. Inc. v. Webb,
137 S.E.2d 887, 890 (Va. 1964), and it is well
established that a business owner has no duty
to remove ice during the time that moisture is
falling and freezing on the ground. FAD Ltd.
Partnership v. Feagley, 377 S.E.2d 437, 438
(Va. 1989). Instead, "a business establishment
. . . may wait until the end of a storm and a
reasonable time thereafter before removing ice



-2-

and snow from an outdoor entrance, walk, platform or steps." Amos, 504 S.E.2d at 366.

As the plaintiff, Hudson bears the burden of establishing that, at the time of his fall, Boddie-Noell had the duty to clear its premises of ice and snow. Id. The defendant correctly notes that whether this duty had arisen at the time of Hudson's fall "is a 'pure question of law' to be decided by the court." Id. (quoting Burns v. Johnson, 458 S.E.2d 448, 450 (Va. 1995)). However, when the existence of such duty depends on the resolution of a material factual dispute, the facts should first be determined by the fact finder. See, e.g., Sanderson v. Boddie-

Page 5

Noell Enterprises. Inc., 2005 U.S. Dist. LEXIS 41764, at *11 (E.D. Va. June 13, 2005) (assuming, for the purposes of the defendant's summary judgment motion, that Boddie-Noell had a duty to employ reasonable efforts to remove ice and snow from its sidewalks, since there was "a genuine dispute of fact respecting whether, at the time of Sanderson's fall, the storm had ended").

In the instant case, the court agrees with Hudson that a genuine factual dispute exists with respect to whether the winter storm had ended at the time of his fall. Although Hudson's wife and Deontay Gray testified that there was frozen precipitation falling at the time that Hudson attempted to enter the restaurant, reports from the National Climatic Data Center indicate that the precipitation ended in Roanoke on the evening of December 16, 2010, and that no precipitation fell on the day of the incident. Likewise, Donald Dean testified that he did not recall seeing any rain or sleet when he traveled to the restaurant on the day in question. Because the court must construe the evidence in the light most favorable to Hudson, the court is unable to conclude, at this stage of the proceedings, that Boddie-Noell had no duty to employ

reasonable efforts to remove ice and snow from its entrances at the time of Hudson's fall.

Boddie-Noell alternatively argues that it had no duty to warn Hudson about the patch of ice because it was open and obvious. See Fobbs v. Webb Bldg. Ltd. P'ship, 349 S.E.2d 355, 357 (Va. 1986) ("An owner of premises owes a duty to its invitee ... to use ordinary care to warn its invitee of any unsafe condition that was known, or by the use of ordinary care should have been known, to the owner; except that the owner has no duty to warn its invitee of an unsafe condition which is open and obvious to a reasonable person exercising ordinary care for his own safety."). The question of whether a dangerous condition was open and obvious is normally one for the jury to determine. See Volpe v. City of Lexington, 708 S.E.2d 824, 828 (Va. 2011) (holding that

Page 6

the "factually specific determination" of whether a dam presented an open and obvious danger "was an issue for the jury," and that the lower court erred in deciding the issue as a matter of law).

Viewing the evidence in the light most favorable to Hudson, the court concludes that reasonable minds could differ as to whether the ice was an open and obvious danger that Hudson should have observed and, thus, that Boddie-Noell is not entitled to summary judgment on this ground. While Donald Dean and Mary Hudson testified that they observed ice by the door, they also indicated that they did not see the ice until they were on it or beside it. Indeed, Mary Hudson described the substance as "black ice." (Mary Hudson Dep. at 41.) As other courts have recognized, black ice "by its very nature . . . is not noticeable upon casual inspection." Woodard v. Erp Operating Ltd. P'ship, 351 F. Supp. 2d 708, 715 (E.D. Mich. 2005) (holding that the alleged presence of black ice created a factual issue for the jury to determine concerning whether the



danger was open and obvious, where the plaintiff testified that he saw the ice after he fell); see also Ashley v. Waffle House. Inc., No. 6:04-22502-RBH, 2006 U.S. Dist. LEXIS 2880, at *8-11 (D.S.C. Jan. 10, 2006) (denying defendant's motion for summary judgment where the plaintiff allegedly slipped on black ice at the entrance to the defendant's restaurant).

In addition, the proximity of Hudson's fall to the restaurant cannot be ignored. As the district court noted in Ashley, a rational jury could find that a person who had successfully navigated a parking lot or sidewalk "could also reasonably believe that the entrance was navigable, especially where the ice at the entrance was allegedly black ice." Ashley, 2006 U.S. Dist. LEXIS 2880, at *11. For these reasons, the court is unable to conclude, as a matter of law,

Page 7

that the patch of ice was "open and obvious to a reasonable person exercising ordinary care for his own safety." Fobbs, 349 S.E.2d at 357.

## II. Breach

Boddie-Noell next argues that Hudson cannot establish that it had actual or constructive notice of the presence of the ice that allegedly caused Hudson to fall, or that it failed to exercise ordinary care to make its premises reasonably safe under the circumstances. For the following reasons, the court concludes that material factual disputes preclude the entry of summary judgment with respect to both of these issues.

In order for Boddie-Noell to be adjudged negligent in this case, Hudson must prove that Boddie-Noell "had actual or constructive notice" of the presence of the dangerous condition. Ashby v. Faison & Assocs., Inc., 440 S.E.2d 603, 605 (Va. 1994). Specifically, he must show that Boddie-Noell "knew or should have known" of the ice that allegedly caused his fall and "failed

to remove it within a reasonable time or to warn of its presence." Id.; see also Miracle Mart, Inc., 137 S.E.2d at 890 ("[I]n order to impose liability for injury to an invitee the dangerous condition must have been known to the owner or occupant of the establishment, or have existed for such a length of time as to make it the defendant's duty in the exercise of ordinary care to have discovered it.").

Applying this standard, the court is unable to conclude that Boddie-Noell is entitled to summary judgment on the issue of notice. As set forth above, the alleged patch of ice was located immediately outside the entrance to the restaurant, in an area in which customers would need to walk. Donald Dean testified that the ice appeared to have been packed down by customers, and that it was in the same vicinity as an ice chipper. Although Jeannette Barrios, the

Page 8

manager on duty, could not recall when she inspected the area during the three-hour period before the plaintiff's fall, Barrios testified that she was supposed to inspect the area "every hour." (Barrios Dep. at 14.) Construing this evidence in the light most favorable to Hudson, the court concludes that a reasonable juror could find that Boddie-Noell's employees were aware of the ice or that it existed for such a length of time that they should have discovered it.

Citing the Virginia Supreme Court's decision in Wynne v. Spainhour, 205 S.E.2d 634 (Va. 1974), Boddie-Noell alternatively argues that evidence is nonetheless insufficient, as a matter of law, to show that it was negligent. In Wynne, the plaintiff slipped on a patch of ice between two parked cars in the defendant's parking lot. Id. at 634-635. The evidence presented at trial, which was "without material conflict," revealed that "some three to four hours before the plaintiff fell, salt had been spread on the icy spots, including the spot where the fall occurred." Id.



-4-

**-625-**

at 635. In setting aside the jury's verdict in favor of the plaintiff, the Supreme Court held that the defendant did not breach any duty owed to the plaintiff. Id The Court emphasized that "[b]y scraping the snow from the parking lot soon after the storm and attempting thereafter to remove systematically the remaining spots of ice, the defendant did all that ordinary care required to maintain his premises in a reasonably safe condition for the plaintiff's visit." Id

Having reviewed the record in the instant case, the court is unable to conclude that Wynne compels the entry of summary judgment in favor of the defendant. Unlike Wynne, the facts in this case are not "without material conflict." Id. Although Boddie-Noell's employees testified they shoveled and spread Ice Melt on the morning of the plaintiff.s accident, Mary

Page 9

Hudson testified that it did not appear that the area in front of the entrance had been cleared at all:

> Q. [D]id it appear that the sidewalk area in front of the door had been cleared or treated?
> A. No, it had not been cleared.
> Q. Okay. It had not been cleared at all?
> A. No.
> Q. Nobody had - it didn't look like anybody had shoveled?
> A. It didn't . . . look like anybody had done anything. It is just like you put it down there and there it was. There wasn't anything that anybody had chipped; there wasn't anything that you put out on it, that you could sprinkle on it, there wasn't anything.

(Mary Hudson Dep. at 42-43.)

Given the alleged location of the ice, and in light of Mary Hudson's testimony, the court is unable to conclude, as a matter of law, that Boddie-Noell did all that ordinary care required to maintain its premises in a reasonably safe condition for the plaintiff's visit. Instead, this issue must be decided by a jury.

### III. Proximate Cause

Boddie-Noell has also moved for summary judgment on the issue of proximate cause. Virginia law is clear that negligence will not be presumed from the mere happening of an accident; the plaintiff must prove that the defendant's negligent actions were the accident's proximate cause. Weddle v. Draper, 130 S.E.2d 462, 465 (Va. 1963). In the premises liability context, as the defendant notes in its brief, the plaintiff must establish that the unsafe condition of which he complains was the proximate cause of his injury. See Roll 'R' Way Rinks, Inc. v. Smith, 237 S.E.2d 157, 162 (Va. 1977). While evidence supporting proximate cause need not be

Page 10

scientifically exact, it "must be sufficient to remove the case out of the realm of speculation and conjecture and into the realm of legitimate inference before submitting it to a jury for its determination." Blacka v. James, 139 S.E.2d 47, 50 (Va. 1964); see also Weddle, 130 S.E.2d at 466 ("It is incumbent on the plaintiff who alleges negligence to show why and how the accident happened, and if that is left to conjecture, guess or random judgment, he cannot recover.").

In moving for summary judgment on this issue, Boddie-Noell cites to Hudson's own deposition testimony and that of Deontay Gray, the only individual who saw Hudson fall. Boddie-Noell emphasizes that Hudson could not say what caused him to fall, and that Gray testified that Hudson appeared to miss the step up onto the curb in front of the restaurant.



-5-

**-626-**

Although this issue is admittedly close in light of the evidence highlighted by the defendant, the court is constrained to conclude that the plaintiff's evidence, when viewed in his favor, is sufficient to survive summary judgment.

In reaching this decision, the court finds persuasive the Virginia Supreme Court's decision in <u>Fobbs v. Webb Building Limited Partnership</u>, 349 S.E.2d 355 (Va. 1986), in which the Court emphasized that facts establishing proximate cause "need not be proved by <u>direct</u> evidence, but instead, may be established by <u>circumstantial</u> evidence." <u>Id.</u> at 357. The plaintiff in <u>Fobbs</u> arrived to work at the defendant's office building on a rainy morning and slipped on the floor in front of the elevators. <u>Id.</u> at 356. Rain had been falling for a protracted period before the accident, causing water to accumulate near the entrance of the building. <u>Id.</u> at 358. Although the plaintiff "could not say what caused her to fall," she testified that she slipped on something slippery and "[o]ther witnesses testified that both before and after she fell, they observed water on the terrazzo floor in the vicinity of her fall." <u>Id.</u> The Supreme Court held that "[f]rom this

Page 11

direct and circumstantial evidence, the jury reasonably could have found that the accumulation of water on the terrazzo floor in the vicinity of the elevators constituted a hazardous condition that caused Hobbs to fall." <u>Id.</u>

In the instant case, while Hudson cannot identify what caused him to fall, Hudson testified that his feet slipped out from under him as he attempted to open the door, and both his wife and Donald Dean testified that they observed a patch of ice on the sidewalk in the same area in which the accident occurred. Although Deontay Gray stated that Hudson appeared to essentially trip over the curb in front of the restaurant, Hudson testified that he "didn't have any trouble stepping up over

the curb," and that it was not until he pulled on the door that his feet slipped out from under him. (Hudson Dep. at 65.)

Viewing the direct and circumstantial evidence in the light most favorable to Hudson, the court concludes that a reasonable jury could find that the accumulation of ice on the sidewalk adjacent to the restaurant's entrance caused Hudson to fall. Accordingly, the issue of proximate cause must be decided by a jury.

## IV. <u>Contributory Negligence</u>

For its final argument, Boddie-Noell contends that Hudson's claim is barred by the defense of contributory negligence. To establish contributory negligence, a defendant must show both that the plaintiff was negligent and that the plaintiff's negligence was a proximate cause of the plaintiff's injury. <u>Rascher v. Friend</u>, 689 S.E.2d 661, 664-65 (Va. 2010). "The issue whether a plaintiff is guilty of contributory negligence is ordinarily a question of fact to be decided by the fact finder. The issue becomes one of law for the [ ] court to decide only when reasonable minds

Page 12

could not differ about what conclusion could be drawn from the evidence." <u>Jenkins v. Pyles</u>, 611 S.E.2d 404, 407 (Va. 2005).

To support its motion for summary judgement on this issue, Boddie-Noell argues that Hudson "fail[ed] to act reasonably for his own safety" and "fail[ed] to heed the open and obvious condition of snow and ice." (Def's Br. at 25.) For the reasons set forth above, however, the court is unable to conclude, as a matter of law, that the patch of ice was open and obvious, or that Hudson was negligent in the manner in which he attempted to enter the restaurant. As previously noted, a rational jury could find that a person who had successfully navigated the parking lot and sidewalk "could also reasonably believe that the entrance was



-6-

navigable, especially where the ice at the entrance was allegedly black ice." <u>Ashley v. Waffle House</u>, 2006 U.S. Dist. LEXIS 2880, at *11; <u>see also</u> <u>Kings Markets. Inc.</u>, 307 S.E.2d 249, 252 (Va. 1983) (declining to conclude that a customer who slipped on ice after departing a store was guilty of contributory negligence, and emphasizing that the customer "successfully negotiated his entrance from the parking lot to the store").

### Conclusion

For the reasons stated, Boddie-Noell's motion for summary judgment must be denied. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

_____

Chief United States District Judge



**-628-**

```
1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF VIRGINIA

3                   (Alexandria Division)

4

5   CAMILLE SEDAR,        )   CASE NO: 1:18-cv-01111 CMH/TCH

6          Plaintiff,     )

7   -vs-                  )

8   BOSTON PROPERTIES,    )

9   LP, et al,            )

10         Defendants.    )

11   _____)

12

13              DEPOSITION OF DAVIDA BUCHANAN

14                  Alexandria, Virginia

15                    May 29th, 2019

16                      9:00 a.m.

17

18

19

20

21

22   REPORTED BY:  ALEXANDRIA KAAN
```



1          Deposition of DAVIDA BUCHANAN taken at the

2     location of:

3

4

5                    HUDGINS LAW FIRM, P.C.

6                    515 King Street

7                    Suite No. 400

8                    Alexandria, Virginia  22314

9

10

11        Before ALEXANDRIA KAAN, Notary Public in the

12     Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



```
 1            APPEARANCES

 2   Appearing on Behalf of the Plaintiff:

 3        DAVID SENSENIG, ESQUIRE

 4        ANDREW PARK, ESQUIRE

 5        PARK SENSENIG

 6        2310 West Main Street

 7        Richmond, Virginia  23220

 8        David.sensenig@parksensenig.com

 9

10   Appearing on Behalf of the Plaintiff:

11        JOSEPH MORIARTY, ESQUIRE (via

12        telephonically)

13        WILLCOX & SAVAGE, P.C.

14        440 Monticello Avenue

15        Suite No. 2200

16        Norfolk, Virginia  23510-2243

17        Jmoriarty@wilsav.com

18

19

20

21

22
```



```
 1                    APPEARANCES (CONTINUED):

 2

 3

 4              Appearing on Behalf of Defendants:

 5                   DAVID HUDGINS, ESQUIRE

 6                   HUDGINS LAW FIRM, P.C.

 7                   515 King Street

 8                   Suite No. 400

 9                   Alexandria, Virginia  22314

10                   (703) 739-3700

11                   Dhudgins@hudginslawfirm.com

12

13

14

15

16

17

18

19

20

21

22   ALSO PRESENT: HELEN TAWIL w/ ANDREW PARK (paralegal)
```



1  EXAMINATION OF DAVIDA BUCHANAN              PAGE

2  BY MR. HUDGINS                             6, 80

3  BY MR. SENSENIG                            60, 83

4

5

6  BUCHANAN EXHIBITS                          PAGE

7  A                  subpoena                6

8  B through K        photographs             6

9  L                  video                   86

10

11

12

13

14

15

16

17

18

19

20

21

22



```
 1              P R O C E E D I N G S

 2                  - - - - -

 3              DAVIDA BUCHANAN,

 4       being first duly sworn to testify the whole

 5  truth, testified as follows:

 6                  EXAMINATION

 7  BY MR. HUDGINS:

 8     Q.  Good morning, Ms. Buchanan.

 9     A.  Good morning.

10     Q.  We were introduced just a short while ago.  My

11  name is David Hudgins and I am Counsel for Boston

12  Properties, which is a Defendant in a lawsuit brought by

13  Ms. Camille Sedar.  I understand you were a witness to

14  her accident on the property of Boston Properties, and

15  I'm going to be asking you a series of questions about

16  what you saw that day.  I'm going to try to make my

17  questions as straight-forward as I possibly can.  If

18  there's anything that I say that is confusing or not to

19  your understanding, would you please stop me and let me

20  rephrase it so we have a complete understanding?

21     A.  Yes.

22     Q.  It's start with some background information for
```



1  you personally.  What is your full name and residence

2  address?

3     A.  Davida Maria Buchanan.

4        (Whereupon the proceedings go off the record.)

5     Q.  So I've just asked Ms. Buchanan for her full name

6  and residence address.  Could you give me that again,

7  please?

8     A.  Davida Maria Buchanan, 2189 Cottonwood, Lane,

9  Culpepper, Virginia 22701.

10    Q.  How long have you lived there, Ms. Buchanan?

11    A.  I've lived there for over nine years.

12    Q.  And how are you employed?

13    A.  How am I employed?  My employment?

14    Q.  Yes, Ma'am.  Where do you work?

15    A.  Department of Defense, Intelligence Agency, 12310

16  Reston, Virginia.

17    Q.  And do you know Camille Sedar?

18    A.  Yes, I do.  She is a coworker.

19    Q.  And does she work right in the same office with

20  you?

21    A.  Yes, she does.

22    Q.  How long have you worked with Ms. Sedar?



1      A.  I've worked with Ms. Sedar for now over seven

2   years.

3      Q.  Do you socialize or have you socialized with Ms.

4   Sedar out of work?

5      A.  Only once.

6      Q.  Would you consider yourself friendly but not

7   friends?

8      A.  I consider us to be friends.

9      Q.  You're friends at work?

10      A.  Yes.

11      Q.  She doesn't go over to your house on a regular

12   basis and you don't go over to her house on a regular

13   basis or anything like that?

14      A.  Because of the commuting distance, that is

15   something that would rarely take place.

16      Q.  So your friendship is something that developed at

17   work and that is where you would see her?

18      A.  Yes.

19      Q.  And you would see her on a daily basis or how

20   frequently?

21      A.  Monday through Friday I work.

22      Q.  Every day?



1    A.   Every day.

2    Q.   Now, on November the 15th, 2016, I understand

3  there was a lunch celebration planned at a restaurant at

4  Reston Town Center?

5    A.   Yes.

6    Q.   Were you part of the planning for that event?

7    A.   Yes.

8    Q.   Tell me what you did personally to make that

9  event come about.

10   A.   I actually sent out notification that the

11 military individual was going to be retiring, and we

12 took up a collection to get a gift for him, a card as

13 well.  We actually had the card passed around to members

14 in the office, as well as a photo of the building for

15 the individual to take with them.  So that was part of

16 the -- and a selection was made of the restaurant by

17 Camille, and we all were going to gather at that

18 location for his celebration.

19   Q.   The name of that restaurant was?

20   A.   I don't know the exact name of it, I just know it

21 was located in Reston Town Center.

22        MR. HUDGINS:  Anybody here?



1          MR. SENSENIG:  Ted's Bulletin.

2     BY MR. HUDGINS:

3        Q.  I think we all agree it was Ted's Bulletin

4     restaurant in Reston Town Center.

5        A.  Okay.  Yes.

6        Q.  So how many people ultimately planned to attend

7     the luncheon at Ted's Bulletin restaurant?

8        A.  We had with the coworkers about eight possibly

9     that was going to attend.

10        Q.  And how did you travel to the event?

11        A.  I travelled with Camille, along with another

12     coworker.

13        Q.  So there were only three of you in that car?

14        A.  Yes.

15        Q.  Whose car was it?

16        A.  Camille Sedar's.

17        Q.  And there was a second car as well with some

18     other folks?

19        A.  There were other cars, yes, but I was not with

20     them.  We did not depart at the same time.

21        Q.  Was there more than one other car?

22        A.  There was more than one other car, but I only



1  departed with Ms. Sedar.

2      Q.  And how far is it from the Department of Defense

3  offices where you work over to Reston Town Center?

4      A.  Probably about 15 minutes.

5      Q.  And was there anything unusual about that ride

6  over?

7      A.  Nothing at all.

8      Q.  And what do you remember about the weather that

9  day?

10     A.  It was sunny and it was hot.

11     Q.  Sunny and hot in November still?

12     A.  At that time it wasn't cold, we didn't have on

13 bulky coats.  It was a pretty good day.

14     Q.  But you remember it as a bright sunny day?

15     A.  It was bright to me.  I don't remember exactly

16 what I had on at that time.

17     Q.  As far as the roadway and sidewalks in that

18 vicinity, was it dry?

19     A.  Yes.

20     Q.  Do you remember where Ms. Sedar parked her car?

21     A.  We parked in the garage at Reston Town Center.

22     Q.  Do you know which garage it was?  Some people



1  have referred to it as the "green garage".

2      A.  I'm not that familiar with it.  I just know it

3  was across from the restaurant and it was Reston parking

4  garage for the town center.

5      Q.  When you parked the car and got out, were you on

6  a level with the street or did you have to climb or

7  descend stairs or anything like that?

8      A.  Yes, we walked upstairs before we exited the

9  building.

10     Q.  And how close to the stairs did you park?

11     A.  We parked on one level and we walked upstairs.

12 So we was probably on the second level and we walked up

13 to whatever level was closest to the exit.

14     Q.  How far was the parked car to the stairs, if you

15 remember?

16     A.  I would not know the exact distance.  I just know

17 we walked upstairs before we exited out of the building.

18     Q.  And when you got to the top of the stairs, can

19 you recall how close you were to the exit and the

20 outside of the parking structure?

21     A.  Probably about ten steps.  Once I became level

22 off of the stairs exiting out of the garage before we



1   there anything unusual about the way that Ms. Sedar was

2   walking that day?

3      A.  No, she walked the same way as she exited out of

4   her vehicle to the street.

5      Q.  Do you remember any of the conversation that was

6   going on as you were walking up the stairs and exiting

7   the parking garage?

8      A.  We were just having general conversation.  It was

9   more of the conversation I was having with the gentleman

10  that was with me more than Ms. Sedar because she was

11  walking a couple feet/steps ahead of me.

12     Q.  The gentleman that was with you, what was his

13  name?

14     A.  Ron.

15     Q.  And last name?

16     A.  We haven't worked together in awhile.  I don't

17  remember his last name.

18     Q.  But his first name was Ron?

19     A.  Mm-hmm.

20     Q.  And do you remember the subject of the

21  conversation you were having with Ron as you ascended

22  the stairwell and started out of the parking garage?



1      A.  I think the conversation pretty much dealt with

2   his new position:  He was going to be departing soon.

3              MR. SENSENIG:  Can I just interject for one

4   second?  I just want to make sure the record's clear.  I

5   think she may be misremembering the first name, and I

6   don't think that's disputed.  But we can clear it up

7   later, I just don't know offhand.

8              MR. HUDGINS:  I don't have the names of the

9   other witnesses handy.

10             MR. SENSENIG:  I've got it, if you want me

11  to suggest it and see if it sounds right to you.

12             MR. HUDGINS:  I'll tell you what, why don't

13  we go off the record?

14             MR. SENSENIG:  Sure.

15      (Whereupon the proceedings go off the record.)

16             MR. HUDGINS:  Let's go back on had record.

17  BY MR. HUDGINS:

18      Q.  We just had a discussion off the record, I think

19  everybody's in agreement.  So maybe we could get back on

20  track and have you state for the record the name of the

21  gentleman that you were talking with as you walked up

22  the stairs and out into the daylight.



1      A.   Rob Rapanut.

2      Q.   And I had asked you if you recalled what you were

3  talking to Rob about.

4      A.   Yes, the conversation may have focused on Rob's

5  departing, because he was scheduled to leave soon to his

6  new agency.

7      Q.   Was he the guest of honor?

8      A.   He was not the guest of honor.

9      Q.   It was another guy?

10     A.   It was a military individual.

11     Q.   What was that individual's name?

12     A.   There again I'm not going to remember the exact

13  name because he's been departed for several years now.

14  He was a major in the military.

15     Q.   He was not in this group of three that you were

16  --

17     A.   He was not.

18     Q.   So as you and Rob were walking up the stairs and

19  coming out, you sensed that Ms. Sedar was heading for

20  that middle section on the stairwell?

21     A.   Yes.

22     Q.   At some point she fell?



1     A.  Yes.

2     Q.  Did you see the start of her fall?  What was the

3   first thing that drew your attention to her having

4   started to fall or being involved in a fall?

5     A.  What drew my attention was -- I didn't actually

6   see the beginning of the fall.  I saw the fall --

7   meaning she had already landed in the area in which she

8   was departing from/leaving from, that stairs that was

9   pretty much the area that she was walking from.

10    Q.  So was she on the ground when you first noticed

11  something was wrong?  Or was she almost on the ground?

12  What was the exact position of her body when you noticed

13  that something was going wrong?

14    A.  When I noticed something was drastically wrong is

15  the actual instance when she actually hit the ground.

16    Q.  So she had fallen and hit the ground?

17    A.  Face down.

18    Q.  And you were in conversation with Rob and you

19  looked up, and that's what you saw?

20    A.  Well, the conversation ceased because we both was

21  coming up the stairwells at the time.  And when she

22  actually fell, she went flat faced down, but at that



1  point the conversation ceased.

2      Q.  How far behind Ms. Sedar were you when you all

3  got to the top of the stairwell and she was exiting the

4  building?

5      A.  Probably about 10 steps away from her or less.

6      Q.  So she was "leading the pack", or so forth?

7      A.  Yes, she was in front.

8      Q.  Was there a reason she was that far ahead of you

9  and Rob?

10     A.  She knew where she was going.  She was familiar

11 with the area, and she knew where the restaurant was.  I

12 didn't think Rob was, so that was probably more than

13 likely since she was driving as well.

14     Q.  And you were following her lead?

15     A.  Yes.

16     Q.  Had she said anything about having parked in that

17 garage before or knowing that area?

18     A.  We didn't discuss it at all.

19     Q.  Did you get the sense that she knew where she was

20 going?

21     A.  Absolutely.

22     Q.  And so you and Rob followed along behind her just



1   as you were going up the steps and exiting the parking

2   structure?

3       A.  Yes.

4       Q.  Now, when you first noticed Ms. Sedar having

5   fallen, can you put an X on Exhibit B on the area where

6   you first saw her laying.  And you've circled an area

7   that part of it is the sidewalk and part of it is the

8   bottom-most step.  And can you describe how her body

9   appeared to you when you first noticed it in that area?

10      A.  Her legs was still on the steps but her face was

11  actually on the concrete.

12      Q.  So it looked like she fell face-first down the

13  stairs?

14      A.  Yes.  Yes.

15      Q.  And was her -- how much of her body was on the

16  sidewalk portion?

17      A.  On the concrete of the sidewalk?

18      Q.  Yes, Ma'am.  Starting with the top of her head

19  and coming down her body, how much of her body was on

20  the sidewalk portion?

21      A.  The sidewalk portion had pretty much her face up

22  until her waistline was actually a little further on the



1    sidewalk.

2       Q.   And part of her body was still on the steps?

3       A.   Yes.  Her legs.

4       Q.   Just her legs?

5       A.   From what I can remember.

6       Q.   And if you had to say what part of the body was

7    divided between sidewalk and steps, would you say it was

8    her waist or lower or higher?

9       A.   I would say her waist area was on the sidewalk,

10   and the rest of her body was on the stairs.

11      Q.   And that was the first thing that drew your

12   attention, seeing her in that position?

13      A.   Absolutely.

14      Q.   So what did you do?

15      A.   I went to her side and I called out her name.

16   And she didn't move, she didn't say anything, but I

17   could tell she was still breathing.  I again talked to

18   Ron [sic], "We need to call the ambulance."  So Ron said

19   -- because he was surprised and he didn't know what to

20   do at the time.  So that is when I said, "Well, I'll

21   call the ambulance, you stay with her."  So we was

22   getting on the phone to call an ambulance, and at that



1    time someone from across the street hollered over to us.

2        Q.   And they called the ambulance?

3        A.   They had said, "We saw the whole thing and the

4    ambulance is on the way."  And they had called someone

5    at the time I was calling someone as welt.

6        Q.   You didn't know who those people were?

7        A.   I didn't know the lady at all.

8        Q.   It was a lady?

9        A.   It was a lady.  Evidently she may have been at a

10   restaurant; there was a place across the street.  But

11   she came out and she said, "I called the ambulance,

12   they're on their way, and I saw everything."  That's

13   all.  I didn't get her name, but it was a female.

14       Q.   Did you ever talk to her or see her after that

15   day?

16       A.   I never seen her again.

17       Q.   Have you talked to anybody about who that person

18   might have been later?

19       A.   No.

20       Q.   So did the ambulance arrive?

21       A.   The ambulance did arrive.

22       Q.   And I take it that Med-tech's took care of Ms.



1  Sedar and got her loaded into the ambulance and off to

2  the emergency?

3      A.  Yes, they did.

4      Q.  Now, when you came out and saw Ms. Sedar in that

5  position on the steps, did you have any idea why she had

6  fallen?

7      A.  I assumed that her fall was because of the brick

8  that was not level, and she had on flat shoes at the

9  time, she did not have a purse.  So I told Ron [sic] the

10  same thing, that the bricks was not level and there was

11  that much space between the brick and the actual ground,

12  the step --

13      Q.  Is that at the very top of the stairs?

14      A.  The very top of the stairs.  The bricks was not

15  level, you could actually press one and it would move.

16  And it was like two bricks in that particular area that

17  we would have been -- we would have all exited at that

18  same location.

19      Q.  Now, you didn't see her step on those bricks?

20      A.  I didn't see her step on the bricks.  No, Sir.

21      Q.  And when you came and went down to give aid to

22  Ms. Sedar, you didn't have any trouble walking down



1  those steps?

2     A.  No, I did not, because I walked over to the side.

3     Q.  Who suggested to you that the bricks that you've

4  just talked about might have been a problem?

5              MR. SENSENIG:  Objection.  Stating facts not

6  in evidence.

7              MR. HUDGINS:  Let me withdraw that and I'll

8  approach it in a different way.

9  BY MR. HUDGINS:

10    Q.  You've testified that you thought that a loose

11 brick or bricks might have been the cause of Ms. Sedar's

12 fall.  Was that a conclusion that you reached yourself

13 or is that somebody else's idea that you shared?

14    A.  No.

15    Q.  How did it come about?

16    A.  That was the conclusion I reached because I went

17 back to the area and I looked at the bricks.  I stepped

18 on the bricks, and I saw the different level of the

19 bricks.  I even brought it to others' attention, a

20 parking attendant that was there, as well as my

21 coworker.

22    Q.  And that was after you went don to where Ms.



1   Sedar was?

2      A.  Mm-hmm.

3      Q.  Now, when you first saw her on the ground having

4   fallen, and your immediate instinct was to go right down

5   the steps to help her.  Would that be fair to say?

6      A.  Yes.

7      Q.  Did you notice any loose bricks at that time when

8   you walked right over?

9           MR. SENSENIG:  Objection.  That's not what

10   she testified.  She testified she went around the side.

11   She didn't testify she went the same way.

12   BY MR. HUDGINS:

13      Q.  Where was you path of travel?

14      A.  My path of travel was on the side of where the

15   bricks was located that was loose.

16      Q.  On Exhibit B we've got a circle at the top of the

17   stairs.

18      A.  Yes.

19      Q.  So that circle at the top of the stairs, is that

20   where those bricks you're talking about were?

21      A.  Yes, they were.

22      Q.  My question is:  When you came out with Ron [sic]



1  and you're talking to Ron [sic] and you looked and you

2  saw Ms. Sedar on the ground, and your first instinct was

3  to go help her.  Is that fair to say?

4      A.  My first instinct was to help her, but I also

5  noticed the level of the bricks before I actually --

6  that's why I went to the side and didn't follow the same

7  path.

8      Q.  So you noticed there was a problem with some

9  bricks?

10      A.  Yes, I did.

11      Q.  Were they obvious to you that there was an issue

12  there?

13      A.  They were more obvious to me because that was the

14  area that she had just fallen from.

15      Q.  But you didn't see the fall?

16      A.  I didn't actually see the direct fall.

17      Q.  So you didn't have any idea why she had fallen

18  when you first saw her?

19      A.  I didn't have any idea why she had fallen, but I

20  have a habit of looking at the ground as I'm walking,

21  and I noticed the bricks before I exited.

22      Q.  Now, as you sit here today and you think back



1  upon what you saw, if Ms. Sedar had not fallen, would

2  you have seen those bricks and stepped around them?

3           MR. SENSENIG:  Objection:  Speculative.

4  BY MR. HUDGINS:

5    Q.  You can answer.

6    A.  Can you rephrase that question again?

7    Q.  I want you to get in your mind's eye how those

8  bricks looked the day of Ms. Sedar's fall.

9    A.  Mm-hmm.

10   Q.  You say you have a habit of looking at the ground

11  when you walk.

12   A.  Mm-hmm.

13   Q.  And I think you've testified that when you went

14  to Ms. Sedar's aid you stepped around what you've

15  described as loose bricks?

16   A.  Yes.

17   Q.  And my question is, based on your recollection

18  sitting here today:  If Ms. Sedar had not fallen, would

19  you have stepped around those bricks?

20           MR. SENSENIG:  Objection:  Speculative.

21   A.  Yes.

22  BY MR. HUDGINS:



1    Q.  So the recollection that you have of the

2    condition of those bricks was such that you would have

3    noticed it whether or not she had fallen?

4              MR. SENSENIG:  Again, same objection:

5    Speculative.

6    A.  There's no way to know exactly if I would have

7    been able to see that the bricks was there at that time

8    to say definitely.

9    BY MR. HUDGINS:

10   Q.  But that day you looked and saw something that

11   caused you to step around?

12   A.  Yes.

13   Q.  Let's see if I can get a little more description.

14   Did you go back and wiggle the brick with your foot?

15   A.  I did go back up to the stairs.

16   Q.  And did you take any pictures yourself?

17   A.  I did not, but I asked coworkers to take

18   pictures.

19   Q.  And when you wiggled the bricks, was it more than

20   one loose or just one that was loose?

21   A.  It was more like two.  They were side-by-side.

22   Q.  We've got some photographs here that maybe we can



1  identify those bricks.  Did you put your foot on the

2  brick to wiggle it, to test it?

3     A.  I did, I put my foot.  Yes, I did with my foot.

4     Q.  And when you did that, did the one end of the

5  brick raise up so that it was no longer level with the

6  other bricks?

7     A.  When I put my foot on it, it moved.  It was

8  already not level because there was space between the

9  brick and the actual concrete, there was space there.

10    Q.  Like a gap?

11    A.  Yes, there was a gap between it.

12    Q.  Did you notice that gap when you went down the

13 stairs to help Ms. Sedar?

14    A.  I noticed the gap, but I did not notice how loose

15 the brick was until I actually tested it myself.

16    Q.  But you saw the gap?

17    A.  I did see the gap.

18    Q.  Was that easy to see as you --

19    A.  If you was not looking down at the ground, it

20 wasn't easy to see unless you stepped on the brick

21 itself.

22    Q.  So you put your foot on one end of the loose



1  brick.  Did the other end raise up so that it was not

2  level with the other bricks, or was it just a little

3  wobbly within the space that it was seated?

4     A.  I cannot remember precisely whether the entire

5  brick moved up or down, but I do know they both moved.

6     Q.  They wobbled from side-to-side?

7     A.  Yes.

8     Q.  But you don't recall them tilting up?

9     A.  No, I do not.

10    Q.  Anything else about that vicinity that you

11 focused on as a possible cause of Ms. Sedar's fall?

12    A.  No. There wasn't any debris on the ground, there

13 was no gravel.  As you could see it was light, there was

14 no snow.  It was not raining so there wasn't no weather

15 issue that would have caused her to slip.  It wasn't wet

16 in the garage.  She did not have on heals, something

17 that may have distracted her or caused her heal getting

18 caught in it.  There wasn't anything else that I could

19 see that would have caused it.

20    Q.  Sometimes people stumble when there's nothing

21 wrong with the stairs or nothing wrong with where

22 they're walking.



1     A.  Mm-hmm.

2     Q.  Did you think that was a possibility, that she

3  had just over stepped or somehow fallen down the stairs?

4     A.  She seemed perfectly fine as she exited the car

5  when we came out of the garage with her walking.

6     Q.  Did you have it in your mind that she could have

7  just slipped or tripped for some other reason besides

8  those bricks?

9     A.  I didn't see anything out there on the ground

10  that would have caused her to trip.

11     Q.  Were you able to talk to Ms. Sedar before the

12  ambulance took her away?

13     A.  Yes.

14     Q.  And what were you able to say to her?

15     A.  I asked her her name.  She wanted to get up and

16  wanted to move once she became conscious and she was

17  aware of the area.  I went with her into the ambulance

18  as well to the hospital.

19     Q.  Did Ms. Sedar say anything about what caused her

20  to trip and fall?

21     A.  No.  She said, "What happened?"

22     Q.  She just said she fell?



1     A.   Right.

2          MR. SENSENIG:   Objection:   That wasn't

3   correct.

4          MR. HUDGINS:   Oh, she asked what happened?

5     A.   She said, "What happened?"

6   BY MR. HUDGINS:

7     Q.   I'm sorry.   I misunderstood.   I think everybody

8   here would agree that Ms. Sedar has testified and has no

9   memory of that event.   In conversations that you had

10  with Ms. Sedar that day or later, did she ever talk

11  about the conditions of the sidewalk or stairs?

12    A.   We talked about it later.   She never said

13  anything that I can recollect as far as the condition.

14  It was just like she had just lost memory of what

15  happened for a period of ten minutes.   She could not

16  remember what caused her to fall.

17    Q.   Now, the third individual, Ron [sic] that we've

18  talked about --

19    A.   Rob.

20    Q.   Rob, sorry, Rob.   Was he standing next to you as

21  you came out and noticed that Ms. Sedar had fallen or

22  was he behind you?   Where was he located?



1    A.  He was slightly ahead of me just a few steps, as

2  I was the last one to actually come out into the open

3  area.

4    Q.  Did he ever say anything to you indicating that

5  he saw Ms. Sedar fall, or did he notice her around the

6  same time you did?

7    A.  I think he was more of a shock to see her in that

8  position.  And then he's like, "Oh, my gosh" kind of

9  atmosphere.  He was startled.

10   Q.  I know you can't tell me what was in his mind, so

11 I'll just ask you what he said to you that day or later.

12 Has he ever said that he saw Ms. Sedar trip on anything

13 or did he first notice her on the ground like you've

14 described?

15   A.  I can't recollect us having a conversation except

16 to say that that that was a terrible fall that she had.

17 I don't remember us having any more detailed

18 conversation on that.

19   Q.  Now, you went back and looked at the loose brick

20 or loose bricks.

21   A.  Yes.

22   Q.  Did he go there with you?



1    A.  He did.

2    Q.  So the two of you discussed that after the fall?

3    A.  Yes.  Yes.

4    Q.  Was that after the ambulance had taken Ms. Sedar

5  -- no, because you rode with her in the ambulance.

6    A.  No.  I rode with her in the ambulance.  It was

7  the conversation we was having while Ms. Sedar was still

8  there, and I indicated he should take pictures of the

9  brick area.

10   Q.  Did he take pictures?

11   A.  I think he took pictures and he had coworkers

12 that was also coming to take pictures.

13   Q.  Let's to take a look at some of these photographs

14 that I've got there before you.  We've already talked

15 about Exhibit B -- can I see that one again, Ma'am?

16   A.  Mm-hmm.

17   Q.  Just so the record is clear on Exhibit B, we've

18 got three circles that you've drawn on Exhibit B.

19   A.  Yes.

20   Q.  The small one is where you exited the stairwell.

21   A.  Yes.

22   Q.  The next one is the top of the stairs in the



1    vicinity where you have described seeing a loose brick

2    after the fall?

3        A.   Yes.

4        Q.   And the third circle at the bottom, that's the

5    area where you've talked about where Ms. Sedar was

6    laying when you first noticed something was wrong?

7        A.   Where her legs were actually laying, not her

8    entire body.

9        Q.   Let's set that one aside and take a look at

10   Exhibit C.  That's another view of the stairwell.  Does

11   that appear to be a fair depiction of how that area

12   looked on the day of Ms. Sedar's fall?

13               MR. SENSENIG:  Objection.

14               Are you saying these pictures were taken the

15   same day of the fall?  Is that what you're representing?

16               MR. HUDGINS:  No, I'm asking her --

17               MR. SENSENIG:  Are you asking her generally

18   or about the condition?

19               MR. HUDGINS:  These are the only photographs

20   we have.  So what I'm asking her --

21               MR. SENSENIG:  We have other photographs of

22   the actual day.



1          MR. HUDGINS:  Well, let's start with this

2     one.

3     BY MR. HUDGINS:

4     Q.  Is this photograph a fair depiction of how the

5     area looked on the day of Ms. Sedar's fall?

6     A.  I would say it looks very clean, like someone had

7     just cleaned the area.  I'm sure there was things on the

8     ground at the time of the fall.  It did not look that

9     clean.  In other words, there was dirt; there may have

10    been leaves on the ground; it did not look that clean.

11    It was like someone had just cleaned the area; it wasn't

12    that clean.  That was the picture of me -- yes.

13    Q.  Would this be a fair depiction of the way the

14    bricks and the stairs looked on the day of Ms. Sedar's

15    fall?

16    A.  From there you can't see the level of the bricks

17    -- the unlevel [sic] of the bricks.  You can only see

18    that it looks fine from there.  The entire area looks

19    like it's fine, so you can't see the leveling of the

20    bricks from this picture.

21    Q.  On the day of the accident, if you were to stand

22    in the same location from which this photograph in



1   Exhibit C was taken, is that the way it would have

2   looked that day?

3            MR. SENSENIG:  Objection:  Speculative.

4   Unless you can establish she was actually standing the

5   and what time she was looking at it from that angle.

6   BY MR. HUDGINS:

7      Q.  Well, I'll start with that question:  Did you

8   walk around after the fall and just kind of look at the

9   area from different angles?

10     A.  After the fall?  No, I went to the top of the

11  stairs where she had actually fallen.  I didn't look at

12  the other area; only the area that we exited.

13     Q.  Just in that middle section, you've already put a

14  circle on the other exhibit where the bricks that you

15  have talked about were located.  But is that generally

16  the way it looked that day, without going up and putting

17  your foot on a brick?

18     A.  Without putting my foot in the area -- yes, that

19  looks like the location.

20     Q.  Take a look at Exhibit D.  Is that a picture of

21  the stairs where Ms. Sedar fell?

22     A.  Yes.  It's the stairwell.



1    Q.  Same question generally:  Is that the way that

2   area looked on the day of her fall but maybe there were

3   some leaves or something on it?

4    A.  Yes, that's the area.

5    Q.  Take a look at Exhibit E.  What do you see there?

6    A.  I see the area where there's the gap in the

7   bricks that were not level, as well as other

8   debris/leaves of sort on the ground.

9    Q.  And so, do you recognize Exhibit E as being a

10  photograph taken on the day of Ms. Sedar's fall?  Or do

11  you know?

12   A.  I recognize the area in the way that it looked as

13  I remembered it.

14   Q.  So Exhibit E, in your recollection, is a

15  representation of how those bricks looked on the day of

16  Ms. Sedar's fall when you went back and looked at the

17  top of the steps?

18   A.  Once I stepped on it, yes.

19   Q.  Is this photograph taken after you stepped on the

20  brick or before?

21   A.  I cannot say whether it was taken before or

22  after.  I did not take the photo, so I don't know.  But



1  I know what the area looked like.

2     Q.  Did you see anybody taking photos?

3     A.  I saw Rob with his cellphone, but I did not see

4  him take the picture, no.

5     Q.  Did you know if anybody had stepped on the bricks

6  or anything like that after Ms. Sedar was there before

7  this photograph was taken?

8     A.  I didn't see that, if anyone else stepped on the

9  bricks.

10    Q.  Now, you testified when you went back to the top

11 of the stairs the bricks were level but loose.

12    A.  They were not level.  They were not level at all.

13 They were like you see the bricks now, they were not

14 level.  Like the bricks beside them, the very end,

15 that's a level brick; this brick was not level.

16    Q.  Which brick is that?

17    A.  The two bricks that's there.

18    Q.  When you went back up to the top of the stairs,

19 compared to this photograph, what did you see?

20    A.  I saw the bricks that was not level; I saw the

21 gap between the brick and the concrete that's right

22 here.



1    Q.  Did it look exactly like that in Exhibit E?

2    A.  The brick that's up may have been down because

3  there's space to the point where you could have gotten

4  your feet -- your toes -- I wear pointy shoes, so my

5  foot would have gotten stuck there.

6    Q.  What kind of shoe?

7    A.  Pointy.

8    Q.  So as you sit here today, can you state with

9  certainty that this is exactly how the bricks looked

10  immediately after Ms. Sedar's fall?

11    A.  I cannot state certainly that that's exactly how

12  it looked.  I do know that it looked unlevel, and I

13  noticed the gap.

14    Q.  But you don't know how -- as you sit here today,

15  can you tell me in inches how big the gap was?

16    A.  Between the brick and the concrete?

17    Q.  Yes, Ma'am.

18    A.  About an inch, maybe inch and a half.

19    Q.  So it looks like there's some caulk material

20  between the bricks and the concrete that has been pushed

21  down.  Is that a fair statement?

22          MR. SENSENIG:  Objection as to the



1  characterization of "pushed down".

2  BY MR. HUDGINS:

3     Q.  Or it's sagged down, it's gone down.  As you sit

4  here today, can you -- would it be possible for you to

5  give me a measurement on how raised up one brick was

6  compared to the rest of the surface?

7     A.  I could not give an exact measurement.

8     Q.  Because I think when we talked originally you

9  went up and your recollection was that you put your foot

10  on the brick and it wiggled.

11     A.  Mm-hmm.

12     Q.  And you thought it wiggled side-to-side more than

13  up-and-down?

14     A.  Not exactly side-to-side or up-and-down.  I

15  couldn't say which one.  I know that they both moved.

16     Q.  Take a look at Exhibit F, it's the next one in

17  your stack.  Is there anything in that photograph that

18  you recognize from the day of the accident?

19     A.  No.  It looks the same as far as the bricks not

20  being level.

21     Q.  When you look at Exhibit F, do you see anything

22  that you recall from the day of the accident?



1              MR. SENSENIG:  Objection:  Asked and

2    answered.

3              MR. HUDGINS:  I just want to make sure we're

4    all talking about the same thing.

5    BY MR. HUDGINS:

6       Q.  Does Exhibit F show anything that you recollect

7    looking at on the day of Ms. Sedar's fall?

8       A.  It shows that there is a gap between the brick

9    and the concrete.

10      Q.  Now, right in the very center of Exhibit F, this

11   photograph, are two bricks.

12      A.  Yes.

13      Q.  Do those two bricks appear to be the same bricks

14   we're talking about that you wiggled with your foot?

15      A.  They look like the same bricks.

16      Q.  And then Exhibit G is a photograph that was taken

17   from a wider perspective?

18      A.  Yes.

19      Q.  The camera person has stepped back.  Are we

20   looking at the center of this photograph at the same two

21   bricks?

22      A.  Yes.



1     Q.  And we had a discussion about what you saw when

2   Ms. Sedar was laying down halfway into the sidewalk at

3   the bottom of the steps.  And you said you noticed --

4   because you have a habit of looking at the ground --

5   there was something you needed to step around?

6     A.  Mm-hmm.

7     Q.  What was that, as you look at Exhibit G?

8     A.  The bricks that was not level.

9     Q.  So those are the same two bricks we looked at in

10  Exhibit F and they're depicted also from a different

11  perspective in Exhibit G?

12    A.  Mm-hmm.

13    Q.  So you didn't have any problem seeing that and

14  stepping around it as you went to Ms. Sedar's aid?

15          MR. SENSENIG:  Objection:  Mischaracterizes

16  what's she said as far as her focus.

17          MR. HUDGINS:  I just want to tie it to this

18  photograph.

19  BY MR. HUDGINS:

20    Q.  In your earlier testimony you testified you have

21  a habit of looking at the ground when you're walking.

22  Is that fair to say?



1    A.  Yes.

2    Q.  And that when you saw Ms. Sedar on the ground,

3   you went down the stairs in a way that you felt was

4   safe?

5    A.  That I did.

6    Q.  And I believe you testified that you stepped

7   around --

8    A.  It would have been the area that is level

9   completely, that's around the area that the brick was

10  not level.

11   Q.  And we're talking about those same two bricks

12  that are right in the middle of Exhibit G?

13   A.  We're talking about the bricks that's on the left

14  side where it's level, I stepped over it.

15   Q.  On the left side?

16   A.  Not on the right, on the left side, on the level

17  area.

18   Q.  Can you take a pen?  Now, you're putting a big

19  circle on the area where you walked?

20   A.  I stepped over, yes.

21   Q.  That's where you walked down the stairs?

22   A.  Mm-hmm.



1    Q.  And you walked there because why?

2    A.  Because I saw that the bricks was not level.

3    Q.  And did you have any trouble seeing that those

4    bricks was not level?

5           MR. SENSENIG:  Objection:  Asked and

6    answered.

7           MR. HUDGINS:  Withdraw that question.

8    BY MR. HUDGINS:

9    Q.  Exhibit H is another photograph of, I believe,

10   the same two bricks.  Based on your recollection, is

11   that how they looked on the day of the fall?

12   A.  Yes.

13   Q.  Exhibit I.  As you look at Exhibit I is there

14   anything you recognize from the day of the accident?

15   A.  Just the bloody area where she laid.

16   Q.  And that's the area where Ms. Sedar ended up

17   after her fall?

18   A.  Face down.  Yes, Sir.

19   Q.  Same thing with Exhibit J:  Is that what you saw

20   after Ms. Sedar was moved from the bottom of those

21   stairs?

22   A.  Yes.



1    Q.   Now, where was she bleeding?  What part of her

2  body?

3    A.   Her facial area was where the blood was, and her

4  arms were blood -- and I think she had blood on her legs

5  where she had actually fallen down the stairs.

6    Q.   Now, Exhibit K, the last photograph that we have:

7  Do you recognize that photograph as taken of the area at

8  the top of the stairs that we've been talking about all

9  day here?

10    A.   Yes.

11    Q.   Do you know who these people in the photograph

12  are?

13    A.   I do not.  There may have been one of the

14  paramedics or someone from the ambulance service,

15  because he has on gloves and he has a phone.  The young

16  lady may have been Ms. Dibella who was the other female

17  that was going to be attending the luncheon.

18    Q.   Do you see in that photograph the bricks we've

19  been talking about?

20    A.   Yes.

21    Q.   Would it be fair to say that there's a gentleman

22  with khaki pants and a pair of brown shoes -- you can't



1  see any other part of his body other than his hand and

2  his leg -- that the two bricks that we've been talking

3  about are immediately to the right of the tip of his

4  shoe?

5     A.  Yes.

6     Q.  Those are the same bricks that we're talking

7  about?

8     A.  Yes.

9     Q.  Now, you rode in the ambulance with Ms. Sedar?

10    A.  Yes.

11    Q.  You stayed there in the emergency department with

12  her for a time?

13    A.  Yes.

14    Q.  When did you depart the hospital?

15    A.  It was several hours later.  Once I called back

16  to the office to see if they could reach out to family

17  members to get in contact with someone to let them know.

18  I wanted to talk with the emergency doctors to let them

19  know that she was not married, and she had no one living

20  with her, that it probably would not be wise to allow

21  her to go home because there was no one there to

22  actually see after her.



1    Q.  And it was awhile before Ms. Sedar came back to

2    work?

3    A.  Yes.

4    Q.  Did you talk with her or visit with her during

5    the time of her absence from work?

6    A.  I talked with her and I talked with family

7    members as well.

8    Q.  Through the time of her healing and so forth?

9    A.  Yes.

10   Q.  And she never could remember anything about the

11   day of that accident?

12   A.  Even when she came back to work, when she was

13   only working a few hours because she couldn't do the

14   full eight hours, she didn't want to think about it.

15   But she asked me what happened, because she could not

16   remember.  And I think the doctors told her she went

17   unconscious, that she was unconscious for a brief moment

18   and she could not remember.

19   Q.  Did you share with Ms. Sedar your thoughts about

20   what might have caused her to trip and fall?

21   A.  I told her about the area which the bricks was

22   not level and that we took pictures of the area.  And



1  she just remembered being in the ambulance.

2      Q.  So did you tell Ms. Sedar you did not see her

3  fall?

4      A.  I did not tell her I did not see her fall.

5      Q.  Did you tell Ms. Sedar that you had a suspicion

6  about the bricks, but you did not actually see her step

7  on those bricks?

8      A.  No, I didn't tell her I had a suspicion about the

9  bricks.  We discussed the area and what it looked like.

10     Q.  So has anybody talked to you and said they

11  actually saw where Ms. Sedar stepped and began her fall?

12     A.  No.  No one talked to me beside the young lady

13  that was across the street that said she saw the whole

14  thing.  There was no one that actually said, "I saw

15  exactly what happened", no.

16     Q.  So you didn't see what caused the fall?

17         MR. SENSENIG:  Objection.

18  BY MR. HUDGINS:

19     Q.  As it happened?

20     A.  Not exactly.

21     Q.  So this discussion about loose bricks, that's

22  your best guess about what caused it to happen.  Would



1  that be fair to say?

2          MR. SENSENIG:  Objection:  Hearsay.

3     A.  I wouldn't call it a guess.  I would pretty much

4  say it was more of a possibility that it was the reason

5  for her fall.

6  BY MR. HUDGINS:

7     Q.  But you can't sit here and state for certain that

8  that's what caused the fall, can you?

9     A.  Not one hundred percent certainty.  It's just an

10 assumption.

11    Q.  Was anybody talking on a cellphone in your group

12 when they were leaving the garage --

13    A.  No.

14    Q.  -- and going toward the restaurant?

15    A.  No.  Nobody used a cellphone.

16    Q.  You've seen people walking around and talking on

17 a --

18    A.  Absolutely.  I'm too worried about falling to do

19 that myself.

20    Q.  Now, was Ms. Sedar talking on a phone or did she

21 are a phone with her?

22    A.  She did not have a phone with her, and she was



1  not talking on a phone.

2     Q.  How about you and the other gentleman?  Did you

3  all have phones?

4     A.  No one was talking on the phone.

5     Q.  Was Ms. Sedar carrying anything when she was

6  exiting the garage heading to the restaurant?

7     A.  From what I can remember, she had a photo and she

8  had a wallet.

9     Q.  When you say a "photo", was it a --

10    A.  A paper photo.

11    Q.  Was that part of the -- for the celebration?

12    A.  Yes, Sir.

13    Q.  How big was the photo?

14    A.  Probably 11 by 14.

15    Q.  Size of a long piece of --

16    A.  It was actually a portrait-sized photo -- I'm

17  sorry -- as far as the size.

18    Q.  Bigger?

19    A.  Bigger.

20    Q.  You've got your arms stretched out like a

21  yardstick wide?

22          MR. SENSENIG:  Objection to that



1  characterization.  She said about 11 by 14.

2  BY MR. HUDGINS:

3    Q.  Well, 11 by 14 is a little bigger than this piece

4  of paper?

5    A.  That's 8 1/2 by 11.

6    Q.  So you had your arms out like it was a pretty

7  good size photo.  Was it on like a poster board or

8  something like that?

9    A.  It was just plain paper.  It was paper, it was

10  not a cardboard.

11    Q.  But it was a photo that was enlarged?

12    A.  Yes.

13    Q.  When you had your hands out, I thought you had it

14  out about three feet apart.  Would it be fair to say it

15  was about a three-foot-wide portrait?

16    A.  It could have been three-foot-wide.  It was a

17  large photo.

18    Q.  So Ms. Sedar had that and she was carrying that

19  in one hand?

20    A.  And she had a wallet as well, a change purse.

21    Q.  Describe the wallet?

22    A.  It was like a change purse, like a women's



1  regular wallet in size.

2    Q.  Dimensions of that would be, what?  Eight inches

3  by five inches, something like that?

4    A.  Something you could carry in your hand.

5    Q.  But not a pocket book?

6    A.  No.  No purse.

7    Q.  And what do you recall about the clothes that Ms.

8  Sedar was wearing that day?

9    A.  She had on a skirt and a top with a suit jacket.

10  Not a long skirt, she doesn't wear short skirts, but it

11  wasn't long.

12    Q.  Knee length or shorter?

13    A.  A little below the knee.

14    Q.  And describe the shoes you recall her wearing

15  that day.

16    A.  She had on flat shoes, maybe an inch heel.

17    Q.  Rubber heel or leather?  If you recall, or do you

18  know?  The whole sole, was it all rubber?

19    A.  It was probably rubber.  I would not say it was

20  leather.

21    Q.  Did you provide a statement of what happened for

22  anybody after the fact?



1      A.   The paramedics.  When they came around they did

2   ask what had happened.  And I gave them the details of

3   what I could remember that happened, and where we had

4   came from walking up the stairs as we exited the garage.

5      Q.   So you told the paramedic what you thought had

6   happened?

7      A.   Mm-hmm.

8      Q.   Did you give a statement to anybody else?

9      A.   No.

10      Q.   How about Ms. Sedar's lawyers?  Have you had any

11   conversations with them before you came here today?

12      A.   Yes, I've had conversations with them.

13      Q.   How many conversations would you say?

14      A.   At least two.

15      Q.   In person or by phone?

16      A.   In person and by phone.

17      Q.   And the in-person conversations with the

18   attorneys, where did those conversations take place?

19      A.   The conversation took place at the Reston

20   location, the area.  And I had met with him again at the

21   location in Charlottesville.

22      Q.   At their law offices in Charlottesville?



1    represents Camille Sedar in this action.  You've just

2    been asked a series of questions.  I'm going to try not

3    to go over ground that we've already plowed, but I do

4    want to just follow up with a few questions.  And I want

5    to start by going back to when you left the office, I

6    think it's already been established you were with

7    Camille and Rob Rapanut.  Is that accurate?

8        A.  Yes.

9        Q.  You went in Camille's car?

10       A.  Yes.

11       Q.  And Camille was driving?

12       A.  Yes.

13       Q.  Did you notice anything erratic about her

14   driving?

15       A.  No.

16       Q.  Did she during that time period complain about

17   anything?

18       A.  No.

19       Q.  Her driving was normal?

20       A.  Yes.

21       Q.  You pulled into the green garage?

22       A.  Yes.



1     Q.  You got out of the car?

2     A.  Yes.

3     Q.  Did she have any trouble or difficulty getting

4  out of the car?

5     A.  No.

6     Q.  I believe you testified you then walked towards

7  the stairwell?

8     A.  Yes.

9     Q.  Did she have any difficulty walking that length

10  to the stairwell?

11     A.  No.

12     Q.  Were you behind her at that time?

13     A.  Yes.

14     Q.  Did you see her walk up the stairs?  You

15  mentioned she walked up the stairwell.  Did you see her

16  walk up the stairwell?

17     A.  Yes.

18     Q.  Did she have any trouble walking up that

19  stairwell?

20     A.  No.

21     Q.  It's my understanding from your testimony that

22  this stairwell then put you out in the area that we see



1   in the area that is marked as Exhibit B.  Is that

2   accurate?

3       A.  Yes.

4       Q.  As you came around the stairwell, I believe you

5   said you started to come close to even with Mr. Rapanut?

6       A.  Yes.

7       Q.  And Ms. Sedar was in front of you?

8       A.  Yes.

9       Q.  Did you see the path she was walking on the brick

10  area?

11      A.  Yes.

12      Q.  So you saw her at that point?

13      A.  Yes.

14      Q.  While she was on the brick?

15      A.  Yes.

16      Q.  Was she distracted in any way?

17      A.  No.

18      Q.  I believe you already testified she wasn't on the

19  phone.

20      A.  No.

21      Q.  She wasn't looking up in the air?

22      A.  No.



1            MR. HUDGINS:  I'll object to any of these

2     leading questions.

3     BY MR. SENSENIG:

4        Q.  Where was she looking?

5        A.  Straight ahead.

6        Q.  If we can show the video.  And the question I'm

7     going to ask you is:  As you look at the video, with

8     relation -- and I want to just get a point of reference.

9     I'm not going to give you a point of reference.  I want

10    you, if you could, is to describe to us as you watch

11    this video, what path Ms. Sedar was on as she was

12    exiting on and on the brick area.  So if you could go

13    ahead and may the video.  And let's watch the whole

14    video.

15           (Whereupon a video plays.)

16       Q.  Looking at that video, are you table to state the

17    path you saw her take on the bricks?

18       A.  Yes.

19       Q.  Could you describe where that was in relation to

20    what was happening in that video?

21       A.  From the exit out of the garage, we were walking

22    down that path area more in the center of the exiting



1  out of -- the actual railing, where the brick was where

2  we were actually exiting to the street area.

3      Q.  Where was her path in relation to the gentleman's

4  foot that you see in the video?

5      A.  That was the path she was on walking.

6      Q.  You saw her on that path?

7      A.  Yes.

8      Q.  And the next thing you saw was her down on the

9  ground?

10     A.  Yes, it was.

11     Q.  When you had Exhibit B in front of you --

12         MR. HUDGINS:  Let me object to all of the

13  leading questions.

14  BY MR. SENSENIG:

15     Q.  Let me go back.  Did you see her while she was on

16  the brick?  Walking on the brick surface?

17     A.  Yes.

18     Q.  Did you see the path she was taking?

19     A.  Yes.

20     Q.  What path was she taking in relation to the

21  video?  Anything you can point to?

22     A.  From what I could see from the video, that's the



1  area she was exiting as she was going towards the

2  stairs.

3     Q.  And again, in relation to where the gentleman's

4  foot was on the brick, where was she exiting on the

5  ground?

6     A.  That was the exit area that she was going towards

7  when I saw her.

8     Q.  And then what's the next thing that you saw?

9     A.  Her being face down on the ground.

10    Q.  Did you see her in that area, and then seeing her

11  face down on the ground, cause you to focus more on that

12  brick area of which we've been speaking; less on the

13  brick area; or not focus any more or less?

14    A.  After seeing her and attending to her, I focused

15  on the brick area because I could see the level, that it

16  was not level.  The brick wasn't level and the space in

17  between the brick and the gap.

18    Q.  I want to back up a little bit:  Because I think

19  your testimony was:  As you were then walking across

20  that same area, you looked at the bricks.

21          MR. HUDGINS:  Hold on.  Listen, don't

22  testify for her.



1  BY MR. SENSENIG:

2     Q.  I'm asking a question.  After she fell, did you

3  go across -- did you walk in the same area where she

4  was?

5     A.  After she had fallen when I came back up to the

6  stairs I went to the area where she had fallen.

7     Q.  I want to take you back to some questions that

8  Mr. Hudgins asked you.  And we can just use -- well,

9  first of all, Exhibit B, let's talk about Exhibit B.

10    A.  Yes.

11    Q.  The circle at the top, what does that represent?

12    A.  That's exiting out of the garage.

13           MR. HUDGINS:  That's the small circle.

14    A.  The small circle.

15  BY MR. SENSENIG:

16    Q.  Does this picture have the blood stain that we've

17 seen on other photographs on it?

18    A.  It does not show the blood stains.

19    Q.  I want to direct your attention in Exhibit B to:

20 Do you see the wall on the left side as you're facing

21 those stairs?

22    A.  Yes.



1    Q.  Now, I want to show you Exhibit G.  Are you able

2  to see the blood stain on Exhibit G?

3    A.  Yes.  I see the blood stain.

4    Q.  And do you see a wall on Exhibit G?

5    A.  Yes, I see the wall.

6    Q.  On the right side?

7    A.  Yes.

8    Q.  And you see the post, and the blood stain is to

9  the right of the post.  Is that correct?

10   A.  Yes, it is.

11        MR. HUDGINS:  Again, you're going to have to

12  quit asking leading questions.

13  BY MR. SENSENIG:

14   Q.  Where is the blood stain in relation to the post?

15   A.  In relation of the post, it's close to the post.

16   Q.  Which side, right or left?

17   A.  It's on the left side.

18   Q.  As you're looking down?

19   A.  As you're looking down it's on the left side.

20   Q.  And the wall.  Where was the wall?

21   A.  The wall was to the right.

22   Q.  As you look at Exhibit B, you circled at the top



1  of the steps in between -- where is the circle in

2  relation to the wall on Exhibit B?

3    A.  The wall is to the right.

4    Q.  On this exhibit, do you see any posts between the

5  wall and where the blood is, for railings going down?

6    A.  I see a railing that's close to the wall.

7          MR. HUDGINS:  If it would help, I think we

8  can all agree that she's testified that the bricks she

9  focused on after the fact were at the top of the stairs

10  in that middle section, and that the blood stain was at

11  the bottom of the stairs just within that middle

12  section.

13          MR. SENSENIG:  Can we go off the record for

14  a second?

15      (Whereupon the proceedings go off the record.)

16  BY MR. SENSENIG:

17    Q.  Let's go to Exhibit F.  Actually, we'll go in

18  order.  Let's start with Exhibit E.  I'm sorry, if you

19  can?

20          MR. HUDGINS:  E?

21  BY MR. SENSENIG:

22    Q.  You were asked some questions about the rise of



1   the brick and how far it was up.  Does Exhibit E

2   generally represent the condition that you saw at the

3   time of the accident?

4       A.  Generally, yes.

5       Q.  Does Exhibit F represent an accurate depiction of

6   what you saw at the time of the accident?

7       A.  Yes.

8       Q.  Does Exhibit G accurately reflect what you saw at

9   the time of the accident?

10      A.  Yes.

11      Q.  The bricks that you went back up and inspected,

12  where were they in relation to where Camille was lying?

13      A.  Where were they?

14      Q.  Yeah.  As far as if you were to take a line from

15  where Camille was lying to where the bricks were that

16  you inspected, how would that line be drawn?

17      A.  That direction.

18      Q.  If you could, go ahead and mark that.  You drew

19  it with1 your finger.  We're on Exhibit?

20      A.  G.

21      Q.  Draw a line from where the bricks were to where

22  Camille was lying.  Reflects a blue line.  Going back to



1  your testimony, when you came out of the -- when you

2  were talking and she was in front of you, after she fell

3  where in relation to Exhibit G did you walk?  What path

4  did you take?

5     A.  To the opposite direction.

6     Q.  And you are pointing towards where the circle is.

7  Is that correct?

8     A.  Yes.  I did not follow the same path that she was

9  on.  I went around her.

10    Q.  And why did you go around that?

11    A.  Why did I go around her?

12    Q.  No.  Around the path that she took to where the

13  circle is.

14    A.  I went around the path that she took because I

15  noticed that the brick was not level.

16    Q.  And at that time she had already fallen.

17  Correct?

18    A.  Yes.

19    Q.  Did the fact that she had fallen change in any

20  way how you focused on that area?

21    A.  Yes.

22    Q.  How?



1    A.  Because I noticed that the brick was not level,

2    and I wanted to make sure that someone saw that, that

3    area.

4    Q.  But again, going back to my question:  Did the

5    fact that she had fallen change as you were approaching

6    that, the focus that you had paid to the area where she

7    was when she fell, more or less or not at all?

8    A.  More or less.

9    Q.  More or less or not at all?

10    A.  More.

11    Q.  Take a look at -- and again I want to talk about

12    which stairwell you were going down.  If you'd take a

13    look at Exhibit C.  Again, from left to right, do you

14    see where the wall is in Exhibit C?

15    A.  Correct.

16    Q.  And you see there's a -- would you agree there's

17    a --

18    A.  -- railing next to the wall.

19    Q.  Does the railing appear to be immediately

20    adjacent to the wall?

21    A.  According to this picture, yes.

22    Q.  And as you look at Exhibit G -- looking at



1   Exhibit G and where the blood stain is and where the

2   wall is:  Does that in any way change your recollection

3   if we look at Exhibit B, as far as which stair area you

4   were going down?

5      A.  A great deal.

6      Q.  How?

7      A.  From my recollection, from this picture here --

8           MR. HUDGINS:  You're looking at Exhibit B

9   right now.

10     A.  My recollection, looking at the picture, I would

11  assume we would have come out of this area and came out

12  this direction.  Looking at Exhibit G, I would restate

13  that only to the mere fact that when she fell she was

14  laying in this area and not that location, because she

15  was face down.  And I think what had happened, she fell

16  this way when she came down the stairs.

17          MR. HUDGINS:  I'm going to object and move

18  to strike that response as speculative and conjectural.

19  I think we can all agree:  We don't want any guesses.

20  We just want what you saw/what you know.

21  BY MR. SENSENIG:

22     Q.  Again looking at Exhibit B and location of the



1   blood stain and the wall, if you could look at Exhibit B

2   -- after reviewing Exhibit G -- if you could look at

3   Exhibit B and place an X -- not a circle but an X --

4   where Camille was lying.  And if you could place another

5   X over the path that you were taking.

6       A.  Exit from there.

7       Q.  Thank you.  Again, Exhibit B does not show the

8   blood stain on it.  Correct?

9       A.  From here it does not.

10      Q.  Do you know when Exhibit B was taken, that photo?

11      A.  I do not.

12      Q.  Exhibit H, does that accurately -- does the

13  depiction in Exhibit H accurately reflect the condition

14  that you saw at the time of the accident?

15      A.  Yes.

16      Q.  And Exhibit K, does Exhibit K accurately reflect

17  what you saw at the time of the accident, the condition

18  of the --

19      A.  The condition of the brick, yes.

20      Q.  After you went to tend to her, you testified you

21  went back to look at the condition of the brick?

22      A.  Yes.



1      Q.   Is it your belief that the condition of the

2   bricks we've been looking at is what caused her to fall?

3              MR. HUDGINS:   Objection.   She's here as a

4   fact witness, not to offer opinion.

5   BY MR. SENSENIG:

6      Q.   Based on what you saw --

7              MR. HUDGINS:   Same objection.

8   BY MR. SENSENIG:

9      Q.   -- is it your belief that the bricks at the top

10  of the stairs caused her to fall?

11             MR. HUDGINS:   Same objection.

12  BY MR. SENSENIG:

13     Q.   It's fine.   You can answer.

14     A.   It is my belief.

15     Q.   And what you base that belief on -- tell me

16  everything you base that belief on.

17             MR. HUDGINS:   Same objection.

18     A.   I based that belief that that was the reason for

19  her fall because I went to the area to the top of the

20  stairs that we exited from and I put my foot on the

21  bricks that actually moved, and I saw the gap.

22  BY MR. SENSENIG:



1    Q.  Was that the path that she was taking when you

2  saw her?

3    A.  That was the path she was taking.

4    Q.  And how did that line up as to where you then

5  were viewing her lying on the ground, as far as up and

6  down the stairs?

7    A.  Can you repeat that?

8    Q.  Sure.  You testified that was the path she was

9  taking.  How did that path line up as far as going up

10  and down the stairs, as to where she was lying on the

11  ground?

12    A.  The path with her laying on the ground -- when

13  she had fallen I think she may have tried to break her

14  fall instead of her coming straight down, it was a side

15  path that she came down, which caused the fractions on

16  her arm because of the weight.

17          MR. HUDGINS:  Objection move to strike the

18  testimony as speculative.

19  BY MR. SENSENIG:

20    Q.  Did you notice anything else in the area that

21  looked like a tripping hazard to you?

22          MR. HUDGINS:  Objection.



1    Q.  Did they bring to your attention that there was a

2    problem with your earlier testimony?

3    A.  No, Sir.

4         MR. SENSENIG:  Objection as to "problem".

5    BY MR. HUDGINS:

6    Q.  What caused you to come back in and change your

7    testimony about the area where the accident occurred?

8    A.  The only reason I made the change is:  The area

9    in which Camille was laying when the ambulance people

10   were attending to her in her laying-down area.  That's

11   the only reason that made me look at this a little bit

12   differently.

13   Q.  All I could ask for is your truthful testimony.

14   A.  Yes, Sir.

15   Q.  But when I finished asking questions, I was under

16   the impression that you had given me your recollection

17   of everything you knew.

18   A.  Yes, Sir.

19   Q.  And then when we came back, you had some

20   different responses to put on the record.  And I've got

21   to ask you this question:  Did these lawyers tell you

22   that there was a problem with your testimony that needed



1   to be fixed?

2       A.   I never spoke to the lawyers.

3       Q.   What caused you to change your testimony?

4       A.   Looking at the brick area and the lighting and

5   the location made me think of where the paramedics were

6   when they were treating her on the concrete.

7       Q.   When I was asking the questions, we marked up

8   Exhibit B, and you put the small circle at the top where

9   you exited the stairwell; and then you put a big circle

10  at the top of the steps where you thought you'd gone

11  back and looked at those loose bricks; And then you had

12  another circle at the bottom where you said Ms. Sedar

13  ended up.

14      A.   Yes.

15      Q.   Now that's changed.  You think now that Ms. Sedar

16  ended up over to the left where you put an X on Exhibit

17  B.

18      A.   Yes.

19      Q.   Is that fair to say?

20      A.   Mm-hmm.

21      Q.   So earlier when you testified, in that middle

22  circle that that's where those bricks that you were



1  wiggling with your foot --

2      A.  Yes.

3      Q.  Are you changing that testimony now?

4      A.  The wiggling of the bricks, no, Sir I am not.

5      Q.  So that's where you put your foot and wiggled

6  bricks --

7      A.  Yes, Sir.

8      Q.  -- as marked on exhibit B?

9      A.  Yes.

10     Q.  And that's in that center section of those three

11  possible ways down those steps?

12     A.  Yes, Sir.

13          MR. HUDGINS:  All right.

14          MR. SENSENIG:  A few questions.

15                    EXAMINATION

16  BY MR. SENSENIG:

17     Q.  Did looking at Exhibit G, which shows the

18  bloodstain, in any way change which your thinking as to

19  which stairwell you were going down -- between breaks

20  when I started asking you questions?

21          MR. HUDGINS:  I'm going to object to that

22  question as suggestive and not a proper line of inquiry,



1  to steer the witness's testimony.

2           MR. SENSENIG:  I'm not steering her at all.

3  BY MR. SENSENIG:

4    Q.  Exhibit B depicts -- did you notice a bloodstain

5  at the time of the accident on the ground?  Did you see

6  blood on the ground at the time of her fall when she was

7  lying on the ground?

8    A.  I did not see the blood until she was removed.

9    Q.  The day of the accident you saw the blood?

10          MR. HUDGINS:  Asked and answered.

11  BY MR. SENSENIG:

12    Q.  Where was the blood in relation to where she was

13  on the ground?

14    A.  The blood was in this area.

15    Q.  And where was she -- you pointed to the X.  And

16  where was she in relation to where the blood was on the

17  ground?

18    A.  She was in the area where the blood was where she

19  had fallen face down.

20    Q.  And when you walked back up from her --

21          MR. HUDGINS:  Wait a minute.  That's

22  assuming facts.



1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                      (Alexandria Division)

4

5    CAMILLE SEDAR,          )    CASE NO: 1:18-cv-01111 CMH/TCH

6            Plaintiff,      )

7    -vs-                    )

8    BOSTON PROPERTIES,      )

9    LP, et al,              )

10            Defendants.     )

11    _____)

12

13                DEPOSITION OF ROBERT RAPANUT

14                   Alexandria, Virginia

15                     May 29th, 2019

16                      11:30 a.m.

17

18

19

20

21

22    REPORTED BY:  ALEXANDRIA KAAN



1          Deposition of ROBERT RAPANUT taken at the

2     location of:

3

4

5                    HUDGINS LAW FIRM, P.C.

6                    515 King Street

7                    Suite No. 400

8                    Alexandria, Virginia  22314

9

10

11       Before ALEXANDRIA KAAN, Notary Public in the

12    Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



```
1          APPEARANCES

2   Appearing on Behalf of the Plaintiff:

3       DAVID SENSENIG, ESQUIRE

4       ANDREW PARK, ESQUIRE

5       PARK SENSENIG

6       2310 West Main Street

7       Richmond, Virginia  23220

8       David.sensenig@parksensenig.com

9

10  Appearing on Behalf of the Plaintiff:

11      JOSEPH MORIARTY, ESQUIRE (via

12      telephonically)

13      WILLCOX & SAVAGE, P.C.

14      440 Monticello Avenue

15      Suite No. 2200

16      Norfolk, Virginia  23510-2243

17      Jmoriarty@wilsav.com

18

19

20

21

22
```



```
 1                    APPEARANCES (CONTINUED):

 2

 3

 4            Appearing on Behalf of Defendants:

 5                 DAVID HUDGINS, ESQUIRE

 6                 HUDGINS LAW FIRM, P.C.

 7                 515 King Street

 8                 Suite No. 400

 9                 Alexandria, Virginia  22314

10                 (703) 739-3700

11                 Dhudgins@hudginslawfirm.com

12

13

14

15

16

17

18

19

20

21

22   ALSO PRESENT: HELEN TAWIL w/ ANDREW PARK (paralegal)
```



 1  EXAMINATION OF ROBERT RAPANUT                        PAGE

 2  BY MR. HUDGINS                                       6, 72

 3  BY MR. SENSENIG                                      51

 4

 5

 6

 7  RAPANUT EXHIBITS                                     PAGE

 8  A                    subpoena             6

 9  M                    photograph           55

10  N                    photograph           60

11  O                    photograph           62

12  P                    photograph           63

13      (Exhibits M through P are retained by Mr. Park.)

14

15

16

17

18

19

20

21

22



```
 1            P R O C E E D I N G S

 2                  - - - - -

 3     (Whereupon Exhibit A is premarked for identification.)

 4                    ROBERT RAPANUT,

 5        being first duly sworn to testify the whole

 6   truth, testified as follows:

 7                    EXAMINATION

 8   BY MR. HUDGINS:

 9     Q.  Good morning, Mr. Rapanut.  We were introduced a

10   little earlier today.  And you understand that I am the

11   lawyer for Boston Properties and Reston Town Center

12   properties who have been sued by Ms. Camille Sedar in a

13   personal injury lawsuit, and that you are here as an

14   eyewitness to an accident that involved Ms. Sedar on the

15   property of my clients.

16     A.  Correct.

17     Q.  I'm going to make my questions as

18   straight-forward as I possibly can.  I'd like to have an

19   understanding with you that if something I say is

20   confusing, or you don't understand, or we're not clear

21   on our communication, that you'll stop me and give me a

22   chance to rephrase so that we're in solid communication.
```



1    A.  Okay.

2    Q.  Fair enough?

3    A.  Yup.

4    Q.  State your full name and resident address.

5    A.  Robert A. Rapanut, 4550 Strutfield Lane, unit

6  2221, Alexandria, Virginia 22311.

7    Q.  Mr. Rapanut, we have premarked a series of

8  exhibits.  And Exhibit A is the notice of deposition and

9  subpoena that brings you here today.  Would you agree

10  with that?

11    A.  Yes.

12    Q.  How long have you lived at that residence that

13  you just gave us?

14    A.  I moved into that residence May of 2015.

15    Q.  And where did you live before that?

16    A.  I lived on Stevenson Avenue in Alexandria,

17  between 2000 to 2015.

18    Q.  How are you employed Mr. Rapanut?

19    A.  I'm employed by the Department of Defense

20  National Geospatial-Intelligence Agency.

21    Q.  Are you a coworker of Camille Sedar?

22    A.  I was.



1    Q.  When did that stop?

2    A.  I departed her location in about July 2017.

3    Q.  Now, the accident that we're here to discuss took

4  place on November the 15th, 2016.

5    A.  Correct.

6    Q.  At that time were you a coworker with Camille

7  Sedar?

8    A.  Yes.

9    Q.  And how long had you been working with her up

10 until that point?

11   A.  I would say about two years.

12   Q.  Were you office friends?

13   A.  Office friends, colleagues, my boss had a direct

14 supervisor with Camille at the time.

15   Q.  And did you socialize outside of work?

16   A.  No.

17   Q.  Now, there was a celebration planned for November

18 the 15th, 2016, was there not?

19   A.  Yes.

20   Q.  And that was for a departing coworker?

21   A.  Correct.

22   Q.  And who was that coworker?



1      A.   Major Marks.

2      Q.   And just from the record of Discovery in the

3   case, I think everybody agrees there was going to be a

4   luncheon at a place called Ted's Bulletin restaurant in

5   Reston Town Center?

6      A.   Correct.

7      Q.   And were you a passenger in a car driven by Ms.

8   Sedar heading for that luncheon?

9      A.   Yes.  Yes.

10      Q.   Do you remember the other individuals who were

11   going to be in attendance?

12      A.   In the car or in attendance?

13      Q.   Not with you, but just generally.  Do you

14   remember everybody that was supposed to be there?

15      A.   There was an invitation sent out to the office.

16   I know at least my boss Damien Kerr was going to attend.

17   And I vaguely recollect if Karen had committed to it.

18   But there was a general invitation to the office

19   management staff.

20      Q.   Now, you were in the car with Camille Sedar and

21   Davida Buchanan?

22      A.   Correct.



1    Q.  Nobody else was in that car?

2    A.  No.

3    Q.  And would it be fair to say that your car arrived

4  first in the vicinity of Ted's Bulletin restaurant for

5  this celebration?

6    A.  Yes.

7    Q.  And you had driven over from the office?

8    A.  Yes.

9    Q.  Everybody says that's about a 10-or-15-minute

10  drive.  It's not far.

11   A.  Correct.

12   Q.  Do you remember, did you sit in front with Ms.

13  Sedar, or were you in the back seat?

14   A.  I don't remember.

15   Q.  Ms. Buchanan testified that you exited on a level

16  that required that you go up a flight of steps before

17  exiting the garage out onto the sidewalk?

18   A.  Yes.

19   Q.  Is that your recollection?

20   A.  Yes.

21   Q.  Do you recall how close to the stairwell the car

22  was parked?



1      A.  I can estimate, but maybe a minute or two walk,

2  walking.

3      Q.  In general, how clear is your memory about the

4  events of November the 15th, 2016?

5           MR. SENSENIG:  Objection:  Vague.

6  BY MR. HUDGINS:

7      Q.  Would you say?

8      A.  Define "clear".

9      Q.  Do you recall any of the events of that day?

10     A.  Yes.

11     Q.  Now, I have to ask you this question:  How many

12  times have you had discussions with Ms. Sedar's lawyers

13  before testifying here today?

14     A.  I met with them two times.

15     Q.  And did you meet with them once at the site of

16  Ms. Sedar's fall?

17     A.  Yes.

18     Q.  And where was the other meeting?

19     A.  In my residence.

20     Q.  They came to see you?

21     A.  Yes.

22     Q.  And you talked to them here today?  You talked to



1  the lawyers here this morning?

2      A.  Pleasantries.

3      Q.  Did they talk to you briefly here just before we

4  started the deposition about what Ms. Buchanan

5  testified?

6      A.  No.

7      Q.  Do you have any knowledge from any source about

8  what Ms. Buchanan testified in her appearance here

9  today?

10     A.  No.

11     Q.  What did you talk about with the lawyers this

12  morning before this examination?

13     A.  I exchanged pleasantries of "Good morning" and

14  general condition of the office, and that type of --

15     Q.  Did they tell you that there was any issue with

16  Ms. Sedar's testimony that required clarification by

17  you?

18     A.  No.

19         MR. SENSENIG:  Objection:  Asked and

20  answered.

21  BY MR. HUDGINS:

22     Q.  Did they tell you that you needed to focus on any



1  aspect of what happened that day?

2     A.  No.

3     Q.  So your testimony is that you talked about

4  nothing but "Good morning" and "How you doing?"

5     A.  Today, yes.

6     Q.  But nothing about the facts of this case?

7     A.  Today, yes.

8     Q.  The prior times you met with the lawyers, did you

9  talk about your recollection and what you observed?

10    A.  Yes.

11    Q.  Were any notes taken and that sort of thing by

12  anybody at those meetings?

13    A.  I believe one of the gentlemen was taking notes.

14    Q.  Did you ever give a statement about the events of

15  November the 15th, 2016?

16    A.  No.  No official statement.

17    Q.  No formal statement?  No oral statement?

18    A.  No.

19    Q.  Have you had discussions with anybody other than

20  the lawyers here about what happened on November the

21  15th, 2016?

22    A.  For the purposes of my boss granting me leave --



1   vacation time today -- I did need to disclose why I was

2   coming here.  And she authorized that vacation time for

3   this deposition.

4       Q.  Apart from the conversations you had with Ms.

5   Sedar's lawyers, have you ever had a discussion with

6   anybody going back and trying to re-create the events of

7   that day?

8       A.  No.

9       Q.  Let's talk about that day.  After you parked, you

10  had to go up the flight of steps.  Was there an order in

11  the three of your group as to who went up the steps

12  first?

13      A.  Camille had gone first.

14      Q.  And were you second or third in line?

15      A.  I don't recall, but I was small talk with Davida,

16  so she had to be in close proximity to me, if not next

17  to me.

18      Q.  So would it be fair to say that you and Davida

19  were carrying on a conversation as you ascended from the

20  parking -- or where the car was parked up to where you

21  exited the garage?

22      A.  Yes.



1    Q.  And were you continuing that discussion as you

2  were exiting out of the building?

3    A.  I don't remember.

4    Q.  As you left the parking garage, do you recall the

5  vicinity of the exit?  What that was like?

6    A.  Yes.  So we parked on the lower level; went up

7  the stairs.  And when you exit the stairs, the exit to

8  the garage goes through the stairs going to the street.

9  And I think there's elevators in that same general

10 vicinity.  It was a natural exit point.

11   Q.  As you walk from the garage out toward the public

12 sidewalk, what do you see?

13   A.  Stairs.

14   Q.  And describe the stairs.

15   A.  The stairs, conventional stairs:  A handrail on

16 the left side; I would think there's about nine steps

17 going down.  There's other parts of the stairs that, due

18 to the elevation, which may have five, but I remember

19 going to the one that had the most stairs.

20   Q.  The most stairs.  And do you recall there being

21 any handrails on those stairs?

22   A.  There's a handrail on the left-hand side of those



1  nine stairs, and I believe there's one on the right-hand

2  side.

3     Q.  And as you were exiting the garage, you were

4  continuing to talk with Davida?

5          MR. SENSENIG:  Objection:  Mischaracterizes

6  his testimony.

7  BY MR. HUDGINS:

8     Q.  Well you tell me.  What were you doing when you

9  were coming out of the garage toward those stairs you

10  have described?

11    A.  I'd say we were engaging in small talk from the

12  car to the stairs.  She was in close proximity; I don't

13  remember the exact contents of that small talk.

14    Q.  As you were talking with Davida, how far ahead

15  was Ms. Sedar?

16    A.  She was about maybe arm's length.

17    Q.  Ahead of the two of you?

18    A.  Correct.

19    Q.  Did there come a time when you noticed that

20  something was wrong with Ms. Sedar's path of travel?

21    A.  Can you be a little more clear on position, time,

22  and all this?



1    Q.  Here's what I want to do:  I want to get your

2  best recollection of what you saw without any

3  speculation or guess about anything, just what you

4  observed.  This is a case about Ms. Sedar falling down

5  some steps.  At some point you saw that there was

6  something wrong going on with Ms. Sedar.

7    A.  Right.

8    Q.  What was the first thing that drew your

9  attention?

10   A.  I recollect that as -- she was ahead of me; she

11  was on the stairs first; and then my field of vision I

12  saw her disappear from my field of vision.  And then I

13  think I saw she was holding a poster which was a

14  going-away gift for Major Marks, and that seemed to go

15  in the air as well.  That shouldn't be in my field of

16  vision.

17   Q.  So the first thing you noticed anything amiss

18  about her path of travel was when she had fallen from a

19  stand-up position?

20        MR. SENSENIG:  Objection:  Mischaracterizes.

21  BY MR. HUDGINS:

22   Q.  I want it in your words, not mine.



1    A.  I said that she left my field of vision, and the

2  gift -- the paper gift for Major Marks -- had come into

3  my field of vision.

4    Q.  And then was there a time that you saw Ms. Sedar

5  in any position other than standing upright?

6    A.  When I realized that she had departed my field of

7  vision, I changed where my vision was and all of a

8  sudden she was on the public sidewalk face down.

9    Q.  She was laying face down on the sidewalk?

10   A.  Correct.

11   Q.  All of her body was in contact with the ground or

12 the stairs?  In other words, you didn't see her in the

13 process of a fall?

14          MR. SENSENIG:  Objection.

15 BY MR. HUDGINS:

16   Q.  You saw the picture go up in the air and then you

17 saw her on the ground?

18          MR. SENSENIG:  Objection.

19   A.  I saw her leave my field of vision, her head; and

20 I saw the gift fly up in my vision; I turned down my

21 field of vision and saw her on the ground face down.

22 BY MR. HUDGINS:



1    Q.  At some point between the time that she was

2    walking ahead of you and the time when you saw that she

3    was on the ground, you didn't see her?

4    A.  I saw her:  She was arm's length ahead of me.  In

5    order to not [sic] avoid bumping into her, I had to be

6    cognizant of who was in front of me.  And she was in my

7    field of vision from the head up.

8    Q.  Ms. Buchanan was in here earlier today, and I

9    think I am correct when I say that she thought that Ms.

10   Sedar was about ten paces in front of the two of you all

11   as you exited the garage.  And you say arm's length.

12   How certain are you of the arm's length?

13   A.  That's my recollection.

14   Q.  Is it possible that she could have been as many

15   as ten steps ahead of you?

16           MR. SENSENIG:  Objection:  Speculative.

17   A.  We were travelling in a group, so she had to be

18   within listening distance if I engaged her in

19   conversation.

20   BY MR. HUDGINS:

21   Q.  Who?

22   A.  Camille.



1    Q.  Were you talking to Camille as you were

2  travelling?

3    A.  No.

4    Q.  You were talking to Davida.

5    A.  She was next to me.  But if I needed to engage

6  her for anything, she -- I can't have her be so far away

7  that she could not hear me.

8    Q.  Well, you're following her.

9    A.  Right.  So she would be --

10   Q.  She was leading the way to the restaurant?

11   A.  Right.

12   Q.  Did you know where the restaurant was?

13   A.  At the time I don't know.  I knew the restaurant

14  as I went to that particular restaurant in DC, but not

15  that location.

16   Q.  Given what you've just told us, would it be fair

17  to say that you did not see what caused Ms. Sedar to

18  fall down?

19           MR. SENSENIG:  Objection:  Vague.

20   A.  I can say what I saw.  So I saw with my own field

21  of view, and I saw what was in my field of view, and the

22  effects after that happened.



1    A.  Correct.

2    Q.  Now, Kerr, Dibella, and Marks, do you remember

3  how long after Ms. Sedar fell that they showed up?

4    A.  I don't remember what exact time they showed up,

5  but they were there as the paramedics and as Camille was

6  on the ground.

7    Q.  While you were there in the area of where the

8  accident happened but before going to Ted's Bulletin

9  Restaurant, did you have any discussion with anybody

10  about what might have caused Camille Sedar to fall down

11  those stairs?

12    A.  I did talk with Damien and Major Marks and Karen.

13  Damien is my direct supervisor, so because of such I

14  have to explain what happened to one of his employees.

15    Q.  Now, none of those individuals, Kerr, Dibella,

16  Marks, were present when Ms. Sedar fell, were they?

17    A.  No.

18    Q.  Did they ask you what happened?

19    A.  Yes.

20    Q.  What did you tell them?  As best you can recall

21  as you sit here today, what was it you told them as far

22  as what had happened to Ms. Sedar?



1    A.  As I testified, we were coming up from the lower

2   level up the stairs; Davida was next to me; Camille was

3   ahead of me; and she was going down the stairs.  I can

4   only recollect my field of vision, but I mentioned to

5   them she was going down the stairs and then she ended up

6   on the sidewalk face down.

7    Q.  Now, when she disappeared from your field of

8   vision, was she on the stairs?

9    A.  Presumably.

10    Q.  Do you know where on the stairs she was?  How

11   many steps she may have taken?

12    A.  I would be speculating to tell you where it is on

13   the stairs.  But she was ahead of me and she's taller

14   than me so it's anywhere within those stairs.  She

15   wasn't beside me or on top of me or above me.

16    Q.  I want to be very clear.  I'm not looking for any

17   kind of speculation or guess.  Just what is in your

18   memory is what we're all about here today.  You do have

19   a vision in your mind of seeing her before she

20   disappeared from your field of view?

21    A.  Yeah.  Yes.

22    Q.  And in that instant, was her head lower as if she



1  had taken a step down the stairs or was it on the same

2  plane of the walkway?

3     A.  She was slightly above, because she's taller than

4  me.  So my field of vision looks up at people.

5     Q.  Would it be fair to say you don't know if she had

6  taken a step down the steps or not?

7     A.  I know when she -- I know and recollect when she

8  departed my field of vision she was almost perpendicular

9  -- not "perpendicular", but the top of her head was

10 where I was seeing.

11    Q.  The top of her head.  Would that indicate to you

12 she had taken a step or more going down the steps before

13 she disappeared?

14    A.  Presumably, that would be what you would do when

15 you go down the stairs.

16    Q.  Ordinarily when you would look at Ms. Sedar,

17 she's a little taller than you so you would be glancing

18 up?

19    A.  Yes.  Yes.

20    Q.  And your testimony and your recollection here

21 today is that the last time you saw her before the paper

22 went up in the air and before she disappeared from



1  sight, that her head was on a level with yours?

2  A.  Yes.

3  Q.  Now, were you looking at her feet at all?

4  A.  No.

5  Q.  So would it be fair to say that you have no idea

6  what might have caused her to trip?

7        MR. SENSENIG:  Objection.

8  A.  I didn't see where she stepped so I can't say

9  what she stepped on or what's in front of her.  I know

10  where we came from and my field of vision and where she

11  landed on the sidewalk.

12  BY MR. HUDGINS:

13  Q.  And I get the impression you are searching your

14  memory for everything you recall about those instances.

15  After the fact, when Kerr and Dibella and Marks came,

16  was there any discussion amongst the group about what

17  might have caused Ms. Sedar to fall?

18  A.  I do remember Damien going to the landing above

19  the stairs; he had his phone with him and started taking

20  video of it.  I don't recollect when he took any photos,

21  but I remember the video he took.  He was stepping on

22  the landing, I assume just to see what the landing is.



1   But he took the video.

2       Q.  Did you personally see anything in the vicinity

3   that might have, in your mind, caused Camille Sedar to

4   trip?

5       A.  In hindsight when Mr. Kerr was taking the video,

6   I did step on the bricks and they seemed loose and not

7   -- they would give a little bit.

8       Q.  Did you see Mr. Kerr jiggling a brick with his

9   foot?

10      A.  I don't remember.

11      Q.  Did you personally step on a brick?

12      A.  I did.

13      Q.  You did?

14      A.  When he was taking the video.

15      Q.  And was the brick loose?  Or how would you

16  describe its condition?

17      A.  I would describe it as loose, can be moved

18  around.  When I stepped on it, it had some give to it.

19  It wasn't my expectation of a of a -- my expectation for

20  a brick on that landing would be it wouldn't move.  And

21  with my feet they moved.

22      Q.  When you say they "moved", did they just jiggle



1  around in their spot?

2     A.  Yes.  I mean, "jiggle" would we a good word.

3     Q.  The brick didn't come lopsided out of its seating

4  when you stepped on it?

5     A.  No.

6     Q.  It was just loose in place?

7     A.  Yes.  And I don't remember how many of the

8  bricks, but where I was stepping on that landing there

9  were more than just one or two isolated bricks to me

10  that jiggled around, as you said, or moved around.

11     Q.  When you went back and just looked around the

12  area --

13     A.  With?

14     Q.  With Mr. Kerr.

15     A.  At that time?

16     Q.  Right.

17        Did you look at all of the area across the top of

18  the stairs or was there some specific area that you

19  focused on?

20     A.  I focused on the area of the landing that -- not

21  "preceded" -- but was directly in front of the area

22  where we were walking down the stairs.



1    Q.  Do you remember if there were any hand railings

2  going down those stairs?

3    A.  Where she fell?

4    Q.  Yes.

5    A.  I testified there were.

6    Q.  There were hand railings?

7    A.  I recollect the handrail on the left and one by

8  the concrete wall.  The left one would be where there's

9  no wall, obviously.

10   Q.  Now, as far as the brick that was jiggling, was

11 that --

12   A.  Or bricks.

13   Q.  -- or bricks -- was that in the area where Ms.

14 Sedar had been walking?  Or was it just a possibility

15 that that was -- I mean, I need to know if you are

16 certain that she walked over that area.

17        MR. SENSENIG:  Objection:  Asked and

18 answered.

19   A.  The landing and where the bricks were, were

20 directly in front of the stairs that she went.

21 BY MR. HUDGINS:

22   Q.  Now, as you sit here today, would it be fair to



1  say that you did not see her step on those jiggly

2  bricks?

3     A.  I did not see her feet or anything below her head

4  or body, to make sure I was not going to bump into her.

5     Q.  So as you sit here today, based on your

6  recollection, you can't testify whether or not that

7  brick was involved in her accident or not?

8            MR. SENSENIG:  Objection:  Mischaracterizes

9  his testimony.

10    A.  Normal course of walking behind, I don't normally

11 look at people's feet when I'm walking around, so I

12 don't -- I don't have any recollection of looking at her

13 feet or where she stepped off or what have you.  I know

14 where her body was, and generally when you -- if you

15 draw a straight line from her head, it would be right

16 where the landing would be.  I can't say that she's

17 levitating or anything, so.

18 BY MR. HUDGINS:

19    Q.  But based on your recollection, you don't know if

20 she ever stepped on that brick, or over the brick, or

21 around the brick or not?

22    A.  I did not see her stepping on any place.  I just



1    Q.  And you saw that the top of Ms. Sedar's head had

2    lowered somewhat.  By how much would you say?  About the

3    height of one of these stairs or two of these stairs?

4              MR. SENSENIG:  Objection:  Leading,

5    mischaracterizes.

6    A.  I don't know.

7    BY MR. HUDGINS:

8    Q.  In inches could you give me some idea of the

9    change of elevation of the top of her head?

10   A.  That would be speculating.

11   Q.  But there was some change?

12   A.  In my field of view, yes.

13   Q.  And then the next thing was she's gone from your

14   field of view, and there's a photograph flying up in the

15   air?

16   A.  And then I looked down and she's on the sidewalk.

17   Q.  And all that took place over here on this

18   left-hand side?

19   A.  Yes.

20   Q.  And then when you went back up when the other

21   folks arrived --

22   A.  The other three.



1    Q.  -- Kerr, Dibella, and Marks.  Did you point out

2   to them the path of travel that you and the other two in

3   your group had taken?

4    A.  Yes.

5    Q.  And when you talked about "jiggling a brick", if

6   you had to, on this photograph point to it, where would

7   you say in that photograph the brick is?

8    A.  I would say the top of the left-most stairs.

9    Q.  Did you look at any bricks along the rest of that

10  stairwell?

11   A.  No.  No.

12   Q.  So your group focused over on that left-hand

13  side?

14   A.  Well, I focused on this left-hand side.  I don't

15  know that the other people were.

16   Q.  Apart from the brick jiggling, did you notice

17  anything else about the walkway or the stairs or

18  anything like that?

19   A.  I did notice that the bricks weren't level, and

20  maybe that's why the bricks were jiggling, they weren't

21  flush.  And maybe that's why it was moving around more

22  than I would expect.



1    Q.  Now, we've got a video here.

2    A.  Okay.

3         MR. HUDGINS:  Can we play that video for

4    this gentleman?

5         MR. SENSENIG:  Sure.

6         MR. HUDGINS:  I want to see if that kind of

7    ties in with what we've been talking.  I believe it's

8    the video that you've described having been taken by

9    Damien Kerr.

10        (Whereupon the proceedings go off the record.)

11   BY MR. HUDGINS:

12   Q.  We're getting ready to view a video.  And we've

13   previously referred to it in Ms. Buchanan's deposition

14   as Exhibit L, and will continue to refer to it as

15   Exhibit L in Mr. Rapanut's examination.  If we could

16   play that video, please.

17        (Whereupon a video plays. )

18   Q.  We've just looked at Exhibit L, which is only

19   about 15-20 seconds long.  Do you recognize that as

20   having been filmed the day of Ms. Sedar's fall?

21   A.  Yes.  Yes.

22   Q.  Was that the video you described earlier as



1  having been taken by Mr. Kerr?

2     A.  Yes.

3     Q.  And who was the gentleman with the camo [sic]

4  pants that was jiggling the brick?

5     A.  Major Marks.

6     Q.  The guest of honor?

7     A.  Yes.

8     Q.  And was that jiggly brick the brick that you've

9  referred to earlier in your testimony?

10    A.  No.  I think it was to the left of that.

11    Q.  That there was another brick that was jiggly?

12    A.  I did say "bricks".  I didn't say where, but that

13  general vicinity.  But it wasn't on that extreme right

14  where Major Marks was stepping on.

15    Q.  So you focus -- when you went back up, you

16  focused on a different brick than the one he was

17  stepping on in that video Exhibit L?

18    A.  Yes.

19    Q.  And the brick you focused on was more to the left

20  of what was in Exhibit L?

21    A.  Yes, correct.

22    Q.  But it was -- you described it as a "jiggly



1  fine to have the witness look at it, as long as we have

2  a reduced copy of that.

3          MR. SENSENIG:  We have Bates numbers, so

4  what we can do is use the Bates numbers.

5          MR. HUDGINS:  I haven't seen anything that

6  big in Discovery.

7          MR. SENSENIG:  I think we'll be able to

8  establish these are the same pictures produced that have

9  the Bates number on them.  You can take a picture, make

10  it smaller or larger, it's the same picture.

11          MR. HUDGINS:  I want to make sure that we're

12  not seeing something today for the first time, that

13  those photographs have been produced in Discovery.

14          MR. SENSENIG:  Yeah, they're Bates numbered.

15  These have the Bates number on them.

16          MR. HUDGINS:  What has been produced to me

17  is a smaller version of that.

18          MR. SENSENIG:  What has been produced to you

19  is an electronic version of that.

20          MR. HUDGINS:  I see.  So I have that

21  photograph in my file.

22          MR. SENSENIG:  Yes, an electronic version.



1           MR. HUDGINS:  I'll accept your

2     representation on that.

3           MS. TOWIL:  It's actually already been

4     introduced as Exhibit G, but a smaller version.

5           MR. SENSENIG:  Is it accurate the

6     photographs we produced are electronic?

7           MS. TOWIL:  Yes, they are.

8           MR. HUDGINS:  That's what I'm driving at.

9     So these things can be attached to the exhibit -- I

10    mean, to the transcript -- so if you want to cross

11    reference it to what we're already looking at, that

12    might make sense.

13          MR. SENSENIG:  There are some.  But there

14    are some that we haven't looked at yet, so I would jut

15    like to use our complete set.

16          MR. HUDGINS:  I'll ask you to do this:  Just

17    refer to the Bates number.  Do you have multiple copies

18    of that today?

19          MR. SENSENIG:  Yeah, I'll give it to you.

20          MR. HUDGINS:  We're looking at Bates 13

21    Sedar-1300.

22          MR. SENSENIG:  Yes, correct.  We'll go ahead



1  and mark this Exhibit M.

2     (Whereupon Exhibit M is marked for identification.)

3        (Whereupon the proceedings go off the record.)

4  BY MR. SENSENIG:

5     Q.  Mr. Rapanut, I just want to state for the record:

6  Did you and I have any conversations during that last

7  break?

8     A.  No.

9     Q.  Did you have any conversations with Mr. Park?

10    A.  No.

11    Q.  With Ms. Towil?

12    A.  No.

13    Q.  Did you have any conversations with anybody in

14 this room during that break?

15    A.  No.

16    Q.  I'd like to show you what we've put in front of

17 you a Bates numbered -- I'll just do it this way, you

18 see the Bates number on the bottom right-hand, it says

19 Sedar 1300.  Do you see that?

20    A.  Yes, I do.

21    Q.  Do you recognize this scene?

22    A.  I do.



1    Q.  What is it?

2    A.  It's the top of the landing above the stairs

3  where Camille had fell.

4    Q.  You testified that you went back up and looked at

5  loose bricks.  Are you able to identify on this picture

6  where those loose bricks were that you looked at?

7    A.  I would say I focused on the left-hand side of

8  this picture.

9    Q.  The bricks that you looked at when you went back

10  up, where were they in relation to the path that Ms.

11  Sedar was walking?

12    A.  I can't pick out the individual bricks, but I was

13  stepping in this general area, the left-hand side of

14  this picture.

15    Q.  And was Ms. Sedar directly in front of you?

16    A.  Can you be more --

17    Q.  Sure.  What we're trying to get at is:  When you

18  went back up to look at the bricks that you said jiggled

19  and the loose bricks, where were those bricks in

20  relation to the path that Ms. Sedar had taken to go down

21  the stairs?  Just generally in relation to her; not on

22  the picture.  Where were they in relation to her path?



1  Were they on her path; to the left of her path; to the

2  right of her path; somewhere else?

3      A.  They would be where I would recollect where her

4  general path -- off of the landing to the stair area.

5          MR. HUDGINS:  Let the record reflect that

6  the witness is holding his hand over the left side of

7  this photograph, like the left five bricks.  That's

8  where I saw the indication by the witness pointing.

9  BY MR. SENSENIG:

10     Q.  Again, the bricks that you witnessed to be

11 jiggling, were they in the path where Ms. Sedar was

12 walking prior to her fall?

13     A.  I was focused on this left-hand side, this is

14 where Camille was in front of me.  And that's where I

15 focused stepping on.  And as I described the moving

16 around or jiggling of the bricks.

17     Q.  And that was where Camille was before she fell.

18 Correct?

19     A.  She was in front of me in this area on the

20 left-hand side.

21     Q.  And again, you're referring to the area where you

22 experienced the loose bricks.  Correct?



1      A.  After we came back from lunch, this is where I

2   focused on the steppage [sic].

3            MR. HUDGINS:  I've got to object to the

4   leading question.

5   BY MR. SENSENIG:

6      Q.  Did you hear anything from Ms. Sedar as the event

7   occurred?

8      A.  Not definitively.  I think I heard a grunt or a

9   small scream, but I can't characterize definitively I

10  heard that.

11     Q.  It's correct to say you heard something audible

12  from her?

13     A.  Yes.

14     Q.  And when did that occur in relation to when she

15  disappeared out of your view?

16     A.  Around the same time.

17     Q.  You mentioned that -- there was some testimony

18  and questions about where her head was in your view.  Do

19  you recall that?

20     A.  I described where my field of view of her was.

21     Q.  And I believe you testified that at some point

22  her head lowered?



1    A.   Lowered or went away from my field of view.

2    Q.   And that's where I want you to be as exact as you

3    can in remembering that.  Did her head lowering and her

4    head disappearing from your field of view occur in a

5    fluid motion?

6    A.   Yes.

7    Q.   So her head lowered as she disappeared from your

8    view?

9         MR. HUDGINS:  Objection:  That's leading and

10   that mischaracterizes the testimony.

11   BY MR. SENSENIG:

12   Q.   You can answer.

13   A.   I described it was fluid, so she left my field of

14   view and disappeared all in the same recollection.  I

15   don't remember it being, you know, minutes in between.

16   They were all contiguous in my mind.

17   Q.   And her head lowering, you can't say that her

18   head lowered because she had successfully taken a step

19   down the stairs.  Is that correct?

20   A.   I don't know.  I just know what left my field of

21   vision; what appeared; the paper -- as I described.

22   Q.   I'd like to show you what has been marked



1 | Sedar-1302.  And this will eventually become Exhibit N.

2 |    (Whereupon Exhibit N is marked for identification.)

3 |    Q.  Do you recall seeing blood at the scene?

4 |    A.  Yes, I do.

5 |    Q.  Does this accurately reflect what you recall

6 | seeing as far as bloodstains?

7 |    A.  I saw the bloodstains on the sidewalk at some

8 | point.

9 |    Q.  Do you see any other bloodstains in this picture?

10 |    A.  On the lower right from the main larger

11 | bloodstain, I see a trail of blood.

12 |    Q.  Do you recall seeing that at the time of the

13 | accident?

14 |    A.  I don't recall any blood on the stairs.  I was

15 | mainly looking at the main blood.

16 |    Q.  Do you recall there being any security personnel

17 | at the scene?

18 |    A.  Yes.  Yes, I do.

19 |    Q.  Did you speak with them?

20 |    A.  Yes.

21 |    Q.  And tell us about that discussion.

22 |    A.  A gentleman with a walkie-talkie who identified



1  from that divider.

2     A.  This is the third brick.

3     Q.  And is that where you just put that circle in the

4  area of the path where Camille was travelling?

5          MR. HUDGINS:  Objection.

6     A.  I'm looking at --

7  BY MR. SENSENIG:

8     Q.  I'll tell you what.  It looks like you have a

9  better view from a different picture.  So let's go back

10  to Sedar 1300, which is Exhibit M.

11    A.  Could I have this too?

12    Q.  Sure.

13    A.  So I would -- so that's the third -- I circled

14  the third brick.

15    Q.  Yes.

16          MR. SENSENIG:  I'm allowed to ask my

17  questions and you can cross examine him.

18  BY MR. SENSENIG:

19    Q.  Is that brick that you circled in the path where

20  Ms. Sedar was travelling?

21          MR. HUDGINS:  Objection.

22    A.  I would say it's to the left.



1  BY MR. SENSENIG:

2     Q.  The brick is to the left of where Ms. Sedar was?

3     A.  Her general path would be to the left of the

4  third brick.  So I motioned that this left area was

5  where I was focusing.

6     Q.  Where were the bricks at that you saw --

7     A.  And I can triangulate that these two leaves are

8  these two leaves on here.

9           MR. HUDGINS:  Wait a minute.  What two

10  leaves?

11          WITNESS:  These two.

12     A.  Correspond to this two.

13          MR. HUDGINS:  Hold on.

14          MR. SENSENIG:  Again, you can cross examine.

15          MR. HUDGINS:  What two leaves are we talking

16  about here?

17          WITNESS:  These two leaves, I believe

18  correspond to these two leaves.

19  BY MR. SENSENIG:

20     Q.  Looking at 1300, which is Exhibit M, where were

21  the bricks that you saw that were loose that you

22  jiggled?



1    A.  This is the general area that I pointed to

2    earlier.

3    Q.  And where was Camille's path in relation to the

4    circle that you just put on Exhibit M?

5    A.  It would be up from the circle, which would be

6    the concrete and it would be on the railing to the left

7    of this photo.

8    Q.  So, is it accurate to say her path crossed the

9    circle you just made?

10          MR. HUDGINS:  Asked and answered.  He said

11   through the middle.

12   A.  I didn't see her feet go through here, but that's

13   what I recollect as her being in front of me.

14   BY MR. SENSENIG:

15   Q.  Right.  Because you were walking directly behind

16   her.  Correct?

17   A.  Yes.

18   Q.  And I think your earlier testimony you talked

19   about if you drew a direct line from -- well, you

20   weren't looking at her feet -- if you drew a direct line

21   from her head down to the ground, that's how -- is that

22   how you can indicate the path that she was walking?



1     A.  Yes.

2     Q.  And again just to be clear, it was within that

3   circle that you just drew?

4     A.  I believe.

5          MR. HUDGINS:  Asked and answered.

6   BY MR. SENSENIG:

7     Q.  Based on your recollection?

8     A.  From my recollection, it was.

9     Q.  You wouldn't have gone -- well, you already

10  testified you knew the path she was taking.  Is it fair

11  to say you wouldn't have gone back and looked at loose

12  bricks that were outside of the path that she was

13  taking?  Is that fair to say?

14          MR. HUDGINS:  That's a leading question.

15  That's an outrageously leading question.

16          MR. SENSENIG:  He's not my witness.

17          MR. HUDGINS:  Huh?

18          MR. SENSENIG:  He's not my witness.

19          MR. HUDGINS:  You're not allowed to sponsor

20  a witness and ask him leading questions.

21          MR. SENSENIG:  I'll withdraw it.

22  BY MR. SENSENIG:



1     Q.  Did you look at any bricks or inspect any areas

2  that were outside of the path that she had taken?

3     A.  No.

4     Q.  I would like to take a look at the video and I

5  just want to ask if you recollect your voice on the

6  exhibit.  Go ahead and play that.

7     A.  Okay.

8     Q.  And while she's getting that, I want to make sure

9  I understood your testimony when Mr. Hudgins was asking

10  questions.  Did you inspect more than one brick?

11     A.  I said "bricks".

12     Q.  And the bricks you inspected were the ones -- are

13  you able to say how many?

14     A.  No.

15         (Whereupon a video plays.)

16     Q.  Tell us when you recognize, if you recognize your

17  voice here?

18     A.  There.  That would be.  And I would be the person

19  explaining.

20     Q.  Are you able to state for the record what you

21  said on that video?  We can play it again, if you want.

22     A.  Yes, I can if it's turned up.



1        I said, "She went down."  And when I said she

2   went down, it was in response to Damien, and that's the

3   individual that was talking.

4       Q.  And did you say anything else after that?

5       A.  After, "She went down"?

6       Q.  After you said, "She went down."

7       A.  I didn't hear anything else.

8       Q.  Play it one more time.

9        (Video plays. )

10      A.  "She went down" and then "Fell down."

11      Q.  If I heard it correctly, somebody said face

12   down".  Did you hear that?

13              MR. HUDGINS:  I didn't.

14      A.  "She went down."  "Fell down face down."

15   BY MR. SENSENIG:

16      Q.  Was that you making that statement?

17      A.  Yes.

18      Q.  Was that accurate she went down face first?

19              MR. HUDGINS:  Objection.

20      A.  I don't -- I did not see her go down.

21   BY MR. SENSENIG:

22      Q.  She disappeared out of your view?

1    A.  She disappeared out of my view.

2    Q.  And you saw her lying on the ground?

3    A.  I did she her face down lying on the ground.

4    Q.  You mentioned that you and Davida were having a

5    conversation as you were approaching the stairs.  Did

6    Ms. Sedar participate in that conversation at all during

7    that time?

8    A.  I don't recall.  I don't remember now.

9         MR. SENSENIG:  Just give me two minutes, and

10   then we'll be done with our part.  Go off the record.

11      (Whereupon the proceedings go off the record.)

12         MR. SENSENIG:  Just a couple more questions.

13   BY MR. SENSENIG:

14   Q.  I want to go back to when you left the car.

15   A.  Okay.

16   Q.  And I believe you stated you walked -- I don't

17   want to re-characterize it.  Tell me how far did you

18   walk after you left the car until you got to the first

19   stairwell.

20   A.  I would say in a minute or so, probably a minute

21   or two, and probably one or two -- two lanes of parking

22   length.



1   Q.  Was Ms. Sedar in front of you during that time?

2   A.  Yes.

3   Q.  Did you witness her walking during that time?

4   A.  Yes.

5   Q.  Did you witness anything unusual about how she

6   was walking during that time?

7   A.  I don't remember anything unusual.

8   Q.  And then you walked up some stairs?

9   A.  One flight, one story.

10  Q.  Did you witness her walking up the stairs?

11  A.  Yes.

12  Q.  Did you notice anything unusual about her walking

13  up the stairs?

14  A.  I wasn't paying attention on how she was walking.

15  She walked up the stairs.

16  Q.  But your recollection is you didn't notice

17  anything unusual about how that occurred?

18  A.  No.

19          MR. SENSENIG:  Those are my questions.

20          MR. HUDGINS:  I've got just a couple of

21  quick followups.

22                    EXAMINATION

