In The

# United States Court of Appeals

### For The Fourth Circuit

## CAMILLE SEDAR,

*Plaintiff - Appellant,*

v.

## RESTON TOWN CENTER PROPERTY, LLC;
## BOSTON PROPERTIES LIMITED PARTNERSHIP,

*Defendants – Appellees,*

**and**

## BOSTON PROPERTIES, INC.; BEACON CAPITAL PARTNERS LLC,

*Defendants,*

v.

## CDA INCORPORATED, d/b/a MaxSent,

*Third Party Defendant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## AT ALEXANDRIA

—————————

## JOINT APPENDIX
## VOLUME III OF IV
## (Pages 749 – 1046)

—————————

| | | |
|---|---|---|
| David J. Sensenig | David D. Hudgins | Joseph P. Moriarty |
| Andrew R. Park | HUDGINS LAW FIRM, P.C. | WILLCOX & SAVAGE, PC |
| PARK SENSENIG LLC | 2331 Mill Road, Suite 100 | 440 Monticello Avenue, Suite 2200 |
| 2310 West Main Street | Alexandria, Virginia 22314 | Norfolk, Virginia 23510 |
| Richmond, Virginia 23220 | (703) 837-3206 | (757) 628-5502 |
| (804) 417-6085 | | |
| | | |
| *Counsel for Appellant* | *Counsel for Appellees* | *Counsel for Appellees* |

# TABLE OF CONTENTS
## VOLUME I OF IV

**Appendix Page**

Docket Entries.................................................................................1

Complaint
     filed August 8, 2018.................................................................8

Order of
The Honorable Theresa Carroll Buchanan
Re: Granting Joint Motion to Substitute Party
     filed October 5, 2018 .............................................................13

Defendant Boston Properties Limited Partnership and Reston Town Center
Property, LLC's Answer and Third Party Compliant Against CDA
Incorporated, D/B/A Maxsent,
With Attachments,
     filed October 17, 2018...........................................................14

     Attachments:

     Complaint
          dated August 8, 2018....................................................27

     Agreement to Provide Services for Security Guard Services between
     Boston Properties Limited Partnership, a Delaware Limited Partnership
     and CDA Inc. dba MaxSent
          dated April 2, 2015 ......................................................32

List of Uncontested Facts
     filed June 26, 2019 ...............................................................72

Defendant's Motion for Summary Judgment
     filed July 12, 2019.................................................................75

Defendants' Memorandum in Support of Motion for Summary Judgment
     filed July 12, 2019.................................................................77

Statement of Material Facts as to Which there is no Genuine Issue,
With Exhibits,
    filed July 12, 2019...................................................................... 90

<u>Exhibits:</u>

A.    **First Amendment to Agreement to Provide Services
        dated June 9, 2016** ................................................ 96

B.    **Excerpts of Transcripts of Deposition of Michael Blanchette
        on June 19, 2019** ................................................ 147

        **Examination** .................................................151

C.    **MaxSent Incident Report
        dated November 15, 2016**.................................... 179

D.    **Excerpts of Transcripts of Deposition of Camile Sedar
        on May 9, 2019** .................................................. 184

        **Examination** .................................................. 188

E.    **Excerpts of Transcripts of Deposition of David Buchanan
        on May 29, 2019**................................................ 208

        **Examination** .................................................. 212

F.    **Excerpts of Transcripts of Deposition of Robert Rapanut
        on May 29, 2019**................................................ 248

        **Examination** .................................................. 253

G.    **Excerpts of Transcripts of Deposition of Karen Dibella
        on May 29, 2019**................................................ 300

        **Examination** .................................................. 304

**Exhibits,** continued:

**H.** Excerpts of Transcripts of Deposition of Damien Keer
on May 29, 2019................................................................. 340

Examination ........................................................ 344

**I.** Photograph
undated ............................................................... 364

**J.** Excerpts of Transcripts of Deposition of Anthony Swartz
on June 19, 2019 ................................................ 365

Examination ........................................................ 369

**K.** Third Party Defendants' Answer and Objections to
Plaintiff's First Interrogatories and Requests for
Production of Documents
dated March 13, 2019 ........................................ 401

**L.** Third Party Defendant's Answer and Objections to
Plaintiff's First Interrogatories and Requests for
Production of Documents
undated ............................................................... 406

**M.** Defendant's Answer to Interrogatories
dated March 1, 2019 .......................................... 410

**N.** Excerpts of Transcripts of Deposition of Denise Hogan
on June 13, 2019 ................................................ 417

Examination ........................................................ 421

# TABLE OF CONTENTS
## VOLUME II OF IV

**Appendix Page**

**Exhibits to Defendants' Memorandum in Support of
Motion to Exclude Expert Testimony**
     filed July 12, 2019:

1.     **Dano Holland's Report with a Statement of
Proposed Opinions, and basis and Reasons for them**
        **dated April 15, 2019** ............................................................ 429

2.     **Dano Holland's Rebuttal Report**
        **dated May 30, 2019** .............................................................. 469

3.     **Transcript of Deposition of Dano Holland**
        **on June 18, 2019** .................................................................... 484

        **Examination** ........................................................................ 487

**Exhibits to Plaintiff's Memorandum in Opposition to
Defendants' Motion Exclude Expert Testimony**
     filed July 26, 2019:

1.     **Dano Holland, P.E. Curriculum Vitae**
        **updated April 11, 2019** ........................................................ 573

2.     **Experts of Transcript of Dano Holland**
        **on June 18, 2019** .................................................................... 576

        **Examination** ........................................................................ 577

12.    **Redacted Emails between Todd Pattison and Mike Blanchette**
        **dated December 27, 2018** .................................................... 589

**Plaintiff's Memorandum in Opposition to
Defendants' Motion for Summary Judgment**
    filed July 26, 2019 ....................................................... 591

<u>**Exhibits:**</u>

A.    **Excerpts of Transcripts of Deposition of Davida Buchanan**
        **on May 29, 2019**.................................................. 629

        Examination ....................................................... 634

B.    **Excerpts of Transcripts of Deposition of Robert Rapanut**
        **on May 29, 2019**.................................................. 701

        Examination ....................................................... 706

# TABLE OF CONTENTS
## VOLUME III OF IV

**Appendix Page**

Plaintiff's Memorandum in Opposition to
Defendants' Motion for Summary Judgment
    filed July 26, 2019, continued,

    Exhibits, continued:

C.    Excerpts of Transcripts of Deposition of Camille Sedar
        on May 9, 2019 ..................................................................... 749

        Examination ....................................................................... 754

D    Photograph
        undated ............................................................................. 765

E.    Photographs
        undated ............................................................................. 766

F.    Photographs
        undated ............................................................................. 769

G.    Excerpts of Transcripts of Deposition of Karen Dibella
        on May 29, 2019.................................................................. 773

H.    Excerpts of Transcripts of Deposition of Anthony Swartz
        on June 19, 2019 ................................................................. 789

        Examination ....................................................................... 794

I.    Excerpts of Transcripts of Deposition of Damien Kerr
        on May 29, 2019.................................................................. 837

        Examination ....................................................................... 842

<u>Exhibits</u>, continued:

J.  Letter to
    Andrew R. Park from
    John A. Bruno
    Orthopedic Medicine of Alexandria, Ltd.
    Re:  Consult for Camille Sedar
            dated April 14, 2019 ............................................................ 865

K.  Affidavit of Camille Sedar
            sworn July 24, 2019 ............................................................. 891

L.  Affidavit of Dano Holland,
    With Attachments,
            sworn July 26, 2019 ............................................................. 894

M.  Excerpts of Transcripts of Deposition of Dano Holland
            on June 18, 2019 ................................................................. 928

            Examination ........................................................................ 931

N.  Excerpts of Transcripts of Deposition of Michael Blanchette
            on June 19, 2019 ................................................................. 944

            Examination ........................................................................ 949

O.  Redacted Emails between Todd Pattison and Mike Blanchette
            dated December 27, 2018 .................................................... 972

P.  MaxSent Incident Report
            dated November 5, 2016 ..................................................... 974

Q.  Excerpts of Transcripts of Deposition of Denise Hogan
            on June 13, 2019 ................................................................. 979

            Examination ........................................................................ 984

R.  Affidavit of Dano Holland,
    With Attachments,
            sworn July 26, 2019 ............................................................. 995

<u>Exhibits</u>, continued:

S.    Photograph
           undated ........................................................................1012

T.    Photograph
           undated ........................................................................1013

U.    Photograph
           undated ........................................................................1014

V.    Virginia Construction Code
           effective July 14, 2014 ......................................................1019

Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment,
With Attachment,
           filed August 1, 2019 ........................................................1024

    <u>Attachment</u>:

    *Harold B. Holbrook v. Deborah S. Davidson*, No. 2:13-cv-00027
           decided January 15, 201 ................................................1032

Order of
The Honorable Claude M. Hilton
Re:  Granting Plaintiff's Motion for Leave to File Video as an Exhibit
           filed August 5, 2019........................................................1037

Order of
The Honorable Claude M. Hilton
Re:  Granting Defendants' Motion for Summary Judgment
           filed August 22, 2019 ......................................................1038

Plaintiff's Notice of Appeal
           filed September 4, 2019....................................................1044

# TABLE OF CONTENTS
## VOLUME IV OF IV – DVD

**Appendix Page**

**Video taken by Damien Kerr of Trip and
Fall Scene at Reston Town Center
undated** ................................................................................1047

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  (Alexandria Division)

4

5   CAMILLE SEDAR,          )   CASE NO: 1:18-cv-01111 CMH/TCH

6          Plaintiff,      )

7   -vs-                    )

8   BOSTON PROPERTIES,     )

9   LP, et al,             )

10         Defendants.      )

11   _____)

12

13              DEPOSITION OF CAMILLE SEDAR

14                 Alexandria, Virginia

15                    May 9th, 2019

16                      10:00 a.m.

17

18

19

20

21

22   REPORTED BY:  ALEXANDRIA KAAN



1         Deposition of CAMILLE SEDAR taken at the location

2   of:

3

4

5                HUDGINS LAW FIRM, P.C.

6                515 King Street

7                Suite No. 400

8                Alexandria, Virginia  22314

9

10

11     Before ALEXANDRIA KAAN, Notary Public in the

12   Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



1          APPEARANCES

2     Appearing on Behalf of the Plaintiff:

3          DAVID SENSENIG, ESQUIRE

4          ANDREW PARK, ESQUIRE

5          PARK SENSENIG

6          2310 West Main Street

7          Richmond, Virginia  23220

8          David.sensenig@parksensenig.com

9

10    Appearing on Behalf of the Plaintiff:

11         JOSEPH MORIARTY, ESQUIRE (via

12         telephonically)

13         WILLCOX & SAVAGE, P.C.

14         440 Monticello Avenue

15         Suite No. 2200

16         Norfolk, Virginia  23510-2243

17         Jmoriarty@wilsav.com

18

19

20

21

22



1        APPEARANCES (CONTINUED):

2

3

4    Appearing on Behalf of Defendants:

5        DAVID HUDGINS, ESQUIRE

6        HUDGINS LAW FIRM, P.C.

7        515 King Street

8        Suite No. 400

9        Alexandria, Virginia  22314

10        (703) 739-3700

11        Dhudgins@hudginslawfirm.com

12

13

14

15

16

17

18

19

20

21

22



```
 1   EXAMINATION OF CAMILLE SEDAR                    PAGE

 2   BY MR. HUDGINS                                  6

 3

 4

 5

 6   SEDAR EXHIBITS                                  PAGE

 7   A through K          photographs                76

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```



```
 1              P R O C E E D I N G S

 2                   - - - - - -

 3                 CAMILLE SEDAR,

 4        being first duly sworn to testify the whole

 5   truth, testified as follows:

 6                    EXAMINATION

 7   BY MR. HUDGINS:

 8     Q.  Good morning.  Would you state your full name and

 9   address, please?

10     A.  Camille Sedar, 43108 Stone Cottage Place,

11   Ashburn, Virginia 20147.

12     Q.  Ms. Sedar, my name is David Hudgins, we were

13   introduced just a short while ago, and as you know I'm

14   the attorney -- or one of the attorneys -- along with

15   Mr. Moriarty who's listening in by conference phone,

16   Counsel for the Defendant in the lawsuit that you had

17   filed.  I'm going to be asking questions about your

18   personal knowledge regarding the events leading up to

19   your lawsuit, and I'm going to try to make my questions

20   as straight-forward and simple as I possibly can.  I

21   would like to have an understanding with you that if you

22   don't understand one of my questions or if it's
```



1   confusing in any way, that you will stop me and let me

2   rephrase it so we're in perfect communication.

3       A.   Okay.

4       Q.   Do we have that agreement?

5       A.   Yes.  Yes.

6       Q.   All right.  Thank you.  Let's start with just

7   some basic background information:  Where were your

8   born?

9       A.   I was born in Murray, Utah.

10      Q.   And date of birth?

11      A.   5/17/1966.

12      Q.   And were you raised in your early years in Utah?

13      A.   Until I was 6, and my family moved away when I

14  was 6 years old.

15      Q.   When you say "moved away", where did they move

16  away to?

17      A.   Las Cruces, New Mexico.

18      Q.   How long did you live in New Mexico?

19      A.   Two years.

20      Q.   After that?

21      A.   Sacramento, California for a year.

22      Q.   So you're bouncing around quite a bit as a young



1    child.  Where did you start elementary school?

2        A.  Utah.  In first grade.

3        Q.  So you had to change schools with each of the

4    moves that you just talked about?

5        A.  Yes.

6        Q.  What year would you have moved, say, to

7    California?

8        A.  My guess would be probably '74.

9        Q.  And you obviously enrolled in the schools there?

10       A.  Yes.

11       Q.  How long was the family in California?

12       A.  Just a year.

13       Q.  From there where did you go?

14       A.  Indianapolis, Indiana.

15       Q.  It sounds like, with that type of moving around,

16   oftentimes people are connected with the military in

17   some respect.  Is that the case with your family?

18       A.  My father worked for the Department of Army but

19   his job was not military.

20       Q.  But his job required him to move from time to

21   time?

22       A.  Yes.



1   November the 15th, 2016 -- you were working your current

2   job?

3      A.  Yes.

4      Q.  And what took you to Reston Town Center that day?

5      A.  One of our co-workers was deploying, so we were

6   having a lunch for him.

7      Q.  What was his name?

8      A.  Major Alan Marks.

9      Q.  And were you meeting him some place or was he

10  with your group?

11     A.  There were two cars driving separately, and we

12  were meeting at the restaurant.

13     Q.  What was the name of the restaurant?

14     A.  It was Ted's Bulletin.

15     Q.  That's part of the Reston Town Center complex?

16     A.  Yes.

17     Q.  I understand from the papers and your Complaint

18  that you parked in the green garage.  Is that --

19     A.  Yes, I don't really know the naming of the

20  garages, just where they're located.  But yeah.

21     Q.  I went and walked around the areas there.  I

22  actually had a doctor's appointment not too far away,



1  and just walked the ground out there.  And I believe

2  that garage is about three quarters of a block from

3  where Ted's Bulletin restaurant is?

4     A.  It's across the street from the Reston --

5     Q.  You exit the garage and go up like one street and

6  it's on the left.  I believe that's how it works.

7     A.  I think so.

8     Q.  So who were the names of the people that were

9  going to meet at Ted's Bulletin?

10    A.  My co-workers, Devita Buchanan, Rob Rapanut,

11  Damian Kerr, Karen Debella, and Major Marks.

12    Q.  How do you know all of those individuals?

13    A.  We all work together.

14    Q.  This was going to be a celebration or a good bye

15  for a deployment of one of your co-workers?

16    A.  Yes.

17    Q.  Was there anything unusual getting up that

18  morning?

19    A.  No.

20    Q.  How was your health that day?

21    A.  It was good.

22    Q.  You didn't have a cold or suffer from allergies



1  or anything like that?

2    A.  No.

3    Q.  Were you taking any medication that day?

4    A.  I took my thyroid medication.

5    Q.  What is the medication and what dosage do you

6  take?

7    A.  It's Synthroid; the dosage is .137 milligrams.

8    Q.  And who's is the doctor who prescreens that?

9    A.  Dr. Jeff Cohen.

10    Q.  Is he your internist?

11    A.  He's my primary physician.

12    Q.  Primary care.  Where is he located?

13    A.  In Ashburn, Virginia.

14    Q.  Now, the two cars that arrived at Reston Town

15  Center:  Did both those cars park in the garage?

16    A.  I know my car parked in the garage.  I'm assuming

17  the other one did; I don't know for sure.

18    Q.  Were you able to find a parking spot on the first

19  level?

20    A.  Yes.

21    Q.  So after you parked, how much of the garage did

22  you have to walk through before coming to the steps



1  where you fell?

2  A.  Probably about a third of the garage.  I don't

3  know the distance.  We actually had to go up a stairwell

4  to get to the outside ground level.

5  Q.  So you parked one floor below ground level?

6  A.  Yes.

7  Q.  So you came up some steps?

8  A.  Uh-huh.

9  Q.  Were the steps adjacent to where these external

10  stairs are where you fell?

11  A.  Yes, As far as I can recall.

12  Q.  Or were they on the other side of the garage?

13  I'm just trying to figure out which stairwell you used

14  to go from one of the basement levels to the ground

15  level.

16  A.  They were adjacent.

17  Q.  Right close by?

18  A.  Yes.

19  Q.  What was the weather like that day?

20  A.  It was really nice, blue sky.

21  Q.  Bright blue sky, and sunny?

22  A.  Nice fall day.



1  you had the accident?

2     A.  I was wearing a skirt and a sweater with a jacket

3  over the sweater and flat shoes.

4     Q.  Normal work attire?

5     A.  Yes.

6     Q.  And the flat shoes, do you remember the

7  manufacturer?

8     A.  Yes, they're 9 West.

9     Q.  Anything unusual about those shoes?  Have you

10 ever had any trouble with them?

11    A.  No.

12    Q.  Anything?  No slippage of the feet within the

13 shoe?

14    A.  No.

15    Q.  And they're flat so there's no heel or anything?

16    A.  Right.  They're my comfortable shoes.

17    Q.  I understand.  There was nothing about your

18 clothing that was impeding you walking comfortably from

19 the garage to the restaurant?

20    A.  No.

21    Q.  How were you feeling that day in general?

22         MR. SENSENIG:  Objection:  Asked and



1   answered.

2           MR. HUDGINS:  I know she said she woke up

3   feeling good.

4      A.  I was feeling good.

5   BY MR. HUDGINS:

6      Q.  At the time you got out of the car in the garage,

7   you were in good spirits?

8      A.  Yes.

9      Q.  Do you remember any of the conversation on the

10  way over there?

11     A.  No.

12     Q.  Do you remember anything about the discussion

13  leading to going over to Ted's Bulletin and meeting with

14  these folks?

15          MR. SENSENIG:  Objection.  Hearsay.

16          Go ahead.

17  BY MR. HUDGINS:

18     Q.  In other words, I'm just kind of going back in

19  time before the accident to see what memory you might

20  have for the planning for that outing.

21     A.  I didn't plan the outing; it was planned by Ms.

22  Debella.  We had a staff meeting earlier that day; I



1  remember talking a little bit about the staff meeting.

2    Q.  So that's what you remember about the plans for

3  going over to Ted's Bulletin?

4    A.  Well, at the office, you know, being reminded of

5  the address and the time and making plans on who was

6  going to ride with whom.

7    Q.  So you remember that part?

8    A.  Yeah.

9    Q.  You just don't remember any of the details of

10  conversation in the car driving over?

11    A.  Not really the details.  Nothing stands out.

12    Q.  How far is it from the work location to the

13  garage at Reston Town Center?

14    A.  I don't know the exact, but it's only a couple

15  miles.

16    Q.  So maybe a 15-minute drive at max?

17    A.  Less than 15 minutes I would say.

18    Q.  Had you made that drive before?

19    A.  Yes.

20    Q.  How many times had you been to the Reston Town

21  Center -- just an estimate -- before this accident

22  happened?



1    A.  I estimate maybe five to eight times a year.

2    Q.  Had you been in that garage before?

3    A.  No.  That was the first time in the garage.

4    Q.  So the route you walked up the stairs and then

5    out to where you fell:  To your knowledge, had you ever

6    travelled that path before?

7    A.  No.  I don't believe I did.

8    Q.  But you had parked in other places at Reston Town

9    Center?

10   A.  Yes.

11   Q.  And you had walked around the area?

12   A.  Yes.

13   Q.  And as you sit here today, you would agree with

14   me that there are brick sidewalks in various places

15   around that whole complex?

16   A.  Yes.

17   Q.  Had you ever had any trouble walking around there

18   before?

19   A.  No.

20   Q.  As far as brick sidewalks are concerned, have you

21   ever lived or worked in an area where there were brick

22   sidewalks?



# Exhibit D

Exhibit D



Sodar - 1298



Case 1:18-cv-01111-CMH-TCB   Document 52-5   Filed 07/26/19   Page 2 of 3 PageID# 674





Case 1:18-cv-00111-CMH-TCB   Document 52-6   Filed 07/20/19   Page 3 of 4 PageID# 676

Sedat - 1301



Sedar - 1302



Sedar - 1303



Sedar - 1304

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF VIRGINIA

 3                  (Alexandria Division)

 4

 5  CAMILLE SEDAR,        )    CASE NO: 1:18-cv-01111 CMH/TCB

 6          Plaintiff,    )

 7  -vs-                  )

 8  BOSTON PROPERTIES,    )

 9  LP, et al,            )

10          Defendants.   )

11  _____)

12

13                DEPOSITION OF KAREN DIBELLA

14                   Alexandria, Virginia

15                     May 29th, 2019

16                       3:00 p.m.

17

18

19

20

21

22  REPORTED BY:  ALEXANDRIA KAAN
```



1        Deposition of KAREN DIBELLA taken at the location

2   of:

3

4

5                    HUDGINS LAW FIRM, P.C.

6                    515 King Street

7                    Suite No. 400

8                    Alexandria, Virginia   22314

9

10

11      Before ALEXANDRIA KAAN, Notary Public in the

12   Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



1          APPEARANCES

2    Appearing on Behalf of the Plaintiff:

3        DAVID SENSENIG, ESQUIRE

4        ANDREW PARK, ESQUIRE

5        PARK SENSENIG

6        2310 West Main Street

7        Richmond, Virginia  23220

8        David.sensenig@parksensenig.com

9

10   Appearing on Behalf of the Plaintiff:

11       JOSEPH MORIARTY, ESQUIRE (via

12       telephonically)

13       WILLCOX & SAVAGE, P.C.

14       440 Monticello Avenue

15       Suite No. 2200

16       Norfolk, Virginia  23510-2243

17       Jmoriarty@wilsav.com

18

19

20

21

22



```
 1                APPEARANCES (CONTINUED):

 2

 3

 4           Appearing on Behalf of Defendants:

 5                DAVID HUDGINS, ESQUIRE

 6                HUDGINS LAW FIRM, P.C.

 7                515 King Street

 8                Suite No. 400

 9                Alexandria, Virginia  22314

10                (703) 739-3700

11                Dhudgins@hudginslawfirm.com

12

13

14

15

16

17

18

19

20

21

22   ALSO PRESENT: HELEN TAWIL w/ ANDREW PARK (paralegal)
```



1  EXAMINATION OF KAREN DIBELLA                        PAGE

2  BY MR. PARK                                         6

3  BY MR. HUDGINS                                      45

4

5

6

7  DIBELLA EXHIBITS                                    PAGE

8  A                    subpoena                       6

9  J                    photograph                     29

10 G                    photograph                     31

11     (Exhibits J and G are retained by Mr. Park.)

12

13

14

15

16

17

18

19

20

21

22



1              P R O C E E D I N G S

2                   - - - - - -

3  (Whereupon Exhibit A is premarked for identification.)

4                 KAREN DIBELLA,

5       having been called forth as a witness, was sworn

6  to tell the truth and testifies as follows:

7                   EXAMINATION

8  BY MR. PARK:

9     Q.  Good afternoon, Karen.  My name is Andrew Park.

10  I know we've met before.  I'm one of the attorneys

11  representing Camille Sedar in this action.  Just as a

12  matter of housekeeping:  We've marked for identification

13  as Exhibit A the notice of deposition that you received

14  for this deposition here today.  Do you recognize that

15  document?

16     A.  Yes, I do.

17     Q.  I'm going to go ahead and hand it to the Court

18  Reporter so she'll we able to organize it.

19       The procedure for what we're here about today is

20  really straight-forward.  I'm going to have some

21  questions for you; Mr. Hudgins may have some questions

22  for you.  That may prompt a couple of additional rounds



1  of questioning, but that's the basic format.

2      A.  Okay.

3      Q.  If at any point I don't make a question clear to

4  your satisfaction, would you let me know?  And is that

5  agreeable to you?

6      A.  Certainly.

7      Q.  Tell us a little bit about your background, if

8  you would.

9      A.  I'm retired military, Airforce.  I've been with

10  the Defense Intelligence Agency -- military since '97

11  and then civilian since 2000.  I lived here in the area

12  for 19 years, so this is the longest location I've ever

13  lived at.  I don't know in particular what you'd like to

14  know.  But since -- I mean, this is concerning Camille;

15  I've known Camille since 2015, I believe it is, '15.  So

16  when I began to work with her, I supervised her.

17      Q.  So you were her supervisor?

18      A.  I was, yes.

19      Q.  Is that how you came to know Camille?

20      A.  Yes.

21      Q.  She began to work as one of your reports, is that

22  fair to say?



1    A.  Correct.  Yes.

2    Q.  And you said that was in 2015?

3    A.  Yes.  Because I'm trying to get my dates straight

4    here.  In 2018 I went on a rotation; 2013 to 2015 I was

5    at DIA headquarters; and then 2015 I want to say in the

6    April timeframe I went to Reston for an assignment, and

7    that's where I met Camille.

8    Q.  It's fair to say that either in the military or

9    as a civilian in the military, you've been moved around

10   with some frequency?

11   A.  Yeah, usually every three years.

12   Q.  So there was a time when you were Camille's

13   supervisor?

14   A.  Correct.

15   Q.  Can you just describe in very general terms what

16   kind of job functions Camille had when she was reporting

17   to you?

18   A.  Sure.  Camille was the -- and still is -- the

19   senior staff officer for the underground facility

20   analysis center located in Reston, Virginia, as part of

21   the Defense Intelligence Agency.  Her primary duties

22   were to manage the administrative functions of the



1   what had happened.  And I believe it was Rob that said

2   when she was coming down the stairs she fell down the

3   stairs.  And so we started -- you know, after they had

4   departed, we started looking to find out what could have

5   happened.

6               MR. HUDGINS:  Objection.  Move to strike the

7   hearsay.

8   BY MR. PARK:

9       Q.  You'll hear some objections as time goes on.

10  That's the lawyers doing what the lawyers need to do for

11  the record, because the Court Reporter is taking it

12  down.

13      A.  It's not a problem.  I just apologize that --

14  this was a long time ago, so I'm trying to --

15      Q.  Absolutely nothing personal.

16              So just in the sequence here:  Camille and Davida

17  -- Camille's taken away by the EMS and Davida

18  accompanies Camille with the EMS?

19      A.  Yes.

20      Q.  And they depart?

21      A.  Yes.

22      Q.  And then you begin as a group to look at what was



1  in front of you?  Is that fair to say?

2      A.  Yes.

3      Q.  And did there come a time when anyone took a

4  video of the area?

5      A.  Yes.  Damien Kerr, he was the only one that had a

6  phone with him.  The building we work in doesn't allow

7  electronic devices.  And since we rode with him, he had

8  his phone in his vehicle; he brought it with him because

9  he had left instructions at the office that if anyone

10  needed to get a hold of any of us, he would be on his

11  cellphone.  So he took photographs of the situation.

12  And by this time, we had already identified the brick

13  that was very loose and was rocking.  And Rob had

14  indicated that that was the area that she had fall --

15          MR. HUDGINS:  Objection.  Move to strike.

16  BY MR. PARK:

17      Q.  Go ahead.  You can finish your answer.

18      A.  Rob indicated that, when he was describing to us

19  what had happened, that was the area she had tripped and

20  fallen down the stairs.

21          MR. HUDGINS:  Same objection.  Same motion.

22  BY MR. PARK:



1    Q.  Before we get to the brick, I'd like to ask you

2    about any blood marks that you observed in the area.

3    Did you observe any blood marks in the area?

4    A.  Yes.  Two.

5    Q.  And before we start looking at videos or pulling

6    out photographs, can you describe for us where those

7    blood marks were and anything else that you can -- any

8    other words you can use just to describe them generally?

9    A.  There were two what I would call pretty

10   significant blood marks:  One was on the bottom of the

11   sidewalk; and then there was one on the steps -- and I

12   believe it was probably the second step up, something

13   like that.  The one on the sidewalk was the largest of

14   the blood marks.

15   Q.  And if you remember, when you arrived where was

16   Camille with respect to the blood marks?

17   A.  I believe she was already on a stretcher at that

18   point, so.  I do not believe -- I cannot remember seeing

19   Camille laying on the ground.  I remember her on the

20   stretcher.

21   Q.  Earlier I think you said one of the blood marks

22   was on the bottom of the sidewalk.  Did I hear that



1  correctly?

2    A.  Yes.

3    Q.  What did you mean when you said "bottom of the

4  sidewalk"?  I didn't quite understand; I just want to

5  make sure I understand what you're saying.

6    A.  Sure.  As you're standing looking at the garage,

7  there's a set of steps leading up to the garage, and

8  then the sidewalk is at the bottom of those steps.  So

9  the sidewalk had significant blood, and about the second

10  step up, I believe, had blood like on the edge of the

11  step.

12    Q.  Based on your observations, did those two blood

13  marks line up on the steps as you were descending or

14  going up the steps?  Or were they staggered?

15          MR. HUDGINS:  Objection to the form of the

16  question.

17    A.  So if you were --

18          WITNESS:  Do I still answer?  I'm sorry.

19          MR. HUDGINS:  Yeah.

20          WITNESS:  So I answer everything.  Right?

21          MR. HUDGINS:  Yeah.

22          WITNESS:  Just want to make sure.



1  I'll ask you a couple more questions about J.  And let

2  me just say:  You can ignore what's been circled on

3  there; you don't need to concern yourself.

4           MR. HUDGINS:  Why don't you just give her a

5  clean J?

6           MR. PARK:  That's a great idea.

7  BY MR. PARK:

8    Q.  Flip that over and let me just give you a clean

9  J.

10   A.  Okay.

11           MR. SENSENIG:  Should we identify that with

12  her name?

13           MR. PARK:  Let's do that.  I'm going to ask

14  the Court Reporter to mark this next in line.

15           MR. HUDGINS:  Why don't you just --

16           MR. PARK:  You want to just mark it as

17  Dibella J?  J.

18   (Whereupon Exhibit J is marked for identification.)

19   Q.  Karen, what does this photograph show generally?

20   A.  It shows the sidewalk; the stairs coming out of

21  the garage; and the blood marks that we observed.  It

22  appears to be someone else standing in the left corner



1   of the photo.

2       Q.  And just so it's clear, I'm going to ask if you

3   would circle and also put your initials, first on the

4   blood mark that you described as being on the sidewalk.

5       A.  Okay.

6       Q.  Just so the record's clear, I'm going to ask you

7   to put a square around the blood mark that you described

8   as being on the risers of the stairs, and initial that

9   as well, if you would.  Thank you.

10          Now in Exhibit K, does that show your feet or

11  your shoes?

12      A.  Yes, it does.

13      Q.  So I take it then -- oh, does it also show Major

14  Marks' boots?

15      A.  I believe those are his next to mine, yes, behind

16  mine.

17      Q.  To the best of your knowledge?

18      A.  Yes.  He was the only one in military uniform.

19  So his was the green ones to the back there in the far

20  left corner.

21      Q.  And you observed the EMS people who were at the

22  scene.  Is that correct?



1    A.  Yes.

2    Q.  Based on your observations, can you tell us

3    whether the blue-shirted person here on the right in the

4    upper right-hand corner was an EMS person?

5    A.  I believe so.

6    Q.  And does this photograph accurately and fairly

7    depict the conditions as you found them?

8    A.  Yes.

9    Q.  Set that to one side.

10       Now, I'd like -- if you would, go to Exhibit G.

11   And I can help you find it, if need be.

12       Now, we're going to do the same thing:  I'm going

13   to swap that one out and we're going to have this marked

14   by the Court Reporter as Dibella G.  I'm going to go

15   ahead and give this Exhibit G that was in front of you

16   to the Court Reporter so she can make sure it gets put

17   in the appropriate line.

18   (Whereupon Exhibit G is marked for identification.)

19   Q.  Karen, does Exhibit G fairly and accurately

20   represent the conditions as you found them after the

21   accident?

22   A.  Yes.



1    Q.  Now, when you saw or observed the EMS, did they

2    have any kind of equipment with them?

3    A.  Yes.  There was quite a bit of equipment bags

4    laying around as they were treating Camille.

5    Q.  There appears to be a bag shown in Exhibit G, a

6    yellow bag.

7    A.  Yes.  Yes.

8    Q.  Did you observe the EMS with yellow bags that

9    looked like that?

10   A.  Yes.

11   Q.  Does Exhibit G show any of the blood marks that

12   you observed at the scene?

13   A.  Yes.  The one on the sidewalk.

14   Q.  Now, Exhibit G does not show the blood mark on

15   the stairs.  Is that fair to say?

16   A.  Correct.  Yes.

17   Q.  Now, you observed this scene with your own eyes

18   when you arrived.  Is that correct?

19   A.  Yes.

20   Q.  And in fact, you pointed out on the video where

21   both of the blood marks were.  Is that correct?

22   A.  Yes.



1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  (Alexandria Division)

4

5   CAMILLE SEDAR,        )   CASE NO: 1:18-cv-01111 CMH/TCH

6          Plaintiff,    )

7   -vs-                 )

8   BOSTON PROPERTIES,   )

9   LP, et al,           )

10         Defendants.   )

11   _____)

12

13              DEPOSITION OF ANTHONY SWARTZ

14                 Alexandria, Virginia

15                  June 19th, 2019

16                     9:00 a.m.

17

18

19

20

21

22   REPORTED BY:  ALEXANDRIA KAAN


800.211.DEPO (3376)
EsquireSolutions.com

1          Deposition of ANTHONY SWARTZ taken at the

2    location of:

3

4

5                     HUDGINS LAW FIRM, P.C.

6                     2331 Mill Road

7                     Suite No. 100

8                     Alexandria, Virginia  22314

9

10

11       Before ALEXANDRIA KAAN, Notary Public in the

12    Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



1          APPEARANCES

2    Appearing on Behalf of the Plaintiff:

3        DAVID SENSENIG, ESQUIRE

4        ANDREW PARK, ESQUIRE

5        PARK SENSENIG

6        2310 West Main Street

7        Richmond, Virginia  23220

8        David.sensenig@parksensenig.com

9

10   Appearing on Behalf of the Plaintiff:

11       JOSEPH MORIARTY, ESQUIRE (via

12       telephonically)

13       WILLCOX & SAVAGE, P.C.

14       440 Monticello Avenue

15       Suite No. 2200

16       Norfolk, Virginia  23510-2243

17       Jmoriarty@wilsav.com

18

19

20

21

22



1        APPEARANCES (CONTINUED):

2

3

4    Appearing on Behalf of Defendants:

5        DAVID HUDGINS, ESQUIRE

6        HUDGINS LAW FIRM, P.C.

7        2331 Mill Road

8        Suite No. 100

9        Alexandria, Virginia  22314

10       (703) 739-3700

11       Dhudgins@hudginslawfirm.com

12

13   Appearing on Behalf of the Witness:

14       TIMOTHY BRUNICK, ESQUIRE

15       CLARKE DOLPH RAPAPORT HULL & BRUNICK

16       5712 Cleveland Street

17       Suite No. 130

18       Virginia Beach, Virginia  23462

19       (757) 466-0464

20       Tbrunick@clarkedolph.com

21

22



```
 1  EXAMINATION OF ANTHONY SWARTZ                PAGE

 2  BY MR. SENSENIG                              6

 3  BY MR. HUDGINS                               107

 4

 5

 6  SWARTZ EXHIBITS                              PAGE

 7  No. 1            notice of deposition        56

 8  No. 2            incident report             57

 9  No. 3                photograph              71

10  No. 4                e-mail                  88

11  No. 5                (skipped)               n/a

12  No. 6            photograph                  99

13  No. 7            photograph                  101

14  No. 8            photograph                  102

15  No. 9            photograph                  103

16  No. 10           photograph                  104

17  No. 11           photograph                  105

18

19

20

21

22
```



1               P R O C E E D I N G S

2                    - - - - - -

3                  ANTHONY SWARTZ,

4       having been called forth as a witness, was sworn

5    to tell the truth and testifies as follows:

6                    EXAMINATION

7    BY MR. SENSENIG:

8       Q.  Good morning, Mr. Swartz.

9       A.  Good morning.

10      Q.  My name is Dave Sensenig.  We met very briefly

11   before getting started here today.  My firm represents

12   the Plaintiff in this action, Ms. Camille Sedar.  As I

13   think you may be aware, the action involves two

14   Defendants:  Boston Properties and Reston Town Center,

15   two corporate entities.  Have you ever been deposed

16   before?

17      A.  No.

18      Q.  I'm going to be asking a series of questions.  So

19   a couple of things I ask of you:  First because as you

20   can see the Court Reporter is taking down all the

21   testimony, we ask that you wait until I'm done asking

22   the question before you start in on your answer so as to



1  not make it difficult on her to get everything down.

2     A.  Okay.

3     Q.  And also as you are doing now, to respond

4  verbally so she can accurately take down your response

5  as opposed to a nod of the head or shrug of the

6  shoulders or something like that.  Does that sound fair?

7     A.  Yes, Sir.

8     Q.  The other thing is:  When I ask a question, if

9  you don't understand the question or you don't hear the

10 question or you're not clear about what the question is,

11 I'm going to ask that you let me know that.  Is that

12 fair?

13    A.  Yes, Sir.

14    Q.  And if at any time you need to take a break, let

15 us know, because we can do that too.

16    A.  Okay.

17    Q.  If you'd state your full name for the record?

18    A.  Anthony Paul Swartz.

19    Q.  What's your current address?

20    A.  1539 Chilly Hollow Road, Berryville, Virginia

21 22611.

22    Q.  How long have you been at that address?



1     A.  A couple of years now.

2     Q.  Where did you live previously?

3     A.  In Lansdale.

4     Q.  Do you know the address?

5     A.  19580 Miramonte Terrace, Leesburg, Virginia 20176

6  I believe.

7     Q.  How long had you been there?

8     A.  Less than six months.

9     Q.  How about, where did you live around the fall of

10  2016?

11    A.  I was living in Paeonian Springs at the time.

12    Q.  Where was that address?

13    A.  39911 Milton Court.  And Paeonian Springs is

14  spelled P-A-E-O-N-I-A-N Springs, Virginia 20129.  That's

15  right outside Leesburg.

16    Q.  How long did you live at that address?

17    A.  Seven years.

18    Q.  As you sit here today, do you have any plans to

19  move from the Chilly Hollow Road address?

20    A.  I do.

21    Q.  Tell me about those plans.

22    A.  I'm planning on moving to DC.  Either DC or



1    Q.  Fall of 2016, were there surveillance cameras

2  located at the green garage?

3    A.  Yes.

4    Q.  How many?

5    A.  I would say in that general vicinity maybe four.

6    Q.  Do you know who owned the cameras?

7    A.  I know whenever there was an issue with them we

8  would call Signals to come out to look at them.

9    Q.  So Signals would perform the maintenance on the

10  cameras?

11    A.  Yes.  Who owned them?  I assumed it was Boston

12  Properties.

13    Q.  Did you have an understanding as to who owned the

14  garage?

15    A.  I assume Boston Properties owned the entire

16  Reston Town Center.

17    Q.  You said to your recollection there were about

18  four cameras located around the green garage.  Was there

19  a camera located in the vicinity of the southwest

20  entrance that we've been talking about?

21    A.  There would have been two that panned in that

22  direction.



1    Q.  Let me back up a second.  Were the cameras

2   attached to the garage itself?

3    A.  No.

4    Q.  How were they mounted?

5    A.  One was attached to fountain 2 right above Obi

6   Sushi on the corner of Freedom and Library, and there's

7   another one that would have been mounted on the -- I

8   want to say loading dock of fountain 2 -- that would pan

9   in that direction.

10   Q.  When you say "pan in that direction", is it

11  correct to say that those two cameras and where they

12  were located had the ability to capture on video the

13  area of the stairwell where Ms. Sedar's incident

14  occurred if they were focused on that?

15          MR. BRUNICK:  Objection to form.

16   A.  I'm a little confused with the question.

17  BY MR. SENSENIG:

18   Q.  Sure.  It was a kind of confusing question.  Let

19  me back up a second.

20          You said there were two cameras in that area; did

21  those cameras have the ability to focus on the stairwell

22  where Ms. Sedar fell?



1          MR. BRUNICK:  Objection to form.

2     A.  I know when they panned, the area where she fell

3  was in the area of pan.

4  BY MR. SENSENIG:

5     Q.  Are you able to say whether the stairwell itself

6  was in the area of panning?

7     A.  Yes.

8     Q.  So the stairwell itself was in the area of

9  panning?

10          MR. BRUNICK:  Objection to form.

11     A.  If you're asking if both cameras could see the

12  stairwell, yes, they could.

13  BY MR. SENSENIG:

14     Q.  Depending on how they were aiming?

15     A.  Yes.

16     Q.  Again I want to go back to November of 2016.  Who

17  made the decision as to what area those two cameras

18  focused on?

19     A.  That I am not aware of.

20     Q.  Was it you?

21     A.  No.  I changed it from time to time, but I don't

22  recall who made a decision to make it in that specific



1   area.

2       Q.   What was the policy as to -- if you're aware --

3   back in November of 2016, what was the policy as to what

4   areas those cameras should focus on?

5           MR. BRUNICK:   Objection to form.

6           But go ahead and answer.

7       A.   If I had a concern saying, for example, I didn't

8   think the camera would look in the right area, I'd take

9   it to Mike.   And then if Mike thought it was a necessary

10  change, he'd take it to Boston Properties, and then we'd

11  call Signals out and they would change the area in which

12  the cameras pan.

13  BY MR. SENSENIG:

14      Q.   What would cause you to think that a camera

15  wasn't panning in the correct area?

16      A.   If it wasn't catching enough of the entrance or

17  something of if it was -- for example, we had one camera

18  that would just pan like the sidewalks down here and it

19  would cut out half the sidewalk.   So of course for

20  safety you'd want to see the whole sidewalk.

21      Q.   So the two cameras that were in place that you've

22  already testified would pan the stairwell at issue,



1     A.   Primarily patrol the property and answer any

2  calls that come over the radio.

3     Q.   Leading up to this incident, do you recall any

4  other notable incidents that day?

5     A.   No.

6     Q.   Do you recall what the weather was like?

7     A.   No.  I know there wasn't snow and I know there

8  wasn't rain, because those I remember pretty clearly.

9  Those incidents tend to result in a serious injury.

10     Q.   Would you agree that this incident resulted in

11  serious injury from what you saw?

12          MR. HUDGINS:  Objection.

13     A.   I mean, my personal opinion, yes.  Any time I see

14  blood I consider it, you know, serious.

15  BY MR. SENSENIG:

16     Q.   Do you recall from investigating the incident,

17  Ms. Sedar being knocked unconscious?

18     A.   Yes.

19     Q.   Would you consider that to be serious?

20          MR. HUDGINS:  Objection.

21     A.   Yes.

22  BY MR. SENSENIG:



1    Q.  The green garage -- at that time of day was the

2    green garage open to the public?

3    A.  Yes.

4    Q.  And at that time, November 15th, 2016, was the

5    public -- the persons who used the green garage required

6    to pay for parking at that time?

7    A.  No.

8    Q.  At some point you were alerted to this incident?

9    A.  Correct.

10   Q.  How were you alerted?

11   A.  Over the radio by my officer who was stationed in

12   the area.

13   Q.  Who was that?

14   A.  That would have been Aloysius Kun, and I do not

15   recall how to spell his name.

16   Q.  I think we have that, but I appreciate it.  Had

17   you worked with Mr. Kun before?

18   A.  Yes.

19   Q.  Do you know when he started at MaxSent?

20   A.  He was there before me, is all I can recall.

21   Q.  Do you recall when he left MaxSent?

22   A.  No.



1      Q.   Did you ever interact socially with him outside

2   of work?

3      A.   No.

4      Q.   Have you talked to him since he left MaxSent?

5      A.   I talked to him maybe twice a month or two after

6   he left just to see how he was doing.

7      Q.   And what was he doing at that time?

8      A.   I think he was on a trip somewhere

9   internationally.

10      Q.   A trip where?

11      A.   A trip internationally somewhere.  Where I don't

12   recall.

13      Q.   Do you have any idea as to his location now?

14      A.   No.

15      Q.   Do you have a phone number for him?

16      A.   I might in my phone actually.

17      Q.   Okay.

18      A.   Let's see.

19          MR. HUDGINS:  Whose phone number is this?

20          MR. SENSENIG:  Mr. Kun, the person we're

21   trying to locate for the day.

22          MR. HUDGINS:  How do we spell Kun?



1          MR. PARK:  K-U-N.

2     A.  No, I do not have his number in this phone, but I

3  can probably find it somewhere.

4  BY MR. SENSENIG:

5     Q.  What's your cellphone number?

6     A.  571-258-9525.

7     Q.  I'm going to ask you if you would, if you could

8  look and see if you could locate his phone number and

9  provide the information to your Counsel?  Would you

10  agree to do that?

11     A.  Outside of today?

12     Q.  Yes.

13     A.  Sure.  If I can find it, yeah, I'll provide it.

14     Q.  Would you let him know either way?

15     A.  Yes.

16     Q.  Great, thank you.  So going back to the incident:

17  You were alerted by Mr. Kun.  How did he alert you to

18  it?

19     A.  Over the radio.

20     Q.  What did he say?

21     A.  He would have said:  "There's a lady who has

22  fallen in the green garage.  Please get over here as



1  soon as you can."

2     Q.  Do you recall where you were when you received

3  that call?

4     A.  No.

5     Q.  Do you recall approximately how long it took you

6  to get to the scene once you were called?

7     A.  No matter where I would have been on the

8  property, it would have been less than five minutes.

9  Because we have mobile units that we drive around on the

10  property, so no matter where I would have been I could

11  have gotten there in under five minutes.

12     Q.  Is mobile unit like a golf cart?

13     A.  Yes.

14     Q.  So you had a golf cart at the time?

15     A.  Yes.

16     Q.  So once you received the call from Mr. Kun you

17  took the golf cart directly to the scene?

18     A.  Yes.

19     Q.  Tell us, what did you witness when you first

20  arrived to the scene.

21     A.  If I can recall correctly, when I first arrived

22  at the scene I believe Ms. Camille was unconscious; her



1  friends were around her; one of her friends I think was

2  on the phone with Fairfax County Police -- I mean EMS; I

3  asked them if everyone was okay.  Of course she was

4  unconscious.  As a policy we don't touch anyone who is

5  unconscious, so I unfortunately couldn't do anything.  I

6  think a bystander or a friend maybe, came over and

7  started doing CPR to help out.  EMS arrived on scene.  I

8  can't remember exactly how long after I got there they

9  arrived on scene, because they're usually pretty quick

10  because they're station's right across the street.  And

11  then they put her on a stretcher and took her off to the

12  hospital.

13      Q.  So you arrived before EMS?

14      A.  Yes.

15      Q.  You stated she was unconscious when you got

16  there.  Was there any point in time during your

17  interaction with Ms. Sedar where she regained

18  consciousness?

19      A.  Not that I can recall.

20      Q.  So you don't recall having any conversations with

21  her?

22      A.  No.  I tried to just give her space.  When I



1  first saw her unconscious I didn't want to bother her or

2  her friends.  I just wanted to make sure people were

3  okay and let EMS do their thing.

4      Q.  Understood.  And Mr. Kun was still on the scene I

5  presume?

6      A.  Yes.

7      Q.  Was there anyone else from MaxSent on the scene

8  when you first arrived?

9      A.  When I first got there, it would have been, I

10 believe, just him.  And then I would have notified my

11 superiors and, I believe, the assistant director at the

12 time, and possibly Mike would have come over during the

13 scene.  Mike comes to some of these scenes, not all of

14 them.  I can't recall if he came to this one or not.

15     Q.  Do you recall if your immediate supervisor came?

16     A.  I believe so.

17     Q.  Probably you stated earlier in the deposition,

18 but who was that?

19     A.  At that time -- that's a good question.  Either

20 Will, Bryan -- one of those two -- maybe Kevin.  The

21 assistant position has changed so many times, so I can't

22 recall back that far who it would have been.



1     Q.  Do you recall anyone else from MaxSent being at

2   the scene?

3     A.  Depending how many emergency response vehicles

4   showed up.  We were pulling officers to direct traffic

5   around the vehicles, so it's very possible.

6     Q.  Was there a specific individual who was tasked

7   with investigating the incident?

8     A.  That would be me.

9     Q.  Was anybody else besides you tasked with

10  investigating the incident?

11    A.  No.

12    Q.  Tell me about the policy and procedures in place

13  at the time for how to go about investigating an

14  incident such as the one with Ms. Sedar?

15        MR. BRUNICK:  Objection to form.

16        Go ahead.

17    A.  I would question her friends, any witnesses to

18  how she fell; where she fell; what kind of shoes was she

19  wearing at the time; had she been drinking previously;

20  was she under the influence of alcohol or anything or

21  substance at all.  And based on the information, I'd go

22  to the location area that people described, and inspect



1   the area very finely to see if there's any loose bricks,

2   broken concrete, that kind of stuff, loose railing.  And

3   then if there was, document, take pictures.  Actually, I

4   can't say I always take pictures, sometimes I forget.

5   But I always document and notify my superiors if there

6   was an issue.

7   BY MR. SENSENIG:

8       Q.  And did you do that in this case?

9       A.  Yes.

10      Q.  In inspecting the area, did you identify any

11  loose bricks?

12      A.  I cannot recall.

13      Q.  Can't recall one way or the other?

14      A.  Yeah, I can't recall.  I know that area is a very

15  tricky area of the property.

16      Q.  Why would you say that?  What do you mean by

17  "tricky area"?

18      A.  The picture you showed me for the stairwell?

19  That's not the only person that's fallen on that

20  stairwell.

21      Q.  How many other people have fallen in that

22  stairwell?



1    A.  Easily two.

2    Q.  Did both falls occur prior to Ms. Sedar's?

3    A.  After.

4    Q.  Tell me what you recall about those falls.

5              MR. HUDGINS:  Objection.

6    A.  I think one woman -- elderly woman -- looks like

7   she tripped, I think, over top and she came back and

8   claimed she broke her ankle.  But she was walking on it,

9   so.

10  BY MR. SENSENIG:

11   Q.  Tripped over the top of what?

12   A.  The stairwell.

13   Q.  In the brick area?

14   A.  It would have been -- these pictures aren't very

15  clear, but that stairwell is not very like --

16   Q.  I can show you some other pictures.

17   A.  Coming out of this garage I myself have almost

18  tripped on the stairwell a thousand times just because

19  of the layout of this entrance.

20   Q.  Over what did you almost trip?

21   A.  Either the brick or the step itself.

22   Q.  And that would include times prior to Ms. Sedar's



1    fall?

2      A.  Yes.

3            MR. HUDGINS:  Objection.

4    BY MR. SENSENIG:

5      Q.  What about the brick -- I want to focus on the

6    time prior to Ms. Sedar's fall.  What about the brick

7    almost caused you to fall numerous times prior to Ms.

8    Sedar's fall?

9      A.  It's kind of just the way that it transitions

10   from the garage to the stairs.

11     Q.  Any incidents prior to Ms. Sedar's fall where you

12   almost trip because of loose bricks in that area?

13     A.  No.  We do a pretty good job making sure those

14   bricks are pretty solid there.

15          Yeah, those I can look at.

16     Q.  These are a little bit better.  We'll get back to

17   this.

18            MR. SENSENIG:  If you could mark this as

19   Exhibit 3.

20    (Whereupon Exhibit No. 3 is marked for identification.)

21            MR. HUDGINS:  There's no Bates numbers or

22   anything, is there?



1          MR. SENSENIG:  I'll represent what I put in

2    front of the witness is a picture that was produced and

3    connected to the expert report issued by Mr. Boyd.

4          MR. HUDGINS:  So these are not any of the

5    photographs that were taken by Ms. Sedar's companions

6    the day of?

7          MR. SENSENIG:  No.  Great point, I don't

8    want to mislead anybody.  This picture comes from the

9    pictures that were taken by Mr. Boyd.  He testified

10   yesterday he took these pictures in, I want to say April

11   of 2019, but whenever his testimony is.  And it's

12   identified in his report as well.

13         MR. HUDGINS:  A couple of years after the

14   fact?

15         MR. SENSENIG:  Right.  This is the location.

16   So this is a picture that was taken by Mr. Boyd.

17   BY MR. SENSENIG:

18     Q.  Mr. Swartz, this is not a picture -- want to make

19   sure you understand -- this is not a picture depicting

20   the condition at the time at the incident.  The purpose

21   of me showing you this picture is to discuss the

22   incident that you were just talking about, regarding an



1    elderly lady who also fell on that stairwell.

2              MR. HUDGINS:  Again, I'll just make a

3    continuing objection to any incidents that took place

4    after the November 15th, 2016, incident involving Sedar.

5              MR. SENSENIG:  I understand.

6    BY MR. SENSENIG:

7    Q.  Those are just legal things that we need to do as

8    attorneys.

9    A.  Understood.  Like I said, my best friend is a

10   lawyer so I'm a little familiar with what's going on.

11   Q.  Good, good.  So looking at Exhibit 3, take the

12   pen and circle if you would, the location where the

13   elderly woman fell.

14   A.  I believe it was -- this pen is not very good.

15   It would have been this area.

16   Q.  What you just circled, do you recognize that to

17   be the same stairwell where Ms. Sedar fell?

18   A.  Yes.  I don't know if it was the same exact

19   location, but same -- I mean, location as to where on

20   the steps she fell -- but same stairwell.

21        There you go.

22   Q.  And based on your investigation, what was your



1   determination as to what caused her to fall?

2             MR. HUDGINS:  Are we talking about this

3   after-the-fact incident?

4             MR. SENSENIG:  Yes.  The elderly woman who

5   fell.  And I understand your continuing objection.

6             MR. HUDGINS:  Do we have a timeframe for

7   this?

8             WITNESS:  This would have been -- let me

9   think -- I want to say the summer after this, possibly

10  '17 summertime, because it was warm when she fell.

11      A.  The only reason I recall it is because she hired

12  a private investigator to come try to look at our

13  security footage, but he was denied our security

14  footage.  That's the only reason why I remember that

15  incident very clearly.

16  BY MR. SENSENIG:

17      Q.  So based on your investigation of that incident,

18  what did you conclude caused her to fall?

19      A.  I think her feet -- but there's a lip on this

20  fricking stair that I've almost fallen on myself a

21  thousand times.

22      Q.  The lip that you've almost fallen on yourself,



1   did that condition exist prior to Ms. Sedar's fall?

2           MR. BRUNICK:  Objection to form.

3   A.  That I cannot recall because there's been some

4   work done in that area multiple times.  This is an area

5   where those bricks had been worked on, so anything could

6   have been changed/could have been different from the

7   time it was done.

8   BY MR. SENSENIG:

9   Q.  You mentioned a second fall.  When did that

10  occur?

11  A.  That's a good question.  So there was the elderly

12  woman, there was Camille -- the other one I think was

13  just a teenager goofing around.  I think he came running

14  out of this garage.

15  Q.  Was it in the same stairwell as Ms. Sedar and the

16  elderly woman?

17  A.  Yeah.

18          MR. HUDGINS:  Same objection as with the

19  other incident; after the fact.

20  BY MR. SENSENIG:

21  Q.  You can set that aside.

22          So now I want to get back to Ms. Sedar's



1  incident.  I believe I asked you whether you inspected

2  the area immediately after the incident.

3     A.  Correct.

4     Q.  And you did so?

5     A.  I did.

6     Q.  Did you speak with any individuals?

7     A.  Yeah.  I would have spoken to my direct superior

8  at the time.  I can't recall his name, I just know the

9  position he would have been, the assistant director.

10 And then I want to see Mike too.

11    Q.  Did you speak with any of her companions?

12    A.  I believe I spoke to one of her friends regarding

13 what happened.

14    Q.  And if you'd turn back to the incident, which is

15 Exhibit 2.  You identify three individuals as witnesses:

16 Sydney Williams, Davida Buchanan, Robert Rapanut?

17    A.  Yeah, they were all together that day.

18    Q.  Do you recall any of the conversations you had

19 with any of those individuals?

20    A.  I would have asked them what happened; where they

21 were coming from; where they were heading to; again, the

22 same things; was anyone drinking, those kinds of things.



1  Q.  Do you have any specific recollection as to what

2  they told you?

3  A.  I know she wasn't drinking.  That's about it,

4  it's a little while ago.

5  Q.  Do you recall anybody alerting you to any loose

6  bricks?

7  A.  No.  I cannot recall.

8  Q.  Is it accurate to say that the information that

9  you collected that day was then put into the narrative

10  that you included on the incident report?

11  A.  Yes.

12  Q.  And if we look on the right side of the incident

13  report, there's a block.  And in there there's a

14  question "photographs taken", and it's checked "no".  Do

15  you see that?

16  A.  Yes.

17  Q.  And I believe you already testified you did not

18  take any photographs of the incident at the time.

19  Correct?

20  A.  No, I did not.

21  Q.  When we received this document connected -- at

22  least in Bates numbering, and I believe connected



1  through Discovery responses, the last three pictures you

2  see in the last three pages of this exhibit:  Have you

3  ever seen those pictures before?

4      A.  Without them being --

5              MR. HUDGINS:  Hold on.  Before he answers

6  that question.

7              MR. SENSENIG:  Do you have an objection?

8              MR. HUDGINS:  I do.  Because you represented

9  for the record that you received these in Discovery, and

10  you've made reference to Bates numbering.  But the

11  photos -- okay, I take that back, I can see them now.

12              MR. SENSENIG:  It's difficult to see it them

13  on the pictures.

14              MR. HUDGINS:  I withdraw that.

15              MR. BRUNICK:  Just for purposes of the

16  record, the accident report and the photographs were

17  produced by MaxSent when MaxSent was in the case.  As I

18  indicated off the record to Counsel, they were produced

19  to the witness today and stapled together, but they were

20  not produced as representative of photographs that had

21  come with the accident report.

22              MR. SENSENIG:  Fair enough.  I'm not trying



1  to -- I just want to clear it up.

2          MR. BRUNICK:  But they were not taken at the

3  time of the accident.

4          MR. HUDGINS:  And I'll acknowledge that they

5  were produced in Discovery in this sequence apparently.

6          MR. SENSENIG:  I think they were initially

7  produced with the initial disclosures, if I remember

8  correctly.

9          MR. BRUNICK:  They could have been.

10  BY MR. SENSENIG:

11    Q.  Again, just asking you:  At any point in time did

12  you take photographs of the subject stairwell in

13  connection with Ms. Sedar's case?

14    A.  I don't recall taking any, no.

15    Q.  I'm talking about at any point of time after the

16  incident.

17    A.  Okay.

18    Q.  From the date of the incident until when you left

19  MaxSent, do you recall taking any pictures of the

20  subject stairwell that was in connection with this case?

21    A.  At some point, yes.

22    Q.  What caused you to do that?



1    A.  I can't recall who, but someone asked me to take

2    pictures of the stairwell.

3    Q.  And it was your understanding that that request

4    was done in connection with Ms. Sedar's fall?

5    A.  I don't want to --

6    Q.  If you remember.  And I don't want you to guess.

7    A.  I cannot recall the conversation I had.  I just

8    know I had been asked to take pictures of the stair well

9    multiple times.

10    Q.  Tell me when, general timeframes, you were asked

11    to take pictures of those stairs?  Just talking about

12    after Ms. Sedar's fall?

13    A.  It would have been any time another person had

14    fallen on the steps, because I got in pretty big trouble

15    for not taking pictures with this report to begin with.

16    So I made sure the incident afterwards, there were

17    photos attached.

18    Q.  Do you have any specific recollection of the

19    photographs that are attached to the report today?

20    A.  This report, without them being in color, I can't

21    really tell.  Because I'm pretty good at memorizing the

22    property when it comes to the time of the year and when



1     A.  Yes.  The way I do it is I write it up at the

2    scene on a little notepad or in my phones.  And e-mail

3    that to dispatch; they copy and paste it into the

4    narrative, this report, and it's done.  That way I don't

5    have to waste my time patrolling, going back to my

6    office to make the report.

7     Q.  When you put it on the notepad on your phone, do

8    you save those?

9     A.  I do.  But I would have had three phones between

10    now and then.

11     Q.  So you don't have it on your phone?

12     A.  No.

13     Q.  You didn't save it on any of MaxSent's computer

14    systems?

15     A.  No.

16     Q.  Do you review the report for accuracy after it's

17    created generally?

18     A.  Generally, yes.  Before whoever is at dispatch

19    e-mails it to my superiors, I'll quickly glance over and

20    make sure what I wrote, that the information that's

21    needed is in it, and then I'll say, "Go and send it

22    off."



1    Q.  Do you recall doing that in this instance?

2    A.  Yes.

3    Q.  What discussion -- you mentioned your superior

4    and you weren't sure whose name it was.  But what

5    discussions did you have at the scene with anybody else

6    from MaxSent, that you recall?

7    A.  It would have been:  What happened; who was

8    involved; who was directing traffic -- as I said, that

9    depends on how many emergency response vehicles show up,

10   how many people we pull to direct traffic around these

11   vehicles.  Because this is actually located right at the

12   entrance of one of our garages.

13   Q.  Do you have any specific recollection about what

14   you discussed concerning what happened?

15   A.  No, I do not.

16   Q.  Do you have any specific recollection of any

17   discussions concerning the condition of the area at the

18   time?

19   A.  No.  More concerned with her wellbeing than

20   anything.

21   Q.  Very good.  After this incident report was sent

22   off to Boston Properties, between that time and the time



1  when you were searching for incident reports in December

2  2018 or January 2019, did you have any discussions with

3  anybody concerning the incident?

4     A.  Yes.

5     Q.  With who?

6     A.  It would have been -- I don't think anyone from

7  Boston Properties.  I think it was only Mike.  I think

8  that was it, just Mike.

9     Q.  When did that communication, or if there were

10 more, when did those communications occur in relation to

11 the time of the incident?

12    A.  It would have been the day after, we were talking

13 about the accident, make sure everything was handled

14 properly, everything was done right.  And those would

15 have been the only discussions we had.

16    Q.  You mentioned the discussion you had with Mike

17 about the photographs already, and you mentioned the

18 discussion you had with Mike about the video.  Correct?

19    A.  I'm a little confused now.

20    Q.  After the incident, tell me about the discussions

21 you had with Mr. Blanchette following the incident?

22    A.  He was upset that I didn't take any photos of the



1  area, so he was just drilling into my head to make sure

2  that we need photos.  Funny enough, he was saying, "In

3  case we go to court, you need photos."  And here we are

4  now over this incident.

5      Q.  To your recollection this occurred the day after

6  the incident?

7      A.  Yes.

8      Q.  Did he at any point in time tell you to go back

9  and take pictures that day?

10      A.  No.

11      Q.  Was that considered by you, to go back and take

12  pictures that day, the day after the incident?

13      A.  No.

14      Q.  Following the incident, did you put up any kind

15  of warning signs?

16      A.  No.  Because we didn't notice any -- that I can

17  recall anything -- that would have required any warning

18  signs to be put up.

19          MR. SENSENIG:  We can mark this as Exhibit

20  4.

21   (Whereupon Exhibit No. 4 is marked for identification.)

22  BY MR. SENSENIG:



1  probably tell how long I was there for, because I wrote

2  this report just about after this was over.

3      Q.  So based on the time of the report of 12:51, is

4  it accurate to say you would have been on the scene

5  until approximately that time?

6      A.  Yes.

7      Q.  Within five minutes?

8      A.  Yeah, because the office is right around the

9  corner from where this happened.

10  (Whereupon Exhibit No. 7 is marked for identification.)

11     Q.  I'll ask you to take a look at the photograph

12  that's been marked as Exhibit 7.

13     A.  Okay.

14     Q.  Again, based on your inspection, does this

15  photograph accurately reflect the condition of the brick

16  and the caulk at the top of the stairs that you saw at

17  the time of the incident?

18     A.  Yes.

19     Q.  And you see in the left-hand photograph, there is

20  an individual that appears to be wearing a long-sleeved

21  red shirt and holding a walkie-talkie.  Do you see that?

22     A.  Yes.



1      Q.  Do you recall anybody being at the scene dressed

2   in that manner holding a walkie-talkie?

3      A.  It looks like Kevin Pate.

4      Q.  And does that reflect your recollection as to --

5   was Mr. Pate your direct report at the time?

6      A.  Yes.  He would have been the assistant director

7   at the time.

8            MR. HUDGINS:  How do you spell his last

9   name, please?

10           WITNESS:  P-A-T-E.

11   (Whereupon Exhibit No. 8 is marked for identification.)

12  BY MR. SENSENIG:

13     Q.  I'd ask you to take a look at what has been

14  marked as Exhibit 8.  And my question is:  Does the

15  photograph in Exhibit 8, based on your inspection at the

16  time, accurately reflect the condition of the area at

17  the time you were there after the incident?

18           MR. HUDGINS:  Objection.

19           MR. BRUNICK:  Objection to form.

20     A.  Yes.

21           MR. SENSENIG:  What was the basis for the

22  objection?



1            MR. HUDGINS:  Well, we know from the video

2    that's been discussed by other witnesses --

3            MR. SENSENIG:  I don't want you to testify,

4    Mr. Hudgins.  All I want to know is the legal basis for

5    your objection.

6            MR. HUDGINS:  The legal basis is that this

7    is a photograph that may well not be accurate as brought

8    up by other witnesses.

9            MR. SENSENIG:  Well, that's for the witness

10   to say.  The photograph has to be examined.

11           MR. HUDGINS:  I'll preserve my objection.

12   BY MR. SENSENIG:

13     Q.  Based on your inspection of the area at the time,

14   does the photograph that is labeled Exhibit 8,

15   accurately reflect the condition as you saw it that day?

16           MR. BRUNICK:  Objection to the form of the

17   question.

18           MR. HUDGINS:  Objection.

19     A.  Yes.

20    (Whereupon Exhibit No. 9 is marked for identification.)

21           MR. SENSENIG:  Exhibit 9.

22   BY MR. SENSENIG:



1    Q.  And if you would take a look at Exhibit 9, I'm

2  going to ask you the same question:  Does the photograph

3  in Exhibit 9, based on your inspection that day,

4  accurately reflect the condition of the area at the

5  time?

6    A.  Yes.

7              MR. BRUNICK:  Objection.

8              Go ahead.

9              MR. HUDGINS:  Same objection.

10  BY MR. SENSENIG:

11    Q.  One more.

12  (Whereupon Exhibit No. 10 is marked for identification.)

13    Q.  If you would take a look at what's been marked as

14  Exhibit 10.  Same question:  Does this photograph, based

15  on your inspection at the time of the incident,

16  accurately reflect the condition that you saw?

17              MR. HUDGINS:  Same objection.

18    A.  Before I answer that, are these the same picture?

19  BY MR. SENSENIG:

20    Q.  Well, they may be.  Does it accurately reflect

21  the condition?

22    A.  Yes.



1            MR. HUDGINS:  Same objection.

2    BY MR. SENSENIG:

3      Q.  Mr. Swartz, you mentioned -- we've already talked

4    about seeing a blood stain.  Do you recall whether there

5    was more than one blood stain?

6      A.  Yeah, there was a pretty good amount of blood.

7      Q.  Do you result whether there was blood in more

8    than one spot?

9      A.  Yes.

10            MR. SENSENIG:  If we could mark this as

11   Exhibit 11.

12   (Whereupon Exhibit No. 11 is marked for identification.)

13   BY MR. SENSENIG:

14     Q.  I'll ask you first:  Based on your inspection,

15   does Exhibit 11 accurately reflect what you saw on the

16   stairs following this incident?

17     A.  Yes.

18     Q.  How many different areas of blood do you recall

19   seeing?

20     A.  I'd say at least four.

21     Q.  Do you recall seeing any blood stains up on the

22   stairs themselves?



1    A.  No.

2    Q.  If you look at Exhibit 11 towards the bottom

3  right-hand corner, can you identify any blood stains on

4  that photograph?

5    A.  Yes.

6    Q.  Would you circle it, please?

7        You've made two circles?

8    A.  Yes, Sir.

9    Q.  Does that comport with your recollection as to

10  the different blood stains you observed at the time?

11   A.  No.  I don't recall there being blood on the

12  steps, just on the sidewalk next to the steps.

13   Q.  But you do recall there being blood in multiple

14  locations?

15   A.  Yes.

16       MR. HUDGINS:  Could you pass that exhibit?

17  And I'll do the same thing and make copies for Counsel

18  too, to take with them.

19       MR. SENSENIG:  Thank you.

20  BY MR. SENSENIG:

21   Q.  Mr. Swartz, I really appreciate your time today.

22   A.  No problem.



1     Q.  I appreciate your answers to the questions.

2   Those are all of the questions I have at this time.

3   However, other Counsel likely has some questions.

4                        EXAMINATION

5   BY MR. HUDGINS:

6     Q.  Mr. Swartz, we were introduced before the

7   deposition started, and you understand I'm Counsel for

8   Boston Properties and Reston Town Center?

9     A.  Yes.

10    Q.  And I'm just going to ask a few followup

11  questions.  What was the date that you started at

12  MaxSent?

13    A.  I believe April something.  I can't remember

14  exactly, I know the month.

15    Q.  That was in 2016?

16    A.  Yes.

17    Q.  So the same year that this incident involving Ms.

18  Sedar occurred, you were hired earlier that year?

19    A.  Yes.

20    Q.  And you were there for about six months before

21  the incident happened?

22    A.  Yes.



1    Q.   And prior to that you had worked with TSA?

2    A.   Yes.

3    Q.   And you had been trained in a law-enforcement

4    capacity with TSA?

5    A.   Yes.

6    Q.   And part of that training was an insistence on

7    accurate attention to detail?

8    A.   Yes.

9    Q.   When you took the job with MaxSent, did you

10   consider that you were competent in the task that you

11   were asked to perform for MaxSent?

12   A.   Yes.

13   Q.   And did you consider that to the extent that

14   there were any details of concern in your daily work for

15   MaxSent, that you would make an accurate and complete

16   observation?

17   A.   I'm a little confused on the question.

18   Q.   That got a little bit convoluted.

19        Part of your job was to make sure that the

20   premises around Town Center were safe for people driving

21   and walking and occupying that vicinity?

22   A.   Correct.



1    Q.  And did you consider that to the extent it was

2  your responsibility to observe safety problems, that you

3  would make an accurate and detailed report of it?

4    A.  Yes.

5    Q.  And you still consider that you were good at your

6  job?

7    A.  Yes.

8    Q.  When you went back after the fact -- you were

9  asked to go back and look for records regarding the

10  incident involving Ms. Sedar -- is it fair to say that

11  you did not locate any records that depicted a safety

12  hazard in the vicinity of her fall?

13    A.  Correct.

14    Q.  And you were the employee of MaxSent that

15  responded immediately to the Sedar fall down those

16  stairs?

17    A.  Yes.

18    Q.  And was it part of your job at that time to

19  inspect the premises to determine whether or not there

20  were any safety hazards?

21    A.  Yes.

22    Q.  If there had been any safety hazards, would you



1    have made a note of them?

2        A.  Yes.

3        Q.  And in this instance you did not observe any

4    safety hazards?

5        A.  No.

6        Q.  And that includes the depictions of the scene and

7    the photographs you were just shown by Counsel for Ms.

8    Sedar?

9        A.  Are we talking about the pictures?

10       Q.  Yes, Sir.

11       A.  Yes.

12       Q.  In your view and your professional assessment,

13   the bricks in the vicinity of Ms. Sedar's fall down the

14   stairs, did not presents a safety hazard?

15           MR. SENSENIG:  Object to the question as

16   asking for opinion testimony.

17           WITNESS:  Am I allowed to answer?

18           MR. HUDGINS:  You can answer.

19       A.  Can you ask the question again?

20   BY MR. HUDGINS:

21       Q.  Just in terms of your professional assessment as

22   part of the security detail for MaxSent, when you were



1  at the scene of Ms. Sedar's fall you did not consider

2  those bricks to present a safety hazard for pedestrians?

3        MR. SENSENIG:  Same objection.  Calls for an

4  opinion.

5    A.  No.

6  BY MR. HUDGINS:

7    Q.  If you had, you would have made a note of it?

8        MR. SENSENIG:  Same objection.

9    A.  Correct.

10 BY MR. HUDGINS:

11   Q.  If you had noticed a safety hazard, would you

12 have taken a picture of it and put it in the incident

13 report?

14       MR. SENSENIG:  Objection:  Calls for a

15 hypothetical of a fact witness.

16   A.  I want to say yes, but I wasn't very good at

17 taking pictures of that incident back then.

18 BY MR. HUDGINS:

19   Q.  As far as what you were asked to do by MaxSent,

20 that was part of your training.  If there had been a

21 safety hazard, you would document it?

22   A.  Yes.



1    Q.  Later you were asked to go back and look at

2    videos, any possible videos that might have covered that

3    area?

4    A.  Correct.

5    Q.  That was how long after the incident?

6    A.  Within a day or two after the incident, and then

7    in reference to these e-mails I was asked to go back and

8    look for footage.

9    Q.  And you recall that you did make that search?

10   A.  Yes.

11   Q.  And as you sit here today, you cannot recall

12   having seen any video footage that depicted Ms. Sedar's

13   fall down the stairs?

14            MR. SENSENIG:  Object to the

15   characterization of the prior testimony.

16   A.  I can't say yes or no if it was hers, because as

17   I said before, there were multiple trips-and-falls that

18   I had watched.  And I can't say for sure if it was hers

19   or someone else's.

20   BY MR. HUDGINS:

21   Q.  As part of your regular practice in the

22   performance of your duties, had you seen a video of Ms.



1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  (Alexandria Division)

4

5   CAMILLE SEDAR,        )   CASE NO: 1:18-cv-01111 CMH/TCH

6          Plaintiff,     )

7   -vs-                  )

8   BOSTON PROPERTIES,    )

9   LP, et al,            )

10         Defendants.    )

11   _____ )

12

13                  DEPOSITION OF DAMIEN KERR

14                    Alexandria, Virginia

15                       May 29th, 2019

16                         1:30 p.m.

17

18

19

20

21

22   REPORTED BY:  ALEXANDRIA KAAN



1          Deposition of DAMIEN KERR taken at the location

2    of:

3

4

5                    HUDGINS LAW FIRM, P.C.

6                    515 King Street

7                    Suite No. 400

8                    Alexandria, Virginia  22314

9

10

11       Before ALEXANDRIA KAAN, Notary Public in the

12    Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



```
 1          APPEARANCES

 2    Appearing on Behalf of the Plaintiff:

 3        DAVID SENSENIG, ESQUIRE

 4        ANDREW PARK, ESQUIRE

 5        PARK SENSENIG

 6        2310 West Main Street

 7        Richmond, Virginia  23220

 8        David.sensenig@parksensenig.com

 9

10    Appearing on Behalf of the Plaintiff:

11        JOSEPH MORIARTY, ESQUIRE (via

12        telephonically)

13        WILLCOX & SAVAGE, P.C.

14        440 Monticello Avenue

15        Suite No. 2200

16        Norfolk, Virginia  23510-2243

17        Jmoriarty@wilsav.com

18

19

20

21

22
```



```
 1                    APPEARANCES (CONTINUED):

 2

 3

 4          Appearing on Behalf of Defendants:

 5                DAVID HUDGINS, ESQUIRE

 6                HUDGINS LAW FIRM, P.C.

 7                515 King Street

 8                Suite No. 400

 9                Alexandria, Virginia  22314

10                (703) 739-3700

11                Dhudgins@hudginslawfirm.com

12

13

14

15

16

17

18

19

20

21

22   ALSO PRESENT: HELEN TAWIL w/ ANDREW PARK (paralegal)
```



```
 1   EXAMINATION OF DAMIEN KERR                    PAGE

 2   BY MR. HUDGINS                               6, 38

 3   BY MR. SENSENIG                                28

 4

 5

 6

 7   KERR EXHIBITS                                 PAGE

 8   A                    subpoena                    6

 9   Q                    photograph                 31

10   R                    photograph                 31

11       (Exhibits Q and R are retained by Mr. Park.)

12

13

14

15

16

17

18

19

20

21

22
```



1                    P R O C E E D I N G S

2                        - - - - - -

3    (Whereupon Exhibit A is premarked for identification.)

4                         DAMIEN KERR,

5         being first duly sworn to testify the whole

6    truth, testified as follows:

7                         EXAMINATION

8    BY MR. HUDGINS:

9        Q.   Mr. Kerr, good afternoon.

10       A.   Good afternoon.

11       Q.   We were introduced not too long ago.  I'm David

12   Hudgins and I am Counsel for Boston Properties and

13   Reston Town Center properties in a lawsuit brought by

14   Camille Sedar regarding an accident that happened on

15   November the 15th, 2016.  To get right to the point:

16   You're here as an eyewitness or a possible witness to

17   some of the surrounding facts.  So I'm going to be

18   asking you about your personal knowledge about anything

19   you may have seen or heard that has possible relevance

20   to this accident.

21       A.   Okay.

22       Q.   I'm going to keep my questions simple and



1  straight-forward.  If there's anything that is unclear,

2  please stop me and I'll be happy to rephrase.

3      A.  Great.

4      Q.  In front of you there is the notice for

5  deposition and the subpoena that brought you here today.

6  Do you recognize those documents?  And we'll mark those

7  as Exhibit A for the record?

8      A.  Yes.

9      Q.  With that formality complete:  What is your full

10  name and your current residence address?

11      A.  Damien Anthony Kerr, K-E-R-R.  8145 Claiborne

12  Drive, C-L-A-I-B-O-R-N-E, Frederick, Maryland, 20702.

13      Q.  How long have you lived at that address,

14  Mr. Kerr?

15      A.  Approximately 20 years.

16      Q.  If we needed to get a hold of you for purposes of

17  scheduling your appearance as a trial witness, is there

18  a phone number that's good to call?

19      A.  Regular business hours it's 571-557-8007.  After

20  business hours my personal cell is 301-514-2181.

21      Q.  How are you employed?

22      A.  US Federal Government.



1     Q.   Are you with the Geospatial --

2     A.   National Geospatial Intelligence Agency.

3     Q.   And you were a coworker of Ms. Sedar?

4     A.   I was.

5     Q.   Are you still with that office where you were a

6  coworker with Ms. Sedar?

7     A.   No, I am no longer.

8     Q.   Were you in that office on November the 15th,

9  2016?

10    A.   Yes.

11    Q.   And when did you depart from that location?

12    A.   December-January 2018 -- 2017/2018.

13    Q.   Are you still employed with the same agency?

14    A.   I am.

15    Q.   You just moved to a different location?

16    A.   Correct.

17    Q.   As of November the 15th, 2016 -- which again is

18  the date of Ms. Sedar's accident -- how long had you

19  known her?

20    A.   Approximately eight months to a year, I would

21  guess.

22    Q.   Would you consider yourself office friends with



1   Ms. Sedar?

2       A.  Friendly.  She was -- it was employee/employer,

3   management/supervisor relationship.

4       Q.  So you were acquainted at the office; you were on

5   friendly terms but not what we would describe as

6   "personal friends"?

7       A.  That's a fair way to characterize it, I would

8   say.

9       Q.  Is it that true today, that you would be friendly

10  with Ms. Sedar, but you don't socialize with her or

11  anything of that sort?

12      A.  That's correct.

13      Q.  When is the last time you talked to Ms. Sedar?

14      A.  Probably a month ago, telling me the

15  deposition -- she needed my address, if I remember

16  correctly.

17      Q.  As far as your job responsibilities, were you in

18  the direct chain of supervision of Ms. Sedar?

19      A.  Yes.  I was two levels above her.

20      Q.  Now, I understand on November the 15th, 2016

21  there was a celebration planned to mark the departure of

22  Major Marks from your office?



1    A.  That's correct.

2    Q.  And I just want to speed through this to get you

3  on your way today.  There was a celebration that was

4  planned over at Reston Town Center at the restaurant

5  called Ted's Bulletin?

6    A.  I believe that's right.

7    Q.  There were two cars that departed from the office

8  to drive over to park to have that luncheon?

9    A.  Correct.

10   Q.  And you were not in the car with Ms. Sedar?

11   A.  Correct.

12   Q.  My information is you rode with Karen Dibella and

13  Major Marks?

14   A.  Correct.

15   Q.  Who was driving?

16   A.  Me.

17   Q.  Would it be fair to say you were somewhat behind

18  the car driven by Ms. Sedar?

19   A.  Yeah, that's fair.

20   Q.  That your arrival at the parking garage near the

21  restaurant was some time after she had parked?

22   A.  I think that's fair.



1    Q. Did you park in the same garage as Ms. Sedar, to

2 your understanding?

3    A. I believe so.

4    Q. Are you familiar generally with the area?

5    A. First time and only time ever in that area.

6    Q. Some people have referred to it as the "green

7 garage", but that's not something you would take note

8 of?

9    A. No.

10    Q. Everybody that's already testified says that the

11 parking was on a level that required going up a flight

12 of steps before exiting out to the stairs where Ms.

13 Sedar had her fall?

14    A. I don't recall.

15    Q. When was the first notification or indication to

16 you personally that Ms. Sedar had had an accident?

17    A. Ms. Buchanan called me. We were, if I recall

18 correctly, en route, and she called me and said Ms.

19 Sedar fell and an ambulance was called.

20    Q. Now, you parked in that garage where Ms. Sedar

21 had parked?

22    A. Yes, Sir.



1    Q.  And did you go up the stairs toward where the

2  exit was that she had used right before her fall?

3          MR. SENSENIG:  Objection:  Speculation.

4          MR. HUDGINS:  Well, let me strike all that.

5  BY MR. HUDGINS:

6    Q.  When you parked, you had to go up a flight of

7  steps to exit the parking structure, or do you remember?

8    A.  I don't recall going up steps.

9    Q.  Do you remember arriving at the area where you

10  were told Ms. Sedar had had her accident?

11    A.  Yes.

12    Q.  Who was there when you came/when you showed up?

13    A.  The ambulance, if I recall correctly, had just

14  arrived.  So the ambulance drivers; paramedics; Major

15  Marks; Ms. Dibella came with me; Ms. Buchanan;

16  Mr. Rapanut.  And Ms. Sedar was on the ground being

17  tended to by the paramedics.

18    Q.  Did you have a chance to try to talk to Ms.

19  Sedar?

20    A.  I did.

21    Q.  Do you recall her saying anything to you?

22    A.  Yes.



1    Q.  What did she say?

2    A.  I went up to her and I asked her how she was, if

3    she was okay.  She said her mouth was sore -- it was

4    clearly cut and bleeding -- and she said her elbow hurt.

5    And they had loaded her on, and I told her that Ms.

6    Buchanan was going to ride with her to the hospital.

7    Q.  Did Ms. Sedar say anything to you about what may

8    have caused her to slip, trip, and fall?

9    A.  No.

10    Q.  Now, when the ambulance departed, at some point I

11    understand that you and some of the other work

12    colleagues went ahead and had your luncheon at Ted's

13    Bulletin?

14    A.  Yes.

15    Q.  And before you departed to go to Ted's Bulletin,

16    was there any discussion amongst your group about what

17    may have caused Ms. Sedar to fall down the steps?

18         MR. SENSENIG:  Object to hearsay.

19         You can go ahead and answer.

20    A.  Yes.

21    BY MR. HUDGINS:

22    Q.  I don't want to testify for you, I want in your



1   words:  What was the discussion?

2              MR. SENSENIG:  Same objection.

3              WITNESS:  Sorry.

4              MR. SENSENIG:  I just have to put something

5   on the record, I'm sorry.  I just said "Same objection",

6   but please go ahead and answer.

7      A.  So Ms. Buchanan and Ms. Sedar left in an

8   ambulance.  The paramedics were cleaning up the blood

9   and biohazard around.  There was, I want to say he was a

10  manager from the parking garage was there, I didn't get

11  his name.

12  BY MR. HUDGINS:

13     Q.  Guy with a walkie-talkie perhaps?

14     A.  I think he had a walkie-talkie, I think he had

15  brown pants but I don't recall specifically.  I couldn't

16  pick him out of a line-up.  And we were looking around:

17  Saw some bricks that looked like they were a little out

18  of place; took a few photographs.  I discussed with --

19  lack of a better term, I'll call him parking garage

20  manager.  I said, "This seems to be a potential tripping

21  hazard, perhaps you should put up some caution tape here

22  so no one else gets hurt."  And he said, "That's not



1  what happened."  And we kind of took our pictures and

2  left.  Neither of us witnessed her falling so neither of

3  us could really determine what happened.

4      Q.  Now, Mr. Rapanut had been with Ms. Sedar when she

5  had fallen?

6      A.  He was in the first car, yeah.

7      Q.  Did he say anything to you about what he had

8  seen?

9      A.  He told me he was in front of her, if I remember

10  correctly.

11      Q.  So did he relate to you he hadn't seen her fall?

12      A.  If I recall correctly, yes.  I believe that he

13  was in front of her so he didn't witness her fall.

14      Q.  So at some point --

15          MR. SENSENIG:  Object to the hearsay and

16  move to strike.

17  BY MR. HUDGINS:

18      Q.  At some point there's kind of a groupthink to

19  look at what possibly could have caused this accident.

20          MR. SENSENIG:  Object to characterization.

21  BY MR. HUDGINS:

22      Q.  Is that fair to say?  I mean, you all were just



1    talking?  What prompted you to start looking at bricks

2    and pavement?

3        A.  Our friend was just taken away in an ambulance.

4    I think it's fairly natural to wonder what the cause

5    was.

6        Q.  And I appreciate that.  Was there anything that

7    was told to you by any source, that she had tripped on

8    something as opposed to just missing a step and falling

9    down?

10            MR. SENSENIG:  Object to hearsay.

11       A.  Nobody said anything to me.  The parking garage

12   manager seemed to allude that she had fallen.

13   BY MR. HUDGINS:

14       Q.  And so at some point you looked at some bricks

15   that were jiggling at the top of the stairs?

16       A.  Mm-hmm.

17       Q.  And who noticed that first?  You, or one of the

18   other gentlemen, or Karen?

19       A.  I don't recall.  I don't recall.

20       Q.  Did you take photographs?

21       A.  I did.

22       Q.  With your cellphone?



1 | personal knowledge and no knowledge from any source as

2 | to her exact line of travel down those stairs?

3 |         MR. SENSENIG:  Objection:  Asked and

4 | answered.

5 |   A.  I do not.

6 | BY MR. HUDGINS:

7 |   Q.  And you took these photos in case there was

8 | something relevant that you could help your colleague

9 | with?

10 |   A.  I think you characterized it earlier.

11 |   Q.  We don't need to re-characterize it.  Now, were

12 | you around when there was a video taken?  Or did you

13 | take a video?

14 |   A.  I took a video.

15 |   Q.  We've watched that, and it has Major Marks kind

16 | of jiggling a brick?

17 |   A.  Yes.

18 |   Q.  As you looked at Exhibit -- we were just looking

19 | at G, can you point to the brick that he's jiggling with

20 | his foot in that?

21 |   A.  From the photograph?  No.

22 |   Q.  Just trying to match the photograph to the video.



1    A.  It was one of these two bricks, I think.

2           MR. SENSENIG:  Which exhibit do you want him

3    on?

4           MR. HUDGINS:  On G.

5           MR. SENSENIG:  He was pointing to H.  He's

6    now on G.

7           MR. HUDGINS:  Let's do this:  Let's play the

8    video.  So we've got your photograph, we've got your

9    video.  Maybe we can kind of sync the two.

10       (Whereupon the proceedings go off the record.)

11          MR. HUDGINS:  So we're getting ready to look

12   at what's been marked as I believe Exhibit L to previous

13   depositions.  Is that correct, Counsel?

14          MR. PARK:  Yes, that's right.

15          (Video plays.)

16   BY MR. HUDGINS:

17     Q.  Can we back that up and freeze it at the point

18   where Major Marks has got his foot on the brick?  And

19   let it play a little bit as the video swings around.

20   I'll tell you where to stop.

21          MR. SENSENIG:  Mr. Hudgins, if you want to

22   get it to a certain point, you're welcome to.



1              MR. HUDGINS:  Hold on just a second.  Stop

2    it right there.

3    BY MR. HUDGINS:

4       Q.  You can see the brick he was jiggling.  Right?

5    Have you got your focus on that one?

6       A.  Yeah.

7       Q.  Can you look at Exhibit G and match those up and

8    put an X on the brick you think he was jiggling?

9              So you've put an X on one of the bricks that are

10   in the middle of the photograph in Exhibit G.  Is there

11   something that kind of drew your attention or allowed

12   you to make that comparison?

13      A.  Assuming it was one of these based on the frame.

14   One of these bricks looks a little loose from the

15   photograph, and it was the left of the perpendicular

16   one.

17      Q.  And you didn't try -- you haven't ever tried to

18   go out and count the bricks over from the wall and try

19   to match up bricks in one photograph versus another

20   versus the video?  You've never done anything like that?

21      A.  No.

22      Q.  And again you have no personal knowledge of how



1   the fall occurred and whether the brick that was being

2   jiggled by Major Marks was involved in the fall or not?

3        A.   Yes.

4               MR. SENSENIG:   Objection:   Asked and

5   answered.

6               MR. HUDGINS:   Let him get his answer out.

7               MR. SENSENIG:   I got to object first.

8               Go ahead and answer.

9        A.   I have no personal knowledge.   Correct.

10              MR. HUDGINS:   Sir, that's all the questions

11  I have.   I'm going to turn you over to Counsel for Ms.

12  Sedar.

13              WITNESS:   Okay.

14                           EXAMINATION

15  BY MR. SENSENIG:

16       Q.   While we're on Exhibit G.

17       A.   G?

18       Q.   Yes, Sir.   I think we already established Exhibit

19  G is a photograph you took.   Correct?

20       A.   Correct.

21       Q.   Does Exhibit G truly and accurately reflect the

22  photograph you took?



1     A.  Yes.

2     Q.  We've already marked some of these.  These are

3  Bates numbers on the bottom right, so I'm going to be

4  referring to those.

5     A.  Okay.

6          MR. SENSENIG:  Have we done 1298?

7          MS. TOWIL:  It should be Exhibit P, and it's

8  the prior E.

9  BY MR. SENSENIG:

10    Q.  This has been previously marked as Exhibit P,

11 it's Bates No. Sedar 1298.  Did you take this

12 photograph?

13    A.  Yes.

14    Q.  And does this photograph truly and accurately

15 reflect the condition that you saw that day?

16    A.  Yes.

17    Q.  And my understanding is you eventually did go to

18 Ted's Bulletin.  Is that correct?

19    A.  I couldn't pick out the name.  But we went to a

20 restaurant.

21    Q.  You eventually went to a restaurant, and you went

22 to a restaurant with, if I remember correctly, everybody



1  that had gone except for Davida, who was in the

2  ambulance, and Camille of course who was taken away in

3  the ambulance?

4      A.  Correct.

5      Q.  Did you take these photographs before or after

6  you went to the restaurant?

7      A.  Before we went to the restaurant, after the

8  ambulance.

9          Can I correct that?

10     Q.  Sure, if you want to.

11     A.  After Ms. Sedar was loaded into the ambulance.

12     Q.  How long would you say -- how much time had

13 elapsed from when you arrived on the scene to when you

14 took these photographs?

15     A.  When I arrived on the scene and when I took these

16 photographs?  Approximately 15 minutes.

17     Q.  Did you see anybody messing with or manipulating

18 the bricks in the photograph?

19     A.  No.

20     Q.  This is a new exhibit, so I don't know what's

21 next in line.

22          MS. TOWIL:  Q.



1      (Whereupon Exhibit Q is marked for identification.)

2  BY MR. SENSENIG:

3      Q.  I'm going to ask the same questions:  Did you

4  take this photograph?

5      A.  I believe so.

6      Q.  And does this accurately reflect the condition as

7  you witnessed it at the time?

8      A.  Yes.

9      Q.  1300 has previously been marked Exhibit M.  Did

10  you take this photograph?

11      A.  I did.

12      Q.  Does this accurately reflect the condition that

13  you witnessed at the time?

14      A.  Yes.

15      Q.  1301 has not been previously marked, so this will

16  be R.

17      (Whereupon Exhibit R is marked for identification.)

18      Q.  Did you take this photograph?

19      A.  I believe so, yes.

20      Q.  Does this accurately reflect the condition that

21  you saw at the time?

22      A.  Yes.



1    Q.  1302 is previously marked Exhibit N as in Nancy.

2  Did you take this photograph?

3    A.  This is a zoomed-in picture somehow.

4    Q.  We just blew up what was taken.

5    A.  Yes.

6    Q.  Do you recall taking this photograph?

7    A.  I do.

8    Q.  Does this accurately reflect what you saw at the

9  time?

10    A.  Yes.

11    Q.  And are you able to point -- did you see blood at

12  the scene?

13    A.  Yes.

14    Q.  Did you see more than one spot of blood?

15    A.  Yes.

16    Q.  How many spots of blood do you remember seeing?

17    A.  Three-four maybe.

18    Q.  Are any of the blood spots depicted in this

19  photograph?

20    A.  Yes.

21    Q.  How many do you see in this photograph?

22    A.  Three.



1  away.  Between the photograph and the video the

2  bloodstain had been washed away.

3     Q.  You could have put X where -- you just pointed to

4  where the bloodstain had been washed away.

5     A.  This and this bloodstain in that general area.

6     Q.  Instead of a circle, if you could put an X from

7  where the bloodstain had been washed away.

8     A.  I'm sorry.  You did say that.

9     Q.  Again, to clarify:  This bloodstain had not been

10  washed away?  In this picture you can still see it.

11  Correct?

12          MR. HUDGINS:  Objection.

13  BY MR. SENSENIG:

14     Q.  Let me ask you:  Had they attempted to wash the

15  bloodstain away?

16     A.  They had.  In the video had been attempted to be

17  washed away.  It was a biohazard, so the paramedics were

18  cleaning the area.

19     Q.  So in Exhibit J is it accurate to say you put two

20  X's where you recall there being bloodstains?

21     A.  Yes.

22          MR. SENSENIG:  Why don't we take a quick



 1   two-minute break.

 2           MR. HUDGINS:  Okay.

 3      (Whereupon the proceedings go off the record.)

 4   BY MR. SENSENIG:

 5      Q.  Mr. Kerr, I asked you when you took the

 6   photographs:  Did you take the video before or after you

 7   went to the restaurant?

 8      A.  The video.  Photographs were first; then the

 9   video; then the restaurant.

10      Q.  So the video was also taken before you went to

11   the restaurant?

12      A.  Correct.

13           MR. SENSENIG:  Those are all the questions I

14   have for now.

15                         EXAMINATION

16   BY MR. HUDGINS:

17      Q.  Video first; photos second -- photos first; video

18   second?

19      A.  Correct.  Photos first; video second; lunch

20   third.

21      Q.  By the time that Major Marks was jiggling that

22   brick, how many other people had put their foot on that



1  brick and jiggled it around, that you saw?

2      A.  I saw no one.

3      Q.  Did you jiggle it around?

4      A.  No.

5      Q.  Was he the first person you saw that day jiggling

6  that brick around?

7      A.  As far as I know.

8      Q.  And do you have any personal knowledge of any

9  other people who may have jiggled that brick before you

10  took the photograph?

11      A.  No.

12      Q.  So would it be fair to say that you don't know if

13  anyone else jiggled it before you took the photograph

14  after Ms. Sedar had her fall?

15      A.  I believe I just said that.  Yeah, I don't know.

16      Q.  Now, some of these big photographs are blow-ups

17  from photographs you took, are they not?

18              MR. SENSENIG:  Object to the

19  characterization.

20  BY MR. HUDGINS:

21      Q.  Well, they're portions of photographs that you

22  took with your cellphone camera and enlarged.  I just



1  want to get a description of how you went from the

2  cellphone photos to some of these photos that are now

3  the Bates-numbered photos.  For instance, this one right

4  here that's marked 1303, that's part of a photo that you

5  took?

6           MR. SENSENIG:  Objection.  Object to the

7  characterization.

8    A.  I believe it is.  I haven't looked at the photos.

9  BY MR. HUDGINS:

10   Q.  Would it be fair to say that these photos that

11 are Bates-numbered that we've looked at today, those

12 have been -- the image has been cropped and changed from

13 what's in your camera, by Counsel?

14          MR. SENSENIG:  Object to the

15 characterization.

16          MR. HUDGINS:  We need to have a record on

17 what happened to them.

18          MR. SENSENIG:  You can ask him.

19   A.  I'm not sure.  Could you repeat the question,

20 please?

21 BY MR. HUDGINS:

22   Q.  In other words if you look at Sedar 1303, is that





Andrew R. Park, Esq.
2310 West Main Street
Richmond, VA 23220

April 14, 2019

Re: Sedar, Camille

Dear Mr. Park:

Thank you for entrusting me to consult on the above named patient. I saw
the patient today, took a medical history and performed an orthopedic
physical examination. I have also had the opportunity to review the
medical records of past treatments. Here are my findings and opinions,
all stated within a reasonable degree of medical probability:

HISTORY FROM PATIENT

On November 15, 2016 she fell down a flight of stairs and she was
injured, suffering fractures in her right elbow, chin and face lacerations
and multiple bruises on her trunk and legs.  She was also diagnosed with
a concussion at the emergency room of Reston Hospital, where she was
examined and then admitted to the hospital as an inpatient.

Treatment for her multipart right elbow fracture was initiated the same
day when Dr. Rouhipour performed a closed reduction and applied a
splint. Three days later, Dr. Kennedy performed an open reduction of the
olecranon, repair of lateral elbow ligament and replacement of the radial
head.

She was then directed to physical therapy and she was treated through
May 17, 2017.  She had a total of 72 physical therapy treatments. Of
course she also had orthopedic follow-up visits during the time of her
physical therapy.

Because of continuing elbow problems, she is a second opinion from Dr.
Laino and, on May 25, 2017 an operation was performed on her right

5845 Richmond Highway #400
Alexandria, VA 22303
Phone: 703.317.8455
Fax: 703.317.8459
www.drjbruno.com

-865-

elbow by Dr. Hasan.  This revision operation included several components and the radial head implant was removed as part of this operation.  During the procedure, a wound culture was taken.

A culture was positive for Staphylococcus infection and she then was treated by an infectious disease specialist with a PICC line and various antibiotics starting June 14, 2017 and finishing August 23, 2017.  The infection was controlled.

On December 18, 2017 another operation was performed on her elbow to revise the internal fixation and remove some bony complications to healing.  She has been followed by Dr. Hasan for at least 8 months after the December operation.

Many problems and limitations remain in her right elbow and wrist.

PAST HISTORY FROM PATIENT

There is no history of any prior related problem.

CURRENT COMPLAINTS

Right elbow pain, stiffness, weakness and loss of function.

Loss of motion in the right wrist and inability to use her hand properly because of the loss of rotation of the forearm.

PHYSICAL EXAMINATION

Left shoulder, elbow and wrist all move normally.

The right shoulder range of motion is not restricted, but the patient experiences soreness in the right shoulder that she attributes to the positions her shoulder assumes of necessity because of elbow loss.

The range of motion of the right elbow was grossly abnormal, as the patient has a 40° flexion contracture with no further extension. The measurement of elbow flexion is 95°. Supination is 0° and pronation 10°. Accordingly, the elbow is fixed in a neutral position. Normal Elbow extension is 0° and flexion 125°.

The range of motion of the right wrist is measured at 45° extension and 25° flexion. Both of these measurements are 20° less than the opposite wrist.

There are surgical scars on the posterior side of the right elbow. I do not detect any neuroma formation within the scars. The patient has loss of sensation on both sides of the elbow scars.

Forearm muscles as well as those muscles that control elbow flexion and extension in the upper arm are all atrophied.

MEDICAL RECORD REVIEW

Medical records, imaging studies and bills have been reviewed from the following providers of care:

**Reston Hospital**
**Synergy Surgicalists**
**Northern Virginia Hand Therapy Center**
**Privia Medical Group/Broadlands Family Ashburn**
**INOVA Medical Group**
**Acupuncture Alexandria**
**Mountcastle Plastic Surgery &Vein Ashburn**
**OrthoVirginia**
**University of Maryland Orthopedics**
**Infectious Diseases Specialists of Virginia**
**AxelaCare/BriovaRx Infusion Services**

**Reston Hospital**

| | |
|---|---|
| 11-15-16 | H&P (Dennis Wang, MD) – Patient fell down a flight of stairs. Positive LOC. Amnesic to event. Complaints of right elbow pain.  Diagnoses: Concussion; Facial Contusion; Closed Head Injury; Injury of RUE; Multiple Abrasions; Closed Comminuted Fracture of Proximal End of Right Ulna; 2 cm Laceration of the Chin; Pulmonary Infiltrates; Hiatal Hernia. Plan: Admit. |
| 11-15-16 | X-Ray, Right Elbow – 1. No convincing acute fracture involving the distal humerus; 2. Acute fracture involving the ulna just beyond the elbow joint with comminution and angulation; 3. The radial head is dislocated relative to the capitellum. There is acute fracture involving the radial head; 4. There is soft tissue swelling and a suspected elbow joint effusion. |
| 11-15-16 | X-Ray, Right Forearm – 1. Acute fracture involving the ulna just beyond the elbow joint with comminution and angulation; 2. The radial head is dislocated relative to the capitellum. There is an acute fracture involving the radial head. |
| 11-15-16 | X-Ray, Right Humerus/Shoulder – No acute fracture. |
| 11-15-16 | CT, Chest – 1. No evidence of pneumothorax, pleural fluid or focal consolidation; 2. Ground glass opacity bilateral upper lung zones, left slightly more so than right which may be related to positioning. Considerations include aspiration or atelectasis; 3. Small to moderate paraesophageal hernia; 4. No fracture or dislocation identified. |

| | |
|---|---|
| 11-15-16 | CT, Abdomen/Pelvis – 1. Small to moderate paraesophageal hernia; 2. No evidence of visceral organ injury, fracture or dislocation. |
| 11-15-16 | X-Ray, Right Elbow, Fluoro – Elbow fracture reduction. Fluoroscopy provided in the OR. |
| 11-15-16 | CT, Head – 1. No evidence of intracranial hemorrhage or mass effect; 2. Mild right frontoparietal scalp soft tissue swelling without frank hematoma. |
| 11-15-16 | CT, CS – 1. No fracture or dislocation identified; 2. Mild to moderate degenerative changes mid to lower CS as above. |
| 11-15-16 | X-Ray, Chest – Hypoinflated study, but lungs appear clear. |
| 11-15-16 | Ortho Consultation (Varqa Rouhipour, MD) – Assessment: Right Proximal Ulna Fracture with Radiocapitellar Dislocation, Posterior. Plan: Closed reduction of radiocapitellar joint if possible. Splint in position of stability. |
| 11-15-16 | Ortho Consultation (Varqa Rouhipour, MD) – OR for reduction, eval of fracture. Likely will require advanced imaging after for definitive ORIF planning. OR when NPO status allows. |
| 11-15-16 | Operative Note (Varqa Rouhipour, MD) – Closed reduction, splinting and evaluation under fluoroscopy. |
| 11-16-16 | CT, UE, Right – Pre-operative evaluation of a complex right elbow fracture as described. |

| 11-16-16 | Progress Note (Carlos Kennedy, MD) – Right terrible triad of the elbow. RUE splint intact skin around splint is normal. Hand appears well perfused. Able to make a fist, thumbs up, and cross fingers, extend fingers without significant pain. No shoulder bony TTP. Plan for ORIF olecranon and radial head arthroplasty NWB RUE Friday. |
|---|---|
| 11-17-16 | Progress Note (Carlos Kennedy, MD) – Splint adjusted as pressure on ulnar small fingers with skin irritation. SILT in all contributions of the hand. Plan for OR tomorrow for right elbow. |
| 11-18-16 | Operative Report (Carlos Kennedy, MD) – 1. ORIF of the right olecranon; 2. Arthroplasty of the radial head; 3. Repair of the lateral collateral ligament of the elbow. |
| 11-19-16 | X-Ray, Elbow, Right – Anatomic alignment status post surgery of the radius and ulna as described above. |
| 11-19-16 | Progress Note (Carlos Kennedy, MD) – Able to wiggle all fingers and thumbs. Sensations till altered with dysesthesias and tingling but seems to be returning per Patient. No new complaints. Encourage OOB mobility. Sling RUE. NWB. |
| 11-20-16 | Progress Note (Carlos Kennedy, MD) – Doing ok. Having some pain issues and lost IV access for breakthrough meds. Tingling in fingers also improving; still able to wiggle all digits, make fist, |

thumbs up and cross fingers. Hand is swollen. Plan for NWB. Maintain splint at all times.

11-21-16     Discharge Summary (Jason Rigoni, DO)

**Synergy Surgicalists**

12-01-16     OV (Carlos Kennedy, MD) - Follow up today after recent discharge from the hospital for routine post-op evaluation. Date of her initial closed reduction was on 11-15-16 when she fell. Date of surgery for ORIF was 11-18-16. Assessment: Patient sustained a severely comminuted right elbow fracture dislocation. She has undergone ORIF of the olecranon with radial head prosthetic replacement. Plan: Overall she is doing ok. Transition to formal ROM hinged elbow brace. Limited ROM within arc of 30-40 degrees. No OT until four weeks out. Wrist and hand modalities.

12-15-16     OV (James Gasho, MD) – 3 weeks out from ORIF of the proximal ulna as well as radial head replacement. She has been in a brace locked at essentially 90 degrees with the sling. She is having pain. Assessment: Right Severe Elbow Injury with Radial Head Replacement which is Reduced as well as Proximal Ulna Fracture, Also Reduced. Plan: Opened the brace from 20 to 120 degrees. Start ROM. OT. Sleep in splint.

12-15-16     X-Ray, Right Elbow – Healing right proximal ulnar fracture status post ORIF. Radial head prosthesis is intact. No malalignment.

01-05-17    OV (Carlos Kennedy, MD) – Patient had a hall in
            November 2016 and sustained a severely comminuted
            right elbow terrible triad injury. She is status post
            ORIF of fracture dislocation with radial head
            prosthetic replacement. Overall, she reports
            significant stiffness of her hand, wrist and elbow.
            Working with OT. Plan: OT to perform all modalities
            as tolerated. Dynamic splinting.

01-05-17    X-Ray, Right Elbow – 1. Healing proximal right ulnar
            fracture status post ORIF; 2. Stable appearance of
            radial ORIF with arthroplasty component.

02-16-17    OV (Carlos Kennedy, MD) – Assessment: Status post
            radial head prosthetic replacement and ORIF of the
            olecranon for a right elbow terrible triad fracture
            dislocation with severe coronoid fracture. Overall
            doing ok, continues to have some motion deficits.
            Plan: With the latest incorporation of static and
            dynamic splinting we have seen some improvement.
            Regardless, she will have some residual motion
            deficits. Additional surgeries should be considered on
            a cautionary basis, as oftentimes motion gains can be
            difficult to obtain and maintain. Focus on OT and
            splinting. Refer to Dr. Rouhipour for 2nd opinion.

02-16-17    X-Ray, Right Elbow – 1. Stable appearance of
            somewhat displaced proximal ulnar fracture fragments
            with more callus formation currently. Plate and screw
            fixation of a proximal ulnar fracture in near-anatomic
            alignment; 2. Radial head prosthesis stable in
            appearance; 3. Diffuse soft tissue swelling and joint
            effusion.

03-02-17     OV (Varqa Rouhipour, MD) - 3.5 months out from
             right elbow surgery. Last seen on 02-16 and Dr.
             Kennedy felt she might be forming some heterotopic
             ossification causing her lack of motion at her elbow.
             Seems to have plateaued with OT. Can't use her right
             hand for many ADLs and typing and office duties at
             work. Plan: The only place I can see blocking her
             motion is possibly forming a synostosis between her
             proximal radius and ulna causing the severe lack of
             rotation. This could also be due to joint incongruity at
             her proximal radial ulnar joint which is hard to
             visualize. She may have some chondrolysis of her
             ulnar humeral joint which is hard to tell on her x-rays.
             Discussed complexities of doing releases for
             regaining her motion both for flexion and extension as
             well as possibly resecting a synostosis to regain
             forearm rotation. CT of the elbow.

03-08-17     CT, Right Elbow/3D – 1. Radial head prosthesis is
             intact without evidence of malposition; 2. Healing
             proximal ulnar fracture status post ORIF. No
             malalignment; 3. Small right elbow joint effusion with
             two osseous loose bodies in anterior recess measuring
             8-9 mm.

**Northern Virginia Hand Therapy Center**

12-19-16     OT IE – Status post terrible triad injury of elbow.
             Requires post-op protection in Bledsoe brace to
             prevent lateral stress to elbow. Presents with profound
             stiffness and edema at shoulder, elbow, FA, wrist and
             hand. Unable to reach face for ADL, drive or work at
             this time. Mild numbness reported at hand and will
             continue to monitor. Recommend OT 3 times a week

for 20 weeks to include: TE; TA; MT;
Splinting/Taping; Patient Education and Hot Packs.

01-04-17    OT Note – Seen 8 times. 6 weeks out from a right
terrible triad injury to her dominant right elbow.
Demonstrates gains with elbow ROM and slow
progression of FA rotation. Shortening of the wrist
flexors limiting wrist extension. Continued pitting
edema through the UE but slowly improving.
Significant joint capsular tightness of the
ulnohumeral, PRUJ and DRUJ and tissue tightness
limiting ROM. Continue to progress ROM and she
may also benefit from home NMES unit for
progression of elbow ROM. Continue POC.

01-23-17    OT Progress Note – Seen 18 times. Recommend she
perform at least 10 minutes of exercise in RUE and
will begin wrist extension dynamic splinting.
Continue lymphedema wrapping and encourage
functional use with RUE for feeding, brushing hair,
and light household chores. Motion at DRUJ and
PRUJ improving and Patient better able to pronate
and supinate. Skin temperature posterior olecranon
demonstrates reduced warmth. Shoulder stiffness
continues but decreased pain. Continue shoulder
exercises. Initiate light strengthening for right hand to
decrease swelling and increase function.

03-17-17    OT Progress Note – Seen 49 times. 4 months out from
ORIF repair. Demonstrates improvement in reduction
of inflammation and edema through the right arm,
decreased myofascial and scar adhesions along the
lateral epicondyle/posterior ulna/FA ext wad,
decreased pain, increased ROM elbow

flexion/wrists/digits, increased grip strength, and increased functional use. She continues to be significantly limited in functional use of her right arm. Limited FA pronation/supination with hard end feel noted during PROM despite judicious use of JAS brace and MT. Elbow flexion also remains limited. Soft tissue inflammation has been improving and significant improvement has been noted during recent treatments enabling further progression of scar mobilization and release of soft tissue adhesions within the musculature of the forearm. Shoulder ROM for reaching OH also improving. Continue POC.

05-02-17    OT Progress Note – Seen 65 times. Noted gains in shoulder ROM as well as wrist ROM. Demonstrates lengthening soft tissue at pec major and along latissimus dorsi enable Patient to better reach above her head and into abduction. Scapular rhythm also improving for greater control and stability. Demonstrates lengthening of the volar wrist/FA musculature assisting in increasing wrist extension. She continues to use dynamic wrist extension splint to assist in progressing soft tissue length. Gains in grip strength. No significant change in her elbow or FA ROM. She will undergo surgery on 05-22-17 for HW removal and joint contracture release to the elbow and FA. Continue POC.

05-17-17    OT Progress Note – Seen 72 times. She demonstrates improved wrist extension as well as shoulder ROM into scaption. Wrist capsular tightness and radiocarpal tightness is improving. She is to be seen one more time before surgery.

**Privia Medical Group/Broadlands Family Ashburn**

01-10-17     OV (Jeffrey Cohn, MD) – Right elbow surgery 7
             weeks ago, shattered her elbow and has been going to
             OT. Diagnosed with traumatic triad. Fell down
             concrete stairs in a parking garage. At the time of the
             injury she had a head injury and is now recovering
             from concussion. Still with tenderness at her face
             from the surgery. Incidental finding of hiatal hernia.
             Assessment: Toxic Diffuse Goiter; Hiatal Hernia;
             Closed Fracture of Head of Radius; Closed Fracture
             of Coronoid Process of Ulna; Closed Traumatic
             Dislocation of Elbow Joint. Plan: Check thyroid.
             Continue PT/OT.

05-04-17     OV (Jeffrey Cohn, MD) – Pre-op evaluation for right
             elbow, closed fracture of head of radius and coronoid
             process of ulna. Plan: Cleared for surgery.

07-11-17     OV (Jeffrey Cohn, MD) – Hypertension;
             Hypothyroidism. Would like to update MD on surgery
             May 25th for her elbow. She had surgery due to a
             fracture on the elbow and was found to have
             osteomyelitis (staph). Also found to have persistent
             fractures from initial injury. Has been seeing ID MD.
             Has a PICC line on her left arm and is doing
             Vancomycin infusions at home. She is on week two of
             8 right now. Also gives herself a Heparin injection
             after ABX infusion. Recent blood work showed
             normal liver and kidney function. Had heterotopic
             bone growth. New plate put in and removed artificial
             radial head. Still with minimal ROM. Will need total
             elbow at some time in the future. PT on hold for now.
             Assessment: Thyrotoxicosis with or without Goiter;

HTN; Screening. Plan: Continue antibiotics and follow up with specialists. Continue current meds and BP monitoring.

11-30-17   OV (Jeffrey Cohn, MD) – Pre-op evaluation. Cleared for surgery.

01-08-18   OV (Jeffrey Cohn, MD) – Follow up HTN and hypothyroidism. During surgery, 12-18-17 to right ulna, had a bone biopsy they told Patient that the "broth had a + result." She needs to watch closely due to her history. Pain to right elbow is controlled with Tylenol. Will eventually need elbow replacement. Assessment: HTN; Thyrotoxicosis with or without Goiter; Osteomyelitis. Plan: Labs.

07-12-18   OV (Jeffrey Cohn, MD) – Follow up HTN and hypothyroidism. Working on elbow on her own. Just legging bone heal gently. Has long screw and bone graft. Considering elbow replacement. Assessment: Thyrotoxicosis with or without Goiter; HTN; Closed Fracture of Head of Radius. Plan: Follow up with Ortho.

**INOVA Medical Group**

01-25-17   OV (Dawna Rogers, MD) – Patient has scars on the face and lip to be checked after a fall two months ago. Concerned about lip, nose and chin. Assessment: Milia; Facial Scarring Secondary to Fall. Plan: Tretinoin Cream. Referral to Plastic Surgeon given.

**Acupuncture Alexandria**

02-22-17   Acupuncture Note (Sarah Shupe Hung, LAc) - Right elbow pain, shoulder stiffness, elbow swelling, some tenderness around scar on elbow; feels like a bruise. Assessment: Damp Stagnation. Plan: TCM Acupuncture to Ashi R Elbow.

04-05-17   Acupuncture Note (Sarah Shupe Hung, LAc) – Here for right elbow pain. Broke elbow in an accident 3 months ago. Plate in radial head. Progress is slower than normal. PT notices less swelling in elbow after last treatment. Talking to MD. Needs to go back in and have another surgery. ROM is not what it should be. Assessment: Damp Stagnation. Plan: TCM Acupuncture was performed at Ashi R Elbow.

## Mountcastle Plastic Surgery &Vein Ashburn

03-16-17   OV (Timothy Mountcastle, MD) – Patient had a fall in November 2016, and is concerned with scars on chin, lips and area between eyes and nose. Concerned with scar on chin, hardness in her lips and redness on the nose from scab. Assessment: Scar of Chin, Lip, Nose; Swelling of LE. Plan: Chin: further reconstruction of this scar could only make it worse; give it a year before considering revision. Lip: massage area to reduce hardness but more surgery could make the area worse. Nose: no further treatment recommended. Start scar creams. Swelling, LE: US to rule out DVT.

03-22-17   OV (Timothy Mountcastle, MD) – Bilateral leg pain and swelling. She has attempted conservative therapy with 6 months of medical grade compression stocking therapy, rest, leg elevation, exercise and

NSAIDs/Tylenol with little relief. Assessment: 1. Venous insufficiency (chronic) (peripheral); 2. Varicose veins of both LEs with pain. Plan: US.

US, Bilateral LE Venous – Venous insufficiency resulting in lifestyle limiting symptoms. Leg symptoms are most likely secondary to refluxing veins. This venous refluxis causing backflow of blood and pooling in Patient's legs. Untreated venous insufficiency will continue to progress and cause further swelling, skin changes, pain and possibly tissue breakdown.

11-27-17    OV (Timothy Mountcastle, MD) – Scar on left chin and bottom lip; resulted after an accident a year ago when Patient fell down a flight of stairs in a car garage. Assessment: Facial Scar; Scar of Chin; Scar of Lip; Plastic Surgery for Unacceptable Cosmetic Appearance; Neoplasm of Uncertain Behavior of Skin. Plan: Bottom lip scar would be difficult to reconstruct and may cause a divot in Patient's lip. She will use creams and does not wish to pursue reconstruction of bottom lip. She would like to try reconstruction of left chin. May take two excisions for end result.

Undated    Operative Note – 1. VNUS ablation right greater Saphenous vein; 2. Area where catheter was inserted, right knee; 3. RF cycles: 6; 4. Length of GSV ablated: 42 cm.

12-05-17    Operative Note – 1. Left GSV VNUS ablation; 2.
            Area where catheter was inserted, above left knee; 3.
            RF cycles used: 4; 4. Length of GSV ablated: 28 cm.

12-08-17    OV (Timothy Mountcastle, MD) – Follow up bilateral
            GSV VNUS. Assessment: Varicose veins of bilateral
            LEs with other complications; Venous insufficiency
            (chronic) (peripheral).

01-17-18    OV (Cataline Bemier, PA-C) – Follow up wound
            check chin lesion. Status post scar revision on chin.
            No issues or complaints. Plan: Happy with overall
            improvement of scar. The hypopigmentation above
            the scar may get a little better in time but not many
            options when it comes to hypopigmentation. Scar
            creams.

**OrthoVirginia**

03-24-17    OV (Daniel Laino, MD) - Evaluation of right elbow
            and wrist. Referred by Dr. Kennedy. She had a
            complex right elbow trans olecranon fracture
            dislocation repaired back on 11-18-16. This occurred
            after a fall on an outstretched hand. She had a repair
            and radial head replacement. The fracture involved
            the coronoid. She was referred to therapy. Comes in
            today with a good amount of elbow as well as wrist
            stiffness. She reports intact sensation throughout the
            right hand. Generally speaking the elbow is not
            significantly painful. Assessment: Right Elbow and
            Wrist Arthrofibrosis and likely Proximal Radial Ulnar
            Joint Synostosis after Complex Elbow Fracture
            Dislocation repaired in November 2016. Plan:
            Complicated injury. Discussed elbow contracture

release. Wrist is a separate issue. Would recommend getting the wrist moving better before proceeding with any additional surgery. She could continue to improve with PT. There probably is a proximal radial ulnar joint synostosis which may make it difficult to get back any pronation and supination without additional surgery. Continue with PT for now.

**University of Maryland Orthopedics**

03-28-17    OV (Syed Hasan, MD) – Evaluation right elbow. She sustained a fracture-dislocation in November 2016 and had ORIF of a comminuted proximal ulnar fracture and radial head replacement. She complains today of significant limited ROM. No pain in the rotator of the forearm at all and very limited flexion-extension. Impression: Status Post ORIF of Right Elbow Fracture-Dislocation and Radial Head Replacement and Elbow Stiffness. Plan: Refer for CT.

03-28-17    CT, RUE – 1. Nonunion of the coronoid fracture. Extensive postsurgical change with a prosthesis within the radial head. Surgical plate within the ulna; 2. 2 loose bodies adjacent to the lateral epicondyle measuring 6 mm and 4 mm.

03-28-17    X-Ray, Right Wrist – Normal.

04-04-17    OV (Syed Hasan, MD) – Follow up elbow. Here to review CT. No change in symptoms. Impression: 1. Right elbow contracture with a malunion, likely some component of nonunion of a complex ulnar fracture; 2. Status post radial head replacement. Plan: She has significant contracture release and significant bony

deformity. Recommend removing the radial head, take up the ulnar hardware and do extensive contracture release to see how much motion we can get back.

05-22-17     Nursing Note – Patient's case was cancelled by her surgeon due to unavailable equipment. IV was discontinued and Patient department pre-op area.

05-25-17     H&P (Theresa McIntosh, PA-C) – Right elbow injury. OR per Dr. Hasan.

05-25-17     Operative Note (Syed Hasan, MD) – 1. Right elbow revision ORIF of the ulna; 2. Right elbow removal of radial head implant; 3. Right elbow removal, takedown of synostosis and heterotropic ossification; 4. Neurolysis posterior interosseous nerve.

05-26-17     Consult (Thomas Merkle, MD) – Patient developed nausea this morning. Feels better after Zofran. Achy right elbow pain. Plan: Discontinue MS Contin; Oxycodone; Continue Tylenol and Zofran.

05-26-17     OT Discharge – Status post right elbow contracture release, radial head excision, ulnar revision ORIF. NWB. Educated on ADL techniques, HEP and don and doffing sling. Recommend outpatient OT once cleared by MD.

05-26-17     Discharge Summary (Syed Hasan, MD) – Admitted 05-25-17 for the above procedure. Pain controlled. Drain removed. PT and OT recommend discharge home.

06-06-17    OV (Syed Hasan, MD) – She has been in the cast. Two weeks out. Plan: She still has significant bony deformity around the elbow which is limiting more ROM and suspect she will require a total elbow arthroplasty down the road. Focus on getting the ulnar shaft to heal and decide further treatment once that is completely achieved. Hinged elbow brace today for protective ROM.

06-06-17    X-Ray, Right Elbow – ORIF of a comminuted fracture of the proximal ulna. Probable resection of the radial head. Bone fragments are seen anteriorly.

06-27-17    OV (Syed Hasan, MD) – Status post radial head resection and replating of a proximal ulnar shaft fracture, which was found to be nonunion at the time of revision surgery. She is wearing an elbow brace. Plan: We need to initially obtain union of her ulnar fracture and then she will likely require total elbow arthroplasty, but that would probably be at least 6 months minimum to ensure good bony union of the ulna.

06-27-17    X-Ray, Right Elbow – Stable postoperative changes. No interval healing of proximal ulnar fracture.

08-01-17    OV (Annie Weber, MD) – She reports continued limited ROM. Pain well controlled. Plan: Continue IV ABX. Come out of sling and wear as needed. ROM of right elbow as tolerated.

08-01-17    X-Ray, Right Elbow – The proximal ulnar fracture appears minimally less distinct than on the prior study, suggestive of early healing. The majority of the

fracture line continues to be lucent without significant healing.

09-12-17    OV (Syed Hasan, MD) – 3.5 months status post a contracture release and revision ORIF of the ulna. She has finished her antibiotics. Impression: Incomplete Healing of Right Ulnar Shaft Fracture. Plan: Review x-rays. Discussed bonegraft or potential revision arthroplasty this time with a long IM screw. Review films and will let her know how to proceed.

09-12-17    X-Ray, Right Elbow – No significant change from previous study. ORIF of a nondisplaced fracture of the proximal ulna is again seen. The fracture line is still evident. Resection of the radial head.

10-20-17    CT, Right Elbow – 1. Status post ORIF of the elbow with metallic plate and screw fixation within the proximal ulna. Ulnohumeral osteoarthrosis; 2. Status post resection of the radial head with soft tissue in its expected location, no evidence of abscess; 3. Patchy sclerosis and permeative appearance with osseous remodeling of the proximal ulna suggestive of chronic osteomyelitis. Nondisplaced fracture of the proximal ulna with sclerotic margins compatible with nonunion.

10-20-17    CT, Right Shoulder – Mild AC joint degenerative change.

10-31-17    OV (Syed Hasan, MD) – Follow up CT. Impression/Plan: Revision surgery. Take culture results of that area and potentially do revision ORIF at that time potentially either plate or IM screw fixation.

| | |
|---|---|
| 12-18-17 | Progress Note – NWB RUE, sling in place. Peri-op ABX. X-Ray. Follow up OR cultures. |
| 12-18-17 | Operative Note (UMMC – Syed Hasan, MD) – 1. Right elbow revision ORIF; 2. Right elbow removal of deep hardware; 3. Right elbow synostosis excision. |
| 12-19-17 | OT Discharge – Presented with increased pain and limited ROM of the right elbow. This is her 3rd elbow surgery in the past year. She was referred here to facilitate safe discharge home. No further acute OT needs at this time. Discharge home. |
| 12-19-17 | X-Ray, Right Elbow – Interval placement of IM screw across the proximal ulnar shaft fracture. |
| 12-19-17 | X-Ray, Right Elbow – No acute fracture or dislocation. Implant in expected alignment and position. Postsurgical changes present. |
| 12-19-17 | Progress Note (Thomas Merkle, MD) – POD #1 status post revision ORIF of right ulnar fracture for nonunion. ID: receiving Clindamycin per Ortho. History of HTN. Acquired Hypothyroidism. Dilaudid for breakthrough pain. |
| 12-19-17 | Discharge Note – Admitted on 12-18-17 for surgery. Pain was controlled. Since surgery, drain has been removed and she has resumed normal bowel and bladder function. PT/OT recommend discharge home. NWB. |
| 12-27-17 | OV (Pamela Brown, CRNP) – Doing well. Remains in a splint at all times. Splint and dressings were |

removed. Incision line is clean, dry and intact with sutures in place. **Missing 2nd page.**

12-27-17    X-Ray, Right Elbow – Healing proximal left ulnar fracture status post hardware revision as above, overlying postsurgical soft tissue changes. Prior proximal radial resection.

01-02-18    OV (Syed Hasan) – Doing well. Plan: Continue HEP for some ROM and flexion-extension as well as supination and pronation. One of her cultures came back positive with some rare growth found with a bacterium, but this is in broth only and also 8 days out, so this most likely represents a contaminant and not a true positive culture result and no other cultures are positive. RTC in two months.

02-27-18    OV (Syed Hasan, MD) – 2.5 months status post revision ORIF of the ulna and also proximal radioulnar synostosis takedown. Doing well. Elbow hurts less. She feels she has a little more motion. Plan: Overall feels quite well, having continued to work with HEP for ROM in all planes. Any further surgery should be delayed to see exactly how much motion she is going to get back out of this surgery and to allow the soft tissues to completely heal.

02-27-18    X-Ray, Right Elbow – There appears to be further healing of the nondisplaced fracture of the proximal ulna since the previous study. Fracture line is still partially visualized. Increasing heterotopic bone formation is seen in the region of the proximal radius. Soft tissue swelling has nearly completely resolved since the previous study.

08-21-18     OV (Syed Hasan, MD) – 8 months out. Overall doing
             well. No pain. Decreased flexion. Feels she has some
             slightly increased rotation, although that is still quite
             limited. Assessment: 1. Healed Ulna, Status Post
             Revision ORIF; 2. Significant Heterotopic Bone of
             the Right Elbow with Proximal Radioulnar
             Synostosis. Plan: Treatment options are probably
             limited only to total elbow arthroplasty at this point.
             Get a 3D CT to ascertain the bony anatomy of the
             proximal radius and ulna.

08-21-18     X-Ray, Right Elbow – Status post ORIF of the ulna.
             Resection of the proximal radial shaft. Similar
             appearance to 02-27-18.

**Infectious Diseases Specialists of Virginia**

06-14-17     OV (Paul Ramilo, MD) – Referred from Ortho. CNS
             + intraop wound culture positive. Recent tick bite.
             Initially suffered a traumatic fall requiring right elbow
             surgery twice. Decreased ROM to elbow ever since.
             Surgical site healing well, closed. Assessment:
             Infection following a Procedure; Bite/Sting by Non-
             venom Insect and Other Non-venom Arthropods.
             Started on Doxycycline 06-09-17. Continue this for
             now. Labs. Return following end of Doxy for re-
             evaluation and labs.

06-28-17     OV (Paul Ramilo, MD) – Wound fully closed. No
             active infection seen today. Completed Doxy recently.
             Labwork reviewed. Plan: Wound culture was actual
             bone that was sent by Dr. Hasan as a result will treat
             as osteomyelitis and therefore initiate IV antibiotic via

PICC. Orders written today for single lumen PICC
and IV Vancomycin to be initiated 6-8 week course.

06-28-17    Fluoro Left PICC Placement – Successful placement
single-lumen power injectable PICC catheter with the
tip at the right atrium.

07-12-17    OV (Paul Ramilo, MD) – Now on Vanco; doing well.
No adverse reactions. Labwork reviewed. PICC clean.
Plan: Complete 8 weeks of Vancomycin.

07-26-17    OV (Paul Ramilo, MD) – Doing well. Labs reviewed.
Plan: Continue Vancomycin.

08-09-17    OV (Paul Ramilo, MD) – 6 weeks to date; doing well.
Plan: Continue treatment.

08-23-17    OV (Paul Ramilo, MD) – Discontinue PICC
tomorrow. 8 weeks to date. Observe off antibiotics for
now.

## AxelaCare/BriovaRx Infusion Services

06-29-17    POC (Greg Fernandes, RN) – Diagnosis:
Staphylococcus; Other Acute Osteomyelitis, Right
Radius. Antibiotic therapy; Labs; IV management.
Infusion therapy. SNV. CVC. PICC removed upon
completion of therapy.

08-24-17    Comprehensive Assessment – Patient ready to have
PICC discontinued. Therapy complete.

STATEMENT OF OPINIONS

As a consequence of the incident that occurred on November 15, 2016, the patient suffered multiple injuries as listed in the emergency room record on the date that she fell.

She was diagnosed with a concussion, CT scan was normal and no further care was provided. I have no reason to think that she will have any permanency associated with head injury, or need for any future medical treatment for that diagnosis.

She suffered facial lacerations. She received appropriate care including the initial emergency room care and the scar revision performed by Dr. Mountcastle. She has facial scars that remain and will be permanent. I am not aware of any plan for further care for her facial scars.

She suffered extensive contusions to both legs. Appropriate care included the performance of Doppler studies to rule out DVT. The procedures that Dr. Mountcastle performed on the veins in the patient's legs were not causally necessitated by the injury of November 15, 2016.

Patient suffered a comminuted displaced fracture of the right elbow, as shown in the imaging studies and described in the operative reports as well as the medical illustrations that I reviewed.

All the care that she received as represented in all of the medical records that I reviewed in this report (other than the vein procedures described two paragraphs above) was fair, reasonable, necessary and causally related to the subject incident. All the medical bills were likewise fair, reasonable, necessary and causally related to the subject incident.

The patient has permanent loss of function of her right upper extremity, notably at the elbow and wrist, as noted in the objective physical findings.

The degree of permanent impairment is extensive. The AMA Guides
5th Edition, using loss of motion to rate impairment places the degree of
impairment aspect 25% of the arm because of motion loss at the elbow
and 8% of the arm because of motion loss at the wrist, for a total of 33%
permanent impairment of the right upper extremity. This translates to
20% impairment of the whole body.

There has been some discussion between the patient and
Dr. Hasan talk about total elbow arthroplasty.  To my knowledge, no
such surgery has been planned.

Sincerely yours,

John A. Bruno, Jr., M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CAMILLE SEDAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 1:18-cv-01111-CMH-TCB |
| | ) |
| BOSTON PROPERTIES LIMITED | ) |
| PARTNERSHIP and RESTON TOWN | ) |
| CENTER PROPERTY, LLC | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF CAMILLE SEDAR

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA | ) |
| | ) ss |
| COUNTY OF FAIRFAX | ) |

I, Camille Sedar, am over the age of 18, and fully competent to make this Declaration.  I declare under penalty of perjury that the following is true to the best of my knowledge and recollection.

1)      I, Camille Sedar, am the Plaintiff in the above captioned case.

2)      On November 15, 2016, as the result of a fall at the Green Garage in Reston Town Center, I suffered serious and permanent injuries, including lacerations to my head and face; a concussion and post-concussive syndrome; and to my right elbow the following injuries: complex radial head and ulna fractures; elbow dislocation; and lateral collateral ligament damage, among other injuries.

3)      On the day of the incident at issue, November 15, 2016, I was wearing my Nine West Leopard Print Flat Shoes ("shoes").

4)      I purchased the shoes roughly two years prior to the date of the incident.

5)    Prior to arriving at the Green Garage on the day of the incident, the shoes had normal

       wear.

6)    Following then incident, the shoes were in my closet in the hospital room during my

       hospital stay.  When I retrieved the shoes to go home, I immediately noticed a rather

       large and noticeable scuff at the top/tip of the right shoe that had not been present

       before the fall.

7)    I believe the visible scuff of my right shoe to be from my fall at Reston Town Center.

8)    I put the shoes on my feet for the trip home from the hospital, but was in a wheelchair

       from the hospital to the car and only walked from the car to my home.  I did not scuff

       the shoes in any way during this short trip into my house.  I have not worn or used the

       shoes in any fashion since that time.

9)    I have kept the shoes preserved in a felt bag since arriving at home from the hospital.

10)   I do not have any history of passing out, blacking out, falling, or any other relevant

       medical issues that would have affected my ability to properly navigate the stairs absent

       the dangerous condition and was not suffering from any health or medical issues at the

       time of the accident.


       Date: July     , 2019



                                              _Camille Sedar_____
                                              Camille Sedar


       IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my official

seal this ___34___ day of July, 2019.


                                              2

_____
Notary Public

My Commission Expires:  03/31/2021

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **CAMILLE SEDAR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:18-cv-01111-CMH-TCB** |
| | ) | |
| **BOSTON PROPERTIES LIMITED** | ) | |
| **PARTNERSHIP and RESTON TOWN** | ) | |
| **CENTER PROPERTY, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF DANO HOLLAND

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA | ) |
| | ) ss |
| COUNTY OF FAIRFAX | ) |

I, Dano Holland, am over the age of 18, and fully competent to make this Declaration.  I declare under penalty of perjury that the following is true to the best of my knowledge and recollection.

1)      I, Dano Holland, was retained by the Plaintiff, Camille Sedar, to render expert testimony in this case.

2)      In connection with my testimony, I reviewed a number of documents and things, including, the Complaint, discovery responses, applicable building codes, photographs, a video, deposition testimony, photographs of Ms. Sedar's shoes, and the scene of the incident.

3)      I have rendered multiple opinions including:

a.      The loose and unstable brick paver was structurally unsound and a hazard that violated the applicable building and maintenance codes.

b.   The loose and unstable brick paver most likely caused Ms. Sedar to lose her balance and fall down the stairway.

c.   The sagging and deteriorating caulk joint immediately adjacent to the loose brick paver would have been visible during routine maintenance inspections and activities.   Closer inspection of the caulk joint failure should have alerted maintenance personnel to the unlevel and loose brick paver which contributed to Ms. Sedar's fall.

4)   The testimony I reviewed from depositions of the eyewitnesses is that more than one brick paver was loose and unstable further supporting my opinions.

5)   The building code sections violated by the Defendants specifically address requirements for egress areas from buildings and exterior stairways.  Among other things, the applicable code requirements direct how small elevation changes in the means of egress should be addressed.

6)   The intent of the applicable code sections violated by the Defendants',' at least in part, is for the safety of the public and/or users of the property.

7)   In connection with my opinions I have issued two expert reports dated April 11, 2019 and May 30, 2019 ("Reports").  The Reports accurately reflect my findings and opinions.

8)   My testimony at trial will be in accordance with the information and statements in the Reports.

Date: July 26, 2019

_____
Dano Holland

IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my official seal this 26th day of July, 2019.

_____
Notary Public

KATHERINE ANNE PHELAN
Notary Public
Commonwealth of Virginia
My Commission Expires January 31, 2021
Commission ID# 7717855

My Commission Expires: 1/31/2021

2

-895-



April 11, 2019


Mr. Andrew R. Park, Esquire
Park Sensenig
2310 West Main Street
Richmond, VA 23220

RE:                      Fall on Exterior Stairway
DATE OF INCIDENT: 11/15/16
CASE:                    Camille Sedar v. Boston Properties, L. P., et al.
HFEG FILE #:        18007

Dear Mr. Park:

At your request, I performed an investigation surrounding a fall that occurred at the Reston Town Center -Green Parking Garage located at 11922 Freedom Drive in Reston, VA. On 11/15/16, your client, Ms. Camille Sedar, fell on the exterior stairway at the southwest corner of the garage and injured herself. As part of my investigation, I reviewed the following documents:

- The Complaint
- Plaintiff's First Interrogatories and Requests for Production of Documents to Defendants
- Plaintiff's First Interrogatories and Requests for Production of Documents to Third-Party Defendant
- The Virginia Uniform Statewide Building Code – 1984, 1987 and 2012 editions
- The International Building Code - 2012 edition
- The Building Officials and Code Administrators Basic Building Code – 1984 and 1987 editions
- The International Property Maintenance Code – 2012 edition
- ASTM F1637-13 – Standard Practice for Safe Walking Surfaces

**OBSERVATIONS**
The following has been learned and observed from my investigation to date:

- Ms. Sedar and some companions were going to a restaurant at Reston Town Center. The car in which Ms. Sedar was traveling was parked on the first level of the Green Garage. After exiting the vehicle, Ms. Sedar and her companions walked to the southwest corner of the parking garage and walked up an interior flight of stairs to Level 2. On this level, a concrete stairway leads from the garage's exit to the public sidewalk along Freedom Drive. Ms. Sedar exited the parking garage and traveled across the landing towards the top of the exterior stairway. As Ms. Sedar reached the end of the brick pavers on the landing adjacent to the top of the stairs, she stepped on a loose and unstable brick paver, lost her balance and fell down the flight of stairs injuring herself. She was knocked unconscious during the fall.
- At the time of the fall, Ms. Sedar was wearing flats. She was also carrying a large piece of paper and a clutch style purse. She was looking straight ahead. Her companions were following her and witnessed her fall.
- Immediately after the incident, Ms. Sedar's companions took photographs of the scene and a video of the loose and unstable brick paver on the top landing where Ms. Sedar stepped just prior to falling.

8508 BURROUGHS COURT, N. CHESTERFIELD, VA 23235   •   804-387-2052

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



- Review of the provided photographs and video taken by Ms. Sedar's companions show a loose and unstable brick that easily rocks back and forth when it is stepped on. The photographs also show a large caulk joint that is deteriorated and sagging in multiple locations (see photographs #1 through #3). The loose brick paver is un-level when observed along the plane of the landing but is not readily discernable when looking down on the walking surface.
- I traveled to the Green Parking Garage on 7/30/18 and 4/4/19 and inspected the exterior of the garage along Freedom Drive and the location at the southwest exterior stairway where Ms. Sedar fell (see photographs #4 through #9). Repairs had been made to the large caulk joint and loose brick paver on the top landing at some time prior to my inspection. Sections of the caulk joint had already begun to sag and separate again.
- The top landing of this exterior stairway is comprised of brick pavers and a band of concrete that is actually the top tread of the concrete stair.
- Four separate handrails are provided on the stairway, but the rails fail to extend the required 12" beyond the stair's top riser.
- A similar exterior stairway is located at the southeast corner of the garage.
- According to the Fairfax County online property records, the garage was built in 1988. Historical satellite photos were used to confirm the original construction date of the garage.

**Code Review**

- As a matter of background regarding building codes in Virginia, since September 1, 1973, the applicable building code has been the Virginia Uniform Statewide Building Code (VUSBC). This state code is made up of three parts, the Virginia Construction Code (VCC), the Virginia Rehabilitation Code (VRC) and the Virginia Maintenance Code (VMC). The VUSBC, which is typically revised about every three years, serves as an administrative code which adopts a family of national model building and maintenance codes. The VUSBC further amends the national codes and directs how the national building codes are to be used and enforced in the state. Between 1973 and 2003, the VUSBC adopted the Building Officials and Code Administrators (BOCA) family of codes. Since 2003, the VUSBC has adopted the International Codes as its model codes.
- The 1984 VUSBC came into effect on 4/1/86, and the 1987 VUSBC came into effect on 3/1/88. Given these dates, the construction plans for the garage were likely designed and submitted to Fairfax County for a building permit when the 1984 VUSBC was in effect.
- The 1984 VUSBC incorporates the 1984 BOCA Basic Building Code.
- At the time of the incident, the 2012 edition of the VUSBC and the adopted provisions of the 2012 International Property Maintenance Code (IPMC) was in effect.
- The following Building and Maintenance Codes are applicable to the exterior stairway where Ms. Sedar fell (see attached excerpts).

  **1984 BOCA**
  ➢ Definitions for Means of Egress and Exit Discharge
  ➢ 800.1 – General - Scope
  ➢ 802.1 – Use and Occupancy Requirements – New Buildings
  ➢ 807.2.1 – Exit Discharge
  ➢ 819.1 – Exterior Stairways – As Required Exit
  ➢ 816.9 – Interior Stairways – Stairway Construction
  ➢ 816.9.1 – Interior Stairways - Strength
  ➢ 825.4 - Hazards to Means of Egress – Floor Surface
  ➢ 825.6 - Hazards to Means of Egress  - Elevation Change

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



**2012 VA Maintenance Code (Part III of the VUSBC)**
- ➢ 103.2 – Maintenance Requirements
- ➢ 302.3 – General Requirements – Sidewalks and Driveways

**2012 International Property Maintenance Code**
- ➢ 304.4 – Exterior Structure – Structural Members
- ➢ 304.10 – Exterior Structure – Stairways, Decks, Porches and Balconies

- The exterior stairway where Ms. Sedar fell is located in the building's means of egress; more specifically, the stairway is located in the exit discharge. The 1984 BOCA code is clear in sections 800.1, 802.1 and 807.2.1 that occupants should be able to safely egress from a building. Sections 816.9, 816.9.1 and 825.4 require that the treads and landings of a stairway and walking surfaces in the means of egress be slip-resistant and be capable of supporting the required loads. In section 825.6, the code even directs how small elevation changes in the means of egress should be addressed. The intent of these code sections is that a safe walking surface be provided in the means of egress to guard against someone tripping, slipping or losing their balance and falling. The loose and unstable brick paver was not capable of supporting Ms. Sedar's weight.

- Because the subject exterior stair is located on the means of egress, it is regulated by the VCC (Part I of the VUSBC). The maintenance codes require that the stairway be maintained free from hazardous conditions and deterioration. Stair components must also be able to support acceptable applied loads. The loose and unstable brick paver was a hazard within the walking surface.

- The national voluntary standard, ASTM F1637-13 – Standard Practice for Safe Walking Surfaces, is a reference that provides guidelines for the construction and maintenance of walking surfaces. It can also serve as an operational list of "Good Practices" for property owners, maintenance personnel and construction contractors. Section 5.1.1 of the standard calls for walkways to "be stable, planar, flush and even to the extent possible." Section 5.1.2 indicates that walkway surfaces should "be capable of safely sustaining intended loads." The standard goes on to identify items specific to exterior walkways in section 5.7 and identifies substandard conditions in section 5.7.1 that should be repaired such as areas where "pavement is broken, depressed, raised, undermined, slippery, uneven or cracked to the extent that pieces may be readily removed." These sections, as well as others in the standard, echo the implied intent of the building and maintenance codes.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC

**Discussions**

The plaintiff was traversing the top landing of the exterior stairway at the southwest corner of the garage. The brick paver immediately adjacent to the top concrete tread was unstable and loose. The long term failure of the adjacent caulk joint likely contributed to the paver's loss of support. The shifting of the brick paver under Ms. Sedar's weight was the condition that most likely caused her to lose her balance and fall down the exterior stairway. The brick pavers on the stairway's upper landing were improperly maintained. The sagging and deteriorated caulk joint should have alerted maintenance personnel to the potential deficiency in the walking surface. The loose and uneven brick paver violates the applicable maintenance and building codes as it does not provide a firm, stable and slip resistant walking surface in the means of egress. The large joint between the brick paver and concrete may have also served as a trip hazard and contributed to the fall once the brick rocked out of level.

From my investigation to date, I have formed the following opinions in addition to any opinions previously stated in this report:

1. The loose and unstable brick paver was structurally unsound and a hazard that violated the applicable building and maintenance codes.
2. The loose and unstable brick paver most likely caused Ms. Sedar to lose her balance and fall down the stairway.
3. The sagging and deteriorated caulk joint immediately adjacent to the loose brick paver would have been visible during routine maintenance inspections and activities. Closer inspection of the caulk joint failure should have alerted maintenance personnel to the unlevel and loose brick paver which contributed to Ms. Sedar's fall.

My opinions, which were reached to a reasonable degree of engineering certainty, are based on my knowledge, experience, training, education, observations, and the information that was obtained or relayed to me during my investigation. If additional information is provided to me, I reserve the right to alter or amend my opinions.

I trust that this information serves to clarify the issues surrounding this matter. A record of my previous testimony is attached. I have not authored any publications. Should you have any questions or if I can be of further service, please contact my office.

Sincerely,

Dano Holland, P.E.
Structural Engineer

COMMONWEALTH OF VIRGINIA
DANO HOLLAND
Lic. No. 033040
4/11/19
PROFESSIONAL ENGINEER

Enclosure

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019





**Photograph taken by Ms. Sedar's companions**

PHOTOGRAPH #1                    DATE TAKEN: 11/15/16

COMMENTS:  Southwest exterior stairway – view of upper landing on exterior stairway.

-900-

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019





**Photograph taken by Ms. Sedar's companions**

PHOTOGRAPH #2                    DATE TAKEN: 11/15/16

COMMENTS:  Southwest exterior stairway – view of brick pavers on upper landing of exterior stairway

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019





**Photograph taken by Ms. Sedar's companions**

PHOTOGRAPH #3                    DATE TAKEN: 11/15/16

COMMENTS:  Southwest exterior stairway – view of unlevel and loose brick paver at upper landing

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #4                    DATE TAKEN: 7/30/18

COMMENTS:  Southwest exterior stairway – looking west

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019





PHOTOGRAPH #5                    DATE TAKEN: 7/30/18

COMMENTS: Southwest exterior stairway – overhead view of stairway

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019


Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #6                    DATE TAKEN: 7/30/18

COMMENTS:  Southwest exterior stairway

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #7                    DATE TAKEN: 7/30/18

COMMENTS: Southwest exterior stairway – Exterior stairway is located on the means of egress from the elevators and interior stair tower.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #8                        DATE TAKEN: 7/30/18

COMMENTS:  Southwest exterior stairway – view of upper landing on exterior stairway

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
April 11, 2019


Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #9                          DATE TAKEN: 7/30/18

COMMENTS: Southwest exterior stairway – 1½" wide caulk joint between brick pavers and concrete on top landing.

# 1984 BOCA Excerpts

sectional area measured in the same plane.

**Solid:** A masonry unit whose net cross-sectional area in every plane parallel to the bearing surface is 75 percent or more of its gross cross-sectional area measured in the same plane.

**Means of egress:** A continuous and unobstructed path of travel from any point in a building or structure to a public way, and consisting of three separate and distinct parts: (a) the exit access, (b) the exit and (c) the exit discharge. A means of egress comprises the vertical and horizontal means of travel and shall include intervening room spaces, doors, hallways, corridors, passageways, balconies, ramps, stairs, enclosures, lobbies, escalators, horizontal exits, courts and yards (see Article 8).

**Member**

**Primary:** Any member of the structural frame of a building or structure used as a column, grillage beam, or to support masonry walls and partitions, including trusses, isolated lintels spanning an opening of 8 feet (2438 mm) or more, and any other member required to brace a column or a truss.

**Secondary:** Any member of the structural framework other than a primary member, including filling-in beams of floor systems.

**Membrane structures**

**Air-inflated structure:** A building where the shape of the structure is maintained by air pressurization of cells or tubes to form a barrel vault over the usable area. Occupants of such a structure do not occupy the pressurized area used to support the structure.

**Air-supported structure:** A building wherein the shape of the structure is attained by air pressure and occupants of the structure are within the elevated pressure area. Air supported structures are of two basic types:

    **Single skin:** Where there is only the single outer skin and the air pressure is directly against that skin.

    **Double skin:** Similar to a single skin, but with an attached liner which is separated from the outer skin and provides an air space which serves for insulation, acoustic, aesthetic or similar purposes.

**Cable-restrained air-supported structure:** A structure in which the uplift is resisted by cables or webbings which are anchored to either foundations or dead men. Reinforcing cable or webbing may be attached by various methods to the membrane or may be an integral part of the membrane. This is not a cable-supported structure.

**Membrane:** As it pertains to membrane structures, a thin, flexible, impervious material capable of being supported by an air pressure of 1.5 inches of water column (373 P) (see Section 621.0).

**Membrane-covered cable structure:** A nonpressurized structure in which a mast and cable system provides support and tension to the membrane weather barrier and the membrane imparts structural stability to the structure.

**Membrane-covered frame structure:** A nonpressurized building wherein the structure is composed of a rigid framework to support tensioned

**34**

**Escalator:** A power driven, inclined, continuous stairway used for raising and lowering passengers (see Section 2117.0).

**Extinguishing system, carbon dioxide ($CO_2$):** A system to supply $CO_2$ from a pressurized vessel through fixed pipes and nozzles. The system includes an automatic detection and actuating mechanism (see Section 1708.0).

**Extinguishing system, dry chemical:** A system consisting of dry chemical and expellant gas storage tanks, fixed piping, and nozzles used to assure proper distribution of an approved extinguishing agent on a specific fire hazard or into a potential fire area. The system includes an automatic detection and actuating mechanism (see Section 1710.0).

**Extinguishing system, foam:** A special system to discharge, either mechanically or chemically, a foam made from concentrates, over the area to be protected (see Section 1707.0).

**Extinguishing system, halogenated:** A system of pipes, nozzles, an actuating mechanism and a container of halogenated agent under pressure (see Section 1709.0).

**Exit:** That portion of a means of egress which is separated from all other spaces of a building or structure by construction or equipment as required in this code to provide a protected way of travel to the exit discharge (see Section 807.0).

**Exit access:** Exit access is that portion of a means of egress which leads to an entrance to an exit (see Section 810.0).

**Exit discharge:** That portion of a means of egress between the termination of an exit and a public way (see Section 807.2.1).

**Exit, horizontal:** A way of passage from one building to an area of refuge in another building on approximately the same level, or a way of passage through or around a wall or partition to an area of refuge on approximately the same level in the same building, which affords safety from fire or smoke from the area of incidence and areas communicating therewith (see Section 814.0).

**Exterior envelope:** The elements of a building which enclose conditioned spaces through which thermal energy may be transferred to or from the exterior (see Section 2402.0).

**Fire area:** The floor area enclosed and bounded by fire walls, fire separation assemblies or exterior walls of a building to restrict the spread of fire.

**Fire department connection:** A connection for fire department use in supplementing or supplying water for standpipes or sprinkler systems (see Section 1713.0).

**Fire grading:** The fire hazard classification of a building or structure in hours or fractions thereof established for its use group and occupancy in Table 1402.

28

# *ARTICLE 8*

## MEANS OF EGRESS

### SECTION 800.0 GENERAL

**800.1 Scope:** The provisions of this article shall control the design, construction and arrangement of building elements required to provide a reasonably safe means of egress from all buildings and structures hereafter erected, and from all buildings hereafter altered to a new occupant load, or manner of use, or inherent fire hazard. Existing buildings and uses shall be controlled by the provisions of Section 804.0.

**800.2 Modification of egress requirements:** When strict compliance with the provisions of this code is not practical, the building official may accept alternate means of egress which will accomplish the same purpose, by the procedure established in Article 1 for modification of this code, or by adoption of approved rules. Existing buildings shall not be occupied during repairs or alterations unless all existing means of egress and any existing fire protection are continuously maintained, or in lieu thereof, other measures are taken which provide equivalent safety.

**800.3 Minimum requirements:** It shall be unlawful to alter any building or structure in any manner that will reduce the number of exits or the capacity of exits below the requirements of this code for new buildings of the proposed use and occupancy.

### SECTION 801.0 PLANS AND SPECIFICATIONS

**801.1 Arrangement of egress:** The plans shall show in sufficient detail the location, construction, size and character of all exits together with the arrangement of aisles, corridors, passageways and hallways leading thereto in compliance with the provisions of this code.

**801.2 Number of occupants:** In other than buildings of Use Groups R-2, R-3 and I-1, the plans and the application for a permit shall designate the number of occupants to be accommodated on every floor, and in all rooms and spaces when required by the building official. When not otherwise specified, the minimum number of occupants to be accommodated by the exits shall be determined by the occupant load prescribed in Section 806.0. The posted occupant load of the building shall be limited to that number.

125

## SECTION 802.0 USE AND OCCUPANCY REQUIREMENTS

**802.1 New buildings:** Every building and structure and part thereof hereafter erected shall have the prescribed number of exits of one or more of the approved types defined in this article. Exits, in combination with the exit access and exit discharge, shall provide safe and continuous means of egress to a street or to an open space with direct access to a street.

**802.2 Mixed use groups:** In buildings classified in more than one use group, each fire area shall be considered separately in determining the required number, capacity, size and construction of all exits.

**802.3 Multiple tenants:** When more than one tenant occupies any one floor of a building or structure, each tenant shall be provided with direct access to approved exits.

## SECTION 803.0 PROHIBITED USE

**803.1 General:** Exits and exit access corridors shall not be used as supply or return air ducts or plenums.

**Exception:** The space between the corridor ceiling and the floor or roof structure above may be used as a return air plenum when the corridor is not required to be of fireresistance rated construction or when the corridor is separated from the plenum by fireresistance rated construction.

## SECTION 804.0 EXISTING BUILDINGS

**804.1 Owner responsibility:** The owner or lessee of every existing building and structure shall be responsible for the safety of all persons in, or occupying, such premises with respect to the adequacy of means of egress therefrom.

**804.2 Unsafe means of egress:** In any existing building or structure not provided with exit facilities as herein prescribed for new buildings and in which the exits are deemed inadequate for safety by the building official, such additional provision shall be made for safe means of egress as the building official shall order.

**804.2.1 Appeal from exit order:** Within seven days after the service of the exit order of the building official, the owner may file a written appeal therefrom, and the building official shall appoint a board of survey as required in Section 123.0 to make a final determination.

## SECTION 805.0 MAINTENANCE OF EXITS

**805.1 Obstructions:** It shall be unlawful to obstruct, or reduce in any manner, the clear width of any doorway, hallway, passageway or other means of egress required by the provisions of this code.

**805.2 Maintenance:** All exterior stairways and fire escapes shall be kept free of snow and ice. They shall be properly painted before and after erection; and shall be scraped and painted as often as necessary to maintain them in safe condition.

126

## SECTION 807.0 TYPES AND LOCATION OF MEANS OF EGRESS

**807.1 General:** All approved exits, including doorways, passageways, corridors, interior stairways, exterior stairways, escalators, smokeproof enclosures, ramps, horizontal exits, bridges, balconies, fire escapes and combinations thereof shall be arranged and constructed as provided in this code.

**807.2 Arrangement:** All required exits shall be so located as to be discernable and accessible with unobstructed access thereto; and so arranged as to lead directly to the street or to an area of refuge with supplemental means of egress that will not be obstructed or impaired by fire, smoke or other cause.

**807.2.1 Exit discharge:** All exits shall discharge directly at a public way or at a yard, court or open space of the required width and size to provide all occupants with a safe access to a public way.

**807.2.2 Egress through adjoining spaces:** Egress from a room or space may open into an adjoining or intervening room or area, provided such adjoining room is accessory to the area served, is not of a higher hazard than the room or space from which egress is made and provides a direct means of egress to an exit. A maximum of one exit access shall be permitted to pass through a kitchen, storeroom, restroom, closet or similar space provided that it is not the only means of access to an exit. An exit access shall not pass through a room subject to locking.

Table 807
### LENGTH OF EXIT ACCESS TRAVEL [In feet[b]] [a]

| Use group | Without fire suppression system | With fire suppression system |
|---|---|---|
| A | 150 | 200 |
| B | 200 | 300 |
| E | 150 | 200 |
| F | 200 | 300 |
| H | — | 75 |
| I | 100 | 200 |
| M | 100 | 150 |
| R | 100 | 150 |
| S-1 | 200 | 300 |
| S-2 | 300 | 400 |

**Note a.** See the following sections for travel distance requirements for special uses.
Section 504.4: The maximum length of exit access travel in unlimited area buildings shall be 400 feet.
Section 618.3.1.4.6: The exit access travel distance set forth in Table 807 may be increased to 300 feet in high-rise buildings under the automatic fire suppression system alternatives.
Section 619.4.1: The maximum length of exit access travel from any point within a covered mall to an approved exit shall not exceed 200 feet.
Section 809.5: The maximum distance from any point on a parking tier to an exit in open parking structures shall be 300 feet.
**Note b.** 1 foot = 304.8 mm.

**807.2.3 Assembly buildings:** All buildings used for assembly purposes shall front on at least one street on which the main entrance and exit discharge shall be located.

129

entirely within the smoke trap area. Doors, when in the open position, shall not obstruct duct openings. Duct openings may be provided with controlling dampers, if needed, to meet the design requirements, but such are not otherwise required.

**818.7.3.1 Engineered ventilation system:** A specially engineered system may be used. Such an engineered system shall provide 2,500 cubic feet per minute (cfm) (1.18 m³/s) exhaust from a vestibule when in emergency operation and shall be sized to handle three vestibules simultaneously. The smoke detectors located outside each vestibule shall, upon release, open the supply and exhaust duct dampers in that affected vestibule.

**818.7.4 Smoke trap:** The vestibule ceiling shall be at least 20 inches (508 mm) higher than the door opening into the vestibule to serve as a smoke and heat trap and to provide an upward moving air column. The height may be decreased when justified by design and test.

**818.7.5 Stair shaft air movement system:** The stair shaft shall be provided with a dampered relief opening at the top and supplied with sufficient air to discharge a minimum of 2,500 cfm (1.18 m³/s) through the relief opening while maintaining a minimum positive pressure of 0.05 inch of water column (12.44 Pa) in the shaft relative to atmosphere with all doors closed.

**818.7.6 Ventilating equipment:** The activation of ventilating equipment shall be by a smoke detector installed outside the vestibule door in an approved location. When the closing device for the stair shaft and vestibule doors is activated by smoke detection or power failure, the mechanical equipment shall operate at the levels specified in Sections 818.7.3 and 818.7.5.

**818.7.7 Standby power:** Mechanical vestibule and stair shaft ventilation systems and detector systems shall be powered by an approved standby power system conforming to Sections 2007.0 and 618.9.1.

**818.7.8 Acceptance and testing:** Before the mechanical equipment is approved by the building official, it shall be tested in the building official's presence to confirm that it is operating in compliance with these requirements.

## SECTION 819.0 EXTERIOR STAIRWAYS

**819.1 As required exit:** Exterior stairways conforming to the requirements for interior stairways as required in Section 816.0, except as to enclosures and fire doors and except as herein specifically modified, may be accepted as an element of a required means of egress in buildings not exceeding five stories or 65 feet (19812 mm) in height for other than buildings of Use Groups I-2 and I-3. Exterior stairways and exit access balconies in climates subject to snow or ice shall be protected to prevent accumulation of same.

**819.1.1 Location and arrangement:** Exterior stairways may be utilized where at least one door from each tenant space opens onto a roofed-over open balcony served by at least two stairways, except that one stairway may be provided as permitted in Section 809.3, so located as to provide a choice of

146

**816.6 Stair exit doors:** Stairway exit doors shall comply with Sections 816.6.1 through 816.6.3.

**816.6.1 Width:** The width of every exit door to or from a stairway shall be not less than the number of units of exit width required for the capacity of the stairway which serves the floor or area from which the exit door leads; but such a door shall not be less than 28 inches (711 mm) in clear width in buildings of Use Group R-3 nor less than 32 inches (813 mm) in clear width in all other use groups.

**816.6.2 Direction of swing:** All doors shall swing on a landing in the direction of egress travel. When opening, stair exit doors shall not reduce the width of landings to less than one-half the required width. When fully open, the exit door may project 7 inches (178 mm) onto the landing.

> **Exception:** Doors leading from a room or tenant space to a stairway in buildings in which only one exit is required need not swing in the direction of egress travel.

**816.6.3 Door construction:** All doorway opening protectives, including the frames and hardware, shall be approved self-closing, swinging fire doors, except in buildings of Use Group R-3 where 1¾ inch solid core wood doors are permitted. Labeled fire doors shall have a maximum transmitted temperature end point of not more than 450 degrees F. (232 degrees C.) above ambient at the end of 30 minutes of standard fire test exposure.

**816.7 Spiral stairways:** Spiral stairways of noncombustible construction may be used as an element of a means of egress in buildings of Use Group R-3 and within a single dwelling unit and from a mezzanine area not more than 250 square feet (23.25 m²) in area and serving not more than five occupants. The minimum width shall be 26 inches (660 mm) with each tread having a 7½ inch (191 mm) minimum tread width at 12 inches (305 mm) from the narrow edge. All treads shall be identical and the rise shall be not more than 9½ inches (241 mm). A minimum headroom of 6 feet 6 inches (1981 mm) shall be provided.

**816.7.1 Circular stairways:** Circular stairways may be used as an element of egress when a minimum tread width of 10 inches (254 mm) is provided and the smaller radius is not less than twice the width of the stairway.

**816.8 Supplemental stairways:** Stairways which are not a required means of egress element, serving one adjacent floor and not connected with a corridor or stairway serving other floors, may be used in all use groups except Use Group I.

**816.9 Stairway construction:** All required interior stairways shall be built of materials consistent with the types of materials permitted in Table 401 for the type of construction of the building; except that wood handrails shall be permitted for all types of construction. Such stairways shall have solid treads and landing platforms, and all finish floor surfaces shall be of slip-resistant materials.

**816.9.1 Strength:** All stairways, platforms, landings and exits in other than buildings of Use Group R-3 shall be adequate to support a live load of 100

142

pounds per square foot (488.20 kg/m²) and a concentrated load of 300 pounds (136.20 kg).

**816.9.2 Enclosures:** Required interior exit stairways shall be enclosed in fire separation assemblies of the fireresistance rating specified in Table 401. An exit enclosure shall not be used for any purpose other than means of egress. A space below a stairway shall be enclosed as required or kept open. Only exit doors shall open into the stairway enclosure.

**Exceptions**
1. Exits in buildings of Use Group R-3.
2. Exits serving and contained within a single residential dwelling unit.
3. Exits in communicating floor levels as provided in Section 816.10.
4. Supplemental stairways as provided in Section 816.8.
5. Exits in open parking structures as provided in Section 809.5.

**816.10 Communicating floors:** In any building, other than Use Group H, provided with an automatic fire suppression system, not more than three communicating floor levels may be permitted without enclosure or protection between such areas, provided all the conditions described in Sections 816.10.1 through 816.10.4 are met.

**816.10.1 Location of floors:** The lowest, or next to the lowest, level is a street floor.

**816.10.2 Open communication:** The entire area, including all communicating floor levels, is sufficiently open and unobstructed to be assumed that a fire or other dangerous condition in any part will be immediately obvious to the occupants of all communicating levels and areas.

**816.10.3 Egress capacity:** Egress capacity is simultaneously sufficient for all the occupants of all communicating levels and areas, all communicating levels in the same fire area being considered as a single floor area for purposes of determination of required egress capacity.

**816.10.4 Other exits:** Each floor level, considered separately, has at least one-half of its individual required egress capacity provided by an exit or exits leading directly out of that area without traversing another communicating floor level or being exposed to the spread of fire or smoke therefrom.

**816.11 Discharge identification:** Stairways which continue beyond the floor of discharge shall be interrupted at the floor of discharge by partitions, doors or other effective means of preventing persons from continuing past the floor of discharge while egressing. A sign shall be provided at each floor landing in all interior stairways more than three stories in height, designating the floor level above the floor of discharge.

### SECTION 817.0 ACCESS TO ROOF

**817.1 By stairway or ladder:** In buildings more than three stories in height except those with a roof slope greater than four units vertical in 12 units horizontal (4:12), access to the roof shall be provided by means of a stairway

### SECTION 824.0 MEANS OF EGRESS LIGHTING

**824.1 Artificial lighting:** All means of egress in other than buildings of Use Group R-3 shall be equipped with artificial lighting facilities to provide the intensity of illumination herein prescribed continuously during the time that conditions of occupancy of the building require that the exits be available. Lighting shall also be provided to illuminate the exit discharge. In buildings of Use Group R-2, means of egress lighting, except that lighting within a dwelling unit, shall be wired on a circuit independent of circuits within any dwelling unit. The disconnecting means and overcurrent protection device shall not be located within a dwelling unit or such that access must be obtained by going through a dwelling unit.

**824.2 Intensity of illumination:** The intensity of floor lighting shall be not less than one foot candle (10.76 lux).

**824.3 Use Groups A and E:** In buildings of Use Groups A and E for the exhibition of motion pictures or other projections by means of directed light, the illumination of aisles may be reduced during such period of projection to not less than 0.2 foot candle (2.15 lux).

**824.3.1 Control:** The lighting of exits, aisles and auditoriums shall be controlled from a location inaccessible to unauthorized persons. Supplementary control shall be provided as specified in Section 605.4 in the motion picture projection room.

**824.4 Power source:** Means of egress lighting shall be connected to an emergency electrical system that complies with Section 2006.0 to assure continued illumination for a duration of not less than 1 hour in case of emergency or primary power loss in buildings listed in Sections 824.4.1 through 824.4.6.

**824.4.1 Use Groups A, E and I:** In all buildings of Use Groups A, E and I.

**824.4.2 Use Group B:** In all buildings of Use Group B containing more than 1,000 occupants.

**824.4.3 Use Group M:** In all buildings of Use Group M when greater than 3,000 square feet (279 m²) in area on any floor, or when having one or more floors above or below grade floor.

**824.4.4 Use Group R-1:** In buildings of Use Group R-1 containing more than 25 sleeping rooms.

**824.4.5 Use Group R-2:** In all buildings of Use Group R-2 containing more than 50 occupants.

**824.4.6 Windowless buildings:** In all windowless buildings or portions thereof containing more than 100 occupants except buildings of Use Group R-3.

### SECTION 825.0 HAZARDS TO MEANS OF EGRESS

**825.1 Floor openings:** Manholes or floor access panels shall not be located in the line of egress which reduce the clearance to less than 32 inches (813 mm).

150

**825.2 Protrusions:** There shall not be low-hanging door closers that remain within the opening of a doorway when the door is open, or that protrude hazardously into the corridor or line of egress when the door is closed. There shall not be low-hanging signs, ceiling lights or similar fixtures which protrude into corridors or lines of egress.

**825.3 Identification of hazardous exits:** Doors leading to dangerous areas such as fire escapes, loading platforms, switch rooms and mechanical rooms shall be equipped with knobs, handles or push bars that have been knurled.

**825.4 Floor surface:** All floors of corridors and lines of egress shall have a slip-resistant surface.

**825.5 Open-sided floor areas:** Guards shall be located along open-sided walking surfaces, mezzanines and landings. The guards shall be constructed in accordance with Section 827.0.

**825.6 Elevation change:** Where changes in elevation exist in exit access corridors, exits or exit discharge, ramps shall be used when the difference in elevation is less than 12 inches (305 mm).

**Exception:** At exterior doors not required for the physically handicapped and aged by Section 512.0, a maximum of 8 inches (203 mm) step down shall be permitted.

## SECTION 826.0 AISLES AND SEATS

**826.1 General:** Buildings of Use Groups A and E which contain seats, tables, displays, equipment, or other material shall be provided with aisles leading to the required exits.

**826.2 Aisle width:** In theater style seating, aisle width shall be sufficient to accommodate the capacity as indicated in Section 808.0 for corridors and shall be not less than 36 inches (914 mm) in width if serving only one side and not less than 42 inches (1067 mm) in width if serving both sides. Such minimum width shall be measured at the point farthest from an exit and shall be increased at the rate of 1½ inches (38 mm) for each 5 feet (1524 mm) in length towards an exit. With continental seating, as specified in Section 826.6, side aisles shall be not less than 44 inches (1118 mm).

**826.3 Aisle spacing:** There shall be a maximum of six intervening seats between any seat and the nearest aisle. With continental seating, as specified in Section 826.6, the number of intervening seats may be increased to 29 where egress doors are provided along each side aisle of the row of seats at the rate of one pair of egress doors for each five rows of seats. Such egress doors shall provide a minimum clear width of 66 inches (1676 mm).

**826.4 Cross aisles:** Aisles shall terminate at a cross aisle, foyer or exit without a dead end length over 20 feet (6096 mm).

**826.5 Aisle gradient:** The aisle slope shall not exceed one unit vertical in eight units horizontal (1:8). Steps shall not be used in aisles where differences in elevation can be accommodated by a slope of less than one unit vertical in

151

# 2012 Virginia Maintenance Code Excerpts

ADMINISTRATION

scope of the code, enforcement, fees, permits, inspections and disputes. Any provisions of Chapters 2 - 8 of the IPMC or any provisions of the codes and standards referenced in the IPMC which address the same subject matter to a lesser or greater extent are deleted and replaced by the provisions of Chapter 1. Further, any administrative requirements contained in the state amendments to the IPMC shall be given the same precedence as the provisions of Chapter 1. Notwithstanding the above, where administrative requirements of Chapters 2 - 8 of the IPMC or of the codes and standards referenced in the IPMC are specifically identified as valid administrative requirements in Chapter 1 of this code or in the state amendments to the IPMC, then such requirements are not deleted and replaced.

> **Note:** The purpose of this provision is to eliminate overlap, conflicts and duplication by providing a single standard for administrative, procedural and enforcement requirements of this code.

**101.8 Definitions.** The definitions of terms used in this code are contained in Chapter 2 along with specific provisions addressing the use of definitions. Terms may be defined in other chapters or provisions of the code and such definitions are also valid.

> **Note:** The order of precedence outlined in Section 101.6 may be determinative in establishing how to apply the definitions in the IPMC and in the referenced codes and standards.

## SECTION 102
## PURPOSE AND SCOPE

**102.1 Purpose.** In accordance with § 36-103 of the Code of Virginia, the Virginia Board of Housing and Community Development may adopt and promulgate as part of the Virginia Uniform Statewide Building Code, building regulations that facilitate the maintenance, rehabilitation, development and reuse of existing buildings at the least possible cost to ensure the protection of the public health, safety and welfare. Further, in accordance with § 36-99 of the Code of Virginia, the purpose of this code is to protect the health, safety and welfare of the residents of the Commonwealth of Virginia, provided that buildings and structures should be permitted to be maintained at the least possible cost consistent with recognized standards of health, safety, energy conservation and water conservation, including provisions necessary to prevent overcrowding, rodent or insect infestation, and garbage accumulation; and barrier-free provisions for the physically handicapped and aged.

**102.2 Scope.** In accordance with § 36-98 of the Code of Virginia, the VMC shall supersede the building codes and regulations of the counties, municipalities and other political subdivisions and state agencies.

**102.3 Exemptions.** This code shall not regulate those buildings and structures specifically exempt from the VCC, except that existing industrialized buildings and manufactured homes shall not be exempt from this code.

## SECTION 103
## APPLICATION OF CODE

**103.1 General.** This code prescribes regulations for the maintenance of all existing buildings and structures and associated equipment, including regulations for unsafe buildings and structures.

**103.2 Maintenance requirements.** Buildings and structures shall be maintained and kept in good repair in accordance with the requirements of this code and when applicable in accordance with the USBC under which such building or structure was constructed. No provision of this code shall require alterations to be made to an existing building or structure or to equipment unless conditions are present which meet the definition of an unsafe structure or a structure unfit for human occupancy.

**103.2.1 Maintenance of nonrequired fire protection systems.** Nonrequired fire protection systems shall be maintained to function as originally installed. If any such systems are to be reduced in function or discontinued, approval shall be obtained from the building official in accordance with Section 103.8.1 of the VCC.

**103.3 Continued approval.** Notwithstanding any provision of this code to the contrary, alterations shall not be required to be made to existing buildings or structures which are occupied in accordance with a certificate of occupancy issued under any edition of the USBC.

**103.4 Rental Inspections.** In accordance with § 36-105.1:1 of the Code of Virginia, these provisions are applicable to rental inspection programs. For purposes of this section:

**"Dwelling unit"** means a building or structure or part thereof that is used for a home or residence by one or more persons who maintain a household.

**"Owner"** means the person shown on the current real estate assessment books or current real estate assessment records.

**"Residential rental dwelling unit"** means a dwelling unit that is leased or rented to one or more tenants. However, a dwelling unit occupied in part by the owner thereof shall not be construed to be a residential rental dwelling unit unless a tenant occupies a part of the dwelling unit that has its own cooking and sleep-

# CHAPTER 3

# GENERAL REQUIREMENTS

*Delete Section 302.1 of the IPMC.*

*Change Section 302.2 of the IPMC to read:*

> **302.2 Grading and drainage.** All premises shall be graded and maintained to protect the foundation walls or slab of the structure from the accumulation and drainage of surface or stagnant water in accordance with the VCC.

*Change Section 302.3 of the IPMC to read:*

> **302.3 Sidewalks and driveways.** All sidewalks, walkways, stairs, driveways, parking spaces and similar spaces regulated under the VCC shall be kept in a proper state of repair, and maintained free from hazardous conditions. Stairs shall comply with the requirements of Sections 305 and 702.

*Delete Section 302.4 of the IPMC.*

*Change Section 302.5 of the IPMC to read:*

> **302.5 Rodent harborage.** All structures and adjacent premises shall be kept free from rodent harborage and infestation where such harborage or infestation adversely affects the structures.

*Delete Sections 302.8 and 302.9 of the IPMC.*

*Delete Section 304.1.1 of the IPMC.*

*Change Section 304.7 of the IPMC to read:*

> **304.7 Roofs and drainage.** The roof and flashing shall be sound, tight and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof drains, gutters and downspouts shall be maintained in good repair and free from obstructions. Roof water shall be discharged in a manner to protect the foundation or slab of buildings and structures from the accumulation of roof drainage.

*Change Section 304.14 of the IPMC to read:*

> **304.14 Insect screens.** During the period from April 1 to December 1, every door, window and other outside opening required for ventilation of

habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged or stored, shall be supplied with approved tightly fitting screens of not less than 16 mesh per inch (16 mesh per 25 mm) and every screen door used for insect control shall have a self-closing device in good working condition.

> **Exception:** Screens shall not be required where other approved means, such as mechanical ventilation, air curtains or insect repellant fans, are used.

*Delete Sections 304.18, 304.18.1, 304.18.2 and 304.18.3 of the IPMC.*

*Delete Section 305.1.1 of the IPMC.*

*Add Section 305.7 to the IPMC to read:*

> **305.7 Carbon monoxide alarms.** Carbon monoxide alarms shall be maintained as approved.

*Delete Section 306 of the IPMC in its entirety.*

*Change Section 308.1 of the IPMC to read as follows and delete the remaining provisions of Section 308:*

> **308.1 Accumulation of rubbish and garbage.** The interior of every structure shall be free from excessive accumulation of rubbish or garbage.

*Change Section 309.1 of the IPMC to read:*

> **309.1 Infestation.** This section shall apply to the extent that insect and rodent infestation adversely affects a structure. All structures shall be kept free from insect and rodent infestation. All structures in which insects or rodents are found shall be promptly exterminated by approved processes that will not be injurious to human health. After extermination, proper precautions shall be taken to prevent reinfestation.

*Add IPMC Section 310 Lead-Based Paint.*

*Add Section 310.1 to the IPMC to read:*

# 2012 International Property Maintenance Code Excerpts

**304.4 Structural members.** All structural members shall be maintained free from *deterioration*, and shall be capable of safely supporting the imposed dead and live loads.

**304.5 Foundation walls.** All foundation walls shall be maintained plumb and free from open cracks and breaks and shall be kept in such condition so as to prevent the entry of rodents and other pests.

**304.6 Exterior walls.** All exterior walls shall be free from holes, breaks, and loose or rotting materials; and maintained weatherproof and properly surface coated where required to prevent *deterioration*.

**304.7 Roofs and drainage.** The roof and flashing shall be sound, tight and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or *deterioration* in the walls or interior portion of the structure. Roof drains, gutters and downspouts shall be maintained in good repair and free from obstructions. Roof water shall not be discharged in a manner that creates a public nuisance.

**304.8 Decorative features.** All cornices, belt courses, corbels, terra cotta trim, wall facings and similar decorative features shall be maintained in good repair with proper anchorage and in a safe condition.

**304.9 Overhang extensions.** All overhang extensions including, but not limited to canopies, marquees, signs, metal awnings, fire escapes, standpipes and exhaust ducts shall be maintained in good repair and be properly *anchored* so as to be kept in a sound condition. When required, all exposed surfaces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**304.10 Stairways, decks, porches and balconies.** Every exterior stairway, deck, porch and balcony, and all appurtenances attached thereto, shall be maintained structurally sound, in good repair, with proper anchorage and capable of supporting the imposed loads.

**304.11 Chimneys and towers.** All chimneys, cooling towers, smoke stacks, and similar appurtenances shall be maintained structurally safe and sound, and in good repair. All exposed surfaces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**304.12 Handrails and guards.** Every handrail and *guard* shall be firmly fastened and capable of supporting normally imposed loads and shall be maintained in good condition.

**304.13 Window, skylight and door frames.** Every window, skylight, door and frame shall be kept in sound condition, good repair and weather tight.

**304.13.1 Glazing.** All glazing materials shall be maintained free from cracks and holes.

**304.13.2 Openable windows.** Every window, other than a fixed window, shall be easily openable and capable of being held in position by window hardware.

**304.14 Insect screens.** During the period from [DATE] to [DATE], every door, window and other outside opening required for *ventilation* of habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged or stored shall be supplied with *approved* tightly fitting screens of minimum 16 mesh per inch (16 mesh per 25 mm), and every screen door used for insect control shall have a self-closing device in good working condition.

**Exception:** Screens shall not be required where other *approved* means, such as air curtains or insect repellent fans, are employed.

**304.15 Doors.** All exterior doors, door assemblies, operator systems if provided, and hardware shall be maintained in good condition. Locks at all entrances to dwelling units and sleeping units shall tightly secure the door. Locks on means of egress doors shall be in accordance with Section 702.3.

**304.16 Basement hatchways.** Every *basement* hatchway shall be maintained to prevent the entrance of rodents, rain and surface drainage water.

**304.17 Guards for basement windows.** Every *basement* window that is openable shall be supplied with rodent shields, storm windows or other *approved* protection against the entry of rodents.

**304.18 Building security.** Doors, windows or hatchways for *dwelling units*, room units or *housekeeping units* shall be provided with devices designed to provide security for the *occupants* and property within.

**304.18.1 Doors.** Doors providing access to a *dwelling unit*, *rooming unit* or *housekeeping unit* that is rented, leased or let shall be equipped with a deadbolt lock designed to be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort and shall have a minimum lock throw of 1 inch (25 mm). Such deadbolt locks shall be installed according to the manufacturer's specifications and maintained in good working order. For the purpose of this section, a sliding bolt shall not be considered an acceptable deadbolt lock.

**304.18.2 Windows.** Operable windows located in whole or in part within 6 feet (1828 mm) above ground level or a walking surface below that provide access to a *dwelling unit*, *rooming unit* or *housekeeping unit* that is rented, leased or let shall be equipped with a window sash locking device.

**304.18.3 Basement hatchways.** *Basement* hatchways that provide access to a *dwelling unit, rooming unit* or *housekeeping unit* that is rented, leased or let shall be equipped with devices that secure the units from unauthorized entry.

**304.19 Gates.** All exterior gates, gate assemblies, operator systems if provided, and hardware shall be maintained in good condition. Latches at all entrances shall tightly secure the gates.

## SECTION 305
## INTERIOR STRUCTURE

**305.1 General.** The interior of a structure and equipment therein shall be maintained in good repair, structurally sound

**Designation: F1637 – 13**

An American National Standard

# Standard Practice for
# Safe Walking Surfaces[1]

This standard is issued under the fixed designation F1637; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This practice covers design and construction guidelines and minimum maintenance criteria for new and existing buildings and structures. This practice is intended to provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear. These guidelines may not be adequate for those with certain mobility impairments.

1.2 Conformance with this practice will not alleviate all hazards; however, conformance will reduce certain pedestrian risks.

1.3 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]

F1646 Terminology Relating to Safety and Traction for Footwear

## 3. Terminology

3.1 See Terminology F1646 for the following terms used in this practice:

3.1.1 Bollard,
3.1.2 Carpet,
3.1.3 Cross slope,
3.1.4 Element,
3.1.5 Fair,

3.1.6 Footwear,
3.1.7 Foreseeable pedestrian path,
3.1.8 Planar,
3.1.9 Ramp,
3.1.10 Sidewalk,
3.1.11 Slip resistance,
3.1.12 Slip resistant,
3.1.13 Walkway.
3.1.14 Walkway surface hardware, and

## 4. Significance and Use

4.1 This practice addresses elements along and in walkways including floors and walkway surfaces, sidewalks, short flight stairs, gratings, wheel stops, and speed bumps. Swimming pools, bath tubs, showers, natural walks, and unimproved paths are beyond the scope of this practice.

## 5. Walkway Surfaces

5.1 *General:*

5.1.1 Walkways shall be stable, planar, flush, and even to the extent possible. Where walkways cannot be made flush and even, they shall conform to the requirements of 5.2 and 5.3.

5.1.2 Walkway surfaces for pedestrians shall be capable of safely sustaining intended loads.

5.1.3 Walkway surfaces shall be slip resistant under expected environmental conditions and use. Painted walkways shall contain an abrasive additive, cross cut grooving, texturing or other appropriate means to render the surface slip resistant where wet conditions may be reasonably foreseeable.

5.1.4 Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use.

5.2 *Walkway Changes in Level:*

5.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.

5.2.2 Changes in levels up to ¼ in. (6 mm) may be vertical and without edge treatment. (See Fig. 1.)

5.2.3 Changes in levels between ¼ and ½ in. (6 and 12 mm) shall be beveled with a slope no greater than 1:2 (rise:run).

5.2.4 Changes in levels greater than ½ in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these.

[1] This practice is under the jurisdiction of ASTM Committee F13 on Pedestrian/Walkway Safety and Footwear and is the direct responsibility of Subcommittee F13.50 on Walkway Surfaces.

Current edition approved Aug. 1, 2013. Published August 2013. Originally approved in 1995. Last previous edition approved in 2010 as F1637 – 10. DOI: 10.1520/F1637-13.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States

F1637 – 13



**FIG. 1  Changes in Levels up to a Maximum of ¼ in. (6 mm)**

5.3  *Carpet:*

5.3.1  Carpet shall be maintained so as not to create pedestrian hazard. Carpet shall be firmly secured and seams tightly maintained. Carpet shall not have loose or frayed edges, unsecured seams, worn areas, holes, wrinkles or other hazards that may cause trip occurrence.

5.3.2  Carpet on floor surfaces shall be routinely inspected. Periodic restretching may become necessary. Periodic inspection is particularly important at step nosing edges.

5.3.3  Carpet and carpet trim (as measured when compressed) shall meet the transition requirements of 5.2.

5.3.4  Shag-type carpet shall not be used on stair treads. Carpeting should be firmly secured onto the tread and around the nosing.

5.4  *Mats and Runners:*

5.4.1  Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather. Replacement of mats or runners may be necessary when they become saturated.

5.4.2  Building entrances shall be provided with mats or runners, or other means to help remove foreign particles and other contaminants from the bottom of pedestrian footwear. Mats should be provided to minimize foreign particles, that may become dangerous to pedestrians particularly on hard smooth floors, from being tracked on floors.

5.4.3  Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations. Mats at building entrances also may be used to control the spread of precipitation onto floor surfaces, reducing the likelihood of the floors becoming slippery.

5.4.4  Mats shall be of sufficient design, area, and placement to control tracking of contaminants into buildings. Safe practice requires that mats be installed and maintained to avoid tracking water off the last mat onto floor surfaces.

5.4.5  Mats, runners, and area rugs shall be provided with safe transition from adjacent surfaces and shall be fixed in place or provided with slip resistant backing.

5.4.6  Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners, and area rugs shall not have loose or frayed edges, worn areas, holes, wrinkles, or other hazards that may cause trip occurrences.

5.5  *Illumination:*

5.5.1  Minimum walkway illumination shall be governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES) (Application and Reference Volumes).

5.5.2  Illumination shall be designed to be glare free.

5.5.3  Illumination shall be designed to avoid casting of obscuring shadows on walkways, including shadows on stairs that may be cast by users.

5.5.4  Interior and exterior pedestrian use areas, including parking lots, shall be properly illuminated during periods when pedestrians may be present.

5.6  *Headroom*—A minimum headroom clearance of 6 ft 8 in. (2.03 m), measured from the walkway surface, shall be provided above all parts of the walkway. Where such clearance is not provided in existing structures, the low clearance portions of the walkway shall be safely padded, marked with safety contrast color coding and posted with appropriate warning signs.

5.7  *Exterior Walkways:*

5.7.1  Exterior walkways shall be maintained so as to provide safe walking conditions.

5.7.1.1  Exterior walkways shall be slip resistant.

5.7.1.2  Exterior walkway conditions that may be considered substandard and in need of repair include conditions in which the pavement is broken, depressed, raised, undermined, slippery, uneven, or cracked to the extent that pieces may be readily removed.

5.7.2  Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 5.2.

5.7.3  Edges of sidewalk joints shall be rounded.

**6.  Walking Surface Hardware**

6.1  Walking surface hardware within foreseeable pedestrian paths shall be maintained flush with the surrounding surfaces; variances between levels shall be transitioned in accordance with 5.2.

6.2  Walking surface hardware within foreseeable pedestrian paths shall be maintained slip resistant.

6.3  Walking surface hardware shall be installed and maintained so as to be stable under reasonable foreseeable loading.

**7.  Stairs**

7.1  *General:*

7.1.1  Stairways with "distracting" forward or side views shall be avoided. A "distracting" view is one which can attract the stair user's attention, (for example, advertisements, store displays), thus distracting the stair user.

7.1.2  Step nosings shall be readily discernible, slip resistant, and adequately demarcated. Random, pictorial, floral, or geometric designs are examples of design elements that can camouflage a step nosing.

7.1.3  Doors shall not open over stairs.

7.1.4  Structure (reserved).

7.2  *Short Flight Stairs (Three or Fewer Risers):*

7.2.1  Short flight stairs shall be avoided where possible.

7.2.2  In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

F1637 – 13

## 8. Speed Bumps

8.1 Design to avoid the use of speed bumps.

8.2 All speed bumps which are in foreseeable pedestrian paths shall comply with 5.2 (walkway changes in level).

8.3 Existing speed bumps, that do not conform to 5.2, shall be clearly marked with safety color coding to contrast with surroundings. Painted speed bumps shall be slip resistant. Pedestrian **CAUTION** signs are recommended.

## 9. Wheel Stops

9.1 Parking lots should be designed to avoid the use of wheel stops.

9.2 Wheel stops shall not be placed in pedestrian walkways or foreseeable pedestrian paths.

9.3 Wheel stops shall be in contrast with their surroundings.

9.4 Wheel stops shall be no longer than 6 ft (1.83 m) and shall be placed in the center of parking stalls. The minimum width of pedestrian passage between wheel stops shall be 3 ft (0.91 m).

9.5 The top of wheel stops shall not exceed 6.5 in. (165 mm) in height above the parking lot surface.

9.6 Adequate illumination shall be maintained at wheel stops as governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES-Application and Reference Volumes).

9.7 Bollards, not less than 3 ft 6 in. (1.07 m) height, may be placed in the center of parking stalls as an alternative to wheel stops. Bollards should be appropriately marked to enhance visibility.

## 10. Gratings

10.1 Gratings used in public areas should be located outside of pedestrian walkways.

10.2 Gratings located in foreseeable pedestrian walkways shall not have openings wider than ½ in. (13 mm) in the direction of predominant travel.

10.2.1 *Exemption*—The requirements of 10.2 do not apply in areas where footwear worn is controlled (for example, industrial areas).

10.3 Gratings with elongated openings shall be placed with the long dimension perpendicular to the direction of predominant travel.

10.4 Gratings shall be maintained slip resistant.

## 11. Warnings

11.1 The use of visual cues such as warnings, accent lighting, handrails, contrast painting, and other cues to improve the safety of walkway transitions are recognized as effective controls in some applications. However, such cues or warnings do not necessarily negate the need for safe design and construction.

11.2 When relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users. Bright yellow is a commonly used color for alerting users of the presence of certain walkway conditions. When properly applied and maintained, other colors can also provide effective warnings.

## 12. Keywords

12.1 carpet; floors; gratings; mats; runners; sidewalks; short flight stairs; slip resistance; speed bump; stairs; walkway; wheel stop

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).*

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                     (Alexandria Division)

4    - - - - - - - - - - - - - - - X

5    CAMILLE SEDAR,                    :

6                     Plaintiff,       :

7         -vs-                         :   CASE NO.

8    BOSTON PROPERTIES, LP, et         :   1:18cv01111 CMH/TCB

9    al.,                              :

10                    Defendants.      :

11   - - - - - - - - - - - - - - - X

12                         Alexandria, Virginia

13                         Tuesday, June 18, 2019

14   Deposition of:

15                    DANO HOLLAND,

16        a witness, called for examination by counsel for

17   the defendants in the above-entitled matter, pursuant to

18   notice, at 2331 Mill Road, Suite 100, Alexandria,

19   Virginia, beginning at 10:14 a.m., before

20   JESSICA CROXFORD, a Court Reporter and Notary Public in

21   and for the Commonwealth of Virginia at Large, when were

22   present on behalf of the respective parties:



```
 1   ON BEHALF OF THE PLAINTIFF:

 2          ANDREW PARK, ESQ.

 3          DAVID J. SENSENIG, ESQ.

 4          PARK SENSENIG LLC

 5          107 North Bridge Street

 6          Bedford, Virginia 24523

 7          (804) 417-6089

 8          david.sensenig@parksensenig.com

 9          andrew.park@parksensenig.com

10

11   ON BEHALF OF THE DEFENDANTS:

12          DAVID D. HUDGINS, ESQ.

13          JOSEPH P. MORIARTY, ESQ. (Via Teleconference)

14          HUDGINS LAW FIRM, P.C.

15          515 King Street, Suite 400

16          Alexandria, Virginia 22314

17          (703) 739-3300

18          dhudgins@hudginslawfirm.com

19

20

21

22
```



1                    C O N T E N T S

2

3  WITNESS:                              DANO HOLLAND

4       Examination by Mr. Hudgins                    4

5

6

7

8                    E X H I B I T S

9  LETTER:                    MARKED FOR IDENTIFICATION:

10      A    Notice of Deposition                     4

11      B    CV, Record of Testimony, and Rate        4

12           Sheet

13      C    Report                                   4

14      D    Rebuttal Report                          4

15      E    Handwritten Notes                       86

16

17

18

19

20

21

22



1                    P R O C E E D I N G S

2              (Holland Exhibits A through D were marked for

3    identification.)

4    Thereupon,

5                        DANO HOLLAND,

6      a witness, called for examination by counsel for the

7    defendants, having been first duly sworn by the notary

8    public, was examined and testified as follows:

9              EXAMINATION BY COUNSEL FOR THE DEFENDANTS

10   BY MR. HUDGINS:

11     Q.  Good morning, Mr. Holland.  We were introduced a

12   little bit earlier this morning.  My name is

13   David Hudgins, and I'm the lawyer for Defendants Boston

14   Properties, Inc., and Reston Town Center Properties,

15   LLC.  On the phone is Mr. Joseph Moriarty, who is also

16   counsel for those entities.  We're here to take your

17   deposition regarding your proposed opinion on behalf of

18   the plaintiffs in this case.

19             You have been deposed before, I take it?

20     A.  Yes.

21     Q.  And so you understand that I'm going to be

22   asking a series of questions exploring the basis for



1  mechanical engineering.  All of those disciplines have

2  to understand the mechanics that you're describing,

3  whether it be dynamic coefficient of friction or static

4  coefficient of friction and how that is developed.

5      Q.  Have you consulted with any engineers in any of

6  those various other fields in developing your opinion in

7  this case?

8      A.  With this case specifically, no.  I've worked

9  with materials engineers, mechanical engineers, other

10  structural engineers in the past with similar cases,

11  evaluating surfaces and components and walkway

12  components similar to this case.

13      Q.  This case involves, you know, a slip, trip, and

14  fall where we have a limited amount of information

15  regarding what happened.

16          You've read the depositions in the case; have

17  you not?

18      A.  Yes.

19          MR. PARK:  Just for the record, object to the

20  prior statement in advance of the question.

21          MR. HUDGINS:  All right.

22  BY MR. HUDGINS:



1    Q.  You're aware that Ms. Sedar herself testified

2  that she has no recollection at all about what caused

3  her to fall down the steps?

4    A.  Yes.

5    Q.  And the two individuals who were present with

6  her who would be eyewitnesses both testified that they

7  didn't see what caused her to fall?

8    A.  That's correct, yeah.  They -- they did not see

9  her feet -- where her feet were placed.

10   Q.  All right.  So given the fact that we have no

11  eyewitnesses as to what caused Ms. Sedar to fall down

12  the stairs in the green garage at the Reston Town Center

13  property, have you attempted to develop an opinion as to

14  what happened that caused her to fall?

15   A.  Yes.

16   Q.  And would you agree with me that there are

17  various things that might have happened?

18   A.  Yes.

19   Q.  Okay.  And what I'd like to know is what -- you

20  have an opinion that, I think, focuses on a loose brick.

21       What other possible scenarios of causation have

22  you explored in developing your expert opinion?



1        MR. PARK:  Object to the characterization of his

2   opinions within the question.

3        You can go ahead.

4   A.  You have a normal condition of somebody just

5   fell, somebody misstepped, somebody fell for no apparent

6   reason.  Don't know why.  They just fell, lost their

7   balance.  That's one possibility and all those different

8   little tangential parts building into that.  It just

9   happened.  Nobody can explain why.

10       There is a trip scenario where she catches her

11  toe or another part of her shoe on part of the walking

12  surface.  There's a stumble scenario where she loses her

13  balance, either from one foot or the other, based on how

14  she places her foot on the walking surfaces in and of

15  herself, independent of any other condition on the

16  walkway surface; or how she places her foot on the

17  components that are there and they shift, causing her to

18  stumble or lose her balance.  The -- the slip scenario

19  does not seem as plausible, but that was thought about

20  in evaluating this situation.

21  Q.  How about the possibility that she simply

22  stepped, didn't realize that she had come to the head of



1  the stairs, and lost her balance stepping on that first

2  step?

3      A.  And just walked off the edge of the step?  Yes.

4      Q.  Isn't that a possibility here?

5      A.  I don't think the -- some of the details

6  around -- or some of the evidence that is there supports

7  that.

8      Q.  What evidence is inconsistent with her simply

9  missing that first step and falling down?

10      A.  There -- in one part of the video, it pointed

11  out where there is blood on the second tread up from the

12  bottom of the stairway.  And Ms. Sedar is approximately

13  5'9", 5'10".  And the distance from the edge of the

14  landing or the edge of that tread to the outermost edge

15  of that second tread is 5 feet.

16          Now, in order -- Ms. Sedar split her chin.  She

17  had abrasions, I think, on her arm and legs as well.

18  But there has also been testimony that she was falling

19  forward face-first.

20      Q.  Whose testimony is that?

21      A.  Rob Rapanut talks about, she fell forward

22  facedown -- or forward -- or fell down forward facedown,



1   that she's falling forward.

2      Q.  That's your recollection of his testimony?

3      A.  I know he says that on the video.  And in his

4   deposition, he says her head goes down.  So between the

5   two of that -- I don't have his entire deposition

6   memorized by heart.  But at one part of it, he talks

7   about stating that she fell down facedown.  He uses the

8   term "down" and "facedown," and he may have been

9   repeating what he said on the video.  But there's an

10  indication that she's falling forward like that, so --

11     Q.  All right.  And you rely on that as part of

12  the -- of your understanding of facts supporting your

13  opinion?

14     A.  You had asked me what facts there were to

15  support her not just walking off the top of the stair.

16  And that's what I'm trying to explain.  I'm -- so --

17     Q.  And I'm skipping around a little bit, and I

18  don't mean to do that because I want you to be able to

19  defend your opinions, so, you know -- and take all the

20  time you need to do that.

21         I do want to follow up on your reference to a

22  video.  The only video that I've seen in this case is a



1  relatively short video where there's a gentleman in camo

2  pants and he's got his toe on a jiggly brick.

3        Is that the one that you're referring to?

4     A.  Yes.

5     Q.  And there's some limited dialogue.  Are you, in

6  part, basing your opinion on something that was said in

7  that video?

8     A.  One part of it, Rob Rapanut says she fell down

9  facedown.  And I may not be saying the exact word, but I

10  know he uses the term "facedown."  Ms. Buchanan in her

11  deposition talks about Ms. Sedar being found facedown on

12  the sidewalk, her final position as she extends forward.

13        Do I use portions of that video from what

14  Rob Rapanut's saying and what he's indicating of how she

15  went forward off the step?  Yes.  Also adding in what --

16  the descriptions that Ms. Buchanan is using in her

17  deposition as far as her final placement, the bloodstain

18  that was on the tread that's pointed out by Ms. Dibella

19  at the end of that video.

20        Those all build into how she was moving forward.

21  Even their testimony of, they were walking -- Rob

22  Rapanut and Ms. Bucannan's testimony that they were



1   walking behind the plaintiff and that she was walking

2   forward.

3       Q.  All right.  Now, you've testified that you're

4   not a biomechanical engineer?

5       A.  That's correct.

6       Q.  Have you done any scientific experiments to

7   validate what the actual course of Ms. Sedar's fall may

8   have been like or how it progressed?

9       A.  Not specific to the human body, no.

10      Q.  So let me ask you this:  You've testified that

11  based on some photographs that have some blood on the

12  sidewalk and that based on that, you've got an opinion

13  as to, you know, where on these stairs Ms. Sedar's fall

14  may have commenced; is that fair to say?

15          MR. PARK:  Object to the characterization of his

16  prior testimony.

17          MR. HUDGINS:  Well, let me -- he can either

18  agree with it or tell me I'm off base.

19  BY MR. HUDGINS:

20      Q.  I believe your testimony has been that some

21  blood on one of the risers on the stairwell where

22  Ms. Sedars [sic] fell -- is part of the basis for your



1  opinion that her fall commenced at the top of the steps

2  rather than missing that first step and falling down

3  more toward the bottom of the steps?

4      A.  Yes.  And not so much looking -- not looking

5  at -- and this may sound odd -- Ms. Sedar as a human,

6  but just as a geometrical figure, a stick figure or a

7  body, a geometric body.  If it's got a certain height

8  and you're dealing with a distance, how -- how do you

9  have that part of this geometric form strike -- it has

10 to have a beginning and it has to have an end and it has

11 to have an impact.  And if there are indications that

12 she's had an impact on a certain part of her body, it

13 adds into where those forces took place, those impacts

14 took place.

15      Now, it's not an exact science in that you're

16 dealing with descriptions of individuals and a face.

17 But in the realm of possibility as to where this occurs,

18 all of that adds into it.  You can't take one thing in

19 blinders and -- and say, "Oh, well, this is definitive

20 in this case because" --

21     Q.  Well, given that we do have kind of a limited

22 amount of information concerning the fall, would you



1  how long those conditions depicted in the photograph may

2  have existed prior to the time of Ms. Sedar's fall?

3      A.  Yes.

4      Q.  And what is your opinion in that regard?

5      A.  In looking at the sagging of the caulking joint

6  and the adhesion failure, some of the tears that you can

7  see in that caulk joint and how they've separated and

8  pulled away from the brick, that's not an instantaneous

9  occurrence in my experience in dealing with caulk joints

10 in the past throughout my career.  It's progressive

11 failure that happens over time with wear and due to

12 weathering and just normal use.

13      All of those conditions, looking at that, it's

14 at least months that it has been slowly developing and

15 pulling itself away from the bricks in both the concrete

16 and the bricks in its depression and sagging.

17     Q.  All right.  And you weren't able to actually

18 look at the caulk as it existed on the day of the

19 accident?

20     MR. PARK:  Objection.  Asked and answered.

21     A.  I have to rely on the photographs that were

22 provided and taken that day.



1    BY MR. HUDGINS:

2        Q.  So you're looking just at the photographs in

3    drawing that conclusion?

4        A.  Yes.

5        Q.  Now, is it possible that some thing or some

6    process may have created those conditions close in time

7    to the accident?

8        A.  In my experience in construction and engineering

9    design, evaluation and inspection, I've never seen

10   anything that would create that in a short amount of

11   time other than a slow progressive failure that I just

12   described.

13       Q.  Is it possible that some individual altered the

14   conditions at the top of those stairs before the

15   photographs were taken but after the time of Ms. Sedar's

16   fall?

17       A.  I don't know how someone would create all of

18   those conditions that I described.

19       Q.  Well, here's a possibility:  One of her friends

20   trying to be helpful walks up the stairs and shoves

21   their hands and pushes the caulk down.

22       A.  You notice where there's depression in those



1  caulks -- or in the area of the caulk where it's

2  depressed, there's valleys and there's dirt in those

3  valleys.

4         And if you take your fingertip, in my

5  experience -- because this has a -- kind of a waterproof

6  surface on the surface of the caulk.  If you start

7  pushing on that, you start smearing those dirty spots in

8  the caulk, I think you would see that.

9         Also, the adhesion failure that you see on the

10 sidewalk of the concrete and the edge of the bricks,

11 that's not something that's readily done with your

12 finger.  And, also, you get tearings.  You can see tiny

13 little tears in the caulk as it's being pulled, and

14 easily that has to do with expansion and contraction of

15 movement as that's torn.

16        If you -- if you ever tore that caulk joint out

17 or used a scraper or your finger to try and dig it and

18 tear it out, usually you see these nice clean lines

19 where that interface in that tear is immediately

20 apparent because you've got new material that's opened

21 up.  And I didn't see any of those in any of that

22 photograph --



1      Q.  In the photograph?

2      A.  Yes, sir.

3      Q.  All right.  It would have been better to observe

4  the conditions live and onsite immediately after the

5  accident; would it not?

6          MR. PARK:  Objection to the extent --

7  BY MR. HUDGINS:

8      Q.  That would be more --

9          MR. PARK: -- it's unclear as to "better."

10  BY MR. HUDGINS:

11     Q.  Well, you -- it would be a more reliable basis

12  for your opinion if you were able to actually do a

13  physical examination of the conditions as they existed

14  on the date of the accident?

15     A.  If by some miracle I was walking down the street

16  and walked up the second after she tripped and was able

17  to document, view, and look at everything, yeah, that --

18  you don't have to deal with as many variables in

19  reviewing that.

20     Q.  Or the next day or a week later or whatever.  I

21  mean, it would have been -- closer in time, it would

22  have been -- a physical examination would always be a



1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                    (Alexandria Division)

4

5    CAMILLE SEDAR,        )    CASE NO: 1:18-cv-01111 CMH/TCH

6          Plaintiff,      )

7    -vs-                  )

8    BOATON PROPERTIES,    )

9    LP, et al,            )

10         Defendants.     )

11   _____  )

12

13            DEPOSITION OF MICHAEL BLANCHETTE

14                 Alexandria, Virginia

15                 June 19th, 2019

16                   12:00 p.m.

17

18

19

20

21

22   REPORTED BY:  ALEXANDRIA KAAN



1          Deposition of MICHAEL BLANCHETTE taken at the

2     location of:

3

4

5                    HUDGINS LAW FIRM, P.C.

6                    2331 Mill Road

7                    Suite No. 100

8                    Alexandria, Virginia  22314

9

10

11        Before ALEXANDRIA KAAN, Notary Public in the

12     Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



```
 1            APPEARANCES

 2    Appearing on Behalf of the Plaintiff:

 3        DAVID SENSENIG, ESQUIRE

 4        ANDREW PARK, ESQUIRE

 5        PARK SENSENIG

 6        2310 West Main Street

 7        Richmond, Virginia  23220

 8        David.sensenig@parksensenig.com

 9

10    Appearing on Behalf of the Plaintiff:

11        JOSEPH MORIARTY, ESQUIRE (via

12        telephonically)

13        WILLCOX & SAVAGE, P.C.

14        440 Monticello Avenue

15        Suite No. 2200

16        Norfolk, Virginia  23510-2243

17        Jmoriarty@wilsav.com

18

19

20

21

22
```



```
 1        APPEARANCES (CONTINUED):

 2

 3

 4   Appearing on Behalf of Defendants:

 5        DAVID HUDGINS, ESQUIRE

 6        HUDGINS LAW FIRM, P.C.

 7        2331 Mill Road

 8        Suite No. 100

 9        Alexandria, Virginia  22314

10        (703) 739-3700

11        Dhudgins@hudginslawfirm.com

12

13   Appearing on Behalf of the Witness:

14        TIMOTHY BRUNICK, ESQUIRE

15        CLARKE DOLPH RAPAPORT HULL & BRUNICK

16        5712 Cleveland Street

17        Suite No. 130

18        Virginia Beach, Virginia  23462

19        (757) 466-0464

20        Tbrunick@clarkedolph.com

21

22
```



1  EXAMINATION OF MICHAEL BLANCHETTE                PAGE

2  BY MR. SENSENIG                                  6

3

4

5

6  BLANCHETTE EXHIBITS                              PAGE

7  No. 1            notice of deposition            10

8  No. 2                 e-mails                    44

9

10

11

12

13

14

15

16

17

18

19

20

21

22



```
 1              P R O C E E D I N G S

 2                  - - - - - - -

 3              MICHAEL BLANCHETTE,

 4      having been called forth as a witness, was sworn

 5   to tell the truth and testifies as follows:

 6                   EXAMINATION

 7   BY MR. SENSENIG:

 8    Q.  Good morning, Mr. Blanchette.  We haven't

 9   formally been introduced.  My name is David Sensenig and

10   my firm represents the Plaintiff in this action, Camille

11   Sedar.  Before we start, I just want to move -- we have

12   exhibits here that were marked for Mr. Swartz's

13   deposition; perhaps I can set these over here so they

14   don't get mixed in.  I'm going to be asking you a series

15   of questions; you'll likely also get questions from

16   other Counsel.  Have you ever been deposed before?

17    A.  No.

18      (Whereupon the proceedings go off the record.)

19    Q.  I'm going to be asking you a series of questions.

20   What I ask of you is:  After I ask a question, if you

21   don't understand it, if you don't hear it, if

22   something's confusing about it, I'm going to ask that
```



1  you let me know.  Is that fair?

2      A.  Sure.

3      Q.  If you answer the question, I'm going to assume

4  you heard it, you understood it, and it was clear to

5  you.  Is that fair?

6      A.  Okay.

7      Q.  If at any point in time you want to take a break,

8  we can do that.  I'm going to try to work through this

9  as quickly as I can.  It's my understanding that you're

10  represented here by Counsel today.  Is that accurate?

11      A.  That is accurate.

12      Q.  And Counsel is Mr. Brunick.  What did you do --

13  aside from any communications you had with Counsel, what

14  did you do to prepare for your deposition today?

15      A.  Everything that my Counsel advised me to do to

16  prepare.

17      Q.  I don't want you to say what he advised you to

18  do.  Did you review any documents?

19      A.  Yes.

20      Q.  What documents did you review?

21      A.  I reviewed incident reports.

22      Q.  How many?



1    A.  I don't know.

2    Q.  One of the incident reports concerns Ms. Sedar.

3    Is that accurate?

4    A.  That is accurate.

5    Q.  The other incident reports you reviewed, when did

6    you review those documents?

7    A.  I was asked -- what do you mean when did I review

8    them?  Prior to --

9    Q.  My question was what documents did you review in

10   preparation for today, and one of the things you said

11   you reviewed was incident reports.  And so my followup

12   question is:  When did you review those incident reports

13   in preparation for today?

14   A.  I'm not exactly sure when it was.

15   Q.  Was it within the last week?

16   A.  No.

17   Q.  Was it within the last month?

18   A.  Probably a couple months ago.

19   Q.  What other documents did you review?

20   A.  Besides incident reports?

21   Q.  Yes.

22   A.  Could you be more specific?  I'm not sure.



1  it accurate to say that that was limited to the Reston

2  Town Center property?

3     A.  Yes.

4     Q.  You were in charge of overseeing the security

5  department for MaxSent that operated on Reston Town

6  Center property?

7     A.  Yes.

8     Q.  And those duties and responsibilities have

9  continued to today?

10    A.  Yes.

11    Q.  Who did you report to in 2015?

12    A.  For who?

13    Q.  Did you have an individual --

14    A.  I report to a lot of -- I report to MaxSent; I

15  report to Boston Properties.  I just don't know exactly

16  who -- I have a lot of bosses.

17    Q.  It's a fair question.  I'm just trying to get a

18  chain of command.  Was there any one individual at

19  MaxSent in 2015 who you would consider to be your direct

20  report or supervisor?

21    A.  Sure.  That would be Mike Cohrs, my VP.

22    Q.  Sorry.  What was the last name?



1    A.  Cohrs, C-O-H-R-S.

2    Q.  You said his title was?

3    A.  He's the regional vice president.

4    Q.  He was in 2015 as well.  Correct?

5    A.  Yes.

6    Q.  What region does he cover?

7    A.  He covers our entire -- he's the vice president

8    for our entire Commercial division.  So we have two

9    divisions:  We have Government and we have Commercial.

10   Q.  He's in charge of Commercial?

11   A.  Correct.

12   Q.  And that's been from 2015 to the present?

13   A.  Correct.

14   Q.  Back in 2015, was there any one individual -- let

15   me strike that.

16       People reported to you in 2015.  Correct?

17   A.  When you say "people", my staff?

18   Q.  Let me rephrase that.

19       Was there any one particular individual who

20   reported directly to you or were there a number of

21   people who reported directly to you?

22   A.  There were a number of people.



1    Q.  Did you receive any training -- specific formal

2    training -- when you first joined the entity that

3    eventually merged with MaxSent?

4    A.  Formal training for?

5    Q.  For your job.

6    A.  Yes.

7    Q.  Describe that.

8    A.  There was a lot of on-the-job training; there was

9    a lot of network training.

10   Q.  What do you mean by "network training"?

11   A.  Computer courses that the company had set up at

12   the time.  Management training; leadership training;

13   different courses that we all take to advance.

14   Q.  And the courses you mentioned, were they all

15   offered sort of inhouse by the company?

16   A.  Yes.

17   Q.  Any outside training?

18   A.  No.

19   Q.  Have you at any point from 2015 to the present

20   held any certifications?

21   A.  Other than my DCJS license, my Virginia State

22   security license, no.



1    Q.  Where is your office?  Do you have an office in

2  Reston Town Center currently?

3    A.  Yes.

4    Q.  Where is that located?

5    A.  It's at 11591 Freedom Drive, suite 100.

6    Q.  And have you been in that same office since May

7  of 2015 when you started at Reston Town Center?

8    A.  No.

9    Q.  How many different offices have you been in since

10  you started there?

11    A.  This is the fourth office.

12    Q.  Let's just do this:  What office did you maintain

13  in November of 2016?

14    A.  I don't know.

15    Q.  What office did you occupy when you first started

16  in May of 2015?

17    A.  I worked right out of the info center, the

18  information center.

19    Q.  Where was that located?

20    A.  That's located behind the Pavilion on property.

21    Q.  Do you recall how soon after you started you

22  moved into that office?



1   Is that correct?

2       A.  Yes.

3       Q.  I want to talk about the incident involving Ms.

4   Sedar.  Do you recall whether you were at work the day

5   Ms. Sedar's incident occurred?

6       A.  I believe I was.

7       Q.  Do you recall -- at some point were you notified

8   at some point the day of the incident that it had

9   occurred?

10      A.  Yes.

11      Q.  How were you notified?

12      A.  I believe I was at a meeting at the time, and I

13  believe I was called or texted to inform me that there

14  was a trip-and-fall incident.

15      Q.  Do you recall who called or texted you?

16      A.  I believe it was my shift supervisor.

17      Q.  And who was that?

18      A.  I believe that was Anthony Schwartz.

19      Q.  And back at that time was it the policy for you

20  to be informed of any of this type of incident that

21  occurred on the property?

22      A.  Any incident, yes.



1    Q.  And were you typically informed by text or call?

2    A.  Yes.  And then typically an e-mail would go out.

3    Q.  Where was the meeting at, that you were in?

4    A.  I don't recall.

5    Q.  Do you recall what Mr. Schwartz communicated to

6    you?

7    A.  Not specifically, no.

8    Q.  What did you do after you were informed about

9    this incident?

10   A.  I asked -- I would assume --

11   Q.  I don't want you to assume.

12   A.  Well, then I don't know.

13   Q.  Do you have any recollection as to what you did

14   after that?

15   A.  No.

16   Q.  Did you at any point during that day go to the

17   scene of the accident?

18   A.  Myself?

19   Q.  Yes.

20   A.  No.

21   Q.  Aside from the contact from Mr. Schwartz

22   informing you of the incident, what communications did



1  you have with anybody else concerning what had happened?

2     A.  That day?

3     Q.  Yes.

4     A.  I don't believe any.

5     Q.  How about the next day?

6     A.  I don't recall.

7     Q.  Do you recall having any discussions with

8  Mr. Schwartz about the incident, at any point in time?

9     A.  Again, so yes, like I said, we followed up with

10  each other at some point throughout that day I would

11  assume, as I would with any incident.  But exactly

12  specifically what that conversation was -- I was aware

13  that the claimant was transported to the hospital.  I

14  was aware there were witnesses with her.  I made sure

15  the report was done properly, and that was the extent of

16  it.  It's unfortunate, but in my experience in my

17  industry that is not an uncommon incident.

18     Q.  And what you just described -- the knowledge that

19  you have -- that was obtained on the day of the incident

20  to your recollection?

21     A.  Yes.

22     Q.  So you do recall having some conversations with



1    Mr. Schwartz after the incident occurred, other than

2    simply being notified?

3        A.  Yes, yes.  I apologize if I didn't answer that.

4    But I did follow up with him at some point before his

5    shift was over, yes.

6        Q.  Do you recall having a conversation with

7    Mr. Schwartz as to whether or not he took photographs of

8    the scene?

9        A.  No.

10       Q.  Do you recall any discussions with Mr. Schwartz

11   where you were questioning why he didn't take

12   photographs of the scene?

13       A.  Yes.

14       Q.  When did that occur?

15       A.  I believe that would have been -- typically --

16   specifically I can't say when that occurred.  It would

17   have been within a 24-to-48-hour period as I was

18   reviewing the incident report, stating, "Where are the

19   photos that are supposed to be attached with this

20   report."  And I was informed that there were no photos

21   taken at the scene.

22       Q.  What was your reaction when you were informed



1  that there were no photos taken at the scene?

2     A.  Probably wasn't very happy.

3     Q.  Do you remember what your reaction was?

4     A.  No.

5     Q.  Do you recall directing Mr. Schwartz to go back

6  out at that time and take photographs of the scene?

7     A.  Yes.

8     Q.  Do you know whether he did so?

9     A.  He did not.

10    Q.  When did you discover that he didn't go back and

11  take photographs of the scene when you specifically

12  instructed him to do so?

13    A.  I don't recall.

14    Q.  Was it within a month of the incident?

15    A.  I would assume, yes.

16    Q.  What did you do when you found out that he still

17  hadn't taken photographs of the scene?

18    A.  I counseled him, I would assume.

19    Q.  Did you tell him to go back and do it again?  To

20  go back and do it?

21    A.  No.  No.

22    Q.  You never took any photos -- within a month of



1   the accident, did you take any photos of the scene?

2       A.  No.

3       Q.  Are you aware of anybody with MaxSent that took

4   photographs of the scene within the first month

5   following the incident?

6       A.  No.

7       Q.  And I assume since you didn't go out there, you

8   haven't talked to any witnesses to --

9       A.  I have not spoken to any witnesses, no.

10      Q.  Aside from your Counsel, have you had any

11  communications with anybody outside of MaxSent

12  concerning Ms. Sedar's fall -- of this incident?

13      A.  No.

14          MR. BRUNICK:  That's a no.

15          WITNESS:  No.  I'm sorry.

16  BY MR. SENSENIG:

17      Q.  Did you have any communications with Mr. Kun at

18  any point in time concerning this incident?

19      A.  No.

20      Q.  If I understand you correctly, the policy at the

21  time of November 2016 was if there was an incident on

22  the property such as the one with Ms. Sedar, that was to



1  be included in the weekly report that was sent to Boston

2  Properties.  Is that accurate?

3      A.  Unless it was reported prior to, yes.

4      Q.  So one way or the other, within one week of an

5  incident like Ms. Sedar's, that incident was to be

6  reported to Boston Properties.  Is that fair to say?

7      A.  Yes.

8      Q.  And how would -- back in 2016 -- my understanding

9  is you were in charge of making that communication.

10  Correct?

11      A.  Yes.

12      Q.  To whom would you communicate that back in 2016?

13      A.  It's a large management team.  We have weekly

14  meetings in which the weekly reports and inspections and

15  incidents are reviewed.  The property is split up into

16  two phases, phase 1 and phase 2.  So at that time that

17  would have been reported, considering that's in Phase 1

18  of the property.  That would have been reported in the

19  phase 1 meeting, which occurs on Monday mornings.  So

20  that would have been reported to the phase 1 property

21  management.

22      Q.  Those meetings take place in person?



1    A.  Those are in person, yes.

2    Q.  So are the reports then provided -- let me just

3  back up:

4       How are the reports provided, in what form?

5    A.  So on the weekly reports there was just a

6  description of what the incidents were that took place,

7  the actually incident reports were not provided.  So it

8  would be a report like this that would say, "incidents

9  following [sic] week trip-and-fall/slip-and-fall,

10  damaged property", the dates they would happen.  Okay?

11  And they would obviously be available for review, but

12  that was just a breakdown of what had occurred in the

13  previous week.  And then if anything came up regarding

14  any incident, they would ask me to pull the file and

15  provide it.  But the actual physical reports would not

16  be provided on a weekly basis.

17    Q.  Just so I understand, when you're referring to

18  the "actual reports" you're referring to the actual

19  incident reports?

20    A.  Correct.

21    Q.  On Monday they would be provided a summary.  Is

22  that fair?



1              MR. SENSENIG:  I'll withdraw it.  I'm fine

2   with that.

3   BY MR. SENSENIG:

4      Q.  I'm trying to skip over things that we've already

5   gone over.

6      A.  I appreciate it.  I've got to get back to work.

7      Q.  We don't want to keep you.  I mean, you've got a

8   lot on your plate.  Tell you what.  Why don't we take a

9   five-minute break?

10      (Whereupon the proceedings go off the record.)

11      Q.  Back on the record.  Mr. Blanchette, have you at

12   any point in time since Ms. Sedar's incident, reviewed

13   any video surveillance concerning her incident?

14              MR. HUDGINS:  Objection to the form.

15   BY MR. SENSENIG:

16      Q.  You can answer.

17      A.  He didn't object?

18      Q.  He objected, but you can still answer the

19   question.

20      A.  I did review footage of the camera that we had in

21   that area.  However, the camera that we had in that area

22   does not cover that stairwell.  But just to be sure



1  nothing was covered for that incident.

2     Q.  When did you review that footage?

3     A.  I would have done that the same day or the day

4  after that incident occurred.

5          MR. SENSENIG:  Tim and Joe on the phone, and

6  obviously Mr. Hudgins here, I'm going to put in front of

7  the witness what was marked as Exhibit 4 to

8  Mr. Schwartz's deposition.  This is an e-mail chain

9  Bates numbered HLF 00088 through HLF 00091.

10         MR. HUDGINS:  And without repeating myself,

11 I will adopt and incorporate all of my objections as

12 made in previous depositions, with at least two of them.

13         MR. SENSENIG:  Understood.

14 BY MR. SENSENIG:

15    Q.  Do you recognize this document?

16    A.  Yes.

17    Q.  If you'd turn to page 2, at the bottom is the

18 beginning of an e-mail that's part of this chain from

19 Mr. Todd Patterson.  Do you see that?

20    A.  Correct.

21    Q.  Dated December 26, 2018.  My understanding is

22 Mr. Patterson was the CEO of MaxSent at the time he sent



1  this e-mail.  Is that accurate?

2     A.  Yes.

3     Q.  Has he been the CEO of MaxSent since the merger

4  with the other firm?

5     A.  Yes.

6     Q.  He still is today?

7     A.  Yes.

8     Q.  If you'd turn to page 3 --

9        (Whereupon the proceedings go off the record.)

10           MR. SENSENIG:  I directed Mr. Blanchette to

11  page 3.  We've already looked at the beginning of that

12  e-mail.

13  BY MR. SENSENIG:

14     Q.  Do you recognize the top of page 3 to be the body

15  of the e-mail that Mr. Patterson sent to you on December

16  26, 2018?

17     A.  Yes.

18     Q.  And accurate to say that in that he's making a

19  request for information?  Is that fair to say?

20     A.  Yes.

21     Q.  And if we turn to page 2, the body of page 2

22  contains your response to Mr. Patterson's request.  Is



1   that accurate?

2       A.   Yes.

3       Q.   And on page 1 there is a separate e-mail from you

4   to Mr. Patterson attaching weekly inspections.   Correct?

5       A.   Yes.

6       Q.   And as part of your e-mail that you sent to

7   Mr. Blanchette on page 2, you reference photographs.

8   Correct?

9       A.   I reference photographs or he requested

10  photographs?

11      Q.   Let me direct you to the specific sentence that

12  I'm looking at.   If you look at page 2, the second

13  paragraph that you wrote to Mr. Patterson, the last

14  sentence states:   "You can see examples of this in some

15  of the photographs of uneven bricks, I have attached."

16  Did I read that correctly?

17      A.   Yes.   Yes.

18      Q.   Is it correct to say that you attached

19  photographs to this e-mail?

20      A.   Yes.

21      Q.   The last paragraph says:   "Please also see the

22  attached weekly and nightly reports that we send out to



1    A.  No.

2              MR. SENSENIG:  Object to the form.

3    BY MR. HUDGINS:

4    Q.  Now, you were asked to go check and see if any

5    video footage existed of the incident involving Ms.

6    Sedar, were you not?

7              MR. SENSENIG:  Object to the form.

8    A.  I was not.  I check footage for any incident, as

9    I stated earlier, within a 24-to-48-hour period to see

10   if there was any footage to begin with.  I knew there

11   was no footage.  By the time this all came to light, we

12   wouldn't have had footage to begin with, because our

13   footage only lasts for 30 days.  So by the time this

14   case even came into question, if I was asked to see if

15   there was footage we wouldn't have had it unless it was

16   saved.

17   BY MR. HUDGINS:

18   Q.  You knew about the Sedar fall within 24 hours,

19   did you not?

20   A.  Yes.

21   Q.  And would you have asked or made an inquiry as to

22   whether or not there was video footage?



1          MR. SENSENIG:  Objection to form.

2     A.  Yes.

3  BY MR. HUDGINS:

4     Q.  Did you do that?

5     A.  Yes.

6     Q.  Was there video footage?

7     A.  No.

8     Q.  If there had been video footage, would you have

9  preserved it?

10         MR. SENSENIG:  Object to the form.

11    A.  Yes.

12 BY MR. HUDGINS:

13    Q.  Is that your usual practice?

14    A.  Yes.

15    Q.  Now, in the Exhibit 4 to the Schwartz deposition

16 that you have there in front of you, there's a reference

17 to "uneven bricks".  That's not talking about any bricks

18 at the location of the southwest stairwell, is it?

19         MR. SENSENIG:  Objection, leading.

20    A.  No.

21 BY MR. HUDGINS:

22    Q.  What is that in reference to?

1    A.  That was just an example.  I was asked to provide

2   some examples -- again, I was asked by my senior

3   leadership to provide examples which would show how we

4   point out those areas of hazards, which I did.  As you

5   see in the e-mail, I mention how we identify those

6   hazards and I provided photos of common hazards that

7   were being spoken of, of the uneven bricks.

8    Q.  It's part of the responsibility of MaxSent to

9   make inspections of the brick sidewalks and surfaces

10   around Town Center, is it not?

11    A.  It is not.

12    Q.  It is not?

13    A.  It is not our primary responsibility, no.  It is

14   our responsibility to point it out should we see uneven

15   bricks or safety hazards, but it is not a documented

16   inspection.  So within our patrols if we would see

17   something that is out of place or a hazard, it's our

18   responsibility to point that out.  But it is not, as I

19   said, a documented inspection as we provide these other

20   inspections that we include.

21    Q.  Now, since the incident involving Ms. Sedar,

22   you've had occasion to look back at the records of



1  inspections in the area of her fall, have you not?

2  A.  Yes.

3  Q.  Was there any record of any defect or hazard in

4  the brick surface at that location prior to her fall?

5  A.  No.

6            MR. SENSENIG:  Object to this line of

7  questioning.  I just want to point out for the record,

8  that when I asked Mr. Blanchette about records that he

9  reviewed, I don't recall him -- I could be wrong -- I

10 don't recall him saying he reviewed these records.  But

11 we can look back on the transcript.

12 A.  If I may?  I believe I did mention that I

13 reviewed incident reports.

14           MR. SENSENIG:  Yes?

15 A.  In reviewing incident reports, that would be

16 records indicating incidents.

17           MR. SENSENIG:  My understanding -- maybe I

18 misunderstand the question, because my understanding is

19 he was asking about inspection reports.  And we've

20 talked about inspection reports that are separate from

21 incident reports.  So I just want to clear up, I think

22 we need to clear up the record as to what you did

Lo, May

**From:** mblanchette@MaxSent.com <mblanchette@MaxSent.com>
**Sent:** Thursday, December 27, 2018 1:44 PM
**To:** 'Todd A. Pattison' <TPattison@MaxSent.com>; 'Novis, Diane' ███████████████; 'Micheal

1

HLF00088

REDACTED          -972-

Cohrs' <MCohrs@MaxSent.com>; 'Anthony Swartz ' <rtcassistant@maxsent.com>
**Cc:** 'Erinn McDonough ' <EPeloquin@MaxSent.com>
**Subject:** RE: Claim # 6814769 Camille Sedar v. Boston Properties Limited Partnership

Good Afternoon Todd,

On the day of this incident Anthony Swartz and Aloysius Kun responded to the scene as the report indicates.  Upon arrival and after the scene cleared Swartz ensured the area was safe and upon inspection did not point out any discrepancies in the bricks or the stairway or identify any trip hazards and it was dry and clear on this particular day ruling out a slip hazard.  There were no other incidents prior to or after this particular incident related to this stairway/garage entrance.  As a matter of fact It's been the only incident that has occurred at this stairwell or any other stairwells in the green garage since I have been here which goes back to May of 2015.  Photo's were not taken and it was reported to Swartz by one of the witnesses at the time of incident that the woman had tripped and fallen down the stairs.  Surveillance footage was never captured of this incident as the camera in the area does not pan to this particular location.

It is very common for us to identify and report any particular safety hazards related to trip and falls, slip and falls, lighting hazards, garage, or common area hazards that may cause injury to the general public.  I have attached several examples of photos that our staff has taken in the past and reported to BXP management to have them resolved.  These types of hazards are not typically resolved immediately so as you can see we would typically put up cones, caution tape, or even barricades in some cases to identify these hazards.  Any day that it rains here at the town center cones are placed on the metal grates on the sidewalks by our staff to caution  the public of the slippery conditions.   It is also important to understand that the bricks tend to shift during the winter months as the temps drop and BXP is constantly having to have them repaired.  You can see examples of this in some of the photos of uneven bricks I have attached.

Please also see the attached weekly and nightly reports that we send out to BXP.  These reports include elevator inspections, panic alarm inspections, lighting inspections, and surveillance cameras audit.  It's difficult to attach all of them but these reports have been going out to the client since May of 2015.  I will have a separate email coming with additional attachments.

Thanks!

Mike Blanchette

2

# MAXSENT

| | | |
|---|---|---|
| | | **Report Document #**<br>2016-000 |

| Property Name<br>RTC | ☒ Incident Report | ☐ Accident Report | ☐ Follow Up Report | | | | | |

| | Date of Report: 11/15/16 | Date of Incident:11/15/16 | Day of Incident:Tuesday | | Medical Assistance Needed? ☒ Yes ☐ No |
| **Background** | Time of Report:1251pm | Time of Incident:1145am | Type of Incident:Trip and Fall | | Ambulance Called? ☐ Yes ☐ No |
| | Location Of Incident:Green garage | | Reporting Officer:Anthony Swartz | | Time Called __1148__ ☒ Am ☐ Pm<br>Time Arrived: __1154__ ☒ Am ☐ Pm |
| | | | | | Hospital Taken To:<br>Reston Hospital |

| **Subject # 1** | ☐(1) Mall Property, Employee, Subcontractor  ☒(2) Tenant Space, Employee, Subcontractor  ☐(3) Customer / Visitor  ☐(4) DNA / Unknown | | | |
| | Name:Camille Seder | Sex:<br>☐ Male  ☒ Female  ☐ N/A | Date of Birth: 05/17/1966 | Photographs Taken?  ☐ Yes<br>☒ No |
| | Street Address:  43108 Stone Cottage Place | | | By: |
| | City:Ashburn | State:VA | Zip:20147- 4448 | Phone Number: | Civil Authorities on Site |

| **Subject # 2** | ☐(1) Mall Property, Employee, Subcontractor  ☐(2) Tenant Space, Employee, Subcontractor  ☐(3) Customer / Visitor  ☐(4) DNA / Unknown | | | |
| | Name: | Sex:<br>☐ Male  ☐ Female  ☐ N/A | Date of Birth: | Police  Schellhammer |
| | Street Address: | | | Fire  425 |
| | City: | State: | Zip: | Phone Number: | EMS:  404 |
| | | | | | Weather Condition  clear |

| **Witnesses** | Name | Address | City / State | Phone Number |
|---|---|---|---|---|
| | 1.Sydney Williams | | | 301-523-1345 |
| | 2.Davida Buchanan | | | 540-881-6518 |
| | 3.Robert Rapamut | | | 703-298-1345 |

**Narrative**
(Always Include Who, What, When, Where, Why &How)

At 1148am Security Officer Aloysius Kun was dispatched to the green garage located on Freedom Drive due to a trip and fall report. The victim of the trip and fall was Camille Seder, an employee at the Reston Town Center. Seder was walking down the stairs of the green garage with three friends to attend a work related meeting at Ted Bulletin when she tripped and fell down the stairs. This fall resulted in severe bleeding on Seder's chin and right leg. Fairfax County Police Department was called by one of Seder's colleagues around 1154am. While waiting for the paramedics to arrive, Sydney Williams, an Uber driver who was with Seder at the time of the incident, performed CPR to aid Seder because she was irresponsive. Fairfax County Fire Truck 425 and Ambulance 404 arrived at the site of the incident at 1154am with Captain Schellhammer. Seder's car keys were not found at the scene of the incident, butDavida Buchanan, who is Seder's friend retrieved most of Seder's belongings and accompanied Seder in the ambulance to Reston Hospital. The scene was cleared at 1211pm.

HLF00092

| Reporting Officer: Anthony Swartz | Supervisor: Mike Blanchette | Security Manager: Mike Blanchette |
|---|---|---|

D:\PrintImageBundle\NTemp\96555361Originals\20160411142946703.PDF

HLF00093



HLF00094



Case 1:18-cv-01111-CMH-TCB   Document 52-16   Filed 07



1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  (Alexandria Division)

4

5   CAMILLE SEDAR,        )   CASE NO: 1:18-cv-01111 CMH/TCH

6          Plaintiff,    )

7   -vs-                  )

8   BOSTON PROPERTIES,    )

9   LP, et al,            )

10          Defendants.   )

11   _____)

12

13              DEPOSITION OF DENISE HOGAN

14               Alexandria, Virginia

15                June 13th, 2019

16                   9:00 a.m.

17

18

19

20

21

22   REPORTED BY:  ALEXANDRIA KAAN



1      Deposition of DENISE HOGAN taken at the location

2  of:

3

4

5                  HUDGINS LAW FIRM, P.C.

6                  2331 Mill Road

7                  Suite No. 100

8                  Alexandria, Virginia  22314

9

10

11     Before ALEXANDRIA KAAN, Notary Public in the

12  Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22



```
 1          APPEARANCES

 2   Appearing on Behalf of the Plaintiff:

 3       DAVID SENSENIG, ESQUIRE (via

 4       telephonically)

 5       ANDREW PARK, ESQUIRE

 6       PARK SENSENIG

 7       2310 West Main Street

 8       Richmond, Virginia  23220

 9       David.sensenig@parksensenig.com

10

11   Appearing on Behalf of the Plaintiff:

12       JOSEPH MORIARTY, ESQUIRE (via

13       telephonically)

14       WILLCOX & SAVAGE, P.C.

15       440 Monticello Avenue

16       Suite No. 2200

17       Norfolk, Virginia  23510-2243

18       Jmoriarty@wilsav.com

19

20

21

22
```



1        APPEARANCES (CONTINUED):

2

3

4    Appearing on Behalf of Defendants:

5        DAVID HUDGINS, ESQUIRE

6        HUDGINS LAW FIRM, P.C.

7        2331 Mill Road

8        Suite No. 100

9        Alexandria, Virginia  22314

10       (703) 739-3700

11       Dhudgins@hudginslawfirm.com

12

13

14

15

16

17

18

19

20

21

22



```
 1   EXAMINATION OF DENISE HOGAN                    PAGE

 2   BY MR. PARK                                    6

 3   BY MR. HUDGINS

 4

 5

 6   HOGAN EXHIBITS                                 PAGE

 7   No. 1              notice of deposition        11

 8   No. 2              notice of deposition        12

 9   No. 3                    map                   20

10   No. 4              property management agreement 37

11   No. 5                  document                45

12   No. 6                  photograph              52

13   No. 7                  photograph              52

14   No. 8                  photograph              52

15   No. 9              answer to Complaint         66

16   No. 10                 photograph              73

17   No. 11                 photograph              73

18   No. 12                 e-mails                 76

19   No. 13             incident report            79

20

21

22
```



1                    P R O C E E D I N G S

2                         - - - - - -

3                      DENISE HOGAN,

4         having been called forth as a witness, was sworn

5    to tell the truth and testifies as follows:

6                         EXAMINATION

7    BY MR. PARK:

8       Q.  Good morning.

9       A.  Good morning.

10      Q.  We met earlier.  My name again is Andrew Park and

11   I'm one of the attorneys representing Camille Sedar in

12   the lawsuit that we're here on for the deposition today.

13   Would you just go ahead and state your name for the

14   record, please?

15      A.  Sure my name is Denise Hogan.

16      Q.  And what's your work address?

17      A.  1818 Library Street, Suite 400, in Reston,

18   Virginia 20190.

19      Q.  I'm assuming that you have some familiarity with

20   the facts or the allegations involved in this particular

21   lawsuit.  Is that fair?

22      A.  I do.



1    Q.  Have you reviewed the Complaint that was filed?

2    A.  Yes.

3    Q.  And have you reviewed the answers that were

4  filed?

5    A.  I have.

6    Q.  Have you reviewed other documents that were

7  produced in the course of the case?

8    A.  Yes.

9    Q.  Have you reviewed any of the deposition

10  transcripts?

11    A.  Can you explain to me what they are?

12    Q.  Sure.

13        MR. HUDGINS:  That's a transcribed,

14  typewritten verbatim account of a deposition.  And I

15  don't believe you've seen any of them.

16    A.  I don't believe I have seen those.

17  BY MR. PARK:

18    Q.  What's your position with the company?  And by

19  "the company" I'm referring to Boston Properties Limited

20  Partnership and/or Reston Town Center LLC.

21    A.  Sure.  I'm currently a property manager with

22  Boston Properties.



```
 1              MR. HUDGINS:  Just to check in:  Joe, David,
 2   can you hear us okay?
 3              MR. MORIARTY:  I can hear you.
 4              MR. SENSENIG:  I can as well, thank you.
 5              MR. PARK:  Thanks.
 6   BY MR. PARK:
 7      Q.  Do you have any kind of employment position with
 8   Reston Town Center Property LLC?
 9      A.  I work for Boston Properties and serve in
10   property management.  One of the properties is Reston
11   Town Center.
12      Q.  My question was just a little bit different, and
13   that is:  Is there any kind of employment relationship
14   that you have with Reston Town Center LLC?
15      A.  I'm so sorry.  I don't understand what you're
16   asking.
17      Q.  So your employer is actually Boston Properties
18   Limited Partnership.  Is that correct?
19              WITNESS:  Can I check my --
20              MR. HUDGINS:  Yeah.  Yeah.
21      A.  Yeah.  The way I will answer you, if it's okay,
22   is the property is managed by Boston Properties Limited
```



1  hired CDA/MaxSent to do.

2          MR. HUDGINS:  It's in the contract.  It

3  states very clearly what they were hired to do.  And I

4  don't want her answering and making legal conclusions or

5  anything else.  I don't think she can do more than point

6  you to the contract.

7  BY MR. PARK:

8    Q.  So Ms. Hogan, you're not prepared to describe for

9  me what it is, beyond what's set out in the contract,

10  that CDA/MaxSent was supposed to do for Boston

11  Properties?

12    A.  In followup to Mr. Hudgins' response, on the

13  contract agreement itself, the scope of work is

14  specified in schedule A, and I believe the

15  specifications are in the attachment 1 that's in this

16  document.

17          MR. HUDGINS:  Is there a page number we can

18  all turn to?

19          WITNESS:  Sure.  It's at the top.

20          MR. HUDGINS:  I'm talking about down at the

21  bottom.

22          WITNESS:  Oh.  305.



1              MR. HUDGINS:  Which is schedule A.

2    BY MR. PARK:

3       Q.  Let me try to ask it in a very direct way.

4       A.  Sure.

5       Q.  Is it your understanding on behalf of Boston

6    Properties and Reston Town Center that they were relying

7    on CDA or MaxSent to conduct inspections of the property

8    condition?

9              MR. HUDGINS:  Same objection.  She can

10   answer.

11      A.  I refer again, with all due respect, to the

12   agreement itself where the scope of work is spelled out

13   on schedule A.

14   BY MR. PARK:

15      Q.  Now, MaxSent is no longer a service provider for

16   Boston Properties.  Is that correct?

17      A.  No.  They are a current provider.

18      Q.  They are?

19      A.  Yes.

20      Q.  Do they still currently provide services at the

21   Reston Town Center?

22      A.  They do.



1    Q.  Was there any period of time where they were

2   replaced by another company?

3    A.  No.

4    Q.  So that's an ongoing contractual relationship

5   between Boston Properties and CDA/MaxSent?

6    A.  It follows the terms of the agreement dates, so

7   they were just recently renewed for an additional term

8   of service.

9    Q.  Just so I understand:  There was never an

10   interruption in the services they provided?

11    A.  No.  There was not.

12          MR. PARK:  Take just a five-minute break.

13          MR. HUDGINS:  Sure.

14     (Whereupon the proceedings go off the record.)

15   BY MR. PARK:

16    Q.  So Ms. Hogan, at the beginning I think you had

17   identified one of the items related to video

18   surveillance you started to talk about that?

19    A.  Yes.

20    Q.  I'd like to come back to that a this point and

21   just ask -- and really I'm focused on November of 2016.

22    A.  Yes.



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.  Can you tell me what the situation was with video

2    surveillance at the green garage?

3    A.  We did not utilize video surveillance.

4    Q.  Was that true throughout Reston Town Center?  Did

5    you use video surveillance anywhere in Reston Town

6    Center in 2016?

7    A.  We do not use video surveillance in Reston Town

8    Center garages.

9    Q.  My question is just a little bit different.  I'm

10   just trying to understand, in some of the office

11   buildings you might use video surveillance?

12   A.  We do not use video surveillance within our

13   office buildings.

14   Q.  Where do you use video surveillance, if at all?

15   A.  We do not use video surveillance.

16   Q.  Thank you.  And that was true you didn't use

17   video surveillance in 2016 either?

18   A.  In 2016, no.

19   Q.  Now, I'd asked some questions earlier about the

20   southwest stairwell of the green garage.

21   A.  Mm-hmm.

22   Q.  And that's where all this occurred.  I'd also



1   of any reporting that they had, and that was provided.

2       Q.  So is it your understanding that the first time

3   MaxSent advised Boston Properties of the incident and

4   provided the incident report was in April of 2018?

5       A.  In my conversations with Kenyetta Price, this was

6   the first time that the report was provided to her from

7   MaxSent, is when Ms. Vargas requested it on April 11,

8   2018.

9       Q.  Do you know if in November 2016 MaxSent advised

10  Boston Properties of the incident?

11      A.  The first time that Boston Properties had seen

12  the incident report was when it was provided in April of

13  2018.

14      Q.  And my question is a little bit different.  It

15  is:  Did Boston Properties know about the incident

16  before receiving this incident report in April of 2018?

17      A.  And again Kenyetta received the copy of the

18  incident report when requested, and it's the first she

19  had known about it was in April '18.

20      Q.  So to your knowledge, MaxSent did not advise

21  Boston Properties about the incident at or near the time

22  the incident occurred?



1                MR. HUDGINS:  Objection:  Asked and

2    answered.

3    BY MR. PARK:

4        Q.  You can answer.

5        A.  I'll go with what I said to follow up that:  When

6    this was requested in April '18 it was the first that

7    Kenyetta Price had seen the incident report.

8        Q.  You have the incident report and then you have

9    knowledge of the incident itself.  And I'm not asking

10   about the incident report.  I just want to know about

11   knowledge of the incident.

12       A.  Yes.  Her first knowledge of the incident from

13   the incident report was in April of 2018.

14       Q.  And I think at the beginning you said that

15   Kenyetta Price is currently the regional property

16   manager?

17       A.  Her current title is regional property manager.

18       Q.  And was she the regional in April of 2018?

19       A.  In April of 2018 she was the senior property

20   manager.

21       Q.  Is it Boston Properties' expectation that MaxSent

22   would provide this incident report.  Near the time of



1   the incident itself?

2     A.  Yes.

3   (Whereupon Exhibit No. 13 is marked for identification.)

4     Q.  Ms. Hogan, as best you know, is this the incident

5   report that MaxSent provided in April of 2018?

6     A.  Yes.

7     Q.  Now, on behalf of the companies, Ms. Hogan, are

8   you aware of any complaints regarding the southwest

9   stairwell at the green garage from 2013 through the

10  present?

11    A.  Can you repeat the question, please?

12            MR. PARK:  Can you read that back?

13            COURT REPORTER:  Sure.  One sec.

14   (The Court Reporter reads back the requested section.)

15    A.  When I did research on this, I researched the

16  2016 time.  And there were no complaints.  I don't have

17  any knowledge prior to 2016.

18  BY MR. PARK:

19    Q.  So let me draw your attention to Exhibit 1, which

20  is at the bottom of the pile.

21    A.  Oh, sure.  Okay.

22    Q.  Let me just read item 8 to you.  Again, this is



1   from Exhibit 1, item 8: "Any complaints regarding the

2   conditions of the green garage, specifically including

3   but not limited to the southwest and southeast areas of

4   ingress/egress from November of 2013 to the present."

5   So is it your testimony that you're not prepared to

6   testify as to item 8 with anything prior to the year

7   2016?

8            MR. HUDGINS: Objection.

9   BY MR. PARK:

10      Q. You can answer.

11      A. As I stated, I have the knowledge from the 2016.

12   Prior to that, I don't have the knowledge at this point

13   in time.

14      Q. What will you do in order to obtain that

15   knowledge? How would you go about doing it?

16      A. We would research our work order reporting tools.

17      Q. Can you tell me what that "work order reporting

18   tools" is?

19      A. Yeah, Absolutely. It's an electronic reporting

20   tool that we would use to record work performed on this

21   particular property.

22            MR. HUDGINS: Counsel, can I ask -- because



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **CAMILLE SEDAR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:18-cv-01111-CMH-TCB** |
| | ) | |
| **BOSTON PROPERTIES LIMITED** | ) | |
| **PARTNERSHIP and RESTON TOWN** | ) | |
| **CENTER PROPERTY, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF DANO HOLLAND

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA | ) |
| | ) ss |
| COUNTY OF FAIRFAX | ) |

I, Dano Holland, am over the age of 18, and fully competent to make this Declaration.  I declare under penalty of perjury that the following is true to the best of my knowledge and recollection.

1)    I, Dano Holland, was retained by the Plaintiff, Camille Sedar, to render expert testimony in this case.

2)    In connection with my testimony, I reviewed a number of documents and things, including, the Complaint, discovery responses, applicable building codes, photographs, a video, deposition testimony, photographs of Ms. Sedar's shoes, and the scene of the incident.

3)    I have rendered multiple opinions including:

   a.    The loose and unstable brick paver was structurally unsound and a hazard that violated the applicable building and maintenance codes.

-995-

   b.  The loose and unstable brick paver most likely caused Ms. Sedar to lose her balance and fall down the stairway.

   c.  The sagging and deteriorating caulk joint immediately adjacent to the loose brick paver would have been visible during routine maintenance inspections and activities.  Closer inspection of the caulk joint failure should have alerted maintenance personnel to the unlevel and loose brick paver which contributed to Ms. Sedar's fall.

4)  The testimony I reviewed from depositions of the eyewitnesses is that more than one brick paver was loose and unstable further supporting my opinions.

5)  The building code sections violated by the Defendants specifically address requirements for egress areas from buildings and exterior stairways.  Among other things, the applicable code requirements direct how small elevation changes in the means of egress should be addressed.

6)  The intent of the applicable code sections violated by the Defendants',' at least in part, is for the safety of the public and/or users of the property.

7)  In connection with my opinions I have issued two expert reports dated April 11, 2019 and May 30, 2019 ("Reports").  The Reports accurately reflect my findings and opinions.

8)  My testimony at trial will be in accordance with the information and statements in the Reports.

Date: July 26, 2019

              Dano Holland

  IN WITNESS WHEREOF I have hereunto subscribed my name and affixed my official seal this 26th day of July, 2019.

Notary Public

KATHERINE ANNE PHELAN
Notary Public
Commonwealth of Virginia
My Commission Expires January 31, 2021
Commission ID# 7717855

My Commission Expires: 1/31/2021



May 30, 2019


Mr. Andrew R. Park, Esquire
Park Sensenig
2310 West Main Street
Richmond, VA 23220


RE:                    Rebuttal of Defendant's Expert Witness Report
DATE OF INCIDENT: 11/15/16
CASE:                  Camille Sedar v. Boston Properties, L. P., et al.
HFEG FILE #:        18007


Dear Mr. Park:


I am in receipt of the 5/13/19 report issued by Mr. Jason D. Boyd of CED Technologies, Inc. and offer the following in response:

- Since the issuance of my April 11, 2019 report, I also reviewed the following:
  - The deposition transcript of Ms. Camille Sedar
  - CDA Incorporated, D/B/A Maxsent's Rule 26(a)(1) Initial Disclosures
  - Plaintiff's Rule 26(a)(1)(A) Initial Disclosures
  - Boston Properties and Reston Town Center's Rule 26(a) Disclosures
- Ms. Sedar has no recollection of the fall. Her companions recall that Ms. Sedar was walking normally and looking forward. There is no indication that Ms. Sedar was doing anything out of the ordinary as she traversed the top landing on her way to the stairway. She was utilizing the walkway and various components as they were present in attempts to navigate through the area. Her companions have indicated through the produced video documentation and the photographs taken shortly after the incident and through their observations that Ms. Sedar was walking through the area where loose, unstable and uneven bricks and the open caulk joint were located when she fell.
- Photographs were produced of the shoes that Ms. Sedar was wearing at the time of the fall (See photographs #1 and #2 - Bates Sedar #1295 and Sedar #1296). There is a large scuff on the toe of her right shoe that she does not recall as being there prior to the fall. This scuff is an indication that the toe of her right shoe caught and dragged on some obstacle.
- The loose, unstable and uneven brick shown in the produced video, as well as the presence of other loose bricks observed by Ms. Sedar's companions, Mr. Rapanut and Ms. Buchanan, are located adjacent to a large open caulk joint that measures approximately 1½" wide. These defects were located in the area through which Ms. Sedar was walking.
- The video of the loose brick, on which Ms. Sedar likely stepped, shows that the brick rocks back and forth with little effort. When Ms. Sedar's foot likely landed on this brick and as she transferred her weight either onto or off of the brick during the normal process of her ambulation, the brick would have pitched or rolled as demonstrated in the video. The unstable nature of this brick would have caused a sudden and unexpected loss of stability in her footing and likely caused her to lose her balance. Similarly, any loose or unstable bricks in the area where Ms. Sedar was walking may have caused a loss of balance and contributed to her fall. Further, loose walkway components such as these bricks which make up the upper landing for this stairway, are of



greater hazard because of their location. If the loose bricks cause a stumble, instability or misstep to occur on this top landing, the person has no flat "recovery area" and is immediately confronted with the stairs. The potential for greater injury is magnified due to a fall down the stair versus a fall on level ground.

- It should also be noted that the large open gap adjacent to the loose brick likely creates a trip hazard as the front edge of the brick shifted downward. As Ms. Sedar's foot moved downward on the brick, the elevation of the adjacent edge of the concrete landing would have likely become greater than ¼", which is the minimum height of a trip hazard, as recognized by ANSI A117.1, Section 303 and ASTM F1637, Section 5.2 (see attached excerpts). The 1½" wide open gap of the caulk joint also exceeds the size of openings allowed by the industry standard ASTM F1637, section 10.2 and the code adopted accessibility standard ANSI A117.1, section 302.3 (see attached excerpts). The sagging caulk creates a hazardous opening in the walkway and a potential trip hazard when located adjacent to unstable bricks that can shift and rotate downward.

- The absence of caulk or excess sag in the caulk joint contributes to the instability of the adjacent brick pavers. The brick pavers are locked in place by friction and their interlocked nature. The displacement of the caulk allows the bricks to shift and become loose. Further, as greater volumes of water are allowed to enter the substrate through the deteriorated and sagging caulk joint, the supporting material below the brick paver can erode leading to greater instability. These are conditions that would occur over several months and are not something that would suddenly occur. Normal and routine inspections performed at a minimum during the change of seasons should identify such maintenance concerns and hazards.

- In his report, Mr. Boyd indicates that the condition of the caulk joint was not something that would indicate an issue with the adjacent brick pavers. At the time of both mine and Mr. Boyd's inspections, the caulk joint on the stair's upper landing had been replaced. However, during my 7/30/18 inspection and subsequent 4/4/19 inspection I also inspected the similar walkway and landing at the southeast corner of the Green Garage. At this stairway's upper landing, loose, raised and unstable bricks were observed on 7/30/18 (see photographs #3 through #5). During my follow-up inspection on 4/4/19, the hazardous conditions still existed (see photographs #6 through #8). Further, the long-term existence of loose and raised bricks are evidence of a lack of maintenance, inspection and identification of such hazardous conditions on the brick paver walkways. Observations of a visible trip hazard were made at one of the exterior walkways during my 7/30/18 inspection. This condition was still present when I re-visited the property over eight months later on 4/4/19.

Based on my additional review and analysis, the original opinions expressed in my 4/11/19 report remain unchanged. In addition to any opinions expressed above, I also offer the following clarifying rebuttal opinions:

1. The footwear worn by Ms. Sedar at the time of her fall was appropriate for the activity she was performing.

2. The scuff on her shoe is an indication that her shoe contacted an obstacle at the time of her fall. This obstacle may have been the edge of the concrete landing strip on the far side of the 1½" open joint.

3. The defendant failed to properly maintain the subject landing and stairway by allowing the caulk joint to sag and deteriorate. The presence of the open joint and sagging caulk allowed the adjacent brick to become loose and unstable. The deterioration of the caulk joint also contributed to the instability of the brick paver. These conditions did not develop overnight but were formed

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



over at least several months. The presence of the loose and unstable bricks observed at the southeast exterior stairway further illustrate these conditions.

4. The unstable, loose and uneven brick(s) and/or the 1½" wide open joint are hazardous conditions in the walking surface. The open joint would allow the toe of Ms. Sedar's shoe to become caught on the edge of the concrete landing strip at the top of the stairway. The unstable, loose and uneven brick(s) would potentially cause a loss of balance and control as these brick(s) would shift when someone steps on them.

My opinions, which were reached to a reasonable degree of engineering certainty, are based on my knowledge, experience, training, education, observations, and the information that was obtained or relayed to me during my investigation. If additional information is provided to me, I reserve the right to alter or amend my opinions.

Should you have any questions or if I can be of further service, please contact my office.

Sincerely,

Dano Holland, P.E.
Structural Engineer

Enclosure

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019





PHOTOGRAPH #1 (Bates Sedar #1295)

COMMENTS: Shoes worn by Ms. Sedar at the time of her fall.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #2 (Bates Sedar #1296)

COMMENTS: Shoes worn by Ms. Sedar at the time of her fall.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #3                              DATE TAKEN: 7/30/18

COMMENTS:  Southeast exterior stairway. The arrow points to a readily identifiable raised brick
              paver.

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019





PHOTOGRAPH #4                          DATE TAKEN: 7/30/18

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019





PHOTOGRAPH #5                                        DATE TAKEN: 7/30/18

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019



Holland
Forensic
Engineering
Group, PLC



PHOTOGRAPH #6                              DATE TAKEN: 4/4/19

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019





PHOTOGRAPH #7                    DATE TAKEN: 4/4/19

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

CASE: Camille Sedar v. Boston Properties, L.P., et al.
HFEG File: 18007
May 30, 2019





PHOTOGRAPH #8                    DATE TAKEN: 4/4/19

COMMENTS:  Southeast exterior stairway – shifted, raised and unstable brick paver

# Chapter 3. Building Blocks

## 301 General

**301.1 Scope.** The provisions of Chapter 3 shall apply where required by the scoping provisions adopted by the administrative authority or by Chapters 4 through 11.

**301.2 Overlap.** Unless otherwise specified, clear floor spaces, clearances at fixtures, maneuvering clearances at doors, and turning spaces shall be permitted to overlap.

## 302 Floor Surfaces

**302.1 General.** Floor surfaces shall be stable, firm, and slip resistant, and shall comply with Section 302. Changes in level in floor surfaces shall comply with Section 303.

**302.2 Carpet.** Carpet or carpet tile shall be securely attached and shall have a firm cushion, pad, or backing or no cushion or pad. Carpet or carpet tile shall have a level loop, textured loop, level cut pile, or level cut/uncut pile texture. The pile shall be $^1/_2$ inch (13 mm) maximum in height. Exposed edges of carpet shall be fastened to the floor and shall have trim along the entire length of the exposed edge. Carpet edge trim shall comply with Section 303.



**FIG. 302.2**
**CARPET ON FLOOR SURFACES**

**302.3 Openings.** Openings in floor surfaces shall be of a size that does not permit the passage of a $^1/_2$ inch (13 mm) diameter sphere, except as allowed in Sections 407.4.3, 408.4.3, 409.4.3, 410.4, and 805.10. Elongated openings shall be placed so that the long dimension is perpendicular to the predominant direction of travel.

## 303 Changes in Level

**303.1 General.** Changes in level in floor surfaces shall comply with Section 303.

**303.2 Vertical.** Changes in level of $^1/_4$ inch (6.4 mm) maximum in height shall be permitted to be vertical.

**303.3 Beveled.** Changes in level greater than $^1/_4$ inch (6.4 mm) in height and not more than $^1/_2$ inch (13 mm) maximum in height shall be beveled with a slope not steeper than 1:2.

**303.4 Ramps.** Changes in level greater than $^1/_2$ inch (13 mm) in height shall be ramped and shall comply with Section 405 or 406.



**FIG. 302.3**
**OPENINGS IN FLOOR SURFACES**

**FIG. 303.2**
**CARPET ON FLOOR SURFACES**

**FIG. 303.3**
**BEVELED CHANGES IN LEVEL**

## 304 Turning Space

**304.1 General.** A turning space shall comply with Section 304.

7

ASTM INTERNATIONAL

**Designation: F1637 – 13**

An American National Standard

# Standard Practice for
# Safe Walking Surfaces[1]

This standard is issued under the fixed designation F1637; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This practice covers design and construction guidelines and minimum maintenance criteria for new and existing buildings and structures. This practice is intended to provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear. These guidelines may not be adequate for those with certain mobility impairments.

1.2 Conformance with this practice will not alleviate all hazards; however, conformance will reduce certain pedestrian risks.

1.3 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]

F1646 Terminology Relating to Safety and Traction for Footwear

## 3. Terminology

3.1 See Terminology F1646 for the following terms used in this practice:

3.1.1 Bollard,
3.1.2 Carpet,
3.1.3 Cross slope,
3.1.4 Element,
3.1.5 Fair,

3.1.6 Footwear,
3.1.7 Foreseeable pedestrian path,
3.1.8 Planar,
3.1.9 Ramp,
3.1.10 Sidewalk,
3.1.11 Slip resistance,
3.1.12 Slip resistant,
3.1.13 Walkway.
3.1.14 Walkway surface hardware, and

## 4. Significance and Use

4.1 This practice addresses elements along and in walkways including floors and walkway surfaces, sidewalks, short flight stairs, gratings, wheel stops, and speed bumps. Swimming pools, bath tubs, showers, natural walks, and unimproved paths are beyond the scope of this practice.

## 5. Walkway Surfaces

5.1 *General:*

5.1.1 Walkways shall be stable, planar, flush, and even to the extent possible. Where walkways cannot be made flush and even, they shall conform to the requirements of 5.2 and 5.3.

5.1.2 Walkway surfaces for pedestrians shall be capable of safely sustaining intended loads.

5.1.3 Walkway surfaces shall be slip resistant under expected environmental conditions and use. Painted walkways shall contain an abrasive additive, cross cut grooving, texturing or other appropriate means to render the surface slip resistant where wet conditions may be reasonably foreseeable.

5.1.4 Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use.

5.2 *Walkway Changes in Level:*

5.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.

5.2.2 Changes in levels up to ¼ in. (6 mm) may be vertical and without edge treatment. (See Fig. 1.)

5.2.3 Changes in levels between ¼ and ½ in. (6 and 12 mm) shall be beveled with a slope no greater than 1:2 (rise:run).

5.2.4 Changes in levels greater than ½ in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these.

[1] This practice is under the jurisdiction of ASTM Committee F13 on Pedestrian/Walkway Safety and Footwear and is the direct responsibility of Subcommittee F13.50 on Walkway Surfaces.

Current edition approved Aug. 1, 2013. Published August 2013. Originally approved in 1995. Last previous edition approved in 2010 as F1637 – 10. DOI: 10.1520/F1637-13.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States

F1637 – 13



FIG. 1  Changes in Levels up to a Maximum of ¼ in. (6 mm)

5.3  *Carpet:*

5.3.1  Carpet shall be maintained so as not to create pedestrian hazard. Carpet shall be firmly secured and seams tightly maintained. Carpet shall not have loose or frayed edges, unsecured seams, worn areas, holes, wrinkles or other hazards that may cause trip occurrence.

5.3.2  Carpet on floor surfaces shall be routinely inspected. Periodic restretching may become necessary. Periodic inspection is particularly important at step nosing edges.

5.3.3  Carpet and carpet trim (as measured when compressed) shall meet the transition requirements of 5.2.

5.3.4  Shag-type carpet shall not be used on stair treads. Carpeting should be firmly secured onto the tread and around the nosing.

5.4  *Mats and Runners:*

5.4.1  Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather. Replacement of mats or runners may be necessary when they become saturated.

5.4.2  Building entrances shall be provided with mats or runners, or other means to help remove foreign particles and other contaminants from the bottom of pedestrian footwear. Mats should be provided to minimize foreign particles, that may become dangerous to pedestrians particularly on hard smooth floors, from being tracked on floors.

5.4.3  Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations. Mats at building entrances also may be used to control the spread of precipitation onto floor surfaces, reducing the likelihood of the floors becoming slippery.

5.4.4  Mats shall be of sufficient design, area, and placement to control tracking of contaminants into buildings. Safe practice requires that mats be installed and maintained to avoid tracking water off the last mat onto floor surfaces.

5.4.5  Mats, runners, and area rugs shall be provided with safe transition from adjacent surfaces and shall be fixed in place or provided with slip resistant backing.

5.4.6  Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners, and area rugs shall not have loose or frayed edges, worn areas, holes, wrinkles, or other hazards that may cause trip occurrences.

5.5  *Illumination:*

5.5.1  Minimum walkway illumination shall be governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES) (Application and Reference Volumes).

5.5.2  Illumination shall be designed to be glare free.

5.5.3  Illumination shall be designed to avoid casting of obscuring shadows on walkways, including shadows on stairs that may be cast by users.

5.5.4  Interior and exterior pedestrian use areas, including parking lots, shall be properly illuminated during periods when pedestrians may be present.

5.6  *Headroom*—A minimum headroom clearance of 6 ft 8 in. (2.03 m), measured from the walkway surface, shall be provided above all parts of the walkway. Where such clearance is not provided in existing structures, the low clearance portions of the walkway shall be safely padded, marked with safety contrast color coding and posted with appropriate warning signs.

5.7  *Exterior Walkways:*

5.7.1  Exterior walkways shall be maintained so as to provide safe walking conditions.

5.7.1.1  Exterior walkways shall be slip resistant.

5.7.1.2  Exterior walkway conditions that may be considered substandard and in need of repair include conditions in which the pavement is broken, depressed, raised, undermined, slippery, uneven, or cracked to the extent that pieces may be readily removed.

5.7.2  Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 5.2.

5.7.3  Edges of sidewalk joints shall be rounded.

## 6. Walking Surface Hardware

6.1  Walking surface hardware within foreseeable pedestrian paths shall be maintained flush with the surrounding surfaces; variances between levels shall be transitioned in accordance with 5.2.

6.2  Walking surface hardware within foreseeable pedestrian paths shall be maintained slip resistant.

6.3  Walking surface hardware shall be installed and maintained so as to be stable under reasonable foreseeable loading.

## 7. Stairs

7.1  *General:*

7.1.1  Stairways with "distracting" forward or side views shall be avoided. A "distracting" view is one which can attract the stair user's attention, (for example, advertisements, store displays), thus distracting the stair user.

7.1.2  Step nosings shall be readily discernible, slip resistant, and adequately demarcated. Random, pictorial, floral, or geometric designs are examples of design elements that can camouflage a step nosing.

7.1.3  Doors shall not open over stairs.

7.1.4  Structure (reserved).

7.2  *Short Flight Stairs (Three or Fewer Risers):*

7.2.1  Short flight stairs shall be avoided where possible.

7.2.2  In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

F1637 – 13

## 8. Speed Bumps

8.1 Design to avoid the use of speed bumps.

8.2 All speed bumps which are in foreseeable pedestrian paths shall comply with 5.2 (walkway changes in level).

8.3 Existing speed bumps, that do not conform to 5.2, shall be clearly marked with safety color coding to contrast with surroundings. Painted speed bumps shall be slip resistant. Pedestrian **CAUTION** signs are recommended.

## 9. Wheel Stops

9.1 Parking lots should be designed to avoid the use of wheel stops.

9.2 Wheel stops shall not be placed in pedestrian walkways or foreseeable pedestrian paths.

9.3 Wheel stops shall be in contrast with their surroundings.

9.4 Wheel stops shall be no longer than 6 ft (1.83 m) and shall be placed in the center of parking stalls. The minimum width of pedestrian passage between wheel stops shall be 3 ft (0.91 m).

9.5 The top of wheel stops shall not exceed 6.5 in. (165 mm) in height above the parking lot surface.

9.6 Adequate illumination shall be maintained at wheel stops as governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES-Application and Reference Volumes).

9.7 Bollards, not less than 3 ft 6 in. (1.07 m) height, may be placed in the center of parking stalls as an alternative to wheel stops. Bollards should be appropriately marked to enhance visibility.

## 10. Gratings

10.1 Gratings used in public areas should be located outside of pedestrian walkways.

10.2 Gratings located in foreseeable pedestrian walkways shall not have openings wider than ½ in. (13 mm) in the direction of predominant travel.

10.2.1 *Exemption*—The requirements of 10.2 do not apply in areas where footwear worn is controlled (for example, industrial areas).

10.3 Gratings with elongated openings shall be placed with the long dimension perpendicular to the direction of predominant travel.

10.4 Gratings shall be maintained slip resistant.

## 11. Warnings

11.1 The use of visual cues such as warnings, accent lighting, handrails, contrast painting, and other cues to improve the safety of walkway transitions are recognized as effective controls in some applications. However, such cues or warnings do not necessarily negate the need for safe design and construction.

11.2 When relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users. Bright yellow is a commonly used color for alerting users of the presence of certain walkway conditions. When properly applied and maintained, other colors can also provide effective warnings.

## 12. Keywords

12.1 carpet; floors; gratings; mats; runners; sidewalks; short flight stairs; slip resistance; speed bump; stairs; walkway; wheel stop

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).*





EXHIBIT
G
ALL-STATE LEGAL®

-1012-



EXHIBIT

B

ALL-STATE LEGAL®

HLF00110

-1013-



EXHIBIT 7

Swartz
6/19/19

PENGAD 800-631-6989



EXHIBIT 8

Swartz
6/19/19










2012

Virginia
Construction
Code

*Part I of the Virginia
Uniform Statewide
Building Code*

**Effective July 14, 2014**

# PREFACE

## Introduction

The *Virginia Uniform Statewide Building Code* (USBC) is a state regulation promulgated by the Virginia Board of Housing and Community Development, a Governor-appointed board, for the purpose of establishing minimum regulations to govern the construction and maintenance of buildings and structures.

The provisions of the USBC are based on nationally recognized model building and fire codes published by the International Code Council, Inc. The model codes are made part of the USBC through a regulatory process known as incorporation by reference. The USBC also contains administrative provisions governing the use of the model codes and establishing requirements for the enforcement of the code by the local building departments and other code enforcement agencies.

In keeping with the designations of the USBC used previously, since the 2012 editions of the *International Codes* are incorporated by reference into this version of the USBC, it is known as the 2012 edition of the USBC.

## Arrangement

The USBC is part of the *Virginia Administrative Code* (VAC), the official compilation of state regulations published under the authority and guidance of the Virginia Code Commission. Due to the difference in the section numbering system between the VAC and the model codes incorporated by reference into the USBC, the UBSC utilizes a dual section numbering system. In the USBC, the VAC section numbers are listed first, followed by a section number matching the model code system. In this printing of the USBC, the VAC section numbers are omitted and only the model code numbering system is utilized. The version of the USBC containing both the VAC section numbers and the model code numbering is available from the Virginia Department of Housing and Community Development (DHCD) and may also be accessed through the website of the Virginia Code Commission or by subscription to the VAC.

## Overview

The USBC is divided into three stand-alone parts. Part I contains regulations specific to the construction of new buildings and structures and is known as the *Virginia Construction Code*. Part II contains regulations specific to the rehabilitation of existing buildings, including alterations, additions and change of occupancy in existing buildings and structures, and is known as the *Virginia Rehabilitation Code*. Part III of the USBC contains the regulations for the maintenance of existing structures which is enforced at the option of the local governments. It is known as the *Virginia Maintenance Code*.

## Codes Purchased from ICC

The 2012 edition of the USBC is being made available in pamphlet form as in past editions of the USBC. In the state pamphlet version, a single line is placed in the margin to delineate changes between the 2009 edition of the USBC and the 2012 edition of the USBC. In addition to the pamphlet form of the USBC published by DHCD, the International Code Council (ICC) publishes versions of the *Virginia Construction Code, Virginia Rehabilitation Code, Virginia Maintenance Code* and a series of Virginia specific trade codes. In the ICC published versions, marginal markings are provided to distinguish between text which is part of the International Codes and text which is part of the state regulations. Double vertical lines in the margins within the body of the codes indicate state amendments to the International Codes. As in the standard printings of the International Codes, a single vertical line in the margins within the body of the code indicates a technical change from the previous edition of the *International Codes*. Deletions from the previous editions of the *International Codes* are indicated in the form of an arrow ( ➡ ) in the margin where an entire section, paragraph, exception or table has been deleted or an item in a list of items or a table has been deleted.

## Technical Assistance

The local building departments and enforcing agencies may be contacted for further information concerning the USBC. Contact information for DHCD is below.

DHCD, Division of Building and Fire Regulation
State Building Codes Office
600 East Main Street, Suite 300
Richmond, Virginia 23219
Phone: (804) 371-7150 – Email: sbco@dhcd.virginia.gov
Website: www.dhcd.virginia.gov

ADMINISTRATION

2. The provisions of Chapter 1 of this code supersede any provisions of the codes and standards referenced in the IBC that address the same subject matter and impose differing requirements.

3. The state amendments to the IBC supersede any provisions of Chapters 2 - 35 of the IBC that address the same subject matter and impose differing requirements.

4. The state amendments to the IBC supersede any provisions of the codes and standards referenced in the IBC that address the same subject matter and impose differing requirements.

5. The provisions of Chapters 2 - 35 of the IBC supersede any provisions of the codes and standards referenced in the IBC that address the same subject matter and impose differing requirements.

**101.7 Administrative provisions.** The provisions of Chapter 1 establish administrative requirements, which include but are not limited to provisions relating to the scope of the code, enforcement, fees, permits, inspections and disputes. Any provisions of Chapters 2 - 35 of the IBC or any provisions of the codes and standards referenced in the IBC that address the same subject matter and impose differing requirements are deleted and replaced by the provisions of Chapter 1. Further, any administrative requirements contained in the state amendments to the IBC shall be given the same precedence as the provisions of Chapter 1. Notwithstanding the above, where administrative requirements of Chapters 2 - 35 of the IBC or of the codes and standards referenced in the IBC are specifically identified as valid administrative requirements in Chapter 1 of this code or in the state amendments to the IBC, then such requirements are not deleted and replaced.

> **Note:** The purpose of this provision is to eliminate overlap, conflicts and duplication by providing a single standard for administrative, procedural and enforcement requirements of this code.

**101.8 Definitions.** The definitions of terms used in this code are contained in Chapter 2 along with specific provisions addressing the use of definitions. Terms may be defined in other chapters or provisions of the code and such definitions are also valid.

> **Note:** The order of precedence outlined in Section 101.6 may be determinative in establishing how to apply the definitions in the IBC and in the referenced codes and standards.

SECTION 102
PURPOSE AND SCOPE

**102.1 Purpose.** In accordance with Section 36-99 of the Code of Virginia, the purpose of the USBC is to protect the health, safety and welfare of the residents of the Commonwealth of Virginia, provided that buildings and structures should be permitted to be constructed at the least possible cost consistent with recognized standards of health, safety, energy conservation and water conservation, including provisions necessary to prevent overcrowding, rodent or insect infestation, and garbage accumulation; and barrier-free provisions for the physically handicapped and aged.

**102.2 Scope.** This section establishes the scope of the USBC in accordance with Section 36-98 of the Code of Virginia. The USBC shall supersede the building codes and regulations of the counties, municipalities and other political subdivisions and state agencies. This code also shall supersede the provisions of local ordinances applicable to single-family residential construction that (i) regulate dwelling foundations or crawl spaces, (ii) require the use of specific building materials or finishes in construction, or (iii) require minimum surface area or numbers of windows; however, this code shall not supersede proffered conditions accepted as a part of a rezoning application, conditions imposed upon the grant of special exceptions, special or conditional use permits or variances, conditions imposed upon a clustering of single-family homes and preservation of open space development through standards, conditions, and criteria established by a locality pursuant to subdivision 8 of Section 15.2-2242 of the Code of Virginia or subdivision A 12 of Section 15.2-2286 of the Code of Virginia, or land use requirements in airport or highway overlay districts, or historic districts created pursuant to Section 15.2-2306 of the Code of Virginia, or local flood plain regulations adopted as a condition of participation in the National Flood Insurance Program.

> **Note:** Requirements relating to functional design are contained in Section 103.10 of this code.

**102.2.1 Invalidity of provisions.** To the extent that any provisions of this code are in conflict with Chapter 6 (Section 36-97 et seq.) of Title 36 of the Code of Virginia or in conflict with the scope of the USBC, those provisions are considered to be invalid to the extent of such conflict.

**102.3 Exemptions.** The following are exempt from this code:

1. Equipment, related wiring, and poles and towers supporting the related wiring installed by a provider of publicly regulated utility service or a franchised cable television operator and electrical equipment and related wiring used for radio, broadcast or cable television, telecommunications or information service transmission. The exemption shall apply only if under applicable federal and state law the ownership and control of the

2

equipment and wiring is by the service provider or its affiliates. Such exempt equipment and wiring shall be located on either rights-of-way or property for which the service provider has rights of occupancy and entry; however, the structures, including their service equipment, housing or supporting such exempt equipment and wiring shall be subject to the USBC. The installation of equipment and wiring exempted by this section shall not create an unsafe condition prohibited by the USBC.

2. Manufacturing and processing machines that do not produce or process hazardous materials regulated by this code, including all of the following service equipment associated with the manufacturing or processing machines.

2.1. Electrical equipment connected after the last disconnecting means.

2.2. Plumbing piping and equipment connected after the last shutoff valve or backflow device and before the equipment drain valve.

2.3. Gas piping and equipment connected after the outlet shutoff valve.

Manufacturing and processing machines that produce or process hazardous materials regulated by this code are only required to comply with the code provisions regulating the hazardous materials.

3. Parking lots and sidewalks that are not part of an accessible route.

4. Nonmechanized playground or recreational equipment such as swing sets, sliding boards, climbing bars, jungle gyms, skateboard ramps, and similar equipment where no admission fee is charged for its use or for admittance to areas where the equipment is located.

5. Industrialized buildings subject to the Virginia Industrialized Building Safety Regulations (13VAC5-91) and manufactured homes subject to the Virginia Manufactured Home Safety Regulations (13VAC5-95); except as provided for in Section 425.

6. Farm buildings and structures, except for a building or a portion of a building located on a farm that is operated as a restaurant as defined in Section 35.1-1 of the Code of Virginia and licensed as such by the Virginia Board of Health pursuant to Chapter 2 (Section 35.1-11 et seq.) of Title 35.1 of the Code of Virginia. However, farm buildings

and structures lying within a flood plain or in a mudslide-prone area shall be subject to flood-proofing regulations or mudslide regulations, as applicable.

7. Federally owned buildings and structures unless federal law specifically requires a permit from the locality. Underground storage tank installations, modifications and removals shall comply with this code in accordance with federal law.

8. Off-site manufactured intermodal freight containers, moving containers, and storage containers placed on site temporarily or permanently for use as a storage container.

9. Automotive lifts.

## SECTION 103
## APPLICATION OF CODE

**103.1 General.** In accordance with Section 36-99 of the Code of Virginia, the USBC shall prescribe building regulations to be complied with in the construction and rehabilitation of buildings and structures, and the equipment therein.

**103.2 When applicable to new construction.** Construction for which a permit application is submitted to the local building department on or after the effective date of the 2012 edition of the code shall comply with the provisions of this code, except for permit applications submitted during a one-year period beginning on the effective date of the 2012 edition of the code. The applicant for a permit during such one-year period shall be permitted to choose whether to comply with the provisions of this code or the provisions of the edition of the code in effect immediately prior to the 2012 edition. This provision shall also apply to subsequent amendments to this code based on the effective date of such amendments. In addition, when a permit has been properly issued under a previous edition of this code, this code shall not require changes to the approved construction documents, design or construction of such a building or structure, provided the permit has not been suspended or revoked.

**103.3 Change of occupancy.** No change of occupancy shall be made in any structure when the current USBC requires a greater degree of accessibility, structural strength, fire protection, means of egress, ventilation or sanitation. When such a greater degree is required, the owner or the owner's agent shall comply with the following:

1. When involving Group I-2 or I-3, written application shall be made to the local building department for a new certificate of occupancy and the new certificate of occupancy shall be obtained prior to the new use of the structure. When impractical to

and imminent threat to the life and safety of the occupants or the public.

**VADR.** The Virginia Amusement Device Regulations (13VAC5-31).

**VCS.** The Virginia Certification Standards (13VAC5-21).

**WORKING DAY.** A day other than Saturday, Sunday or a legal local, state or national holiday.

*Change the following definitions in Section 202 of the IBC to read:*

**24-HOUR BASIS.** The actual time that a person is an occupant within a facility for the purpose of receiving care. It shall not include a facility that is open for 24 hours and is capable of providing care to someone visiting the facility during any segment of the 24 hours.

**AMBULATORY HEALTH CARE FACILITY.** Buildings or portions thereof that are licensed by the Virginia Department of Health as outpatient surgical hospitals.

**AUTOMATIC FIRE-EXTINGUISHING SYSTEM.** An approved system of devices and equipment that automatically detects a fire and discharges an approved fire-extinguishing agent onto or in the area of a fire and includes among other systems an automatic sprinkler system, unless otherwise expressly stated.

**BUILDING.** A combination of materials, whether portable or fixed, having a roof to form a structure for the use or occupancy by persons, or property. The word "building" shall be construed as though followed by the words "or part or parts thereof" unless the context clearly requires a different meaning. "Building" shall not include roadway tunnels and bridges owned by the Virginia Department of Transportation, which shall be governed by construction and design standards approved by the Virginia Commonwealth Transportation Board.

For application of this code, each portion of a building that is completely separated from other portions by fire walls complying with Section 706 shall be considered as a separate building (see Section 503.1).

**CUSTODIAL CARE.** Assistance with day-to-day living tasks, such as assistance with cooking, taking medication, bathing, using toilet facilities, and other tasks of daily living. In other than in hospice facilities, custodial care includes occupants that have the ability to respond to emergency situations and evacuate at a slower rate or who have mental and psychiatric complications, or both.

**GROUP HOME.** A facility for social rehabilitation or substance abuse or mental health problems that contains a group housing arrangement that provides custodial care but does not provide medical care.

**OWNER.** The owner or owners of the freehold of the premises or lesser estate therein, a mortgagee or vendee in possession, assignee of rents, receiver, executor, trustee or lessee in control of a building or structure.

**REGISTERED DESIGN PROFESSIONAL (RDP).** An architect or professional engineer, licensed to practice architecture or engineering, as defined under Section 54.1-400 of the Code of Virginia.

**SWIMMING POOL.** An aquatic vessel as defined in the International Swimming Pool and Spa Code (ISPSC).

**STRUCTURE.** An assembly of materials forming a construction for occupancy or use including stadiums, gospel and circus tents, reviewing stands, platforms, stagings, observation towers, radio towers, water tanks, storage tanks (underground and aboveground), trestles, piers, wharves, swimming pools, amusement devices, storage bins, and other structures of this general nature but excluding water wells. The word "structure" shall be construed as though followed by the words "or part or parts thereof" unless the context clearly requires a different meaning. "Structure" shall not include roadway tunnels and bridges owned by the Virginia Department of Transportation, which shall be governed by construction and design standards approved by the Virginia Commonwealth Transportation Board.

*Delete the following definitions from Section 202 of the IBC:*

**AGRICULTURAL BUILDING.**

**EXISTING STRUCTURE (FOR CHAPTER 34).**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| **CAMILLE SEDAR** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:18cv01111 CMH/TCB** |
| | ) | |
| **BOSTON PROPERTIES, LP, *et al.*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Defendants Boston Properties LP ("BPLP") and Reston Town Center Property, LLC ("RTC"), by counsel, submit the following Reply to plaintiff Camille Sedar's Opposition to their Motion for Summary Judgment, and state as follows:

In her Opposition, plaintiff Camille Sedar ("Sedar") attempts to muddy the factual record to create "circumstantial" evidence from whole speculation. There are no material facts *genuinely in dispute* as to lack of causation in this matter. Sedar's arguments regarding whether any particular brick had insufficient grout around it or moved when jostled are irrelevant where she cannot link any alleged defect to her fall. While BPLP and RTC dispute Sedar's allegations that they had actual or constructive notice of any unsafe or hazardous condition prior to her accident, the notice issue is not even reached where Sedar cannot show proximate cause.

**I.      No Facts Genuinely in Dispute.**

There is no dispute regarding the central facts of this case. Sedar and several of her coworkers went to Reston Town Center for a luncheon at the restaurant Ted's Bulletin; Sedar was with two other coworkers, Davida Buchanan ("Buchanan") and Robert Rapanut ("Rapanut") when she fell down stairs while walking from the "Green Garage" on her way to the restaurant;

1

and three other coworkers arrived after Sedar's fall. While Sedar makes the argument that

Buchanan and Rapanut "witnessed" her fall, their testimony makes clear that they did not see her

trip, slip, stumble, lose her balance, or otherwise begin her fall. Buchanan and Rapanut were

walking together and having a conversation, while Sedar walked ahead of them (Statement No.

10). These witnesses do not know how or why Sedar fell, and admit that their after-the-fact

investigation of the scene amounted to assumptions and speculation (*See* Dkt. 45, Defendants'

Memorandum in Support of Summary Judgment at 11-12).

Sedar focuses on "an area of bricks that were not level" as circumstantial evidence,

labeling them as a dangerous condition (Opp. at 3). In addition to the fact that it is unknown how

Sedar fell, whether Sedar might have stepped on the allegedly unlevel bricks is a matter of pure

speculation. Buchanan is unclear about Sedar's path of travel from the garage, marking one area

on a photo of the landing and later attempting to change her testimony in response to leading

questions from Sedar's counsel (Opp. at 9, 23-24)[1]. Rapanut testified that he found a brick on the

landing that could be jostled with his foot, but said that the photos and video submitted as

evidence are of a different brick (Statement Nos. 25, 26 and 27). Rapanut also identified a path

of travel that was different from Buchanan's original description (Dkt. 45 at 12). For the first

time, Sedar alleges that a concrete lip where the stairs meet the brick pavers may have caused her

to fall, rather than the jiggly brick (Opp. at 26).[2]

While Sedar tries to create disputed facts as to the lack of inspections by BPLP, RTC

and/or MaxSent, there is no dispute that none of these entities had notice of any condition on the

---

[1] The Opposition noted that Buchanan was prompted to change her testimony, "[w]hen oriented during further examination…" (Opp. at 24).

[2] There is no evidence, expert or otherwise, that Sedar tripped on a concrete lip.

2

landing that might present a hazard prior to the accident (Statement Nos. 29, 30, 33, and 36).

MaxSent inspected the area immediately after the fall and found no hazards (Statement No. 20).

## II.     No Evidence of Proximate Cause

Virginia law is clear that negligence will not be presumed from the mere happening of an

accident; the plaintiff must prove that the defendant's negligent actions were the accident's

proximate cause. Weddle v. Draper, 204 Va. 319, 130 S.E.2d 462, 465 (1963). In the premises

liability context, as the defendants note in their brief, Sedar must establish that the unsafe

condition of which she complains was the proximate cause of her injury. *See* Roll 'R' Way

Rinks, Inc. v. Smith, 218 Va. 321, 237 S.E.2d 157, 162 (Va.1977); *see also* Cannon v.

Clarke, 209 Va. 708, 711, 167 S.E.2d 352, 354 (1969).

Sedar's claims must fail because she cannot show that any condition on the property was

the proximate cause of her fall. With no witnesses to testify about how or why she fell, Sedar

relies solely on her proposed expert witness, civil engineer Dano Holland, to tie her fall to the

bricks.[3] Holland noted that the caulk around certain bricks had broken down over time due to

weather and normal use, and that the gap between a few bricks he identified (which were in a

different area than Sedar's fall) constituted a dangerous condition that BPLP and RTC should

have known about (Opp. at 6, 15). From those observations, Holland makes a giant leap for his

opinion that the "dangerous condition" most likely caused Sedar's fall. As noted in Holbrook v.

Davidson, No. 2:13CV00027, 2014 WL 198222, at *4 (W.D. Va. Jan. 15, 2014), "none of that

matters if the plaintiff also cannot show that it was precisely these dangerous defects that caused

the fall." In a case involving a fall down a staircase, the expert in Holbrook offered expert

testimony regarding alleged defects in a staircase, including its steepness, lack of a handrail and

---

[3] For the reasons stated in defendants' Motion to Exclude Expert Testimony, Holland's opinion should not be considered.

improper termination onto the basement floor to explain the fall. Granting summary judgment, the court did not consider the expert testimony where witnesses could only make assumptions as to how the fall happened, and where other possible explanations existed.[4] Id. at *5. Likewise, Holland's testimony does not matter since Sedar cannot show that the allegedly dangerous defects in the landing caused her fall.

Indeed, a number of other scenarios seem equally likely to have caused Sedar to fall. She was carrying a large poster-sized photo and her wallet in her hands (Statement No. 11) and she might have missed a step; the sun in her eyes may have blocked her vision; she failed to use one of four sets of handrails that were positioned on the stairs (Statement No. 17); or any number of other reasons. Where the evidence shows that any one of several things may have caused the injury, for some of which the defendant is responsible and for some of which it is not, and leaves the real issue to speculation and conjecture, then the plaintiff has failed to establish a case. Safeway Stores, Inc. v. Tolson, 203 Va. 13, 16, 121 S.E.2d 751, 753 (1961).

While Sedar goes to great lengths in her attempt to establish a dangerous condition on the landing with Holland's testimony that the caulk between certain of the bricks did not meet Virginia's building code, Sedar has still failed to meet her burden of establishing a *prima facie* case. Even if there was some violation, however minor, "mere proof of an accident and negligence does not establish a cause of action." Blacka v. James, 205 Va. 646, 139 S.E.2d 47, 50 (1964).

Sedar argues that the photos, the video, a scuff mark on her shoe, along with her expert's opinion, amount to circumstantial evidence which should be considered by a jury (Opp. at 20).

---

[4] The court noted that the fall might have occurred because plaintiff's mother lost her balance or stepped backwards while accessing the vegetable bin at the top of the stairs, or her shoe might have come off while ascending or descending the stairs, or she might have become dizzy or lightheaded while on the stairs, or she simply lost her footing on the steps, or her dogs might have tripped her. Id.

4

However, circumstantial evidence cannot be based on pure speculation. Sedar's argument acknowledges that there must be a legitimate inference supporting proximate cause, and not merely "speculation and conjecture" (Opp. at 20, citing Blacka, *supra*). *See also* Page v. Arnold, 314 S.E.2d 57, 60 (Va.1984)("Proof of 'possibility' that a fact exists is not enough to take the issue out of the sphere of pure conjecture and rank speculation into the realm of legitimate inference, sufficient for a jury to be permitted to consider the question"; Weddle, 130 S.E.2d at 466 ("It is incumbent on the plaintiff who alleges negligence to show why and how the accident happened, and if that is left to conjecture, guess or random judgment, he cannot recover").

Cases cited by Sedar are distinguishable from the facts presented here. In the cases of Hudson v. Boddie-Noel Enterprises, Inc. No. 7:11CV00466, 2012 WL 2153375, at *5–6 (W.D. Va. June 13, 2012) and Fobbs v. Webb Building Limited Partnership, 232 Va. 227, 349 S.E.2d 355 (1986), each court focused on the plaintiff's own testimony that he or she slipped on something slippery in connection with other circumstantial evidence of water on the floor (Fobbs) or ice on the sidewalk (Hudson) in allowing the jury to consider the evidence. In this case there is a critical gap in the evidence, as neither Sedar nor any witness can link any alleged defective condition of the bricks to the accident.

Sedar's reliance on McGuire v. Hodges, 233 Va. 199, 639 S.E.2d 284 (2007) is misplaced. McGuire is a wrongful death action against a homeowner for negligent failure to maintain a fence and gate surrounding her pool, which allegedly caused a toddler's drowning death. The evidence showed that the enclosed the pool had only one gate for entry and exit, and that the gate failed to meet the requirements of national and local building codes. In setting aside a jury verdict, the trial court concluded that the evidence at trial failed to establish that the building code violations relied

upon by McGuire were a proximate cause of Cody's death. Id. at 205. The Virginia Supreme Court reversed, finding that the circumstantial evidence was sufficient to support the decision reached by the jury that Hodges' negligence was a proximate cause of Cody's death, *as there was no evidence of an alternative means of access to the pool other than the defective gate*. Id. at 208-209 (emphasis supplied). As noted above, there is ample evidence of a myriad of ways that Sedar could have fallen, there is no consistent evidence regarding her path of travel, so she cannot sufficiently establish an inference of negligence by more than a mere possibility that she fell due to the condition of the bricks.

The wrongful death case of Wooldridge v. Echelon Service Co., 243 Va. 458, 459, 416 S.E.2d 441, 442 (1992) is also inapposite. In considering whether a plaintiff produced sufficient evidence to establish proximate cause in a fatal attack in a building for which Echelon provided security services, the court found that a jury question was presented as to whether the security guard saw a perpetrator enter the building but failed to pursue or investigate further and whether the inaction of the guard was a proximate cause of death. Id. at 460, 416 S.E.2d at 442. The guard testified that the "flash" he saw was a person and that, after calling out to the individual, he chose not pursue the man further. Id. at 461-62, 416 S.E.2d at 443. The court also considered evidence that the man apprehended a short time later was the sole unauthorized person found in the building at the time of the attack, and concluded that the jury could have inferred based upon the circumstantial evidence that the assailant was the person seen by the security guard, and that the security guard's "inaction" was a proximate cause of the victim's death. Id.

Wooldridge was distinguished by Atrium Unit Owners Ass'n v. King, 266 Va. 288, 294–95, 585 S.E.2d 545, 548–49 (2003), where the court concluded the plaintiff failed to carry her burden in showing sufficient evidence from which a jury reasonably could infer a causal

6

connection between a condominium unit owners association's alleged negligence regarding a convenience key and the damages sustained by the plaintiff in a burglary of her condominium. The court considered testimony that that the use of a key was only one of several ways in which a burglar could have gained access to the condominium without using force, and found "[p]roof of 'possibility' of causal connection is not sufficient." Id., *citing* Wilkins v. Sibley, 205 Va. 171, 175, 135 S.E.2d 765, 767 (1964).

Here, unlike the cases cited by Sedar, there is nothing in the record from which the jury could reasonably infer a causal connection between BPLP or RTC's alleged negligence and the damages Sedar sustained as a result of the accident.

## III.     CONCLUSION

Sedar has not come forth with sufficient evidence to bring the issue of causation out of pure conjecture and speculation. Nor has she established that BPLP or RTC had notice or even constructive notice of an unsafe condition. There being no material facts genuinely in dispute, summary judgment is warranted.

WHEREFORE, for the foregoing reasons, defendants Boston Properties Limited Partnership and Reston Town Center, LLC respectfully request that their Motion for Summary Judgment be granted and that Judgment be entered in their favor against the plaintiff.

**BOSTON PROPERTIES, LP and RESTON TOWN CENTER PROPERTY, LLC**

By:     _____/s/_____
        David D. Hudgins

David D. Hudgins (VA Bar No. 20602)
Hudgins Law Firm, P.C.
2331 Mill Road, Suite 100
Alexandria, VA  22314
(703) 739-3300
Fax:  (703) 739-3700

7

**-1030-**

dhudgins@hudginslawfirm.com

By:        /s/
          Joseph P. Moriarty

Joseph P. Moriarty
Willcox & Savage, P.C.
440 Monticello Ave., Suite 2200
Norfolk, VA 23510-2243
jmoriarty@wilsav.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August, 2019 I sent the foregoing electronically to the following counsel of record:

David J. Sensenig
Andrew R. Park
Park Sensenig, LLC
2310 West Main St.
Richmond, VA 23220

          /s/
          David D. Hudgins

KeyCite Yellow Flag - Negative Treatment
Distinguished by Whitaker v. Hyundai Motor Company, W.D.Va.,
October 10, 2018

2014 WL 198222
Only the Westlaw citation is currently available.
United States District Court, W.D. Virginia,
Big Stone Gap Division.

Harold B. HOLBROOK, Administrator of the
Estate of Monetta Faye Holbrook, Deceased,
Plaintiff
v.
Deborah S. DAVIDSON, Defendant.

No. 2:13cv00027.
|
Jan. 15, 2014.

**Attorneys and Law Firms**

John Edward Jessee, Jessee & Read, Abingdon, VA,
Robert B. Hines, II, Hines Law Office, PLC, Jonesville,
VA, for Plaintiff.

Guy M. Harbert, III, John Reed Thomas, Jr., Gentry
Locke Rakes & Moore, Roanoke, VA, for Defendant.

*MEMORANDUM OPINION*

PAMELA MEADE SARGENT, United States Magistrate
Judge.

*1 The plaintiff, Harold B. Holbrook, brings this
wrongful death action on behalf of the estate of his
deceased mother, Monetta Faye Holbrook. This matter is
before the undersigned on the Defendant's Motion For
Summary Judgment, (Docket Item No. 18), ("Motion").
The plaintiff has responded to the Motion, and the
defendant has filed a reply. This matter is now ripe for
disposition. Plaintiff has requested a hearing on the
Motion. However, after reviewing the Motion, the
plaintiff's Brief in Opposition and the defendant's Reply,
and the arguments and representations contained therein,
the court finds that the matter can be resolved without the

benefit of a hearing. A jury trial in this matter is
scheduled for February 4 and 5, 2014, before the
undersigned. The action, including the Motion, is before
the undersigned magistrate judge upon transfer pursuant
to the consent of the parties under 28 U.S.C. §
636(c)(1). Based on the arguments and representations
presented, and for the reasons stated in this Memorandum
Opinion, the Motion will be granted.

*I. Facts*

The parties are in agreement regarding the facts
underlying this wrongful death action. In the late summer
or early fall of 2007, Monetta Holbrook, ("Holbrook"),
began working as a caretaker for Kathleen Seals,
("Seals"), at Seals's home in Big Stone Gap, Virginia.
Seals lived with her daughter, Deborah Davidson,
("Deborah," "Davidson" or "defendant"), and Davidson's
husband, Thomas Davidson, ("Thomas"), (collectively
"Davidsons"), in the home owned by Deborah. (Docket
Item No. 18–1 at 2). Holbrook's duties as a caretaker
consisted of caring for Seals, sitting with her, assisting her
with using the bathroom and cooking her meals. (Docket
Item No. 18–1 at 3). Although Holbrook was not
obligated to clean the home, she sometimes did so.
(Docket Item No. 18–1 at 10). The home consists of one
main living level. (Docket Item No. 18–1 at 3–4). The
home also has an attic, which is accessible by a set of
pull-down stairs, as well as a basement, accessible by a
stairway from the kitchen, as well as by an outside
entrance. (Docket Item No. 18–1 at 4). At the top of the
basement stairs is a landing with a vegetable bin. (Docket
Item No. 18–1 at 7–8). There were four small dogs also
living in the home, which roamed freely throughout.
(Docket Item No. 18–1 at 10).

The Davidsons kept extra grocery items, like butter and
soft drinks, in a refrigerator in the basement. (Docket Item
No. 18–1 at 13, 16; Docket Item No. 18–4 at 4). They
made a habit of telling Holbrook that they would bring up
anything from the basement that she might need during the
day. (Docket Item No. 18–1 at 4; Docket Item No.
18–4 at 4). For instance, if the kitchen refrigerator ran out
of butter or soft drinks, Deborah asked Holbrook to
inform her so that she or Thomas could bring the items up
from the basement. Deborah warned Holbrook not to go
down to the basement due to the steep stairs from the first
day that Holbrook worked in the home. (Docket Item No.
18–1 at 4, 15; Docket Item No. 18–4 at 9). However,

despite such warning, Holbrook used the stairs on several occasions to retrieve items from the basement. (Docket Item No. 18–1 at 4). When the Davidsons saw this occur, they repeated their warning to Holbrook not to use the stairs. (Docket Item No. 18–1 at 4). In any event, Thomas was at the home the vast majority of the time to assist Holbrook and could retrieve anything from the basement that she might need. (Docket Item No. 18–1 at 4).

**\*2** On the morning of May 19, 2010, Holbrook arrived at the home at approximately 8:00 a.m. She spoke with both Deborah and Thomas, complaining of feeling dizzy and lightheaded. (Docket Item No. 18–1 at 15; Docket Item No. 18–4 at 3). She attributed the dizziness to her blood pressure. (Docket Item No. 18–4 at 3). Holbrook also complained of a pain in her arm and weakness in her knees. (Docket Item No. 18–4 at 3). Deborah went to work that day, and Thomas left the home to mow grass. (Docket Item No. 18–4 at 3). At approximately 2:45 p.m., Christy Jones, ("Jones"), Seals's granddaughter, came to the home to bring Seals some potato salad and to visit Holbrook, who was her aunt. (Docket Item No. 18–1 at 8; Docket Item No. 18–3 at 4). When Jones asked Seals where Holbrook was, Seals stated that she had gone home. (Docket Item No. 18–3 at 4). However, Jones noticed that the basement door was open. When she looked down into the basement, Jones saw Holbrook lying on the floor at the bottom of the stairs. (Docket Item No. 18–3 at 5). Holbrook was deceased. Jones called emergency services, and Officer W. Hollinger, an Investigator with the Big Stone Gap Police Department, responded to the home. (Docket Item No. 18–3 at 5; Docket Item No. 18–5 at 3). Officer Hollinger took photographs of the scene, completed a police report and contacted the medical examiner. (Docket Item No. 18–5 at 3, 5; Docket Item No. 18–6 at 2).

Officer Hollinger was unable to determine whether Holbrook was going up or down the stairs when she fell, nor was he able to determine the cause of the fall. (Docket Item No. 18–5 at 6). Officer Hollinger believes that it is possible that Holbrook's shoe came off, causing her to fall, or that she fell backwards from the top landing while accessing the vegetable bin. (Docket Item No. 18–5 at 7–8). Officer Hollinger stated that he does not find any one possible cause of the accident to be any more probable than any other. (Docket Item No. 18–5 at 9–10). Plaintiff Harold Holbrook and Van Holbrook, Holbrook's other son, similarly do not know what caused their mother to fall. Van Holbrook stated that based upon his conversations with others, he believes that she "slipped and fell on some steps." (Docket Item No. 18–2 at 9).

John Franklin Loehr, III, a Class A general building contractor since approximately 1986, and plaintiff's expert witness, stated in his deposition testimony that he measured the stairway in Davidson's home, took photographs of it and compared it with the International Residential Code, ("Code"). (Docket Item No. 20–3 at 5, 11, 14). Loehr stated that, due to defects in the stairway, it is very difficult to negotiate. (Docket Item No. 20–3 at 14). Loehr stated that the basement stairs are defective in three main areas. (Docket Item No. 20–3 at 15). First, the treads and risers on the stairs are not to Code, making the stairs steeper and the treads narrower than they should be. (Docket Item No. 20–3 at 15). Second, the staircase lacks a handrail, as required by Code. (Docket Item No. 20–3 at 17). Finally, the stairs terminate in a manner resulting in a greater than three-eighths of an inch difference between the largest riser and the smallest riser, in violation of Code. (Docket Item No. 20–3 at 15). More specifically, Loehr stated that the last wooden tread is 18 and one-half inches off the floor. (Docket Item No. 20–3 at 23). He noted that there is a six-inch concrete block between this last wooden tread and the floor, leaving a 10– or 11–inch step. (Docket Item No. 20–3 at 23). He stated that the risers should have continued down to the concrete basement floor, and the steps should have continued between seven- and eight-inch risers on down until they met the floor, as required by Code. (Docket Item No. 20–3 at 23). Loehr stated that having a bigger step or a smaller step at the bottom is really difficult to negotiate. (Docket Item No. 20–3 at 23). Additionally, Loehr stated that the stairway is not fastened very well, and the concrete blocks at the bottom are loose. (Docket Item No. 20–3 at 24).

**\*3** Dr. Maurice Nida, D.O., the Wise County Medical Examiner, performed a physical examination of Holbrook at Lonesome Pine Hospital. (Docket Item No. 20–4 at 5). Dr. Nida concluded that she died as a result of the fall. (Docket Item No. 20–4 at 6). More specifically, Dr. Nida stated that Holbrook died from an open skull fracture to the back of the head. (Docket Item No. 20–4 at 5). He further stated that the police report noted the presence of a steel pole at the bottom of the stairs. (Docket Item No. 20–4 at 5). He stated that Holbrook's injuries were "one hundred percent consistent" with her having struck her head on the pole, resulting in a sudden death. (Docket Item No. 20–4 at 6). Dr. Nida stated that, for that reason, he did not perform any further investigation into any potential contributing factors to her fall, such as a heart attack. (Docket Item No. 20–4 at 6). Dr. Nida concluded that Holbrook died as the result of a fall, but he could not state the cause of the fall, as he did not witness it. (Docket Item No. 20–4 at 6).

## II. Analysis

With regard to a motion for summary judgment, the standard of review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(a); *see, e.g.,* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See* *Anderson,* 477 U.S. at 255; *Matsushita,* 475 U.S. at 587. Thus, the court will view the facts and inferences in the light most favorable to the plaintiff on the defendant's Motion. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington–South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir.1996).

The plaintiff alleges that Holbrook fell and died as a result of the dangerous nature of the staircase. The plaintiff alleges that the defendant was negligent in failing to warn Holbrook of the dangerous stairs and/or failing to repair the dangerous conditions related to the stairs. On the other hand, the defendant argues that any alleged defect in the staircase was open and obvious, thereby requiring no warning. However, even assuming the alleged dangerous condition of the stairs was not open and obvious, both the defendant and her husband warned Holbrook on multiple occasions not to use the basement stairs, and they did so from the first day she began working in the home. Finally, the defendant argues that the plaintiff has failed to show that the allegedly dangerous and defective condition of the stairs proximately caused Holbrook to fall, resulting in her death.

**\*4** A federal court exercising diversity jurisdiction, as here, is obliged to apply the substantive law of the state in which it sits, including its choice of law rules. *See* *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.,* 386 F.3d 581, 599–600 (4th Cir.2004) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 79 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496 (1941)). Here, Virginia is the forum state. In Virginia, liability for tort depends upon the law of the place of injury. *See Lachman v. Pa. Greyhound Lines, Inc.,* 160 F.2d 496, 500 (4th Cir.1947); *C.I.T. Corp. v. Guy,* 195 S.E. 659, 663 (Va.1938). In the case at bar, Holbrook was injured at the Davidsons' home, located in Big Stone Gap, Virginia. Therefore, this court must utilize the substantive law of Virginia. To assert a claim for negligence, a plaintiff must allege a legal duty owed by the defendant, a breach of that duty by the defendant, and an injury that was proximately caused by the breach. *See* *McGuire v. Hodges,* 639 S.E.2d 284, 288 (Va.2007). In Virginia, owners and occupiers of property may be held liable for injuries caused to other persons by conditions on their premises. *See* *Tate v. Rice,* 315 S.E.2d 385, 388 (Va.1984). The duties owed to a plaintiff depend upon her status on the premises, specifically, whether she is an invitee, a licensee or a trespasser. In Virginia, an invitee is defined as a person to whom the "landowner or occupier has extended an express or implied invitation to the visitor and the visitor enters pursuant to the invitation." *Bauer v. Harn,* 286 S.E.2d 192, 194–95 (Va.1982). There is no dispute that Holbrook was an invitee in Davidson's home.

In Virginia, an owner or occupier of land must use ordinary care to keep his premises reasonably safe for an invitee, although he is not an insurer of the invitee's safety. *See* *Tate,* 315 S.E.2d at 388. Moreover, an invitee has the right to assume that premises are reasonably safe for his lawful use, in the absence of information to the contrary. *See* *Tate,* 315 S.E.2d at 388. While a landowner must give notice or warning of an unsafe condition which is known to him and unknown to an invitee, such notice is not required where the dangerous condition is open and obvious, and is patent to a reasonable person exercising ordinary care for his own safety. *See* *Tate,* 315 S.E.2d at 388 (citations omitted). The duty of an owner or occupier of a private residence to maintain his premises in a condition which is reasonably safe for an invitee does not extend to warning of, or removing, a danger that is open and obvious. *See* *Tate,* 315 S.E.2d at 388. Thus, the obviousness of the danger serves to eliminate any duty on the landowner's part to warn of or to remove the danger. *See* *Tate,* 315 S.E.2d at 388.

Additionally, in order to hold an owner liable for injuries sustained because of an alleged unsafe condition of the premises, whether open and obvious or not, it must be shown that such condition was the proximate cause of the injuries. *See* Cannon v. Clarke, 167 S.E.2d 352, 354 (Va.1969) (citing *Hargrave's Adm'r v.. Shaw Land & Timber Co.,* 68 S.E. 278, 279 (Va.1910); *State–Planters Bank & Trust Co. v. Gans,* 200 S.E. 591, 593 (Va.1939); *Thalhimer Bros., Inc. v. Buckner,* 76 S.E.2d 215, 217 (Va.1953)). A review of the briefs and the evidence presented by the parties persuades me that granting summary judgment in favor of the defendant is appropriate in this case. First, while the plaintiff has offered expert testimony regarding the alleged defects in the staircase, including its steepness, lack of a handrail and improper termination onto the basement floor, none of that matters if the plaintiff also cannot show that it was precisely these dangerous defects that caused the fall. The medical examiner who examined Holbrook's body concluded that she did, in fact, die as the result of a traumatic brain injury due to a fall, but he stated that he could not opine as to the cause of the fall, as he was not a witness to it. In fact, noone witnessed Holbrook fall. The only other person in the home at the time of the fall was Mrs. Seals, who thought Holbrook had simply gone home. Deposition testimony from Officer Hollinger also fails to clarify the cause of the fall. Hollinger stated that he was unable to determine whether Holbrook fell as she was coming up or going down the stairs. He stated that she might have fallen as the result of losing her shoe on the stairs, but he also stated that she could have fallen backwards from the landing at the top of the stairs while trying to retrieve something from the vegetable bin. Officer Hollinger stated that he did not find one or the other of these possibilities more probable than the other.

**\*5** Similarly, Holbrook's son, Van Holbrook, stated in his deposition that he "assume[d] that [his mother] slipped and fell on some steps ." However, he added that "nobody really seems to know what happened." (Docket Item No. 18–2 at 10). All of this being said, several possibilities exist as to the cause of Holbrook's fall. She might have fallen due to the steepness of the stairs, the lack of a handrail or the improper termination at the bottom of the staircase. However, she also might have fallen because she lost her balance or stepped backwards while accessing the vegetable bin at the top of the stairs. Her shoe might have come off while ascending or descending the stairs, causing her to fall. She might have become dizzy or lightheaded while on the stairs, as she had complained of these things earlier that day. She could have simply lost her footing on the steps. She could have experienced a medical emergency of some sort that caused the fall. Any

one of the four small dogs, who Deborah testified roamed freely around the home, could have run under her feet or somehow managed to trip her, causing her to fall. While Holbrook's death is a tragedy, allowing the case to go to a jury trial without any evidence as to the cause of her fall would call for pure conjecture and speculation. This I cannot do. In Virginia, "where the evidence shows that any one of several things may have caused the injury, for some of which the defendant is responsible and for some of which he is not, and leaves the real cause to speculation and conjecture, then the plaintiff has failed to establish his case." Williamsburg Shop, Inc. v. Weeks, 110 S.E.2d 189, 192 (Va.1959).

In summary, even assuming that the basement stairway constitutes a dangerous condition, which was not open and obvious, and even assuming, contrary to their deposition testimony, that the Davidsons failed to warn Holbrook of such dangerous condition, because the plaintiff has failed to provide evidence that the dangerous character of the stairway, in fact, caused Holbrook to fall, the plaintiff has failed to meet his burden with regard to proximate causation on his negligence claim, and the defendant is entitled to summary judgment as a matter of law.

### III. Conclusion

Accordingly, the defendant's Motion is granted. An appropriate judgment will be entered.

### JUDGMENT

This case is before the court on the Defendant's Motion For Summary Judgment, (Docket Item No. 18), ("Motion"). For the reasons detailed in the Memorandum Opinion accompanying this Judgment and entered this day, the Motion is hereby **GRANTED,** and judgment is entered in favor of the defendant, Deborah S. Davidson.

The Clerk is directed to enter this Judgment. The Clerk is directed to send copies of this Judgment and accompanying Memorandum Opinion to all counsel of record. The Clerk is further directed that this case is to be closed and stricken from the court's docket.

**Holbrook v. Davidson, Not Reported in F.Supp.3d (2014)**

Not Reported in F.Supp.3d, 2014 WL 198222

**All Citations**

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| CAMILLE SEDAR, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:18-cv-1111 |
| ) | |
| BOSTON PROPERTIES LIMITED ) | |
| PARTNERSHIP and ) | |
| RESTON TOWN CENTER PROPERTY, ) | |
| LLC, ) | |
| ) | |
|     Defendants. ) | |

**ORDER**

THIS MATTER comes before the Court on Plaintiff's Motion for Leave to File Video as Exhibit (Dkt. 53).

Plaintiff seeks to attach a video taken shortly after the incident causing her alleged personal injury to her Oppositions to Defendants' Motion for Summary Judgment and Motion to Exclude Expert Testimony. The Court will allow the video to be filed as an exhibit to the Oppositions. Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Leave to File is GRANTED and the exhibit deemed filed with the appropriate documents.

*Claude M. Hilton*
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
August _5_, 2019

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

CAMILLE SEDAR,                )
                              )
        Plaintiff,            )
                              )
v.                            )        Civil Action No. 1:18-cv-1111
                              )
BOSTON PROPERTIES LIMITED     )
PARTNERSHIP and RESTON TOWN   )
CENTER PROPERTY, LLC,         )
                              )
        Defendants.           )

**ORDER**

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment (Dkt. 44) pursuant to Fed. R. Civ. P. 56.

Plaintiff, Camille Sedar, brought the original action in this case in Virginia state court seeking damages for injuries suffered due to a tumble she took down a flight of stairs in a parking garage owned and operated by Defendants.

Plaintiff exited the parking garage at Reston Town Center on November 16, 2016 by way of an exterior staircase. Plaintiff was headed to a celebratory lunch with a number of coworkers. The staircase Plaintiff used had four or five steps depending on which section Plaintiff took and was made of concrete with a landing made of bricks at the top and a concrete pad at the bottom. It was a bright and sunny day and there was no moisture or pooled liquid on the ground. As Plaintiff was walking, she

was carrying a large poster-sized photograph and her phone in her hand. There is no evidence that Plaintiff used the handrail as she descended the stairs.

All of a sudden, Plaintiff fell down the stairs, landed face first, and lost consciousness. Due to her loss of consciousness, Plaintiff does not remember what, if anything, caused her fall. None of Plaintiff's colleagues saw what actually caused Plaintiff to fall. There were also discrepancies amongst Plaintiff's colleagues about which section of the stairs Plaintiff descended.

After the paramedics arrived, some of her colleagues looked around the area to attempt to find something that may have caused Plaintiff to stumble and fall down the steps. A couple of her colleagues found some loose bricks in the landing at the top of the stairs, as well as a slight gap in the caulking between the bricks and the top concrete step. They surmised that these caused Plaintiff's fall.

When Plaintiff fell, she was wearing flat-heeled shoes. Plaintiff was not under the influence of any substance, nor was she feeling ill in any way when the incident occurred.

Plaintiff submitted an expert report that stated that both the loose bricks in the landing and the gap in caulking between the brick and concrete could cause an individual to trip and fall down the stairs. The report further opined that the damage

2

to the bricks and caulking would not be able to occur quickly as it would take a significant amount of time for the caulking to expand and contract and the bricks to become dislodged. The expert also opined that these issues were violations of Virginia statutory building codes.

Defendants claim that they were unaware of the specific loose bricks. They admitted, however, that the bricks frequently came loose and needed to be replaced. After Plaintiff's accident, an employee of the security company employed by Defendants scoured the area and found no significant defects.

Plaintiff initially filed this suit in Virginia state court before it was removed to this Court. The Complaint is for two counts: Negligence (Count I) and Negligence Per Se (Count II). Sitting in diversity, this Court applies Virginia substantive law to Defendants' summary judgment motion. Levine v. Emp'rs Ins. Co. of Wausau, 887 F.3d 623, 627 (4th Cir. 2018).

Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). A court must not contradict

3

the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 526 (4th Cir. 2003) (internal quotations omitted). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to find an issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. See Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986); Blacka v. James, 139 S.E.2d 47, 50 (Va. 1964).

Defendants contend that Plaintiff's claims of negligence fail due to a lack of evidence to support her claim. Under Virginia law, the elements of negligence are (1) a legal duty, (2) a breach of that duty, and (3) damage caused by that breach. Fox v. Custis, 372 S.E.2d 373, 375 (Va. 1988). Negligence per se is established when (1) the defendant violated a statute enacted for public safety, (2) the plaintiff belongs to the class of people the statute aimed to protect from the harm the violation caused, and (3) the violation was the proximate cause of the plaintiff's injuries. Halterman v. Radisson Hotel Corp., 523 S.E.2d 823, 825 (Va. 2000).

Plaintiff claims that either the loose brick on the landing or the gap in the caulking was the cause of her accident. In

4

premises liability cases, there must be actual or constructive notice of the defective condition on the property for a legal duty to exist. Grim v. Rahe, Inc., 434 S.E.2d 888, 889 (Va. 1993). Plaintiff's claims initially fail because she has produced no evidence that Defendants had either actual or constructive notice of the defects in the bricks and caulking. While Plaintiff contends that Defendants had a duty to continually inspect the premises and her expert opined that the defects could not have occurred rapidly, Plaintiff has still not demonstrated that the defects were noticeable for a sufficient length of time to charge Defendants with constructive notice. Colonial Stores v. Pulley, 125 S.E.2d 188, 190 (1962). Further, the fact that Defendants were aware bricks frequently came loose and replaced them demonstrates that Defendants took reasonable care to inspect the premises and remedy hazards when found.

Additionally, Virginia law does not impose liability under the ordinary duty of care to remedy sidewalk irregularities that are, as here, under an inch or two. See, e.g., City of Newport News v. Anderson, 223 S.E.2d 869 (1976) (one inch sidewalk depression); City of Richmond v. Schonberger, 68 S.E. 284 (1910) (stone raised two inches above street surface). Plaintiff contends that these cases would be inapposite as this is not a sidewalk case but a stair case, and the risk of injury on stairs is greater leading to a higher standard of care. This contention

5

is unavailing as the Court found no case law, and Plaintiff provided none, to support the idea that the duty of care is heightened when stairs versus flat sidewalks are involved.

Even if Plaintiff had produced evidence that Defendants were on notice regarding the defective bricks and caulking, she has produced no more than mere speculation that they were the cause of her accident. Scientific evidence is not needed to support proximate cause, but it "must be sufficient to remove the case out of the realm of speculation and conjecture and into the realm of legitimate inference before submitting it to a jury for its determination." Blacka, 139 S.E.2d at 50. Here, Plaintiff contends that the most likely cause of her fall was either the defective brick or caulking. There is no testimony or other evidence, however, that shows Plaintiff actually tripped over either of the defects and there are other probable theories as to the cause of her fall. Thus, the cause is left in the realm of speculation and should not be sent to a jury. For these reasons, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is GRANTED and this case is DISMISSED.

_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
August 22, 2019

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CAMILLE SEDAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 1:18-cv-01111-CMH-TCB |
| | ) |
| BOSTON PROPERTIES LIMITED | ) |
| PARTNERSHIP, | ) |
| | ) |
| and | ) |
| | ) |
| RESTON TOWN CENTER PROPERTY, LLC, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff Camille Sedar, by counsel, appeals to the United States

Court of Appeals for the Fourth Circuit from the Order entered August 22, 2019, which Order

granted the Defendants' Motion for Summary Judgment and dismissed the case.

Date:   September 4, 2019

**CAMILLE SEDAR**

By Counsel:

_____/s/ Andrew R. Park_____
Andrew R. Park (VSB No. 41072)
David J. Sensenig (VSB No. 41102)
PARK SENSENIG LLC
2310 West Main Street
Richmond, Virginia 23220
Tel (804) 417-6085
Fax (888) 552-1781

david.sensenig@parksensenig.com
andrew.park@parksensenig.com
*Counsel for Camille Sedar*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon the following electronically this 4th day of September 2019:

>Joseph P. Moriarty, Esq.
>WILLCOX & SAVAGE, P.C.
>Wells Fargo Center
>440 Monticello Avenue, Suite 2200
>Norfolk, Virginia 23510-2243
>Email: jmoriarty@wilsav.com
>*Counsel for Defendants Boston Properties Limited Partnership and*
>*Reston Town Center Property, LLC*
>
>David D. Hudgins, Esq.
>Mary Goegel, Esq.
>Hudgins Law Firm, P.C.
>Eisenhowever Center III, 2331 Mill Rd., Suite 100
>Alexandria, VA 22314
>Email: dhudgins@hudginslawfirm.com
>Email:  mgoegel@hudginslawfirm.com
>*Counsel for Defendants Boston Properties Limited Partnership and*
>*Reston Town Center Property, LLC*

/s/ Andrew R. Park

3