*In The*

# United States Court of Appeals
### For The Fourth Circuit

## CAMILLE SEDAR,

*Plaintiff - Appellant,*

v.

## RESTON TOWN CENTER PROPERTY, LLC;
## BOSTON PROPERTIES LIMITED PARTNERSHIP,

*Defendants – Appellees,*

**and**

## BOSTON PROPERTIES, INC.; BEACON CAPITAL PARTNERS LLC,

*Defendants,*

v.

## CDA INCORPORATED, d/b/a MaxSent,

*Third Party Defendant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## AT ALEXANDRIA
————————

## BRIEF OF APPELLANT
————————

**David J. Sensenig**
**Andrew R. Park**
**PARK SENSENIG LLC**
**2310 West Main Street**
**Richmond, Virginia 23220**
**(804) 417-6085**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  19-1972           Caption:  Camille Sedar v. Reston Town Center Property, LLC; Boston Properties

Pursuant to FRAP 26.1 and Local Rule 26.1,

Camille Sedar
(name of party/amicus)


who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:




09/29/2016 SCC                          - 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐ YES ☑ NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                              ☐ YES ☑ NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____/s/_____      Date: _____9/12/2019_____

Counsel for: __Camille Sedar, Appellant_____

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____9/12/2019_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____/s/_____              _____9/12/2019_____
        (signature)                                          (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ..................................................................... 2

STATEMENT OF THE CASE ......................................................................... 4

    I.      Nature of Case, Course of Proceedings, and Disposition ..................... 4

    II.     Statement of Facts ............................................................................. 4

          A.     The Lunch Outing to Reston Town Center ................................ 4

          B.     Sedar's Fall From the Platform at the Top of the Stairs ............. 5

          C.     Sedar's Injuries and Damages ................................................... 8

    III.    Defendants' Notice of the Dangerous Condition ................................ 8

    IV.    Expert Testimony on the Dangerous Condition, Notice and Proximate Cause ............................................................................... 9

SUMMARY OF ARGUMENT ....................................................................... 10

    I.      Eye Witnesses .................................................................................. 10

    II.     Defendants' Agents .......................................................................... 11

    III.    Expert Testimony ............................................................................. 11

    IV.    Causation ......................................................................................... 12

LEGAL STANDARDS .................................................................................. 13

I.      Standard Of Review ...........................................................13

II.     Negligence .......................................................................14

III.    Negligence Per Se ............................................................15

ARGUMENT ...............................................................................16

I.      A Dangerous Condition Existed Where Sedar Began Her Fall. .........16

II.     The Dangerous Condition Violated Building Codes for Public
        Safety Designed to Protect Individuals Like Sedar from the Harm
        that She Suffered ..............................................................17

III.    Defendants Had Notice of the Dangerous Condition.........................19

        A.      Actual Notice ........................................................19

        B.      Constructive Notice.................................................20

        C.      Failure to Inspect Premises ......................................21

IV.     The Dangerous Condition Was The Proximate Cause Of Sedar's
        Fall ..................................................................................23

CONCLUSION ...........................................................................30

REQUEST FOR ORAL ARGUMENT ................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen Realty Corp. v. Holbert*,
    227 Va. 441 (1984) .......................................................................19

*Amos v. NationsBank, N.A.*,
    256 Va. 344 (Va. 1998) .................................................................14

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................13, 26

*Blacka v. James*,
    205 Va. 646 (Va. 1964) .................................................................23

*Brown v. Koulizakis,*
    229 Va. 524 (Va. 1985) .................................................................23

*Cerquera v. Supervalue, Inc.*,
    715 F. Supp. 2d 682 (E.D. Va. 2010) ..........................................14

*Fobbs v. Webb Building Limited Partnership*,
    232 Va. 227 (Va. 1986) .................................................................23

*Holcombe v. NationsBanc Financial Services,*
    248 Va. 445 (Va. 1994) .................................................................14

*Holland v. Edelblute*,
    179 Va. 685 (Va. 1942) ...........................................................14, 18

*Hudson v. Boddie-Noell Enters., Inc*. Civ. Action No.:
    7:11CV00466 (W.D. Va., June 13, 2012) ........................27, 28, 29

*Jacobs v. N.C. Administrative Office of the Courts*,
    780 F.3d 562 (4th Cir. 2015). ................................................13, 14

*Liberatarian Party of Va. V. Judd*,
  718 F.3d 308 (4th Cir. 2002) ........................................................... 13

*MacCoy v. Colony House Builders, Inc.*,
  239 Va. 64 (Va. 1990). ............................................................. 15, 18

*McCormick v. AT&T Tech Inc.*,
  934 F.2d 531 (4th Cir. 1991) .......................................................... 14

*McGuire v. Hodges*,
  273 Va. 199 (Va. 2007) ..................................................... 15, 28, 29

*Miracle Mart. Inc. v. Webb*,
  205 Va. 449 (Va. 1964) ................................................................. 15

*Norfolk & W. Ry. Co. v. Mace*,
  151 Va. 458 (1928) ....................................................................... 15

*Northern Virginia Power Co. v. Bailey*,
  194 Va. 464 (Va. 1952) ................................................................. 23

*Roll 'R' Way Rinks, Inc. v. Smith*,
  218 Va. 321 (Va. 1977) ................................................................. 23

*Schlimmer v. Poverty Hunt Club*,
  268 Va. 74 (Va. 2004) ................................................................... 15

*Sons v. Basham*,
  126 Va. 72 (Va. 1919) ................................................................... 14

*Tolan v. Cotton*,
  134 U.S. 1861 (2014) .................................................................... 13

*Trimyer v. Norfolk Tallow Co.*,
  192 Va. 776 (Va. 1951). ........................................................... 14, 21

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
  888 F.3d 651 (4th Cir. 2018) ......................................................... 13

*Wooldridge v. Echelon Service Co.*,
    243 Va. 458 (Va. 1992) ...........................................................................28, 29

## **STATUTES**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1332 ...............................................................................................1

## **RULES**

4th Cir. L. R. 34(a) .........................................................................................31

Fed. R. Civ. P. 56(a)........................................................................................13

# STATEMENT OF JURISDICTION

Appellant Camille Sedar ("Sedar"), the plaintiff below, initially filed this action in the Circuit Court for the County of Fairfax, Virginia. Appellees Boston Properties Limited Partnership and Reston Town Center Property, LLC, the defendants below, (collectively referred to here as "Defendants") removed the case to the United States District Court for the Eastern District of Virginia, Alexandria Division, as Sedar and Defendants were residents of different states and the amount in controversy exceeded $75,000. The United States District Court for the Eastern District of Virginia thus had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332.

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction to hear this appeal from the District Court's grant of Defendants' Motion for Summary Judgment. The District Court entered judgment in Defendants' favor on August 22, 2019. The Order constituted a final order and disposed of all claims. On September 4, 2019, Sedar timely filed a Notice of Appeal with the District Court.

## STATEMENT OF THE ISSUES

I.     Whether the District Court erred by granting Defendants' Motion for Summary Judgment on claims of negligence and negligence per se despite sufficient evidence that established triable issues of fact under controlling law, thereby depriving Sedar of her opportunity to present her case to a jury at trial.

II.     Whether summary judgment is proper on the issue of whether a dangerous condition existed when Sedar presented reliable expert testimony that a dangerous condition existed on the Defendants' property which violated building codes enacted for public safety, along with eyewitness testimony, photographs, and video that describe and depict the hazard.

III.     Whether summary judgment is proper on the issue of actual or constructive notice when the evidence supported a finding that the Defendants had actual notice of the dangerous condition through their agent, and when Sedar presented reliable expert testimony that the condition had existed for a significant period of time whereby Defendants should have known of its existence through reasonable inspection.

IV.     Whether summary judgment is proper on the issue of  proximate cause where two eyewitnesses testified that Sedar fell while walking over the area where the dangerous condition existed; where photographs and blood stains show that she fell where the dangerous condition existed; where expert

testimony was offered supporting the assertion that Sedar began her fall at the point of the dangerous condition; and where there is no evidence of any other cause for the fall.

## STATEMENT OF THE CASE

### I.     Nature of Case, Course of Proceedings, and Disposition.

This appeal is from the District Court's Order dismissing Sedar's claims of negligence and negligence per se arising out of a trip and fall that occurred on property owned and operated by Defendants. *See* J.A. at 72. Sedar originally filed this action in the Circuit Court for the County of Fairfax, Virginia. Defendants removed the case to the United States District Court for the Eastern District of Virginia, Alexandria Division and filed a Motion for Summary Judgment. On August 22, 2019, the District Court entered a Final Order granting summary judgment in favor of Defendants. On September 4, 2019, Sedar timely filed a Notice of Appeal with the District Court.

### II.     Statement of Facts.

#### A.     The Lunch Outing to Reston Town Center.

On November 15, 2016, Sedar and some of her colleagues scheduled a farewell luncheon for a colleague, Major Alan Marks, who was being deployed overseas. J.A. at 637. Sedar and her colleagues traveled in separate vehicles to Reston Town Center ("RTC") where they intended to have lunch at Ted's Bulletin, a restaurant located at RTC. J.A. at 638.

Sedar drove two of her colleagues, Davida Buchanan ("Buchanan") and Robert Rapanut ("Rapanut"), to RTC and parked her vehicle in the Green Garage, a parking garage on the Defendants' property. J.A. at 72; J.A. at 681-682. Appellee

4

Reston Town Center Property, LLC owned the Green Garage. *Id*. at 72. Appellee Boston Properties, LP managed the property. *Id*.

After parking, Sedar and her colleagues walked to an interior stairwell and traveled up a staircase to exit out of the parking garage. J.A. at 639-640; J.A. at 715. Buchanan and Rapanut observed Sedar during this time and did not notice anything unusual or erratic about Sedar's ability to traverse the parking garage and the stairs. J.A. at 748; J.A. at 681-684. Sedar had not voiced any complaints during this time. J.A. at 681. Buchanan testified she did not notice anything erratic about Sedar while Sedar drove to RTC. *Id.*

As they exited the parking garage, they approached a set of outdoor stairs. J.A. at 684-685. The weather was pleasant, and the ground was dry and devoid of any hazards other than the dangerous condition created by the bricks and caulk. J.A. at 639, 656; J.A. at 760. Sedar was wearing shoes with a flat sole. J.A. at 649, 679. As they approached the stairs, Buchanan and Rapanut were walking directly behind Sedar. J.A. at 645-646, 658-659, 682; J.A. at 743. Sedar was not talking with Buchanan or Rapanut, nor was she using her phone. J.A. at 676. Sedar was looking straight ahead and was not distracted in any way. J.A. at 683-684.

### B.     Sedar's Fall From the Platform at the Top of the Stairs.

As she was walking across the platform at the top of the stairs, Sedar suddenly fell down five concrete stairs to the ground landing face down. J.A. at 644, 671, 700;

J.A. at 718, 721-722, 746-747. Sedar's sudden fall caused Buchanan to immediately look to the ground at the point from where Sedar had just fallen where she saw an area of bricks that were not level. J.A. at 649, 650, 652-656. Buchanan avoided that area while going down the stairs to help Sedar, who had been rendered unconscious from the fall. J.A. at 649-650. After tending to Sedar for a short period, Buchanan went straight back up the stairs to further inspect the brick area that she had noticed immediately after Sedar's fall. J.A. at 650.

At the platform at the top of the stairs, Buchanan testified that the bricks were not level and ". . . you could actually press one and it would move" and "it was like two bricks in that particular area." J.A. at 649. According to Buchanan, "[w]hen I put my foot on it [the brick], it moved." J.A. at 655. "It was already not level because there was a space between the brick and the actual concrete, there was space there . . . there was a gap between it." *Id*. The gap between the brick and concrete was "[a]bout an inch, maybe inch and half." J.A. at 666. Buchanan pointed out the dangerous condition to Rapanut and a parking attendant. J.A. at 649, 650.

Rapanut also witnessed the fall. J.A. at 717. According to Rapanut, Sedar's head was in his field of vision, and then it disappeared. J.A. at 718. He heard something audible from Sedar, a "grunt" or "small scream," at the time she disappeared from his view, and he then saw the card she was holding going through the air. J.A. at 717-718, 738.

Rapanut also identified the landing at the top of the stairs, where Sedar was walking, as the point where Sedar began her fall. J.A. at 726-727. Like Buchanan, he also described the loose bricks and how the bricks moved when he placed his feet on them. J.A. at 725. He also noticed that the bricks were not level and were not flush. J.A. at 730. In the video taken immediately after the fall (discussed below), Rapanut can be heard describing what he saw as his colleague, Major Marks, demonstrated the looseness of the bricks. J.A. at 746; J.A. at 1047.

Paramedics soon arrived on the scene, as did security personnel from MaxSent, a security company with whom Defendants had contracted. J.A. at 805-806. The second trailing car of colleagues who were planning to have lunch with Sedar's group also arrived soon after Sedar's fall. J.A. at 846-848. One of these individuals was Damien Kerr. *Id.* at 848. Kerr took photographs and a video of the area soon after his arrival and before going to lunch. J.A. at 852-853, 858, 862; J.A. at 766-772; J.A. at 1047. The photographs show bloodstains at the bottom of the stairs and on the second step. J.A. at 783.

As she was preparing to leave the hospital after the incident, Sedar noticed a significant scuff mark on the tip of her right shoe. J.A. at 892 (for photographs of the shoes see J.A. 1000-1001). The scuff had not been present before the incident. *Id.* Sedar wore her shoes home (using a wheelchair from the hospital to a car and

then walking from the car to enter her home). *Id.* She then placed them in a felt bag in her closet. *Id.* She has not worn or used the shoes since that time. *Id.*

## C. Sedar's Injuries and Damages.

Sedar was rendered unconscious as a result of her fall down the concrete stairs. J.A. 805-806. Sedar was transported to the hospital where she had multiple surgeries on her right arm. J.A at 865. Sedar suffered serious and permanent injuries, including lacerations to head and face, concussion and post-concussive syndrome, and multiple injuries to her right arm and elbow, including complex radial head and ulna fractures, elbow dislocation, and lateral collateral ligament damage. J.A. at 865-890.

## III. Defendants' Notice of the Dangerous Condition.

Defendants relied on a company called MaxSent to manage the property. J.A. at 985-988. Anthony Swartz ("Swartz"), a MaxSent employee who arrived on the scene after Sedar's fall, testified that he knew of the dangerous condition prior to Sedar's fall. J.A. at 809-10. Specifically, he testified that the area in question was "a very tricky area of the property," and that he had "almost tripped on the stairwell a thousand times . . . ." *Id.*

Michael Blanchette ("Blanchette") was in charge of the MaxSent security department that worked at Reston Town Center. J.A. at 952. Blanchette testified that MaxSent had no affirmative duty to inspect the property for defects to the brick sidewalks and walking surfaces but was only required to report any "uneven bricks or safety hazards" they happened to observe. J.A. at 970. Furthermore, Blanchette

testified they had no obligation to document or log defects located on brick sidewalks or surfaces. *Id.* Blanchette further stated in an email that "the bricks tend to shift during winter months as the temps drop and [Boston Properties] is constantly having to have them repaired." J.A. at 590.

## IV. Expert Testimony on the Dangerous Condition, Notice and Proximate Cause.

Dano Holland ("Holland"), a structural engineer with expertise in construction, construction code requirements, structural engineering, and building materials, among other things, opined that the conditions at the platform at the top of the stairs in question constituted a defective and dangerous condition that violated numerous building code requirements relating to an exterior stairway at the means of egress. J.A. at 894-895, 896-899. Holland also provided expert testimony concerning the brick and caulk materials, the breakdown of these materials over time due to weather, normal use and other factors, and that due to the process of the breakdown over time reasonable inspections would have revealed the dangerous condition. J.A. at 894-895; J.A. at 940, 941. Holland further testified that his calculations indicated that Sedar began her fall at the spot of the dangerous condition, and that the condition was the most likely cause of her fall. *Id.* at 894-895.

# SUMMARY OF ARGUMENT

This Court's review is de novo. When properly applying the appropriate standard of review at the summary judgment stage, the evidence in the record demonstrates: (1) that there was a dangerous condition that violated applicable building codes intended for the safety of invitees such as Sedar; (2) that Defendants had notice of the dangerous condition; and (3) that the dangerous condition was the cause of Sedar's fall. The core of this appeal argument is the evidence. Thus, we summarize the evidence here.

## I.     Eye Witnesses

Fortunately for Sedar, her colleagues witnessed her fall, witnessed and described with particularity the dangerous condition of the landing, and made a contemporaneous record of the dangerous condition by taking photographs and making a video with his mobile phone. Consistent with the adage "a picture is worth a thousand words," the photographs and video powerfully depict the dangerous condition at the platform at the top of the stairs. From various angles, the photographs show the gaps in the bricks, the sagging caulk, the exposed lip of concrete, and the unevenness of the bricks. The video literally shows the looseness of the brick. And it is both significant and undisputed that this condition existed at the platform at the top of a set of concrete stairs comprised of five steps.

## II. Defendants' Agents

Defendants' agent, MaxSent, through its employees, agreed that the conditions shown in the photographs accurately depict the conditions that existed at the time of the incident. An employee experienced issues with the same location prior to Sedar's fall. This is rare, direct evidence of notice of a continuous dangerous condition at the spot where Sedar fell. Defendants also knew that the condition of the brick pavers used at the site deteriorated over time and required regular inspection and repair. Despite this knowledge, Defendants did not have anyone perform proactive, periodic inspections of the brick paths and stairways including the platform at the top of the stairs where Sedar's fall began.

Defendants pointed responsibility to MaxSent, yet MaxSent stated in no uncertain terms that it was not responsible for inspecting the brick sidewalks and surfaces of Defendants' property. This finger-pointing shows that Defendants had nobody "minding the shop," especially when drawing all reasonable inferences in Sedar's favor.

## III. Expert Testimony

Based on the eyewitness testimony, the photographs, and the video, Sedar was prepared to present supporting expert testimony at trial through Holland, a structural engineer. In Holland's opinion, the conditions that existed at the time of the incident were dangerous and violated several building code requirements that are in place for

the safety of individuals such as Sedar, and designed to protect the public from the exact type of injury that Sedar sustained. According to Holland, Defendants knew or should have known about the dangerous condition, which occurred over a period of months and would have been discovered through reasonable inspections. His calculations also indicated that Sedar started her fall on the landing where the defective condition existed.

## IV. Causation

Sedar may prove proximate cause by circumstantial evidence. Here, there is substantial circumstantial evidence of causation. The testimony of the eyewitnesses, along with the photographic and video evidence, place Sedar walking over a hazardous condition at the time her fall began. The physical evidence is consistent with the account of the witnesses. A blood stain on the stairs shown in the photographs and described in the video and seen by witnesses lines up with the path of Sedar's fall from beginning to end. The pronounced, new scuff mark on the toe of Sedar's right shoe is consistent with her trip and fall as a result of the conditions witnessed and documented by Sedar's coworkers. Finally, no other probable cause of her fall exists.

# LEGAL STANDARDS

## I.     Standard Of Review.

The review of a district court's grant of a motion for summary judgment is de novo. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The court shall grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the non-moving party. *See, e.g., Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015). A court commits error where it fails to consider all the evidence in the record. *Jacobs*, 780 F.3d at 569. In *Tolan v. Cotton,* 134 U.S. 1861 (2014), the Supreme Court granted certiorari where the court "fail[ed] to credit evidence that contradicted some of its key factual conclusions" and "improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party." *Tolan*, 134 U.S. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Jacobs,* 780 F.3d at 568 quoting *Liberatarian Party of Va. V. Judd*, 718 F.3d 308, 313 (4th Cir. 2002)(additional citations omitted). "Summary judgment cannot be granted merely because the court believes that the movant will

prevail if the action is tried on the merits." *Jacobs*, 780 F.3d at 568 (internal citations omitted*)*.

## II.    Negligence

Defendants had a duty to maintain the premises in a reasonably safe manner and to warn invitees of any hidden dangers. *Amos v. NationsBank, N.A.*, 256 Va. 344, 346 (Va. 1998); *See also Sons v. Basham*,  126 Va. 72, 79 (Va. 1919)(invitee status when a visit onto another's property is of common interest or mutual advantage). Defendants had a duty to inspect the property and subsequently either repair or warn of hidden dangers and defects of which Defendants knew or should know but of which the invitee does not and could not reasonably know. *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 781 (Va. 1951).

A property owner must use "ordinary care to render the premises reasonably safe for the invitee's visit." *Cerquera v. Supervalue, Inc.*, 715 F. Supp. 2d 682, 686 (E.D. Va. 2010) (citing *Holcombe v. NationsBanc Financial Services,* 248 Va. 445, 447 (Va. 1994)). "[O]rdinary care is a relative term, and that degree of care sufficient under certain circumstances may be negligence or even gross negligence under others. It cannot be assumed as a matter of law that certain circumstances do or do not constitute negligence . . . ." *Holland v. Edelblute*, 179 Va. 685, 688 (Va. 1942), *see also McCormick v. AT&T Tech Inc.*, 934 F.2d 531, 335 (4th Cir. 1991)("the degree of care required…varies according to the circumstances of each case.").

Whether a property owner used ordinary care is a question for the jury. *Norfolk & W. Ry. Co. v. Mace*, 151 Va. 458, 464-65 (Va. 1928). To impose liability for an injury, a "dangerous condition must have been known to the owner or occupant of the establishment, or have existed for such a length of time as to make it the defendant's duty in the exercise of ordinary care to have discovered it." *Miracle Mart. Inc. v. Webb*, 205 Va. 449, 452-53 (Va. 1964).

### III.    Negligence Per Se

To prove negligence per se, a party must show that (1) the opposing party violated a statute enacted for public safety, (2) the party seeking to rely on negligence per se was a member of the class of persons intended to be protected by that statute, (3) the harm the proponent experienced was of the type the statute was designed to protected against, and (4) the statutory violation was the proximate cause of the proponent's injury. *Schlimmer v. Poverty Hunt Club* 268 Va. 74, 78-79 (Va. 2004). "The violation of the [Uniform Statewide] Building Code, like any statute enacted to protect health, safety, and welfare, is negligence *per se*." *MacCoy v. Colony House Builders, Inc.*, 239 Va. 64, 69 (Va. 1990). Whether there was a violation of the statute and whether the violation was the proximate cause of the injury are issues for the trier of fact. *McGuire v. Hodges*, 273 Va. 199, 206 (Va. 2007) (internal citations omitted).

# ARGUMENT

## I.     A Dangerous Condition Existed Where Sedar Began Her Fall.

The existence of the dangerous and defective condition is supported by the testimony of eyewitnesses, photographs of the scene taken immediately after the incident, a video of the scene taken immediately after the accident, which includes audio statements of eyewitnesses describing just minutes after the incident what they observed, and by the expert testimony of Holland.

Buchanan and Rapanut's personal and direct observations evidence the defective condition and that Sedar was walking over the hazard at the time her fall began. Buchanan described the defect in detail when she testified that the gap between the brick and the concrete was "about an inch, maybe an inch and a half." J.A. at 666. Buchanan identified two loose bricks that were side-by-side. J.A. at 654. Rapanut described the loose bricks and how the bricks moved when he placed his feet on them. J.A. at 725. He also testified that the bricks were not level and were not flush. J.A. at 730. Kerr testified about the bricks that were "out of place" and that he told someone with a walkie-talkie that the condition "seems to be a tripping hazard" and said they should put some caution tape in the area. J.A. at 850. Buchanan identified the location of the hazard as the point from where Sedar began her fall. J.A. at 649, 650, 652, 654-656.

The photographic evidence shows the gaps in the bricks, the sagging caulk, the exposed lip of concrete, and the unevenness of the bricks. J.A. at 766-769, 772.[1] The Defendants' agent, Swartz, agreed that the photographs reflect the condition of the landing at the time of the incident. J.A. at 689-690, 694, 858, 825-830,1014-1018.  Similarly, the video evidences the looseness of the brick. J.A. at 1047.

## II. The Dangerous Condition Violated Building Codes for Public Safety Designed to Protect Individuals Like Sedar from the Harm that She Suffered.

Holland testified that the condition of the bricks and stairs violated building code enacted for public safety. J.A. at 505; J.A. at 896-899. The area where the fall occurred was "in the exit discharge" of the garage. J.A. at 898. As detailed in Holland's initial expert report, the BOCA code specifically addresses requirements for egress areas from buildings and the treads and landings of a stairway. J.A. at 898. The code "even directs how small elevation changes in the means of egress should be addressed." *Id.* The area was in violation of the Virginia Uniform Statewide Building Code because it is an exterior stair located on the means of egress. J.A. at 894-895. Beyond the building code violations, Holland opines that the "large open

---

[1] Kerr, who took the photographs and video, testified the photographs and video were taken very soon after his arrival, after Sedar was loaded into the ambulance and *prior* to going to lunch. J.A. at 858. Kerr also testified that he took the video prior to going to the restaurant. J.A. at 862.

gap adjacent to the loose brick likely creates a trip hazard as the front edge of the brick shifted downward." J.A. at 998.

The building code requirements addressed by Holland are for the safety of the invitees, such as Sedar. "The intent of these code sections is that a safe walking surface be provided in the means of egress to guard against someone tripping, slipping or losing their balance and falling." J.A. at 898.

It is important to note, and it consistent with Holland's testimony regarding the applicability of building code, that Sedar did not fall on a sidewalk maintained by a municipality.[2] Sedar's fall took place at the top of the stairs that are part of the exit discharge of the building and are covered by the relevant building codes designed to protect the public. Municipal sidewalks are not subject to the same building and maintenance standards. This distinction is recognized by Virginia law which makes a violation of building codes enacted for public safety, like the building codes at issue in this matter, a negligence per se. *MacCoy*, 239 Va. at 69.

A determination of ordinary care requires an analysis of the particular circumstances of each case. *Holland,* 179 Va. at 688. Logically, and as noted by Holland in his expert report, exterior stairways and exit discharges must be maintained differently from a flat sidewalk area due to the greater risk of harm that

---

[2] The trial court appears to have ignored the evidence concerning a violation of the applicable building codes and misapplied century old Virginia case law concerning municipal sidewalks.

would be caused by a trip at the top of stairs. J.A. at 894-895, 997-998. ("Further, loose walkway components such as these bricks which make up the upper landing for this stairway, are of greater hazard because of their location. If the loose bricks cause a stumble, instability or misstep to occur on this top landing, the person has no flat 'recovery area' and is immediately confronted with the stairs."). J.A. at 997.

In this case, the dangerous condition must be analyzed as to whether Defendants used the ordinary care required to maintain a brick landing at a point of egress at the top of stairs. Under this analysis, and as supported by Holland's expert testimony, such a condition is in violation of building codes and constitutes a dangerous condition under those circumstances.

### III.   Defendants Had Notice of the Dangerous Condition.

#### A.   Actual Notice

The evidence supports a finding that Defendants had actual notice of the dangerous condition. First, Defendants had actual knowledge of the dangerous condition through their agent, MaxSent, which Defendants relied on to manage the property, and which knowledge is imputed to the Defendants. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 446 (1984).

Swartz, a security guard employed by MaxSent, testified that he had almost tripped in the same area prior to Sedar's fall, as follows:

> Q:    Over what did you almost trip?
> A:    Either the brick or the step itself.

> Q: And would that include times prior to Ms. Sedar's fall?
> A: Yes.

J.A. at 810-811. Swartz also testified that the lip exposed as a result of the defect could have caused her fall as he had almost fallen on it "a thousand times." J.A. at 813-815. While during this portion of his testimony he could not recall the timeframe of these personal incidents, his description of the condition matches the the evidence of the condition at the time of her fall (sagging caulk and exposed lip) and allow for a reasonable inference that his near falls occurred prior to the time of Sedar's fall and, therefore, that Swartz knew about it *prior* to her fall. J.A. at 814-815; J.A. at 766-769, 772.

Blanchette, the MaxSent manager, knew the condition of the bricks used at RTC deteriorated over time. According to an internal email that surfaced during the deposition of one of Defendants' experts, Blanchette wrote that "the bricks tend to shift during winter months as the temps drop and [Boston Properties] is constantly having to have them repaired." J.A. at 590. This internal email is yet another concession that Boston Properties knew the bricks moved or shifted.

## B. Constructive Notice

Holland's testimony and the photographs support a finding that Defendants had constructive notice of the dangerous condition. The photographs and video taken at the time of Sedar's fall show the sagging and deteriorating caulk joint, and evidence that the condition had existed for not just days or even weeks, but for

months prior to Sedar's fall. According to Holland "**these conditions did not develop overnight but were formed over at least several months**." J.A. at 998-999 (emphasis added). The "sagging of the caulk joint and the adhesion failure" along with "tears that you can see in that caulk joint" support the conclusion that the condition had existed over "at least months." J.A. at 940-941. The sagging and deteriorated caulk joint immediately adjacent to the loose brick paver would have been visible during routine maintenance inspections and activities." J.A. at 895. "Closer inspection of the caulk joint failure should have alerted maintenance personnel to the unlevel and loose brick paver which contributed to Ms. Sedar's fall." *Id.* A reasonable jury could find that had Defendants performed periodic inspections the condition would have been revealed.[3]

### C.    Failure to Inspect Premises

A landowner must inspect his property and subsequently either repair or warn of hidden dangers and defects of which the owner knows or should know but of which the invitee does not and could not reasonably know. *Trimyer,* 192 Va. at 781. Here, the Defendants had no policies or procedures in place to inspect property for

---

[3] The trial court cites to Holland's opinion that the defective condition of the bricks and caulk at the time of the incident had existed for a significant amount of time, J.A. at 1042, but without any other evidence concluded that there is no evidence that the defects were noticeable for a "sufficient length of time." *Id.* This finding ignores the remainder of Holland's testimony that the length of time was such that reasonable inspections would have discovered the dangerous conditions and improperly inserts its opinion as to what is reasonable for what should be a jury determination.

these types of dangerous conditions, nor did Defendants inspect their property for these dangerous conditions. The sole policy for grounds maintenance appears to be for the security company, MaxSent, to "see something, say something."

Defendants assert that they contracted with MaxSent to "ensure that the property was maintained." J.A. at 83. However, according to Blanchette, the MaxSent supervisor at RTC, **MaxSent had no such duty to inspect**. J.A. at 970 (emphasis added).  MaxSent's responsibility was to notify Defendants if it happened to discover any defects on the property, but not to affirmatively inspect for potentially dangerous conditions or safety hazards such as the condition at issue in this case. *Id.* Whether Defendants exercised ordinary care when they did not perform inspections of the brick paths and walkways, even on a periodic basis, is a jury issue. Moreover, the Defendants cannot avail themselves of a "notice" defense at summary judgment when it made no efforts to discover defects on their property and they cannot point to any evidence that they made such affirmative efforts.

Thus, based on Holland's testimony, the photographs, the video, the testimony of the Swartz and Blanchette, and Defendants' total failure to inspect the premises for dangerous conditions and safety hazards, a reasonable jury could conclude that Defendants had actual or, at the very least, constructive notice of the hazard.

### IV. The Dangerous Condition Was The Proximate Cause Of Sedar's Fall.

The plaintiff must establish that the unsafe condition of which he complains was the proximate cause of his injury. *See Roll 'R' Way Rinks, Inc. v. Smith*, 218 Va. 321, 329 (Va. 1977). Facts establishing proximate cause "need not be proved by direct evidence, but instead, may be established by circumstantial evidence." *Fobbs v. Webb Building Limited Partnership*, 232 Va. 227, 230 (Va. 1986). While evidence supporting proximate cause need not be scientifically exact, it "must be sufficient to remove the case out of the realm of speculation and conjecture and into the realm of legitimate inference before submitting it to a jury for its determination." *Blacka v. James*, 205 Va. 646, 650 (Va. 1964). The Plaintiff does not need to disprove the possibility of every other cause. *Northern Virginia Power Co. v. Bailey*, 194 Va. 464, 470-72 (Va. 1952). Generally, the question of proximate cause is to be determined by the trier of fact. *Brown v. Koulizakis,* 229 Va. 524, 531 (Va. 1985).

The evidence supports a finding that the dangerous condition caused Sedar's fall. While none of the witnesses saw Sedar's foot in contact with the bricks, as Virginia law states, such direct evidence is not required to establish causation and a jury may draw reasonable inferences and deductions. *Fobbs*, 232 Va. at 230 (Va. 1986). Sedar's colleagues, Buchanan and Rappanut testified, in no uncertain terms, that Sedar was walking over the hazard at the moment she fell. J.A. at 651-652, 726-727.

Sedar suddenly fell down the stairs and to the ground landing face down. J.A. at 671, 700, 718, 721, 722, 746, 747.[4] Buchanan saw Sedar's fall and immediately looked to the ground in front of her where Sedar had fallen from and she noticed an area of the bricks that was not level. J.A. at 649-652, 654-656. Buchanan noticed the bricks because that was the area from which Sedar had just fallen, and she avoided that area while going down the stairs to tend to Sedar. J.A. at 651-652.

> Q: My question is when you came out with Ron [sic] and you're talking to Ron [sic] and you looked and you saw Ms. Sedar on the ground, and your first instinct was to go help her. Is that fair to say?
>
> A: My first instinct was to help her, but I also noticed that the level of the bricks before I actually - - that's why I went to the side and didn't follow the same path.
>
> Q: So you noticed there was a problem with some bricks?
>
> A: Yes, I did.
>
> Q: Were they obvious to you that there was an issue there?
>
> A: They were more obvious to me because **that was the area that she had just fallen from.**

*Id.* (emphasis added). Buchanan further confirmed that Sedar was walking over the dangerous condition when she fell when discussing the video taken by Kerr. J.A. at 685.

After tending to Sedar, Buchanan went straight back up the stairs to further inspect the brick area she noticed immediately after Sedar's fall. ("After the fall?

---

[4] The testimony concerning the violent nature of the fall itself supports a finding that it was not a situation where she stumbled, but instead her fall was caused by a sudden trip on the dangerous condition.

No, I went to the top of the stairs where she had actually fallen. I didn't look at the other area; only the area that we had exited.") J.A. at 663. [5]

The pictures taken immediately after the accident clearly establish where the incident occurred because of the blood marks, if nothing else. The photographs containing the bloodstains present undisputed evidence as to where the incident occurred, where the dangerous condition was located, and where everyone was focused after the incident. J.A. at 768, 770, 771. The dangerous condition directly lines-up with the bloodstains on the concrete left by Sedar as a result of her fall.

Rapanut also witnessed the fall and where it occurred. According to him, Sedar's head was in his view then it suddenly disappeared in a fluid motion. J.A. at 739. He heard something audible from Sedar and saw the card she was holding going through the air. J.A. at 717, 738. The video taken immediately after the incident includes audio from Rapanut describing what happened as Major Marks tests the loose brick in the area of the dangerous condition further documenting that the dangerous condition was where Sedar fell. J.A. at 746; J.A. at 1047.

Sedar has presented significant evidence through Buchanan, the photographs, the video and other testimony to establish Sedar's path in relation to the dangerous

---

[5] The trial court accepted the Defendants' false narrative that "[a]fter the paramedics arrived, some of her colleagues looked around the area to attempt to find something that may have caused Plaintiff to stumble and fall down the steps." J.A. at 1039. This statement mirrors Defendants' Statement of Material Facts, *see* J.A. at 93, which misrepresents what actually occurred.

condition. To the extent there is any factual dispute about where the incident occurred or where the dangerous condition is located any such dispute must be resolved in favor of Sedar on summary judgment. *See Anderson*, 477 U.S. at 255 (all evidence must be construed in the light most favorable to the party opposing summary judgment).[6]

There is no evidence to support any probable alternative theories.[7] Buchanan could not identify any other potential causes for the incident, such as debris, gravel, rain, weather, moisture, the type of shoes she was wearing, or distraction, other than the dangerous condition caused by the bricks. J.A. at 639, 656, 676, 679, 681, and 682. Buchanan testified that Sedar seemed "perfectly fine" as she exited the car and garage. J.A. at 656-657. Sedar testified that she was not experiencing any medical issues that morning and was feeling fine. J.A. at 892. Sedar had no history of blacking out or falling or any other relevant medical issues. *Id.*

---

[6] The trial court also erred by noting "[t]here were also discrepancies amongst Plaintiff's colleagues about which section of the stairs the Plaintiff descended." J.A. at 1039. First, this statement is inaccurate as the entirety of the testimony of Buchanan, along with the testimony of Rappanut and the photographic and video evidence, clearly identify the location of the fall. Nevertheless, this statement on its face demonstrates error as even if there were discrepancies any such inconsistencies were to be viewed in the light most favorable to Sedar.

[7] The trial court adopted the Defendants' argument that there were "other probable theories as to the cause of her fall" without identifying any other potential causes or supporting evidence of "other probable" causes. J.A. at 1043.

The fact that the dangerous condition caused Sedar's fall is further evidenced by her shoes. Sedar was wearing flat shoes as opposed to a shoe with a heel. Following the incident, Sedar was inspecting her shoes when she noticed a pronounced scuff mark on the right shoe that had not been there prior to the incident. J.A. at 892. The scuff mark provides further circumstantial evidence that the dangerous condition caused her to trip and fall down the stairs.

Finally, Holland provides expert testimony that the dangerous condition was the most likely cause of the fall. He combined information taken from the evidence outlined above regarding the fall, the photographs taken immediately following the fall, the video taken immediately after the fall, and his inspection of the property, the scuff on Sedar's shoe, and other information with his expertise in structural engineering to opine that the brick was structurally unsound and a hazard that most likely caused Sedar to lose her balance and fall down the stairs. In addition, Holland testified that the measurements of the steps in connection with Sedar's height and the location of the blood stains supports a finding that the start of her fall occurred on the landing where the defective condition existed. J.A. at 938-939.

Under Virginia precedent, sufficient evidence has been presented in this case to support a finding of probable cause. In *Hudson v. Boddie-Noell Enters., Inc*. Civ. Action No.: 7:11CV00466 (W.D. Va., June 13, 2012) the plaintiff slipped and fell as he approached the door to the Hardees restaurant, but he was unable to see what

caused him to fall. The plaintiff testified that he observed ice in the area where he fell. *Id* at 11. The plaintiff's wife, who was with him at the time, also testified that they observed ice in the area after the plaintiff's fall, but she did not observe the plaintiff step on the ice and slip. *Id.* Another witness testified that the plaintiff appeared to have tripped on the curb before getting to the door. *Id.* After considering the circumstantial evidence in the light most favorable to the plaintiff, the *Hudson* Court concluded that a reasonable jury could determine that the ice in front of the restaurant door caused the plaintiff to fall. *Id.* at 12.

In *McGuire,* the Supreme Court of Virginia considered the tragic case of a toddler who allegedly squeezed through an unsecured fence and gate and drowned in the pool. *McGuire, 273 Va. at 199-203*. There was no direct evidence in *McGuire* of how the child got through the gate. *Id.* at 208. Circumstantial evidence showed that homeowner had a defective gate with a low latch, or an unlocked gate tied together with a chain, and that the toddler had been seen attempting to open the gate. *Id.* at 208-09. Nobody saw the toddler enter through the defective gate, but it was sufficient to prove negligence if a jury could reasonably infer that the toddler could open the gate wide enough to get through. *Id.* at 209-10.

In *Wooldridge v. Echelon Service Co.*, 243 Va. 458 (Va. 1992), an assailant entered a government building and killed one person in the building. While there was no direct evidence that the defendant knew or permitted the assailant on the

property, the circumstantial evidence established that the defendants saw a "flash . . . like someone had ran . . . from the down elevator to the up elevator" and failed to take action to pursue the person, that the call alerting security of the attack occurred soon after the "flash," and the assailant was the only unauthorized person in the building at the time of the attack. *Id.* at 459-60. The *Woolridge* Court concluded that this was sufficient circumstantial evidence for a jury to conclude that the defendant's inaction was the proximate cause of the plaintiff's injury. *Id.* at 461-62.

Like the Plaintiffs in *Hudson*, *McGuire* and *Woolrdige*, Sedar has presented sufficient circumstantial evidence for a jury to reasonably conclude that the dangerous condition was the proximate cause of Sedar's fall. This finding can be made without conjecture or speculation. In the end, this case presents a factual scenario that walks right up the line of direct evidence to prove proximate cause. The fact that Sedar tripped and fell on the dangerous condition is fully supported by the testimony of the eyewitnesses, the photographs, the video, her shoes, and by expert opinion. When the facts are viewed in the light most favorable to the plaintiff and including all reasonable inferences that may be drawn, as they must be on summary judgment, the fact that the dangerous condition was the cause of her fall is the only reasonable conclusion.

## **CONCLUSION**

It is well-established that summary judgment is not a substitute for trial where there are genuine issues of material fact. When applying the correct standards on summary judgment and assessing all the evidence in light of applicable Virginia common law on negligence claims, Sedar's case presents triable issues. Accordingly, Sedar respectfully requests the Court to reverse the trial court's grant of summary judgment and remand for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Sedar requests oral argument to assist the Court in its review of the pertinent facts that support Sedar's request to reverse the trial court's grant of summary judgment.

Respectfully submitted,

/s/ David J. Sensenig
David J. Sensenig
Andrew R. Park
PARK SENSENIG
2310 West Main St.
Richmond, VA 23220
(804) 417-6085
(888) 552-1781 (facsimile)
david.sensenig@parksensenig.com
andrew.park@parksensenig.com

*Counsel for the Appellant*

# **CERTIFICATE OF COMPLIANCE**

1.     This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

     [ X ] this brief contains [7,001] words.

     [   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.     This brief document complies with the typeface and type style requirements because:

     [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

     [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: 10/22/2019                /s/ David J. Sensenig              

                                               *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of October 2019, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Joseph P. Moriarty, Esq.
> Willcox & Savage, P.C. Wells Fargo Center
> 440 Monticello Avenue, Ste. 2200
> Norfolk, Virginia 23510
> (757) 628-5500
>
> David D. Hudgins, Esq.
> Hudgins Law Firm, P.C.
> Eisenhower Center III
> 2331 Mill Road, Ste. 100
> Alexandria, VA 22314
> (703) 739-3300
>
> *Counsel for Appellees*

I further certify that on this 22nd day of October 2019, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court, and a copy of the exhibit volume to be send to the counsel for appellees above.

> /s/ David J. Sensenig
> *Counsel for Appellant*